**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| **PAY AS YOU GO, LLC,**<br><br>                    Plaintiff,<br><br>    v.<br><br>**VIASAT, INC.,**<br><br>                    Defendant. | C.A. No. 7:26-cv-00245<br><br>**JURY TRIAL DEMANDED**<br><br>**PATENT CASE** |

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Pay As You Go, LLC, files this Complaint for Patent Infringement against Viasat, Inc., and would respectfully show the Court as follows:

### I.  THE PARTIES

1.      Plaintiff Pay As You Go, LLC ("PAYG" or "Plaintiff") is a Texas limited liability company having an address at 1 East Broward Boulevard, Ste 700, Fort Lauderdale, FL 33301.

2.      On information and belief, Defendant Viasat, Inc. ("Viasat" or "Defendant") is a Delaware corporation with a regular and established place of business at 600 Congress Ave., 14th Floor, Austin, Texas 78701.  Defendant has a registered agent at C T Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

### II.  JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4.      On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long-Arm Statute, due at least to its

1

business in this forum, including at least a portion of the infringements alleged herein at 600 Congress Ave., 14th Floor, Ausitn, Texas 78701.

5. Without limitation, on information and belief, Defendant has derived revenues from its infringing acts occurring within Texas.  Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from goods and services provided to persons or entities in Texas.  Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its sale of products and/or services within Texas. Defendant has committed such purposeful acts and/or transactions in Texas such that it reasonably should know and expect that it could be sued in this Court as a consequence of such activity.

6. Venue is proper in this District under 28 U.S.C. § 1400(b). On information and belief, Defendant has a regular and established place of business in Texas and in this District at 600 Congress Ave., 14th Floor, Ausitn, Texas 78701.  On information and belief, from and within this District, Defendant has committed acts of infringement, including at least a portion of the infringements at issue in this case.

7. For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

### III.  THE PATENT-IN-SUIT

8. Plaintiff incorporates the above paragraphs herein by reference.

9. On March 14, 2006, United States Patent No. 7,013,127 ("the '127 Patent") was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '127 Patent is attached hereto as Exhibit A and incorporated herein by reference.

10. PAYG is the assignee of all right, title, and interest in the '127 patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant

times against infringers of the '127 Patent.  Accordingly, PAYG possesses the exclusive right and standing to prosecute the present action for infringement of the '797 Patent by Defendant.

### Background of the Invention

11.     The '127 Patent relates to telecommunications services and methods that enable a user and/or other responsible party to make payments as the user uses the telecommunication services.

12.     As described in the specification of the '127 Patent, before the invention claimed in the '127 Patent, it was known in the art of telecommunication services to provide calling card accounts to customers. A customer would receive account information in the form of a personal identification number ("PIN") and a toll-free access number that allowed the customer to utilize the account. Those accounts were generally one of two types: (1) a pre-paid account, which was an account with a pre-defined amount of usage paid for in advance by the customer; and (2) a usage-based account, which was an account that is billed on a periodic billing cycle according to usage during the billing period. Pre-paid wireless (cell phone) service was one example of a pre-paid account.

13.     Prior to the '127 Patent, pre-paid wireless service enabled customers to use the convenience of cellular and digital communications by establishing a pre-paid account with a wireless telecommunication vendor. Typically, pre-paid wireless cards, each card corresponding to a wireless services account, were purchased in preset denominations, such as $20, $50 or $100, often from a limited number of locations. Each card provided the user with a specified amount of wireless calling dollars or minutes. After the initial allocation was exhausted, the user could "recharge" or reload their wireless account, usually by calling a toll-free number, and either talking

3

with a customer service representative or using an automated system to charge additional calling dollars or minutes to a credit card.

14. There were many inventions directed to these types of systems and methods. For example, U.S. Pat. No. 6,185,545 discloses a method for effecting payment of goods or services that establishes an intermediary account associated with the user account to permit the user to pre-pay for telecommunications services. Another patent, U.S. Patent No. 6,282,276, discloses value-added service calls that traditionally have been "800" or "900" number calls. U.S. Patent No. 6,397,055 discloses a system and method for charting a pre-paid wireless call user. U.S. Patent No. 6,424,706 discloses a system and method for accessing the value associated with a pre-purchased amount of telecommunication time. WO 01/82582 discloses communication billing systems that provides interrelated processing of wireless service events and wire line service events. WO 02/11422 discloses a communication account system for dynamically providing communication accounts to communication devices for immediate transfer to users, including a means for determining an amount of prepaid time for communication.

15. These prior art pre-paid systems were burdensome to both the user and the telecommunication service provider. Moreover, these prior art pre-paid systems generally required that the user have a current credit card with an available balance, which created a significant burden in and of itself to certain classes of user, such as individuals who lacked sufficient regular income, individuals with too much existing debt, individuals with poor credit histories, and individuals who lacked and/or were unable to obtain a social security number.

### The Patented Invention

16. The '127 Patent discloses specific improved methods for effecting payment for pay-as-you-go telecommunication services via a third-party. The claimed method comprises:

monitoring a user's use of telecommunication services at regular time intervals; communicating results of the monitoring to the provider of the telecommunication services, who then processes the results and communicates those to the user; and receiving a payment from the user, wherein: (i) the payment is received from the user at a third-party point-of-sale together with an account identifier, (ii) data indicative of the payment transaction is received sale by the telecommunication services provider from the third party; and (iii) an amount of money equal to the payment is received by the telecommunications services provider from the third-party. The point-of-sale can be a physical location, such as a retail merchant site; a vending machine; and an automated teller machine, or a virtual location, such as a website or application. The payment at the point-of-sale can be made in any acceptable form, including cash, a wire-transfer or bank-transfer, a debit card transaction, and a credit card transaction.

17.     The methods of the claimed invention are an improvement over conventional methods that allow a user to pay as the telecommunication services are being used (*i.e.*, "pay-as-you-go"). Various embodiments of pay-as-you-go methods are illustrated in FIG. 1 and FIG. 2 of the '127 Patent.

18.     Unlike standard mobile phone calling plans that charged a set monthly fee for a specific amount of calls or usage, pay-as-you-go plans only required the user to purchase minutes or usage when they would like to make a call or use the telecommunication services. This was a significant advantage to consumer-users who did not want to be bound by an annual, or even biannual, contract, as well as to consumer-users who did not possess sufficient credit (or credit-worthiness) to qualify for such a contract. This latter group included not only individuals with bad credit ratings, but also hourly-wage earners, individuals under the age of 18, and individuals unable to obtain a social security number.

19.    Pay-as-you-go calling plans also represented an advance to consumer-users who, for whatever reason, wanted to preserve their privacy and so were reluctant to enter into a contract with a telecommunications service provider that would require the disclosure of confidential personal information, like the consumer-user's name, home address, social security number, and the like. In 2020, there were approximately 74 million pay-as-you-go consumer-users in the United States.

20.    Pay-as-you-go systems also provide an advantage for telecommunication service providers.  With pay-as-you-go systems, use of the telecommunication services can be suspended by the telecommunication services provider upon the available balance in a user's account being fully consumed. And, because use is monitored at regular time intervals, such a suspension can generally be achieved before the user and/or the responsible party accumulates any balance due.

21.    However, a significant drawback of prior art pay-as-you-go systems and methods was the inability to add extra time or services after the initial purchase of the phone and time without a credit or debit card. Because of this, many prior art pay-as-you-go systems and methods were almost as bad as standard mobile phone calling plans for individuals with bad credit ratings, hourly-wage earners, individuals under the age of 18, and individuals without social security numbers. Such systems and methods were also less-than-desirable for individuals who wished to protect their private, personal confidential information and/or preserve their anonymity through cash-only transactions or the like. For all of those different groups of individuals, prior to the invention of the methods claimed in the '127 Patent, the only solution to the problem of running out of time was to purchase another pre-paid phone altogether—a "solution" which could end up being prohibitively expensive in the long term.

22.     Unlike prior art pay-as-you-go systems and methods which required direct payment from a user to the telecommunications service provider via a credit or debit card to add time or data for further use, the methods of the invention claimed in the '127 Patent permit a user to make payments via a third-party point-of-sale site. Such a third-party point-of-sale site may be a physical location, such as a gas station or convenience store equipped with an electronic point-of-sale device, or a virtual location, such as a website or app like PayPal® or Venmo®. While such payments can be made electronically, *e.g.*, via credit card, debit card, check card or any other such means, including on-line banking, they do not have to be made electronically like the prior art systems required. Rather, payments according to the invention claimed in the '127 Patent can also be made in cash, *i.e.*, the user can make a payment with cash at a designated location, and the amount paid at the designated location will credited to the user's account to cover the services rendered in step 68 of FIG. 2.

23.     To use a designated location 12 to make payment, a user 10 may be issued an account identifier 14, *e.g.*, an individual account number, in step 62 of FIG. 2, that uniquely identifies that user 10. Such an account identifier 14 enables a user 10 to make a payment at the designated location in step 64 of FIG. 2. As noted above, this may be done, *e.g.*, via a point-of-sale terminal 16, where a user's credit card or debit card is "swiped" both to identify the user 10 and to collect payment of a specified amount, or where a user physically inserts cash in the form of paper bills and/or metal coins and enters his/her account identifier via a pin pad or the like. The payment information is then relayed to the telecommunication services provider 18 in step 66 of FIG. 2. The designated location 12 can be any physical or virtual location that processes a credit or debit card and/or can accept cash, *e.g.*, retail stores such as a dry cleaner, a drug store, a supermarket, or a convenience store, etc., and websites and mobile applications like PayPal®.

24.     The inventions claimed in the '127 Patent include methods that enable a user of pay-as-you-go telecommunication services to make payments for those telecommunications services via a third-party point-of-sale.

25.     Prior to the invention claimed in the '127 Patent, users of telecommunications services that did not have a credit card, debit card, and/or linkable bank account were generally unable to use "pay as you go" systems. This requirement presented a problem to users with bad credit ratings, hourly-wage earners, and individuals under the age of 18, as well as individuals who wished to protect their privacy and/or preserve their anonymity.

26.     The methods claimed in the '127 Patent are directed to novel ways of permitting users of telecommunications services to purchase those services on an as-needed basis without needing a credit card, debit card or linkable bank account, and without having to disclose personal identifying information. This represents a significant advantage to users with bad credit ratings, hourly-wage earners, individuals under the age of 18, and individuals without social security numbers, as well as individuals who wished to preserve their anonymity.

27.     Claim 1 also provides a specific technical solution for integrating disparate systems, including telecommunication usage monitoring systems, telecommunication billing systems, and retail point-of-sale systems into a unified payment framework.  For example, the limitation "monitoring a user's use of the telecommunication services at regular time intervals" is a technical element that involved not merely collection information but implements a specific technical monitoring mechanism that executes operations at defined intervals, which differs from traditional post-paid billing cycles.  This real-time processing capability requires technical infrastructure to capture, process, and communicate usage data at predetermined intervals rather than relying on traditional monthly billing cycles.  This represents a technical advancement because it enables

8

immediate awareness of usage patterns and allows for responsive system actions based on current usage data. The specification of US 7,013,127, in column 4, lines 44-49, describes this as enabling the telecommunication services provider to produce "the equivalent of an updated invoice" immediately upon completion of service use.  The technical implementation requires the system to maintain a running tally of usage that is updated every monitoring interval, implement algorithms to aggregate these frequent data points into billable amounts, and provide instant access to this information when the user ends their session. This transformation from reactive billing systems to proactive usage management represents a technical solution to the problem of efficiently allocating resources and notifying users in telecommunication services. Regular interval monitoring establishes a technical framework that maintains ongoing awareness of system utilization, enabling both service providers and users to make informed decisions based on current usage data rather than historical data.

28.     The limitation "communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user" is a technical limitation requiring a specific technical data flow and processing architecture, which is not a generic communication concept.  The claimed invention implements a communication framework for relaying usage information and payment status. As described in the specification of US 7,013,127, in column 4, lines 52-57, "[t]he telecommunication services provider 18 then relays this information in step 78 of FIG. 2 back to the user 10 via e-mail 30, via interactive web access 40, via SMS 42, via MMS 44, and/or via a voice and/or a data call 46…." (Ex. A at 4:51-55).  This multi-channel approach represents a technical solution because it implements multiple communication pathways to ensure users receive timely information about their usage and account status. The system can notify users through

various technical means, adapting to user preferences and device capabilities. The specification describes that this includes notification "if the user 10 is at a pre-designated limit," demonstrating proactive account management.  (Ex. A at 4:55-57).  This limitation defines a specific technical protocol for data exchange. This is not generic communication but a defined technical flow: usage data → provider → processing → user notification.

29.     The limitation "receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier" is another technical limitation requiring a specific technical implementation that utilizes account identifiers in point-of-sale systems, rather than any particular payment method.  The limitation "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the telecommunication services provider" is another technical limitation requiring a specific three-part technical reconciliation system, which is not a simple payment transfer.  This limitation requires a specific technical reconciliation mechanism that tracks and settles payments across multiple parties. Claim 1 of the '127 Patent therefore solves a technical problem by creating an integrated architecture or integrated system that enables real-time monitoring, immediate billing, and distributed payment processing through retail infrastructure.

30.     The claimed invention also implements integration at the network level between telecommunication services networks and payment processing systems. As shown in Fig. 1 of the '127 Patent, the claimed invention requires technical connections between the telecommunication services network 24, the telecommunication services provider 18, point-of-sale terminals 16, and various communication channels.  Figure 1 and the accompanying description in the specification

of the '127 Patent demonstrate that the telecommunication services network 24 is technically coupled with the telecommunication services provider 18 through data communication pathways that enable transmission of call detail records (CDRs) and usage monitoring data. The point-of-sale terminals (16) are integrated into this architecture through the establishment of secure communication channels that permit the transmission of payment transaction data, including account identifiers and payment amounts, to the telecommunication services provider (18). This network-level integration enables real-time data flow between disparate systems, creating a unified technical framework for service monitoring, billing, and payment processing.

31.    The technical framework achieves unification through the implementation of a centralized data processing architecture at a telecommunication services provider, which serves as the integration hub for disparate data streams. The network-level integration is evidenced by the invention's ability to correlate usage data from the telecommunication services network with payment data from point-of-sale terminals, enabling immediate account updates and service adjustments.  The data flow capability is achieved through event-driven architectures where state changes in one system component trigger notifications and updates in connected systems. Traditional telecommunication billing systems operated with temporal delays between service usage, billing calculation, and payment processing, with each function residing in isolated systems that exchanged data through batch processes.  The invention coordinates multiple technical systems, including telecommunication networks, point-of-sale systems, communication platforms (such as email, SMS, MMS, and voice), and interactive voice and data systems. This coordination creates a comprehensive technical ecosystem for pay-as-you-go telecommunication services.

32.    Claim 1 of the '127 Patent cannot be performed with mental processing, along with pen and paper.  The step of "monitoring a user's use of the telecommunication services at regular

11

time intervals" cannot be manually performed as it necessitates a technical integration within a telecommunication network.   Nor can "communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user" be performed manually because it also requires a technical integration within a telecommunication network and the ability to process results from such electronic monitoring.

33.    The claims of the '127 Patent are therefore not directed to an abstract idea or law of nature.

34.    The claims of the '127 Patent provide solutions to a specific and persistent problems that existed with conventional pay-as-you-go systems and methods, including how could certain users (such as individuals with bad or no credit, hourly-wage earners, individuals under the age of 18, individuals without a social security number, and individuals who wished to maintain their privacy) continue to use a prepaid phone or similar device once the original time had expired and/or been consumed. The inventions claimed in the '127 Patent provide a real-world solution to that real-world problem.

35.    The invention described in the claims of the '127 Patent enables users to add to a pre-paid phone or similar device after the initial purchase thereof without using a credit or debit card or bank account and without needing to reveal personal confidential information, such as an individual's name or social security number. The patented invention does this by enabling such users to provide payment to the telecommunications service provider through a third-party willing to accept forms of payment other than a credit or debit card, including virtual sites, like PayPal®, and brick-and-mortar businesses, like convenience stores and gas stations.

36.    The claimed invention also has several inventive concepts.

37.    The claimed invention is distinguishable from claims that merely recite generic steps of "receiving," "authenticating," and enabling transactions without specifying how these functions are performed.  Claim 1 of the '127 patent specifies how monitoring occurs (*e.g.*, at regular time intervals), how communication flows (*e.g.*, specific bi-directional paths with processing; usage data → provider → processing → user notification), how payment is integrated (*e.g.*, through point-of-sale transactions using account identifiers), and how reconciliation occurs (*e.g.*, three-part settlement system, involving a telecommunication services provider, a point-of-sale proprietor, and a user). It was not routine, well-known, or conventional to use any of these limitations at the priority date of the '127 Patent.

38.    The use of "a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider" represents an unconventional technical solution because it creates a new payment pathway that leverages existing retail infrastructure for telecommunication services.  For example, "[t]he designated location 12 can be any location that processes a credit card, e.g., retail stores such as the dry cleaners, the drug store, the supermarket, etc." (Ex. A at 4:34-37).  The technical implementation requires coordination between disparate systems, including retail point-of-sale terminals and telecommunication billing systems, to create a unified payment ecosystem. This goes beyond traditional payment methods by enabling cash payments through a distributed network of retail locations.

39.    The independent Claim 1 further recites that "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider." This element requires the establishment of a communication pathway between the retail point-of-sale system and the telecommunication services provider's billing infrastructure. The technical

13

implementation must include secure data transmission protocols. The system must implement authentication mechanisms to verify legitimate transactions. The system must provide real-time or near-real-time data synchronization to ensure timely account crediting.

40. Claim 1 also recites "a payment is received from the user at a point-of-sale together with an account identifier," necessitates the implementation of a technical interface at the point of sale. The point-of-sale terminal must be configured to accept the account identifier associated with telecommunication services. The terminal must be programmed to process payments designated for telecommunication accounts rather than retail purchases. The system must implement data capture mechanisms that associate the payment amount with the specific account identifier.

41. Claim 1 further recites that "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider." This element requires the establishment of a communication pathway between the retail point-of-sale system and the telecommunication services provider's billing infrastructure. The technical implementation must include secure data transmission protocols. The system must implement authentication mechanisms to verify legitimate transactions. The system must provide real-time or near-real-time data synchronization to ensure timely account crediting.

42. Claim 1 also recites "an amount of money equal to the payment amount is received from a point-of-sale proprietor by the telecommunication services provider," which establishes a unique payment architecture for telecommunication systems. This architecture involves three distinct parties in each transaction. The user provides payment at the retail location. The point-of-sale proprietor collects and temporarily holds these funds. The telecommunication services provider ultimately receives the payment from the proprietor. This three-part system necessitates the implementation of sophisticated tracking and reconciliation mechanisms. The system must

maintain transaction records that link each user's payment to the corresponding account identifier. The technical implementation requires the establishment of a trusted intermediary relationship. The point-of-sale proprietor effectively becomes a payment agent for the telecommunication services provider. This relationship requires technical mechanisms for transaction verification and dispute resolution.

43.     The ordered combination of the claim limitations was also not routine, well-known, or conventional at the priority date of the '127 Patent.  The claimed invention's interval-based monitoring represents an unconventional technical solution to the problem of real-time billing and account management. As described in the specification of '127 Patent, the system monitors usage "at regular time intervals... e.g., at 5-, 10-, 15- or 30-minute intervals." (Ex. A at 4:40-44). This granular monitoring enables immediate billing calculations and account management decisions. Similarly, the technical advancement is further described in the '127 Patent, which describes how "Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated."  (Ex. A at 2:26-32).  The invention's ability to monitor and process usage data at regular intervals enables dynamic account management, including the automated suspension and reactivation of accounts based on payment status. This creates a technical framework that prevents debt accumulation while maximizing service availability.

44.     The technical implementation differs from traditional billing architectures. Traditional systems employ batch processing models with monthly data aggregation. The claimed system implements stream processing with continuous data flow.  As explained in the '127 Patent, "Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated."  (Ex. A at 2:26-

15

32).  This capability requires the system to maintain real-time usage accumulators. The invention implements calculation engines that process accumulated interval data upon session termination. The invention must also provide data access interfaces for user queries.

45.    The comprehensive data flow system described in Claim 1 creates an interconnected network of information exchange that enables sophisticated management of telecommunication services. The process begins with the monitoring component, which tracks a user's telecommunication usage at regular time intervals. As described in the '127 Patent, this monitoring generates detailed usage data that captures when services are used, for how long, and what types of services are consumed. (Ex. A at 4, lines 40-57).  This raw monitoring data then flows to the telecommunication services provider through established communication channels. The telecommunication services provider acts as the central processing hub in this ecosystem. When the provider receives the monitoring results, it processes this information to create meaningful data for the user. As disclosed in the '127 Patent, the provider produces "the equivalent of an updated invoice" from the call detail records received from the telecommunications services network. (Ex. A at 4:46-49).  This processing involves calculating charges, applying rate plans, and preparing comprehensive account status information. The provider can then communicates these processed results back to the user through one of multiple available channels. (*Id.* at 4:51-57).

46.    The claims of the '127 patent recite a particular way of effecting such payments via a third-party point of sale site, which are not generic and do not preempt alternate methods of payment.  Alternative ways exist and are known for a user to affect payment for pay-as-you-go telecommunications services, including the prior art method of submitting a credit or debit card directly to the provider of the telecommunications services.

16

### IV.  COUNT I
### (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 7,013,127)

47.    **Direct Infringement.** Upon information and belief, Defendant directly infringed claim 1 of the '127 Patent in Texas, this District. and elsewhere in the United States. As shown below, Defendant performed steps of a pay-as-you-go method for affecting payment of telecommunication services with its usage-based pricing (Pay-per-Usage) plan that satisfied each limitation of claim 1 of the '127 Patent.  Viasat provides the Viasat Internet service monetization platform, which is an all-in-one solution that enables merchants to offer and sell their services (*e.g.*, software, telecommunication services, PDF access, etc.) on a subscription, usage-based, or pay-as-you-go model.  All steps of the asserted claim were performed using the BOSS Revolution monetization platform.

48.    Defendant provided a Pay-per-Usage plan that allows merchants to charge customers based on their consumption of products and services, such as calls and messages ("telecommunication services"). Defendant perform a method for affecting payment of telecommunication services. For example, Viasat provides the Viasat Internet service, a home internet service for users, through a Viasat-provided modem or gateway that is Wi-Fi enabled and provides connectivity to devices within the home. Further, Viasat provides the My Viasat application, which enables users to manage the Viasat Internet service. The application enables users to monitor data usage, view and pay bills, manage account settings, and purchase additional high-speed data through the "Data Boost" feature ("payment of telecommunication services").

**SATELLITE INTERNET FOR ALL**

# Two plans. One mission: better internet from above.

Connect to reliable, high-speed home internet — so you can browse, shop, learn, and more — wherever you call home, whenever you want. Viasat Internet plans gives you:

- Unlimited data*
- No contract plan option*
- Professional installation
- Live customer support
- And more!

(*E.g.*, https://www.viasat.com/satellite-internet/).[1]

**Will my Viasat Internet service come with a wireless modem?**

Yes, your Viasat Internet service will come with a new Viasat modem or gateway with built-in Wi-Fi. If you want, you can use any modern wireless modem. A wireless modem will allow you to create a home network with your Viasat Internet service, which will let you share the service wirelessly with your computer and other devices such as tablets and smart phones.

(*E.g.*, https://www.viasat.com/satellite-internet/faq/).

---

[1] Red boxes and text added to figures unless otherwise noted.

# Welcome to Viasat Internet!

It's our mission to connect you to the things you care about without a lot of hassle, so let's get down to business: This guide will help you set up your Viasat Internet account, show how to get the most out of your service, and answer some common questions.

If you'd like more information about a certain topic, visit **help.viasat.com**. Otherwise, enjoy your Viasat experience, and know that we are thrilled to have you as a customer.

*The Viasat Internet Team*
The Viasat Internet Team



**My Viasat – my.viasat.com**

My Viasat is the online consumer portal where you'll manage your Viasat Internet service. Once you set up your account, write your login information here for future reference.

**Note: For information on setting up your account, refer to page 2 of this guide.**

(*E.g.,* https://www.viasat.com/content/dam/us-site/residential/documents/EasyStart_Welcome _Guide%20(1)-compressed-compressed%20(1).pdf).

19



# About this app →

The Viasat Internet app is an easy, fast way to manage your account needs. <u>Pay your bill, check your data usage, troubleshoot common issues and more</u> – all without having to pick up the phone.

Pay your bill: Easily make a one-time payment or update your payment method.

Check your data: See how much data you have used during the current billing cycle....

(*E.g.*, https://play.google.com/store/apps/details?id=com.viasat.cts.store.ViasatInternet&pli=1).

(*E.g.*, https://play.google.com/store/apps/details?id=com.viasat.cts.store.ViasatInternet&pli=1).

If you run out of High-Speed Data, most Choice and unlimited data plans have the option to buy more with Data Boost! This feature is perfect for movie night, extra house guests, and more!

Most Choice and unlimited data plans come with a set amount of High-Speed Data. If you run out of High-Speed Data, you will continue to receive unlimited access to Standard Data which may result in slower speeds.

(*E.g.*, https://www.viasat.com/satellite-internet/help/residential/plans-and-add-on-services/buy-more-high-speed-data-with-data-boost/).

49. Defendant performed the step of monitoring a user's use of the telecommunication services at regular time intervals. For example, the Viasat-provided modem or gateway collects internet and network activity data, including the amount of data consumed by each device ("monitoring a user's use of the telecommunication services"), when those devices are connected to the Viasat modem providing the Viasat Internet service. Further, the My Viasat app provides functionality that enables users to view current data usage for the current billing cycle ("regular time intervals"), check remaining high-speed data, monitor account activity, track billing

information, and receive notifications and account updates relating to internet usage and service status.

**Will my Viasat Internet service come with a wireless modem?**

Yes, your Viasat Internet service will come with a new Viasat modem or gateway with built-in Wi-Fi. If you want, you can use any modern wireless modem. A wireless modem will allow you to create a home network with your Viasat Internet service, which will let you share the service wirelessly with your computer and other devices such as tablets and smart phones.

(*E.g.,* https://www.viasat.com/satellite-internet/faq/).

- **Information Automatically Collected**

When you use our Sites, we may use cookies, log files, or other similar technologies to conduct analytics of our Sites. For example, we may automatically collect certain non-personal information from you such as your browser type, operating system, software version, Internet Protocol (IP) address, Internet service provider and platform types. We may also collect non-personal information about your use of the Sites, including the areas or pages of the Sites that you visit, the amount of time you spend using the Sites, the number of times you return to the Sites, the amount of time it takes to load a page, the order in which the content on a page loads, and other Site usage data. This information helps us to track and understand how visitors use our Sites and improve the performance and user experience of our Sites.

We may also collect information regarding your use of our Services and how our Services perform, including account login credentials, the amount of time it takes to load a page, the order in which the content on a page loads, your browser type, IP address or media access control (MAC) address, cookies, domain and subdomain names and the complete addresses ("URLs") of the websites you visit. If you connect devices (via a wired and/or wireless connection) to our modem, we may also collect information specific to each device you connect, including, but not limited to, the device's unique MAC address, the hostname of the device, connection properties specific to each device, the times the device connects to or accesses the modem and the amount of data each device consumes. We may use the information described in this paragraph to troubleshoot your home network and to optimize, troubleshoot, measure, and monitor the performance of our network and Services, including performing de-bugging, measuring service levels and

(*E.g.,* http://viasat.com/content/dam/us-site/legal/documents/subscriber-privacy-policy.pdf).

| | |
|---|---|
| **Online usage information** including Internet and other network activity data that we capture as an internet service provider (ISP), including the website domains you visit, the date and time of visits, and related network metadata, details of mobile apps on your device that make use of the Mobility Services, malicious traffic your device may encounter when visiting websites, and crash reports | • Indirectly |

(*E.g.,* https://www.viasat.com/privacy/mobility-privacy-notice/en-us/).

The My Viasat mobile app offers troubleshooting, alerts, the ability to view and pay your bill, check your usage and so much more. It's designed to let you have more control over your Viasat Internet Experience.

(*E.g.,*       https://www.viasat.com/satellite-internet/help/residential/account-admin-billing-support/my-viasat-mobile-app/).

22



(*E.g.*, https://play.google.com/store/apps/details?id=com.viasat.cts.store.ViasatInternet&pli=1).

(*E.g.*,                 https://www.viasat.com/satellite-internet/help/residential/account-admin-billing-support/my-viasat-mobile-app/).

(*E.g.*,    https://www.viasat.com/satellite-internet/help/residential/plans-and-add-on-services/buy-more-high-speed-data-with-data-boost/).

50.     Defendant performed the step of communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user.  For example, the Viasat modem or gateway monitors and collects information relating to a user's internet data consumption over

various time intervals, including connection sessions, daily usage, and monthly usage ("results of said monitoring"). This usage information is communicated to Viasat's backend servers ("telecommunication services provider"), configured to receive, process, and analyze the collected data. Based on such processing, the servers determine metrics including, but not limited to, total data consumed, remaining high-speed data allowance, data usage scores, and eligibility for supplemental services such as Data Boost. The processed usage information is subsequently communicated to the user through the "Usage" section of the My Viasat application. Specifically, the application presents the processed results in the form of usage graphs, consumption meters, remaining data indicators, and billing-related information associated with the subscribed data services ("communicates processed results to said user").

| | |
|---|---|
| **Online usage information** including Internet and other network activity data that we capture as an internet service provider (ISP), including the website domains you visit, the date and time of visits, and related network metadata, details of mobile apps on your device that make use of the Mobility Services, malicious traffic your device may encounter when visiting websites, and crash reports | • Indirectly |

(*E.g.*, https://www.viasat.com/privacy/mobility-privacy-notice/en-us/).

- **Information Automatically Collected**

When you use our Sites, we may use cookies, log files, or other similar technologies to conduct analytics of our Sites. For example, we may automatically collect certain non-personal information from you such as your browser type, operating system, software version, Internet Protocol (IP) address, Internet service provider and platform types. We may also collect non-personal information about your use of the Sites, including the areas or pages of the Sites that you visit, the amount of time you spend using the Sites, the number of times you return to the Sites, the amount of time it takes to load a page, the order in which the content on a page loads, and other Site usage data. This information helps us to track and understand how visitors use our Sites and improve the performance and user experience of our Sites.

We may also collect information regarding your use of our Services and how our Services perform, including account login credentials, the amount of time it takes to load a page, the order in which the content on a page loads, your browser type, IP address or media access control (MAC) address, cookies, domain and subdomain names and the complete addresses ("URLs") of the websites you visit. If you connect devices (via a wired and/or wireless connection) to our modem, we may also collect information specific to each device you connect, including, but not limited to, the device's unique MAC address, the hostname of the device, connection properties specific to each device, the times the device connects to or accesses the modem and the amount of data each device consumes. We may use the information described in this paragraph to troubleshoot your home network and to optimize, troubleshoot, measure, and monitor the performance of our network and Services, including performing de-bugging, measuring service levels and

(*E.g.*, http://viasat.com/content/dam/us-site/legal/documents/subscriber-privacy-policy.pdf).



## About this app  →

The Viasat Internet app is an easy, fast way to manage your account needs. Pay your bill, check your data usage, troubleshoot common issues and more – all without having to pick up the phone.

Pay your bill: Easily make a one-time payment or update your payment method.

Check your data: See how much data you have used during the current billing cycle....

(*E.g.*, https://play.google.com/store/apps/details?id=com.viasat.cts.store.ViasatInternet&pli=1).



(*E.g.*,          https://www.viasat.com/satellite-internet/help/residential/account-admin-billing-support/my-viasat/).



(*E.g.*,        https://www.viasat.com/satellite-internet/help/residential/account-admin-billing-support/my-viasat/).

- View your current plan details
- Check your data usage and even buy more High-Speed Data (if available for your plan)
- Check your balance due
- Set up auto-pay
- Add on additional services

(*E.g.*, https://www.bossrevolution.com/en-us/unlimited-plans-terms).

51.    Defendant performed a step of receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the telecommunication

services provider. For example, the My Viasat app enables users to make payments for the availed internet services, such as the "Data Boost" service, directly through their user accounts. Access to the app is provided through the Viasat login system using user account credentials ("account identifier"). Further, the My Viasat app includes billing and payment management features that support online payment methods, such as credit cards, debit cards, and PayPal ("point-of-sale"). Upon completion of a payment transaction, payment details and account-related transaction information ("data indicative of the payment transaction") are communicated to Viasat servers ("telecommunication services provider") for processing and account management. Therefore, upon information and belief, payment for the data services is received by Viasat through a payment processor or financial institution, and an amount corresponding to the payment amount is received by the telecommunication services provider from the point-of-sale proprietor.

- **Make a secure, one-time payment through My Viasat and avoid the $5 assistance fee if an agent processes your payment.**
  - Click on *Billing* at the top of the page. Next, locate and click on *Make a payment*
- **Make a one-time payment using your current payment method on file**
  - Select Billing; then select *Make a payment*
  - Select one of the payment options offered by clicking on the link, and the payment amount will appear for the payment option selected:
    - Pay balance
    - Pay another amount
  - Your payment will automatically come from the current payment method on file
  - Click *Pay* and your payment will begin to process. That's all there is to it
- **Are you using a different payment method for this one-time payment?**
  - If you use a different payment method for only this payment, check the *Use a different payment method box*, then select payment type
    - Credit/Debit Card- Enter your card details then click *Pay*
    - Bank Account - Login to our secure online banking tool with your banking username and password to process your payment. You no longer need a routing or account number.
    - PayPal - Login to your PayPal account and confirm payment details then click agree and pay

(*E.g.*,    https://www.viasat.com/satellite-internet/help/residential/account-admin-billing-support/my-viasat/).



(*E.g.*, https://play.google.com/store/apps/details?id=com.viasat.cts.store.ViasatInternet&pli=1).

The following table describes the personal data we collect from and about you depending on the Mobility Service, some of which we combine in our systems.

| Personal Data Description | Information Source |
|---|---|
| **Identifiers** such as your name or alias, Mobility Service account credentials like username and password, online identifiers (*e.g.*, cookies and similar tracking technology), airline frequent flyer account number or pilot and crew identifiers (for our inflight internet services), and other similar identifiers | • Directly from you<br>• Indirectly<br>• Third parties |
| **Contact details** such as address, phone number and email address used for contact or service support purposes | • Directly from you |
| **Financial and related information** like your credit card number for payments and payment transaction related details | • Directly from you<br>• Third parties (payment processor) |
| **National identification numbers** such as your tax identification number that we associate with your access to Mobility Services in certain countries | • Directly from you |

(*E.g.*, https://www.viasat.com/privacy/mobility-privacy-notice/en-us/).

# Welcome to Viasat Internet!

It's our mission to connect you to the things you care about without a lot of hassle, so let's get down to business: This guide will help you set up your Viasat Internet account, show how to get the most out of your service, and answer some common questions.

If you'd like more information about a certain topic, visit **help.viasat.com**. Otherwise, enjoy your Viasat experience, and know that we are thrilled to have you as a customer.

*The Viasat Internet Team*
The Viasat Internet Team



account identifier

**My Viasat – my.viasat.com**

My Viasat is the online consumer portal where you'll manage your Viasat Internet service. Once you set up your account, write your login information here for future reference.

**Note: For information on setting up your account, refer to page 2 of this guide.**

(*E.g.*, https://www.viasat.com/content/dam/us-site/residential/documents/EasyStart_Welcome_Guide%20(1)-compressed-compressed%20(1).pdf).

30



(*E.g.*,   https://login.viasat.com/oauth2/auss5o0l1DDF9mIke696/v1/authorize?client_id=0oa1z83

muzscFURhw697&response_type=code&redirect_uri=https%3A%2F%2Fmy.viasat.com%2Fcal

lback&scope=openid%20profile%20email%20offline_access%20sbn&state=asdfasdf).

52.     Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such infringement of the '127 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

53.     The claims of the '127 Patent are method claims to which the marking requirements are not applicable.  Plaintiff has therefore complied with the marking statute.

## V.  **JURY DEMAND**

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

    a.    Judgment that claim 1 of United States Patent No. 7,013,127 has been infringed directly and indirectly, either literally and/or under the doctrine of equivalents, by Defendant;

    b.    Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

    c.    That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

    d.    That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

June 29, 2026

Respectfully Submitted,

*/s/ Steven G. Kalberg*
David R. Bennett (IL Bar No. 6244214)
Steven G. Kalberg (IL Bar No. 6336131)
(admitted *pro hac vice*)
Direction IP Law
P.O. Box 14184
Chicago, IL 60614-0184
(312) 291-1667
dbennett@directionip.com
skalberg@directionip.com

*Attorneys for Plaintiff*
*Pay As You Go, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2026, I electronically filed the above documents with the Clerk of Court using CM/ECF which will send electronic notification of such filings to all registered counsel.

*/s/ Steven G. Kalberg*
Steven G. Kalberg

33