# EXHIBIT 24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| VALVE CORPORATION, | |
| Plaintiff, | CASE NO. C23-1016 |
| v. | Seattle, Washington |
| LEIGH ROTHSCHILD; ROTHSCHILD BROADCAST DISTRIBUTION SYSTEMS, LLC; DISPLAY TECHNOLOGIES, LLC; PATENT ASSET MANAGEMENT, LLC; MEYLER LEGAL, PLLC; AND SAMUEL MEYLER, | February 11,2026<br>8:38 a.m.<br><br>JURY TRIAL, VOL. 3 |
| Defendants. | |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMAL N. WHITEHEAD
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:

Dario A. Machleidt
Kathleen R. Geyer
Christopher P. Damitio
Kilpatrick Townsend & Stockton LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101

David A. Reed
Kilpatrick Townsend & Stockton LLP
100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309

Marianthi Karas
Kilpatrick Townsend & Stockton LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

For the Defendants:

Joseph J. Zito
René A. Vazquez
Robert B. Cadle
DNL Zito
1250 Connecticut Avenue, NW, Suite 700
Washington, DC 20036

For the Defendants: Matthew J. Cunanan
DC Law Group
12055 15th Ave NE, Suite B
Seattle, WA 98125

Reported by: Nancy L. Bauer, CCR, RPR
Federal Court Reporter
700 Stewart Street, Suite 17205
Seattle, WA 98101
nancy_bauer@wawd.uscourts.gov

Jury Trial, Day 3
8:38 a.m.

THE COURT: All right. Good morning, all.

Thank you for flagging some evidentiary issues for me. It's good and, I think, productive that we can discuss them outside the presence of the jury.

So I understand that a number of proposed exhibits have been objected to, specifically Exhibit 592, 322, 550, 19, and 12.

I'll hear from the objecting party first. So Mr. Zito, who from your team will speak to the objections?

MR. ZITO: Sure. I'll put the particular documents and the objections just up here so we can all look at it.

The general objection, if we look at the first one here -- can we look at the first document? Oh, these are responses to -- these are responses to interrogatories in a different case from -- if you'll go back up to the top, Rob, sorry -- from 2018. And they're supposed to show, I believe, the economic status of the client in 2018, which is four years before any of the current controversies started; it's almost ten years ago now; and it was -- what? -- five years before 2023. So the relevance is what we were objecting to.

What money was in what bank accounts when for different Rothschild entities back in 2018. We don't think it's relevant to -- they have a damages issue, they have an issue of being

underfunded and a whole bunch of issues regarding economics. They took their discovery on economics. We have a report from Ms. Sorini [sic], I believe. And this isn't relevant to whether or not there's money in accounts now or what he was doing in the time period this case covers. This was earlier than that.

THE COURT: Okay. And I'll note, I mean, the Exhibit 592 that I have is 262 pages long. So I understand that there are excerpts of 592 that are being proposed. So can someone give me the page numbers, perhaps Bates numbers, for the range that is being proposed as an exhibit?

MS. KARAS: Good morning, Your Honor. Maria Karas for Valve Corporation. The proposed Bates numbers are LAMKIN116 to LAMKIN140.

THE COURT: All right. And Mr. Zito, I think we're probably going to go back and forth here, so if you'd like you can remain at counsel's table, but just please speak clearly into the microphone.

I'm going to go to Ms. Karas. Will you be speaking on behalf of Valve?

MS. KARAS: Yes, Your Honor.

THE COURT: All right. Again, you can remain seated as well, counsel. Just speak into the mic. All right.

So, tell me what is going on with Exhibit 592.1, as it's been repaginated.

MS. KARAS: So Exhibit 592.1 is an excerpt from a case

involving Rothschild entity RCDI in the Eastern District of Texas. It includes responses to interrogatories and a declaration from Mr. Rothschild in response to an order to show cause. These documents have information regarding the assets in RCDI's bank account. And the assets of Rothschild's companies are relevant to show whether Mr. Rothschild uses his companies as mere shell companies, as well as whether they're undercapitalized to avoid paying debts.

We think both of these are relevant to the issues of bad faith and alter ego in this case.

THE COURT: So relevant -- I mean, help me work through some of the evidentiary issues that I'm considering right now. I mean, RCDI is a different entity.

Has Mr. Rothschild personally signed these documents -- the interrogatory responses, I should say?

MS. KARAS: Yes, Your Honor. Mr. Rothschild submitted a declaration on Pages 139 and 140, and Mr. Rothschild also -- RCDI submitted a declaration that was signed by Mr. Rothschild on Pages 133 and 134.

THE COURT: All right. So is it your contention, then, that these are party statements?

MS. KARAS: Yes, Your Honor, statements of an opposing party.

THE COURT: Mr. Zito, relevance is a low bar. So I'm worried about hearsay-type concerns. I mean, we've got

Mr. Rothschild as the declarant, if he's the one who's signing these documents. So what am I missing in that sense?

MR. ZITO: If you look at No. 2, he's a declarant on behalf of Rothschild Connected Devices Innovation, not declarant on -- as Mr. Rothschild. He wasn't a party in this case; Rothschild Connected Devices Innovations is the party in this case, who's not a party in this case -- sorry -- a party in the case we're looking at, and not a party in the current case.

And yes, he signed the declaration, but on behalf of a party, not personally. These aren't his personal finances. These are the finances of Rothschild Connected Devices Innovation, and I think it's going to be confusing to the jury in addition to being irrelevant. And I think its de minimis relevance, if any, is outweighed by -- we're now entering another company, another party, and documents from 2018. And I think it's much more confusing than it's going to be relevant.

That's our objection. We don't think the documents are fraudulent or anything like that. We just don't see why we're digging through things that aren't very relevant.

THE COURT: All right. I'm going to reserve ruling as it relates to 592.1. One of the big problems I had in reviewing the document was its length. So now that I have the Bates range narrowed down, I will take a look at Exhibit 592.1, knowing that we're looking at Bates range LAMKIN116 through 140.

MR. MACHLEIDT: Your Honor, Dario Machleidt on behalf

of Valve. May I have 20 seconds about that document?

THE COURT: I don't like to split argument in this way, but I will indulge you because I didn't say that at the outset. So please go ahead, briefly.

MR. MACHLEIDT: The concern Mr. Zito had about our use of -- Dario Machleidt on behalf of Valve -- the use of the document, we don't care about RCDI's finances. The issue -- one of the bad faith issues here -- is that we need the law, we need the Washington law because when you have the shell companies of Mr. Rothschild that go after companies like Valve, if they lose and they get hit with an attorney fee award, they do not have the funds to pay Mr. --

THE COURT: No, I mean, I understand the relevance. So I mean, I'm not moved by the relevance objection at all. I'll take a look at the documents. But I'll give you an opportunity, briefly -- perhaps it's Ms. Karas here on this -- but about the idea that Mr. Rothschild is not signing in his personal capacity but on the behalf of RCDI, which is not a defendant in this case.

Any response to that?

MR. MACHLEIDT: Yes. In that the document matters because if Mr. Rothschild takes the stand and says, Yes, my companies may not have much funds, but we have PAM; we have Patent Asset Management. It has the funds. It will pay the attorney fees if we get hit with a fee award. That document,

the raw responses and the declarations, Mr. Rothschild never offers to pay the attorney fee award in that case through Patent Asset Management. Instead, he is forcing the defendant in that case to add him personally to the case.

Mr. Rothschild is of course a defendant in this case. But should Mr. Rothschild say, Yeah, RBDS doesn't have much money; Display Technologies doesn't have much money, but it doesn't matter because if they lose an infringement lawsuit, well, you know what, PAM will pay. That evidence shows that's not true.

THE COURT: Mr. Machleidt, no, I understand your case theory, but I'm look at this from an evidentiary standpoint. And I mean, I -- I'm just -- I'm trying to pin down the evidentiary basis for considering the admission of this document and, you know, looking at the independent basis for it. You know, you're presenting this in your case-in-chief, so I guess it's not impeachment on a collateral matter here with an extrinsic document. But I just -- I want to just take a look at what's being represented both in the declaration and the interrogatory responses.

So I'm reserving ruling on Exhibit 592.

Mr. Zito, I'll hear from you on Exhibits 322 and 550.

MR. ZITO: Yeah, this is -- okay. These are correspondence between counsel at Orrick and Mr. Lobbin in a different RBDS case from 2020. And it expressed that these two documents, I believe both 323 [sic] and 550 -- is that the same?

I don't know if we can pull that one up. I don't have these memorized. I'm sorry.

The 322 document, our concern is that that's an opinion of a counsel who's not here to be cross-examined or talked about, and so it's inadmissible opinion or expert testimony. This is what the attorney at Orrick thinks about a case. I don't see how that's relevant here, even if we're talking about the same patent, the '221 Patent and the --

THE COURT: All right.

MR. ZITO: So that's that one. The other one is, again, it's an opinion in a different case regarding --

THE COURT: This one is an order in the Southern District of California.

MR. ZITO: By "opinion," I meant an opinion of court, an order.

THE COURT: All right. Thank you, Mr. Zito.

MR. ZITO: Trade dress rights between -- again, neither of those parties, Iconic Mars and Kaotica, are in this case, Your Honor.

THE COURT: Thank you, Mr. Zito. Ms. Karas?

MS. KARAS: Your Honor, as an initial point, Rule 701 applies to opinion testimony by lay witnesses and --

THE COURT: I'm sorry. I don't mean to cut you off. I think I need to direct this a little more here.

I've looked at these documents, so talk to me about

hearsay. I mean, this is --

MS. KARAS: Okay.

THE COURT: This is -- he's not an expert. I mean, 322 is a litigation document by an adversary. Why should I let 322 in as a matter of 801 and perhaps 403?

MS. KARAS: Valve does not intend to offer this document for the proof, but to show the nonhearsay purpose that defendants had notice of the invalidity and the prior art of this patent as early as November 2020.

THE COURT: This letter is directed to Mr. Lobbin.

MS. KARAS: Yes.

THE COURT: Who is Mr. Lobbin in the context of this case? He's counsel -- former counsel for Mr. Rothschild?

MS. KARAS: Yes, Your Honor.

THE COURT: So you are hoping to attribute knowledge to Mr. Rothschild by showing that this letter directed to Mr. Lobbin evidences knowledge?

MS. KARAS: Yes, Your Honor. Mr. Lobbin has represented that he provides these letters to his client.

THE COURT: All right. Let's see how the testimony unfolds on this one. I think you can put the question to Mr. Rothschild about knowledge of claims from accused infringers that the '221 Patent is invalid, and we'll see how the response unfolds and whether or not this document comes in.

I think notice is a nonhearsay purpose. But 403 is the

catchall here, and I am worried about confusion here. I'm going to reserve on ruling on Exhibit 322.

Tell me about 550. This is an order from another case. What is -- what's the purpose of 550?

MR. MACHLEIDT: Your Honor, Dario Machleidt on behalf of Valve. I'll be handling this argument. The purpose of 550 is both rebuttal and potentially cross, depending on how the defendants end up using Mr. Lobbin. He is now going to be a live witness in this case.

Mr. Lobbin currently represents Mr. Rothschild in an ongoing lawsuit. He has represented RBDS and other Rothschild companies in many patent infringement lawsuits. We took his deposition. When we offer his testimony in our case-in-chief, we do not intend to put this order in front of him; however, when we deposed him, he had quite a few derogatory and negative things to say about Kilpatrick Townsend, the law firm that we all work for. The reason being, not long ago, our law firm -- in particular, Ms. Geyer and myself -- we had a case against Mr. Lobbin. He had filed it against one of our clients.

THE COURT: So Mr. Machleidt, then, bias, is that where we're going?

MR. MACHLEIDT: Correct, but also context. If he, on the stand -- either it's elicited or he says on his own that we are anti-inventor, or -- in fact, during his deposition he said that we -- "we," Kilpatrick -- have an attorney-fee grifting

scam because this case has no money, it has no damages, and we're just taking advantage of Valve.

If he goes into that type of irrelevant and prejudicial opinion testimony on the stand, which we cannot control, we want to at least have the ability to have the discussion with you about putting it in context for the jury, why he personally dislikes us so much.

THE COURT: Okay. Mr. Zito, any response to that?

MR. ZITO: For that -- excuse me. For that purpose, should it arise, I guess I wouldn't -- this is -- our problem is I thought they were going to offer this as a starting exhibit for a witness that they're proffering --

THE COURT: Okay.

MR. ZITO: -- to impeach him and make him look bad before he starts to speak.

THE COURT: Well, he is their witness, but, I mean, I think he's an adverse witness. So we'll see how the testimony unfolds and if 550 becomes an issue.

So I'll reserve ruling on 550 as well.

Nineteen and 12. I mean, 12 -- what is Exhibit 12?

MR. DAMITIO: Your Honor, Chris Damitio for Valve. Exhibit 12 is an article that was posted online.

THE COURT: All right. I see that. I mean, it's titled "Stupid Patent of the Month." Tell me how this comes in.

MR. DAMITIO: Yes, Your Honor. As we mentioned in our

email, these exhibits would only be used in rebuttal depending on the testimony, in this case, of Mr. Lobbin or Mr. Rothschild; for example, if they were to testify that the '221 Patent has a good reputation in the industry, that people recognize the strength of the patent, this evidence would come in to rebut that assertion, and only in that case.

THE COURT: All right. Yeah, I have a hard time seeing how Exhibit 12 comes in, but we'll see how it unfolds.

Nineteen?

MR. DAMITIO: Similarly, Your Honor, this would be used in rebuttal, specifically with Mr. Rothschild as to the cost of litigation. This could be used in the event that Mr. Rothschild says that litigation is not expensive, that the costs are very low. This document references the cost of litigation for Mr. Rothschild, and so it would be used to rebut that assertion in the event that that testimony is elicited by Mr. Rothschild.

THE COURT: I mean, we're talking about rebutting, but, I mean, really what we're talking about is contradicting testimony given by a witness. And there are rules around that, and they get a little tricky when we're trying to decide whether it's a collateral matter and whether or not extrinsic evidence is allowed.

So in that instance, I mean, there needs to be an independent basis for the admission of this document. It's not

enough just to say, Well, we're going to offer this up to show that he lied -- unless it's the witness' own statement.

So Donald McPhail, who is he in the context of this case -- or, I should say, the other case, the other Western District case? I believe this was the one for -- no, this is this one. Okay.

MR. ZITO: It's in this case, Your Honor.

THE COURT: All right.

MR. ZITO: Unlike the -- excuse me. Unlike the proposed bias exhibit from Mr. Lobbin, we would still object to these coming in because they're highly inflammatory; they're not just contradictory. If Mr. Rothschild should slip and say his '220 Patent is nice and good or smart, you can't come in and say the industry is represented by a guy who writes a blog called "Stupid Patent of the Month." He's been writing that blog for years. Very few people agree with his opinion.

THE COURT: Yeah, and I've already sort of laid my cards on the table with Exhibit 12. What about 19?

MR. ZITO: Nineteen is the same thing. This doesn't show that litigation is expensive. They want this to show that he didn't pay his previous counsel in this case, and that's why they asked to get out. He wants to show prejudice. He wants to show that Mr. Rothschild's a deadbeat, that his own counsel doesn't like him. This is way too inflammatory.

If he simply says litigation shouldn't be that expensive,

that's his opinion. Maybe he thinks these -- you know, and we don't have the other side. Maybe he thinks these guys billed him more than they should have. Maybe that's the argument. I don't know. But this is inflammatory because it's their counsel that quit, so they're quitting because they didn't get paid.

THE COURT: All right.

MR. ZITO: And I don't think it comes in to show that litigation's expensive. They have an expert who is going to testify how expensive -- two experts that are going to testify how expensive litigation is. They've already put Mr. Schenck up, who's testified how expensive litigation is. They don't need former counsel's dispute with the party to demonstrate that litigation is expensive. Clearly, it's much too biased...

THE COURT: All right. Thank you for providing the context here for Exhibit 19. I'm going to reserve on that one as well. I'm reserving on Exhibit 12; although, again, I'm hard-pressed to see how Exhibit 12 comes in. So that's where I'm at as to these documents.

I'll take a closer look at 592. We'll see how the trial testimony unfolds, as to whether or not 322 and 550 become relevant. And then I will look at Exhibit 19 more closely with the context that the parties have provided for its potential relevance and use at trial.

Our jury is here. So they're to be commended for showing up on time. I hope your morning commutes were okay.

The final jury instructions, I have a draft of them. We will circulate that at the lunch break. I will ask the parties for comment. I won't be taking formal exceptions to them. This is, at this point, a discussion copy. I just want to get it right as to how we're going to instruct the jury.

There's some sticky elements there, and I know that when you all put your initial submissions together, you did so without the benefit of the Court's rulings. So now that you have rulings on the dispositive motions, some of the other evidentiary concerns as it relates to the *Daubert* challenges and the motions in limine, I think that I might ask you to take another stab at some of the instructions. And I'll show you my work in terms of where I'm at for some of the stickier instructions here in this case.

Lastly, Mr. Schenck's W-2, Exhibit 572, I understand, you know, just wanting to keep your earnings private. I mean, that's something that I think as a culture, I don't know, right or wrong, people tend to hide how much they make. But as a matter of public concern, I don't see how the amount that Mr. Schenck can be shielded in the context of these public proceedings -- the document itself, the W-2, has been redacted. I think I saw an EIN number on there, so, you know, I would invite you to take another look to see if any additional information needs to be redacted.

But as far as I'm concerned, there's no reason to seal the

document or close the courtroom to discuss Mr. Schenck's earnings for -- I believe it was 2023.

MR. MACHLEIDT: Dario Machleidt for Valve. Your Honor, would you like us to respond now or simply to take another look at the document and follow up in terms of -- I certainly would like to speak to Mr. Schenck in terms of next steps.

THE COURT: Understood. Yeah, take a look at the document. It was admitted without condition. Let me know if you want to withdraw it or if we need to swap in a further redacted version of the document. But I just wanted to, you know, pick that up as something that was perhaps left unaddressed yesterday.

MR. MACHLEIDT: Yes, Your Honor.

THE COURT: All right. Anything else to address before we get our jury?

MR. MACHLEIDT: Not from Valve, Your Honor.

THE COURT: All right. Is the plan still to play a deposition designation video?

MR. DAMITIO: Yes, Your Honor. That will be Valve's first witness.

THE COURT: All right. Well, let's go to work. Mr. Cogswell, can you get our jury?

(Jury present.)

THE COURT: Please be seated. Thank you, all, for

showing up on time. The dedication, and commitment to the process, of jurors never ceases to amaze me. So thank you so much for being here. I would have liked to have brought you out a little bit sooner, but the lawyers and I were working, so sorry to keep you waiting.

As you recall, when we concluded yesterday, we were about to play a deposition video for you. We've resolved some issues, and now we are going to play that video. So I will turn it to Valve's counsel to introduce what it is that you all are about to watch.

MR. DAMITIO: Your Honor, Valve will call Mr. Randall Garteiser by video deposition as its next witness.

Mr. Garteiser is former lead counsel for certain of Mr. Rothschild's companies, and served as counsel for Mr. Rothschild's companies in three lawsuits filed against Valve in Texas after this case was filed.

THE COURT: All right. Thank you, Counsel.

(Video deposition of Randall Garteiser is played.)

MR. DAMITIO: Your Honor, at this time, Valve offers the designations of Mr. Garteiser into evidence.

THE COURT: Counsel, I think entering the designations themselves is not warranted. We've got the testimony that was just heard live in court. So I apologize if we got our signals crossed in terms of -- from an evidentiary standpoint, whether the written text would be entered or not, but it will not be.

We've just heard the testimony.

MR. DAMITIO: Understood, Your Honor.

MR. MACHLEIDT: Your Honor, at this time, Valve calls Mr. Falcucci to the stand.

THE COURT: Mr. Falcucci, please make your way up front here. Stand in front of Mr. Cogswell, and he will swear you in.

DANIEL FALCUCCI,
having been first duly sworn, testified as follows:

THE COURT: Mr. Falcucci, if you could state and spell your name for our court reporter?

THE WITNESS: Daniel Falcucci, D-a-n-i-e-l, F-a-l-c-u-c-c-i.

THE COURT: And make your way to the witness box, sir.

MR. MACHLEIDT: Permission to approach, Your Honor?

THE COURT: Yes.

Mr. Falcucci, take a moment there to get settled. You know about the chairs. I think you're actually sitting in an identical chair, so adjust it as you need to. You've got the water there, I see. An exhibit binder has just been handed to you. And in addition, there's the monitor as well. Exhibits may appear on that from time to time. Of course, you know about the microphone. Please speak slowly and clearly into the mic.

THE WITNESS: Okay, Your Honor. Thank you.

THE COURT: With that, Mr. Machleidt, you may inquire.

MR. MACHLEIDT: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MACHLEIDT:

Q. Good morning, Mr. Falcucci.
A. Good morning.
Q. Is your full name Daniel Falcucci?
A. Daniel Joseph Falcucci Marquardt.
Q. Do you currently work for Patent Asset Management?
A. Yes, I do.
Q. Are you the chief operating officer of, if I may, PAM?
A. That's correct.
Q. You're not a Valve employee, are you?
A. No.
Q. Do you currently have, I'll call them business development responsibilities, as the chief operating officer at PAM?
A. We have a small team, and I wear a lot of hats. That used to be my title, business development director, and some of that may still be entailed in my current position.
Q. In 2021, were you working at Patent Asset Management?
A. Yes, I believe I started October '21.
Q. At that time did you have the title business development manager?
A. Director, yes.
Q. I believe you have two binders in front of you. Can you turn -- correct, the bigger one, the one on top, and go to the

tab marked Exhibit 625.
A. Sure. It's a big binder.
Okay.
Q. Mr. Falcucci, do you see the document that is at 625?
A. Yes.
Q. Do you see your name anywhere on that document?
A. Yes.
Q. Is that an email chain between yourself and -- I'll say a few other people connected to Patent Asset Management?
A. Yes.
MR. MACHLEIDT: Your Honor, Valve offers Exhibit 625 into evidence.
THE COURT: Any objection?
MR. ZITO: No objections.
THE COURT: 625 is admitted. You may publish.
MR. MACHLEIDT: Thank you, Your Honor.
(Plaintiff Exhibit 625 admitted.)
MR. MACHLEIDT: And thank you, Ms. Gray. Would you please call out the bottom of this page; essentially where it says "forwarded message," down.
THE WITNESS: Sure. It's an email from --
MR. MACHLEIDT: Oh, I'm so sorry. That was just making -- I was asking Ms. Gray --
THE WITNESS: Apologies.
MR. MACHLEIDT: -- to do that, just so we, on the

screen, could see that a little better. My bad. No worries.

THE WITNESS: No problem.

Q. (By Mr. Machleidt) Now that we have that, Mr. Falcucci, do you see that this is an email from Mr. Rothschild, as you and I just mentioned, to a few folks connected with Patent Asset Management?

A. Yeah, that's correct.

Q. And the date of this email is October 26, 2021?

A. Yes.

Q. Do you see -- frankly, right below the date -- where it says "weekly goals"?

A. Yes.

MR. MACHLEIDT: And Ms. Gray -- and certainly Mr. Falcucci on the hard copy in front of you, if you'd like -- Ms. Gray, would you please scroll us down to Page 2 and there's a lot of redacted text here.

If you could, Ms. Gray, just call out the bottom part that is -- thank you, Ms. Gray.

Q. (By Mr. Machleidt) Mr. Falcucci, with what we're looking at on the screen, do you see in a parenthetical it says "Daniel"?

A. Yes. Sugouri and Daniel.

Q. Does "Daniel" in this parenthetical refer to you, Mr. Falcucci?

A. Yes.

Q. Sticking with what's on the screen in front of us, right below where it says "Daniel," do you see the text "need to review Valve agreement to see if there's a path to more revenue"?
A. Yes, I see that.
MR. MACHLEIDT: Ms. Gray, will you get us to the top of this document and call out -- I think it ends up being the first email not in the chain but in the document.
Q. (By Mr. Machleidt) Mr. Falcucci, is what's in front of us an email from you to Mr. Rothschild?
A. Yes.
Q. Is the date of that email October 26, 2021?
A. Yeah. It looks like just about two weeks after I might have started, yes.
Q. Mr. Falcucci, as part of your response to Mr. Rothschild, do you see where you wrote, "I'll work hard to get these matters completed for PAM"?
A. I see that.
MR. MACHLEIDT: Ms. Gray, you can take that down. Thank you.
Q. (By Mr. Machleidt) Mr. Falcucci sticking with the binder in front, will you go to tab 640, please.
A. Sure.
Okay.
Q. Are you familiar with the document that is at 640?

A. Yeah, yes.
Q. Do you see your name on that document?
A. Yes.
MR. MACHLEIDT: Your Honor, Valve offers Exhibit 640 into evidence.
MR. ZITO: No objection --
THE COURT: Any objection?
MR. ZITO: No objection, Your Honor.
THE COURT: 640 is admitted. You may publish.
(Plaintiff Exhibit 640 admitted.)
MR. MACHLEIDT: Thank you, Your Honor.
Ms. Gray, please call out, more or less, the -- the top third or half of this document, please.
Q. (By Mr. Machleidt) Mr. Falcucci, what we're looking at, is that an email from yourself to yourself, dated October 28, 2021?
A. Yes. And I believe it's from my personal Gmail to my new work email address, because it's only about two weeks after I started, so there may have been confusion on the email.
Q. Understood. And if we scroll down -- and, frankly, what we look at on the screen in front of us -- do you see that on October 28th of 2021, there's an email from Mr. Rothschild from his Gmail account to what appears to be your Gmail email address?
A. Yes. Again, some confusion with the proper accounts, but yes.

Q. The subject of Mr. Rothschild's email, it reads, "Here is the Steam agreement for your review and our discussion." Did I read that correctly?
A. Yes, that's correct.
MR. MACHLEIDT: Ms. Gray, if you scroll up back to the email from Mr. Falcucci's Gmail -- I'm going to stop the question there.
Q. (By Mr. Machleidt) The email that you're sending this message to, is that your work email at Patent Asset Management?
A. Yeah, that's correct.
Q. Do you see in that top email, there's a reference to an attachment called "2016/01/12 License Agreement, Valve and clean"?
A. I see that, yes.
MR. MACHLEIDT: Ms. Gray, you can take that down. Thank you.
Q. (By Mr. Machleidt) Mr. Falcucci, have you been in the courtroom since the beginning of trial yesterday?
A. Yes.
Q. In the 2021 -- let me take a step back.
Did you hear Mr. Lavery and Mr. Quackenbush testify yesterday?
A. Yes.
Q. In 2021 and then in 2022, did you contact those two Valve employees on several occasions?

A. Yes, as business development director, I did.
Q. Before reaching out to any Valve employees, you did some research into Valve?
A. I -- yes.
Q. Based on the research that you did, again going back to the 2021, 2022 time period, you learned that Valve was in general a video game company?
A. Yes.
Q. None of the research that you did led you to believe that Valve was involved in the medical device industry?
A. I did not notice that from a small amount of research.
Q. Are Display Technologies and RBDS, or Rothschild Broadcast Distribution Systems, are they subsidiaries of Patent Asset Management?
A. Yes.
Q. Have the lawsuits filed by those types of Patent Asset Management subsidiaries led to hundreds of license and settlement agreements?
A. Those two subsidiaries have led to -- I'd certainly say dozens. Perhaps that -- no. That high of a number, it's high.
Q. I appreciate the distinction. So taking however many subsidiaries there are under Patent Asset Management, not limited to those two, have those subsidiaries and their litigations led to on the order of hundreds of license agreements?

A. Yes. Many companies, I believe, were happy to license those patents.
Q. Speaking of companies that took licenses, you're aware that in 2016, Valve and Mr. Rothschild and Display Technologies entered into the Global Settlement and License Agreement?
A. Yes.
Q. We've heard it a few times, within that agreement, the '221 Patent is one of the licensed patents?
A. Right. Correct.
Q. Did Valve, to your knowledge, pay Mr. Rothschild or Display Technologies $130,000 as part of that settlement agreement?
A. I believe they paid Display Technologies.
Q. Mr. Falcucci, you're aware that -- sort of moving forward in time -- in June of 2023, Mr. Meyler, on behalf of RBDS, sent a demand letter to Valve referencing the '221 Patent?
A. Yes, I'm aware.
Q. Is it fair to say that you personally are not sure what led to that June 2023 demand letter?
A. I guess I'm not sure specifically, but, you know, I would -- I might, you know, have an awareness of it or take some guesses.
Q. I will not ask you to guess in court.
A. Okay.
Q. Going back to the attempts or the times that you reached out to Valve in 2021 and 2022, had you read the settlement

agreement, the Global Settlement Agreement, before reaching out to Valve?
A. Yes, I believe I probably did.
Q. When you contacted Valve, was at least one of your goals to get Valve to enter into a new settlement agreement?
A. My primary goal was to engage in a discussion of some sort, maybe set a meeting. And no -- no response. It's okay. But that was the primary goal.
Q. Understanding that that was the primary goal, was a goal of yours, when you reached out to Valve, to get Valve to enter into a new settlement and license agreement?
A. I would say that that was a topic of discussion that I would like to have had with Valve and its employees or attorneys.
Q. You mentioned topic of discussion. There actually were no discussions between you and Valve, correct?
A. That's correct. I received no response.
Q. Okay. When you were attempting to get a response from Valve, was one of your goals to get Valve to enter into a new license agreement?
A. It was something that we were, you know, willing to offer them, a broader scope of a license agreement, because five years later, we had a different and broader set of patents than the 35.
Q. What was the last part of your answer? Did you say 10 to

35?

A. No, of the 35 that were on the GSLA.

Q. Thank you. Mr. Falcucci, will you please turn to Tab 239 in your binder.

Mr. Falcucci, are you looking at the document at Tab 239?

A. Yes.

Q. You're familiar with that document?

A. Yes.

Q. Did you help prepare parts of it?

A. Yes.

MR. MACHLEIDT: Your Honor, Valve offers Exhibit 239 into evidence.

THE COURT: Any objection?

MR. ZITO: No objections.

THE COURT: 239 is admitted. You may publish to the jury.

(Plaintiff Exhibit 239 admitted.)

MR. MACHLEIDT: Thank you, Your Honor.

Q. (By Mr. Machleidt) Mr. Falcucci, what we have on the screen, is that Page 1 or Slide 1 of what's in the binder in front of you?

A. Yes.

Q. On this first page of the document, do you see that underneath Patent Asset Management, it says "New Deal Proposal"?

A. Yes.

MR. MACHLEIDT: Ms. Gray, would you go to the next page, I believe.

Q. (By Mr. Machleidt) On the second page of the slide, is that photo a photo of Mr. Rothschild?

A. Yes, it is.

Q. Do you see in the first bullet point, there's a reference to Patent Asset Management being a, quote, "patent assertion company"?

A. Yeah. "A patent assertion company that works with inventors, patent brokers," yes.

Q. Actually, my next question, continuing where you left off, do you see also where this bullet point paragraph continues to say that Patent Asset Management finds ways to enforce patent rights?

A. Yes. "We work with inventors and patent brokers to find ways to enforce patent rights and reward inventors' efforts."

Q. Is Mr. Rothschild the founder of Patent Asset Management?

A. Yes.

MR. MACHLEIDT: Ms. Gray, can you go to the next slide, please.

Q. (By Mr. Machleidt) On this third slide of the exhibit, do you see the title "PAM and Valve Corporation"?

A. Yes, I do.

Q. At the -- I'll say middle, but middle to bottom of the slide, do you see the text that the terms of agreement include a

license and the covenant not to sue for patents listed in Exhibits C and D?
A. Yes, I see that.
Q. Those exhibits in the agreement, is that a reference to the Global Settlement and License Agreement between Valve, Mr. Rothschild, and Display Technologies?
A. Yes, that's correct.
MR. MACHLEIDT: Ms. Gray, can you move us to -- I believe it should be Slide 4. Thank you, Ms. Gray.
Q. (By Mr. Machleidt) In this Slide 4 -- and I think you had mentioned this earlier when you referenced, you know, 35 patents. In this slide, do you see a reference to PAM having acquired several new portfolios?
A. Yes, I do.
MR. MACHLEIDT: Ms. Gray, would you get us to Page -- or Slide 11, please?
Q. (By Mr. Machleidt) At the top of this slide, do you see the text "featured inventory" and then "not subject to an agreement"?
A. Yes, I do.
Q. The two patents on this slide, as part of the new deal proposal -- is it okay with you if I refer to them as the '160 and the '664 Patent?
A. Yes.
Q. Is one of the points of this slide that the '160 and the

'664 patents, they're not subject to that Global Settlement and License Agreement?

A. That's right.

Q. The two patents here, the '160 and the '664, is it fair to say that they relate to medical device inserts?

A. Yes, that's correct.

MR. MACHLEIDT: Ms. Gray, you can take that down for a moment. Thank you.

Q. (By Mr. Machleidt) And, Mr. Falcucci, you have the entire document in front of you. It's tough to do this just with a -- a screen in front of me.

In that new deal proposal, there's no reference to, for example, Valve's Steam platform?

A. I'd have to look through it.

Q. Of course.

A. Not -- not that I see.

Q. Same thing, look through as much as you need, but there's also no reference in that new deal proposal to Valve's Steam Cloud?

A. I don't see that, either. It's just other patents that are listed. I didn't see --

Q. Are there no -- please continue.

A. I see other patents listed. I don't see reference to Valve Steam Cloud.

Q. Mr. Falcucci, certainly in front of you --

MR. MACHLEIDT: And, Ms. Gray, if you could, would you take us to Slide 14, please?

Q. (By Mr. Machleidt) Mr. Falcucci, on this Slide 14 of the new deal proposal, do you see a reference to, near the top, a comprehensive list of patents that PAM would like to offer under a new CNS/license agreement?

A. Yes, I see that.

Q. Does CNS stand for covenant not to sue?

A. Yes.

Q. I think we heard it yesterday. Do you understand a covenant not to sue to be a promise not to sue?

A. Yes, I do.

Q. To the left of that text that's currently highlighted, do you see the language "comprehensive new asset list"?

A. Yes, I see that.

MR. MACHLEIDT: Ms. Gray, would you take us to Slide 15, please? And on this slide, if you could call out the bottom two rows. Thank you, Ms. Gray.

Q. (By Mr. Machleidt) On this slide of the new deal proposal, do you see a reference to the '195 and the '723 patents?

A. Yes.

MR. MACHLEIDT: And, Ms. Gray, can you get us to Slide 19 and call out the fifth row, please.

Q. (By Mr. Machleidt) Mr. Falcucci, same question: You see in this new deal proposal what we've been calling the '221 Patent?

A. Yes, I see that.

MR. MACHLEIDT: Ms. Gray, thank you for that. You can take those down.

Q. (By Mr. Machleidt) Going back to the $130,000 payment from Valve to, I think you said, Display Technologies; as part of the discussion that you had -- or tried to have with Valve, was there ever the intent on your part or the part of PAM to return the $130,000 to Valve?

A. I don't think that came up.

Q. When you say you don't think that came up, do you mean that the return of those funds, that was not a topic or that was not something that you had considered during the time when you were reaching out to Valve?

A. That's correct.

Q. Do you recall -- and certainly if you don't, I can ask this a different way, but do you recall yesterday some testimony about claim charts?

A. Yes, I do.

Q. The claim chart, do you agree that, at a very, very, very high level, it has parts of the patent on one side, and on the other side, it has descriptions or pictures of whatever product the patent owner potentially thinks is infringing?

A. Yes, I recall.

Q. Mr. Falcucci, the new deal proposal that you and I were just talking about, did you -- I'll say on at least one

occasion -- send that to Valve?
A. Yes.
Q. Within that new deal proposal -- or at the time that you sent the new deal proposal, is it correct that there were no claim charts for each of the patents in that proposal comparing them to any Valve product?
A. No, because it was essentially marketing material coming from me, director of business development. So it was simply an open invitation to discuss our full inventory.
Q. Mr. Falcucci, I certainly don't mean to -- to say that you did not answer my question. I believe you did. But you began with a "no," so I think we have kind of that ships passing in the night. I'm going to try one more time. Again, I think we're on the same page. Does that work for you?
A. Yes.
Q. At the time that you sent this new deal proposal to Valve, is it correct that there were no claim charts comparing the patents in that proposal to any Valve product?
A. No, I don't think there was a claim chart included.
MR. MACHLEIDT: Ms. Gray -- I apologize, Ms. Gray. I'm jumping the gun.
Q. (By Mr. Machleidt) Mr. Falcucci, could you turn to Tab 270 in your binder?
A. Sure.
Okay.

Q. Have you seen that document before?
A. Yes.
Q. Is it safe to say that it is a business-related document within PAM?
A. Yes.
MR. MACHLEIDT: Your Honor, Valve offers Exhibit 270 into evidence.
THE COURT: Any objection?
MR. ZITO: No objections.
THE COURT: Exhibit 270 is admitted. You may publish to the jury.
MR. MACHLEIDT: Thank you, Your Honor.
(Plaintiff Exhibit 270 admitted.)
MR. MACHLEIDT: Ms. Gray, I think for now, if you could just call out the very first paragraph, or all the text that follows the No. 1, please?
Q. (By Mr. Machleidt) And before asking you specific questions about this, the title of this document, is it PAM 2024 Business Outline?
A. Yes.
Q. Do you see, as one of the revenue goals in front of us, an objective for PAM is to intake $200,000 or more in monthly gross revenue?
A. Yes.
Q. A little bit below that, do you see the reference to

keeping the total number of case filings at 40-plus?
A. Yeah, I see that.
MR. MACHLEIDT: Ms. Gray, you can take that down. Thank you.
Q. (By Mr. Machleidt) Mr. Falcucci, please turn to Exhibit 653 in your binder.
A. Okay.
Q. Do you see your name on that document?
A. Yes.
Q. Is that an email chain that includes, among others, yourself?
A. Yes.
MR. MACHLEIDT: Your Honor, Valve offers Exhibit 653 in evidence.
THE COURT: Any objections?
MR. ZITO: No, no objections.
THE COURT: Exhibit 653 is admitted. You may publish.
(Plaintiff Exhibit 653 admitted.)
Q. (By Mr. Machleidt) Mr. Falcucci, I think we'll begin with Page 2. No. I apologize. My bad.
Do you see on Page 1, at the top, that you are in the "to" line of this email?
A. Yes.
MR. MACHLEIDT: Ms. Gray, can you get us to Page 2. And I think -- call out the August 29 email at the bottom,

please. I see that there are two of them.

Q. (By Mr. Machleidt) In this email that's part of the chain that came to you -- and I understand your name is not here -- do you see the text, "Daniel has that AG if you have problems finding it"?

A. Yes, I see that.

Q. You understand that AG in this email that ultimately was forwarded to you, that's a reference to the Valve agreement?

A. Yes.

MR. MACHLEIDT: Ms. Gray, you can take that down. Thank you.

Q. (By Mr. Machleidt) Mr. Falcucci, will you go to Exhibit 639, please.

A. Okay.

Q. Mr. Falcucci, have you seen the document that is at Tab 639 before?

A. Yes. It's from -- email from 2022.

Q. Do you see your name at least somewhere on that email?

A. Yes.

MR. MACHLEIDT: Your Honor, Valve offers Exhibit 639 into evidence.

THE COURT: Any objection?

MR. ZITO: No objection, Your Honor.

THE COURT: 639 is admitted. You may publish.

(Plaintiff Exhibit 639 admitted.)

MR. MACHLEIDT: Thank you, Your Honor.

Ms. Gray, will you please call out the bottom part of this document. Perfect. Thank you, Ms. Gray. And you can just keep it at that. I think that's sufficient.

Q. (By Mr. Machleidt) Mr. Falcucci, are we looking at an email from you to Mr. Meyler dated May 10, as you indicated, of 2022?

A. Yes.

Q. Do you see, a little bit lower on the screen in front of us, the bolded text in your email, "sending letter/notice before filing a complaint"?

A. Yes, I see that.

Q. Bear with me. It's -- it's not too much. I'm going to read some of the blue text, if you don't mind.

But before that, do you see the initials "JD" in the blue text in front of us?

A. Yes, I see that.

Q. Does that stand for "jurisdiction"?

A. I would assume so.

Q. Any issues if, when I read this, I say jurisdiction instead of JD?

A. No, that's -- that's okay.

Q. Mr. Falcucci, in this May 10, 2022, email from you to Mr. Meyler, you wrote, "Defendants sometimes receive a notice letter before we file complaints, depending on the laws of that

jurisdiction and specifically the presence or absence of any anti-trolling-type law. Here, it would depend whether there is any such law, and the local helps to," and then on our screen, it cuts off.

Did I read the words in front of us correctly?

A. Yes, you read them correctly.

MR. MACHLEIDT: Ms. Gray, just to close it out, because the bottom is cut off, can you go to the very top of the next page.

Q. (By Mr. Machleidt) That paragraph ends -- well, the paragraph I just read, do you agree that it ends with the words "advise of same"?

A. Yes.

Q. Mr. Falcucci, is the Washington Patent Troll Prevention Act one of the anti-trolling type laws referred here in your email?

A. I mean, it could be one of several that we may be aware of.

MR. MACHLEIDT: Ms. Gray, you can take that down. Thank you.

Q. (By Mr. Machleidt) And, Mr. Falcucci, will you please go to 626 in your binder.

A. Okay.

Q. Have you seen the document at 626 before today?

A. Yes. It looks like an email chain from 2022.

MR. MACHLEIDT: Your Honor, Valve offers Exhibit 626 into evidence.

THE COURT: Any objection?

MR. ZITO: No objections, Your Honor.

THE COURT: Exhibit 626 is admitted. You may publish.

(Plaintiff Exhibit 626 admitted.)

MR. MACHLEIDT: Thank you, Your Honor.

Ms. Gray, will you please take us to Page 2 and call out the email from December 29, 2022.

Q. (By Mr. Machleidt) Mr. Falcucci, are we looking at an email from you to Mr. Rothschild?

A. Yes.

Q. Is the subject line "Letter regarding Valve attached"?

A. Yes.

Q. In about -- well, let me roll that back.

Do you see where you refer to "Sam"?

A. Yes.

Q. When you refer to Sam in this email of yours, are you referring to Mr. Meyler?

A. Yes.

Q. In this email that you wrote to Mr. Rothschild, do you see where you say, "I'm concerned that Sam will be on the hook to do this when it -- when it is somewhat far beyond the typical duties of local counsel"?

A. Yes, I see that referring to concerns that Jay might not be responding. This was when he was very late stages of his illness.

Q. Understood. And fair to say that you had concerns about the scope of duties that Mr. Meyler was being asked to handle?
A. Yes.
MR. MACHLEIDT: Your Honor, may I have 10 seconds to confer?
THE COURT: Yes.
MR. MACHLEIDT: Thank you, Your Honor.
Your Honor, no further questions at this time. I pass the witness.
THE COURT: Very good.
Mr. Zito, cross?
MR. ZITO: Certainly.
THE COURT: Mr. Zito, while you're setting up -- yesterday there was an issue with the exhibit binders. I just wanted to clarify, for purpose of the record, that Mr. Zito's office did provide chambers with a copy of the witness binders, that I believe is on the stand now. So I wanted to clarify that. I apologize if I left the impression that you had not done your job in that respect.
MR. ZITO: Thank you, Your Honor.
Could we give him the red binder that's -- just in case.
THE WITNESS: Thank you.
MR. ZITO: Don't put away the other binder yet.
THE WITNESS: Okay.

CROSS-EXAMINATION

BY MR. ZITO:

Q. Let's go with where we just left off. Why were you concerned about Mr. Jay Johnson in January of 2023 -- or excuse me -- December, late December of 2022?

A. I think, as I mentioned, it was -- we were hearing from his office less and less, likely due to his advanced stages of cancer.

Q. You're going to have to speak up a little bit.

A. We were hearing from Jay's office less and less due to, I presume, him being very ill.

Q. Okay. And could you give us some background, who Jay Johnson is?

A. Yes, I --

Q. How you know him.

A. Sure. I know him to have been a patent attorney that has worked with Mr. Rothschild and PAM for quite a while. I had a brief period of time working with him. And beyond that, I just know that he was a -- like I said, he had worked with Leigh as an attorney. He was also considered a friend. And, unfortunately, he had cancer, and ultimately passed away from that, but had worked quite a bit up until the -- the later stages of his life.

Q. Okay. And when you first got to know him, was -- was he responsive?

A. Yes.
Q. And how would you describe his responsiveness?
A. Well, I think it would have come up more if he was unresponsive, so it was --
Q. Okay.
A. -- very acceptable.
Q. Okay. So when you sent him an email, he timely responded to the emails?
A. I believe so.
Q. And when there was an issue in a litigation, would you find that he timely responded with the answers?
A. Yes.
Q. Okay. When did you notice that he became untimely?
A. Probably about -- I guess it would be late '22, early '23.
Q. Okay. And describe what -- how you -- what do you mean when you say he was untimely at that point?
A. Well, there would be messages that would be not responded to as timely as he typically would. So, you know, we would check in with his paralegal. I think her name was Angela. And even after he had passed away, we coordinated a little bit with his law partner.
Q. And when did he pass away?
A. I would think it's February of 2023.
Q. And was he in charge of the litigations against Valve that were filed in 2022?

A. He was -- yes. He was leading the -- he was leading those discussions and litigations, as I believe it.
Q. And when you say you were concerned that Sam would have to do things far beyond the typical duties of local counsel, did you mean you were concerned that Sam would make mistakes, would screw things up, do things wrong?
A. I don't know him to make a -- I would say I had a concern that maybe we were asking too much of him.
Q. Okay. Was -- to your knowledge, was Sam a patent attorney?
A. No.
Q. Okay. Had Sam created the charts that were filed with the complaint?
A. No.
Q. Complaint -- I mean there was two complaints. I'm sorry. Let me correct that. Okay.
And by this point, one of the complaints had already been dismissed, correct?
A. I believe so.
Q. Okay. So we're just talking about the one remaining complaint.
A. Right.
Q. Okay. And I think we saw --
(Court reporter interruption.)
MR. ZITO: Sorry. My apologies.
THE COURT: I find it's useful to get right on the

microphone. They've got the spit cover on there, so it's okay. Plosives will come out just fine.

Q. (By Mr. Zito) And you heard testimony earlier regarding -- from Mr. Schenck regarding exchanges between Mr. Schenck and Mr. Meyler, correct?

A. That's correct.

Q. Okay. And you saw where Mr. Schenck asked some questions and Mr. Meyler responded?

A. Yes.

Q. Okay. Did Mr. Meyler -- was he the original author -- author of the responses in those letters?

MR. MACHLEIDT: Objection; foundation and hearsay. Mr. Meyler will testify.

THE COURT: One moment.

Overruled.

MR. ZITO: Let me get -- lay the foundation.

Q. (By Mr. Zito) Do you know where the response -- the technical responses to the technical questions that were asked, do you know where they came from?

A. The technical questions that were asked? I'm sorry. Could you repeat that?

Q. Excuse me. Say again?

A. Can you repeat that?

Q. Yes.

If you recall, in the testimony of Mr. Schenck, he asked

some questions, and I asked him if his questions were responded to, and he said yes. And they included some screenshots and some descriptions, those responses.

A. Okay.

Q. Do you know who generated those responses?

A. Probably a research group of some type.

Q. Okay. Can you tell me generally how PAM operates when making patent analysis?

A. You mean analyzing infringement?

Q. Correct.

A. Sure. We go through a process of looking at the patent, asking professional, experienced groups to examine the patents for products that companies are using in the marketplace to see whether they believe they're infringing. If they do believe that, then they may generate a detailed claim chart. And once the claim chart is prepared, it's reviewed by several people, including counsel and people at PAM internally. And it's only acted upon until they're -- every -- all parties are fully satisfied.

Q. Would Mr. Jay Johnson have been one of those counsels that you just referred to?

A. Yes, absolutely.

Q. And would you review charts to see if they were technically accurate?

A. Not a lot and not -- probably not at that time. I'm not

very technically skilled as the engineers and patent attorneys.

Q. Okay. And when you're talking about the engineers, are these -- do you know anything about their backgrounds? Experience? Qualifications?

A. Patent analyses typically involves engineers, some attorneys which are also engineers, some research groups which include engineers, and they typically have the technical abilities to examine patents and produce claim charts.

Q. And do you have any engineering training or technical ability?

A. No.

Q. Okay. And we didn't get into your -- or you didn't get into your background. What is your background education prior to 2021, when you joined Patent Asset Management?

A. I have a degree in media studies and production. I have a law degree. I -- I have a background -- after law school, I worked for a criminal record expungement firm. I briefly worked for a personal injury firm for a few months before I worked at Patent Asset Management.

Q. So had you had any prior experience with patents before joining Patent Asset Management?

A. Not much.

Q. I'm going to ask you to flip back to No. 239.

MR. ZITO: And put that on the screen.

Q. (By Mr. Zito) Do you recall when you sent this to Valve?

A. Yes.
Q. And when was that?
A. Sometime early on in my employment there at PAM.
Q. Okay. Which started in October of 2021, correct?
A. That's correct.
Q. On Page 3 of that document, which we looked at, there is a picture of a contract and reference to the Global Settlement and License Agreement, correct?
A. Correct.
Q. Okay. Did that slide intend to convey the intent to breach that agreement?
A. Absolutely not.
Q. The intent to set that aside and ignore that agreement?
A. No.
Q. Was that a threat to breach the agreement?
A. Absolutely not.
Q. And it was noted that, on Page 15 and on Page 19, the two patents that were included in that agreement were included in your long list of patents; is that correct?
A. That's correct.
Q. Okay. Was that an intention to tell Valve that you wanted more money for those two specific patents?
A. Absolutely not. This was a comprehensive list of everything under Patent Asset Management's control at that time.
Q. Okay. If we look back at Page 14, which we looked at, the

following -- do you see the language, "the following is a comprehensive list of patents that PAM would like to offer"?
A. Yes, I see that.
Q. Does that indicate these are only new patents?
A. No.
Q. Or is that --
A. Comprehensive, all of them.
Q. Okay. And can we look at the first page of that list? That's Page 15 of the document. It's not showing up on the screen. That's fine.
And if we flip to Page 16, and then look at Page 17, 18, and 19, and then Page 20, 21, 22, 23, and 24 is the last page.
Do you know how many patents are in that list?
A. It looks like hundreds.
Q. I'd like to go back, because we skipped a lot of pages here, to Page 5 of the exhibit. And then if we look at Page 4, actually, first. Sorry. One more. Previous page. One more. There we go.
Here, you differentiate from the final list, correct?
A. That's correct.
Q. And you're talking about new patents only?
A. That's correct.
Q. And if we look at the next page, can you tell us what this patent is related to?
A. It says, "Content distribution system for distributing

content over network with particular applicability to distributing high-bandwidth content."
Q. To your understanding at the time, we're back in 2022, did Valve distribute high-bandwidth content?
A. I believe so.
Q. And what -- what is your understanding of Valve's primary business?
A. As a video game software tech company.
Q. Online video game?
A. Yes.
Q. And if we could look at the next page.
Can you tell us what those two patents are about?
A. ITS patents, "Apparatus, method, and system for tracking information access" and "Apparatus, method, and system for directory quality assurance."
Q. Did you think those patents had any relevance to Valve's business at the time?
A. They may have.
Q. Did you make any technical analysis?
A. Not personally.
MR. ZITO: If we could flip to the next page.
Q. (By Mr. Zito) Can you tell us what those two patents are about?
A. Sure. Touchpoint Projection Innovations, "Network gateway with enhanced requesting" and "Network communication system with

improved security."

Q. Do you -- did you have any knowledge or information at the time as to whether those applied to anything Valve was doing?

A. Not specifically.

Q. Let's flip to page -- two pages. Down to Page 10. One more page.

Can you read what this is about?

A. Integrated Technology, output production/video game management analysis.

Q. Did you have any understanding that that might be a patent that was relevant to Valve's business?

A. Not really. But this one is a little bit more objectively easier to understand because "video game" is in the phrase.

Q. Okay. And I'm not going to go through each of these, but let's look at -- okay. It's the next one on the next page, and that's one we looked at before.

Could you read what this patent relates to?

A. Sure.

"Distribution Intelligence Systems, Dynamic intramedullary hardware," parentheses, "medical."

Q. Okay. Did you, at that time, think Valve was in the medical hardware business?

A. Not primarily.

Q. Then what would be the reason for including a medical hardware patent in this -- I believe it's called a new deal

proposal?

A. Well, I was a newer employee at Patent Asset Management. It was a patent that we put in there to feature. And I'm not a hundred percent sure of all the products that a company might be manufacturing or using.

Q. You said you had sales and marketing training?

A. I had a position in business development before Patent Asset Management.

Q. But you also had a degree related to?

A. Media studies and production.

Q. Okay. In your understanding, what's the purpose of putting out a proposal such as this one?

A. To enter into further discussion to consider if there's any interest in further business.

Q. And did you intend to threaten Valve to sue them on a medical device patent?

A. No.

Q. If you could look at Exhibit 270 in your binder.

A. Okay.

MR. ZITO: Will you put that up on the screen?

Q. (By Mr. Zito) Those were your -- I think you testified earlier that these were your goals on a business outline?

A. Yes, PAM 2024 business outline.

Q. Did you meet the objective shown in No. 1?

A. I -- I don't know if -- I'm not sure that we did.

Q. What about any of the key results?
A. Perhaps at times. This is very rudimentary.
Q. When you say they're "rudimentary," what do you mean?
A. This outline was, you know, a basic goal-setting.
Q. Were you instructed that -- to do whatever it takes to meet these goals?
A. No.
Q. Okay. Were you instructed to do something improper to meet these goals?
A. Absolutely not.
Q. Okay. If you look down at No. 2, can you read what that says?
A. Sure.
Q. First line.
A. "Portfolio assessment and enhancement, Q1 to Q2."
Q. And what's the objective?
A. "Evaluate existing patent portfolios for strengths and weaknesses."
Q. And then in No. 3, could you read what that is?
A. "Collaboration with attorneys throughout the year."
Q. And the objective?
A. Objective is "foster strong partnerships with legal teams for effective litigation."
Q. And then could you read No. 4?
A. "Risk management and data security throughout the year."

Q. And the objective?

A. "Ensure adherence to legal and ethical standards in patent enforcement, reinforce data security."

Q. And could you read the key results there?

A. Key results say, "Regularly review and update compliance protocols, mitigate legal risks associated with litigation, enhance software security with 2FA, proper sharing permissions, and admin oversight."

Q. And if we could go to No. 5, what is that objective?

A. "Monetization strategies, Q4."

Q. And objective?

A. "Acquire new, strong, inorganic patents, explore and execute alternative ways to monetize patent portfolios, complete global deals."

Q. Okay. Were you instructed to ignore No. 4 in order to accomplish No. 5?

A. No, never.

Q. Were you instructed to accomplish No. 5 maintaining No. 4?

A. We would always maintain No. 4.

Q. Could you talk a little bit about No. 3 and how the objective was accomplished, again from a high level, inside of PAM?

A. Sure. You know, we worked with different attorneys and law firms. We found it good to work with, you know, a couple firms, a few firms at a time. Some had different strategies than

others. Some might be interested in different technologies than others. So it was an interest in engaging with qualified, well-known legal counsel.

Q. And did you listen to and rely upon legal counsel? When I say "you," I'm talking about PAM as an organization.

A. Yeah, constantly.

Q. And yet PAM as an organization made a mistake in 2022; isn't that correct?

MR. MACHLEIDT: Objection; leading.

THE COURT: Overruled.

THE WITNESS: That's correct.

Q. (By Mr. Zito) Okay. Can you tell me what your understanding of that mistake was?

A. Sure. Yeah, it was an unfortunate mistake that was an amalgam of things, likely. Administrative mistake. Just an unfortunate error that -- you know, we had Jay Johnson passing away. We had our files being migrated to a different digital folder. We had our general counsel leave not too long before that.

You know, as I heard from the testimony, I mean, there was, you know -- it could be that there was a different patent number listed on the GSLA. Sometimes patents are assigned to different entities. I believe that to be the case. So...

Q. And you said your general counsel; who was that?

A. Sugouri Batra.

Q. And when did she leave?
A. I believe she left about October of 2022.
Q. And could you tell us what the result of the -- you were talking about a bunch of process errors. What was the result? What was the actual mistake that was made, to your understanding?
A. I believe the primary mistake was the *Display* case being filed, yeah, and a letter which may have included a patent that was included in the GSLA.
Q. Okay. And was that patent also included in Document 239 that we see?
A. More than likely. I would have to take a look. Yeah, I believe so. So, yes.
Q. Yes, which one was it?
A. I think it was the '221 Rothschild Broadcast Distribution Systems patent.
Q. And to your understanding, what happened after that suit was filed?
A. After the *Display Technologies* suit?
Q. Correct, asserting a patent that was already licensed.
A. Once we became aware of the error, we immediately took steps to dismiss it.
Q. And how did you become aware of the error?
A. I believe Mr. Schenck or Valve made us aware.
Q. Okay. Now, did you send No. 239, which is the Patent

Management -- the new deal proposal -- did you send that to Mr. Schenck?
A. Yes.
Q. Okay. Did Mr. Schenck ever respond to you sending this proposal to him?
A. No one at Valve responded.
THE COURT: Mr. Zito, it is time for our morning recess.
MR. ZITO: Thank you, Your Honor.
THE COURT: Folks, we'll be back at 10:45.
(Court in recess 10:30 a.m. to 10:49 a.m.)
(Jury present.)
THE COURT: Please be seated. Mr. Falcucci, if you'll take the stand, please.
We left off with the cross-examination of Mr. Falcucci.
Mr. Zito, you can begin when you're ready.
MR. ZITO: Thank you.
Q. (By Mr. Zito) When we left off, do you recall I asked you if you ever received any response from anyone at Valve?
A. Yes, I recall that.
Q. And your answer was you did not.
A. No, I did not.
Q. Had anyone at Valve responded and indicated to you that some of these patents were already licensed, would --
A. No.

Q. -- would PAM have filed suit on those licenses, those patents, anyway?
A. Absolutely not.
Q. Okay. Was it, at any time, PAM's policy to file litigation on already licensed patents?
A. No. Never was, never has been.
Q. But it did happen in this case?
A. Yes.
Q. Okay. Once, correct?
A. I believe so, yes.
Q. Okay. And according to testimony we heard from Mr. Garteiser this morning by video, it also happened in another case.
A. Yes.
Q. Okay. Do you know why that happened in the other case?
A. Probably a similar mistake of administrative error.
Q. Okay. And you heard what Mr. Garteiser testified to as to what happened subsequent to that filing. Do you have any personal knowledge or recollection?
A. I think I do recall it having been dismissed quickly.
Q. Okay. Was it PAM's intention in that matter that Mr. Garteiser discussed to get more money from the same patent that had already been licensed?
A. Absolutely not.
Q. Was it PAM's intention when the mistake was made with

respect to Valve that we've talked about to get more money from the same patent again?

A. No.

Q. Okay. All right. I'm going to -- oh, one other thing. If you could turn to 639, and that's your discussion with Mr. Meyler about engagement letters and anti-trolling laws.

Do you see that?

A. Yes.

Q. Okay. Was the intent of your discussion about anti-trolling laws so that PAM could violate anti-trolling laws?

A. No.

Q. Why was PAM interested in anti-trolling laws?

A. To be aware of the laws that were being passed so that we could be sure to be compliant.

Q. Thank you. All right. I'm going to ask you to look at the red binder that's in front of you. And if you could take a look at Tab No. 6, which is Defense Exhibit A-6.

I believe the Court has a blue binder for those. It's --

THE COURT: Thank you.

MR. MACHLEIDT: Your Honor, this is not so much an objection, but we do not have a cross binder.

THE COURT: Do you have copy of Exhibit A-6?

MR. MACHLEIDT: Yes. We have copies of all the exhibits, but electronically. So if I may go to a computer,

take a look at the exhibits, or pull up a computer?

THE COURT: You should have a copy of the exhibits. The exhibits were exchanged. So bring up your copy of the exhibit on your computer.

MR. MACHLEIDT: Thank you, Your Honor.

MR. ZITO: If you could look at the first page of Exhibit 6 [sic].

And I believe we already entered this exhibit into the record with Mr. Schenck and they're also records in a public case.

THE COURT: Now, A-6 is the one where we got twisted around yesterday.

MR. ZITO: Correct.

THE COURT: And the copy that you had, had your notes. So I said for identification purposes that we'd mark it as A-6A. I understand you to be referencing the actual A-6 exhibit right now, but it has not been admitted. A-6A, for that matter, has not been admitted.

Q. (By Mr. Zito) Could you look at that exhibit and tell me if you recognize it?

A. Yes.

Q. Okay. What is the first item in that exhibit?

A. It is the first page of *Display Technologies versus Valve Corporation* complaint for infringement of patent.

Q. And do you recognize that as the complaint that was filed?

A. Yes.
Q. Okay. And could you look at the second item in that joint exhibit, which starts on Page A-6-19?
A. Okay.
Q. And what is that document?
A. A claim chart.
Q. And do you recognize that document?
A. Yes.
MR. ZITO: Can you put it up for counsel to see?
Q. (By Mr. Zito) And do you recognize the document that starts on Page 7 of A-6?
A. Yes.
Q. And what is that document?
A. A patent.
Q. And can you read the patent number on that?
A. Sure. Patent No. 9,300,723.
Q. Do you recognize that patent?
A. Yes.
MR. ZITO: Okay. And could we scroll down to the next complaint?
Q. (By Mr. Zito) Do you recognize the document that starts on Page 40 of that document?
A. Yes.
Q. Okay. What is that?
A. The complaint for patent infringement. It's -- the parties

*Social Positioning Input Systems versus Valve Corporation.*
Q. And could you look at the first attachment to that, which is on Page 45 and 46?
A. Yes, I see it.
Q. Okay. Do you recognize that document?
A. Yes. On Page 46 on the screen, it looks like a page from the patent 9,261,365.
Q. And then could we look at the final document, which starts on Page 62.
Do you recognize that document?
A. Yes.
MR. ZITO: We would move for admission of Exhibit A-6.
THE COURT: No objection?
MR. MACHLEIDT: No objection, Your Honor.
THE COURT: All right. Thank you. Exhibit A-6 is admitted. A-6 is admitted, and you may publish.
MR. ZITO: Thank you.
(Defense Exhibit A-6 admitted.)
Q. (By Mr. Zito) Let's stay on the last page that we were just talking about, Page 62 of this document.
Who made this claim chart that you've identified?
A. An outside vendor that -- you know, an outside vendor research group.
Q. Who did they create it for?
A. They would have created it for the patent owner looking to

see if there was infringement.
Q. Okay. And can you tell us what you know, generally, about the outside vendors that PAM uses?
A. Sure.
They specialize in -- like I said, it could be engineers or Ph.D.'s or attorneys, I suppose, who specialize in reviewing products in the marketplace and assessing whether they can be charted against the patent.
Q. And to your understanding, is this the claim charts that, I think, Mr. Schenck was talking about?
A. Yes, I recall that.
Q. Okay. And what do you see in the left-hand column?
A. It says "Claim 1," and it lists, I guess, the first claim of that patent.
Q. Okay. Those are the words from the claim?
A. Yes.
Q. And what's in the right-hand column?
A. It says "evidence" and it describes, I guess, the technology that they claim it's related to.
MR. ZITO: Thank you. Now, if you'd go back to the first page.
Q. (By Mr. Zito) Do you see what patent is referenced in this complaint?
A. Yes. The 9,300,723 Patent.
Q. All right. If you could look at what's Exhibit 4 [sic] in

your notebook in front of your?
A. Okay.
Q. Do you recognize Exhibit 4?
A. Yes.
Q. Okay. And what is that?
A. Sorry. Page 4 or Exhibit 4?
Q. Exhibit 4 in the red binder, sorry. Behind Tab 4.
A. Okay. Well, I'm looking at a page that says "demand for jury trial" at the bottom.
Is that correct?
Q. No, behind --
A. Oh, I'm sorry.
Q. -- Tab No. 4.
A. That's right.
THE COURT: Mr. Zito, just for clarity on the record, we're talking about Exhibit A-4.
MR. ZITO: A-4. My apologies.
THE WITNESS: Okay. I see it now.
Q. (By Mr. Zito) Okay. Do you recognize Exhibit A-4?
A. Yes, I do.
Q. Okay. What is that?
A. It's the Global Settlement and License Agreement between Display and Valve.
MR. ZITO: I'm going to move for admission of Exhibit A-4.

THE COURT: This will be our second copy of the GSLA. Is there anything different about A-4 as compared to Exhibit 273, which has already been admitted?

MR. ZITO: No, just so it's in order.

THE COURT: Mr. Machleidt, any objection?

MR. MACHLEIDT: No objection, Your Honor.

THE COURT: You'll get two copies of the GSLA. A-4 is admitted. You may publish to the jury.

MR. ZITO: Thank you, Your Honor.

(Defense Exhibit A-4 admitted.)

Q. (By Mr. Zito) Did you have any involvement in A-4?
A. No.
Q. Okay. And A-4 was executed two years before -- a little more than two years before you got to PAM?
A. Yes. Definitely more than that.
Q. Okay. And now, do you recall the number of the patent that was in one of the two Texas lawsuits we just looked at?
A. I believe it was '723, it ended with.
Q. Okay. And do you recall the rest of it?
A. 9,300.
Q. All right. Can you look on the two schedules attached to Exhibit A-4 and see if you find that same patent?
A. I don't see it.
Q. Okay. Earlier, you testified that the first of the two Texas suits was filed on a patent that was already licensed,

correct?
A. Right.
Q. Okay. And in 2022, when that suit was filed, you didn't realize it was already licensed?
A. That's right.
Q. Okay. And if you look at the schedule, you don't find that patent on there; isn't that correct?
A. That's correct.
Q. Okay. Do you know why it was already licensed then?
A. Do I know why it was licensed in the original GSLA?
Q. Right. Why the original global settlement license covered the '723 Patent?
A. Yes. Because it's part of the same family of patents.
Q. Okay. Did you know about patent families at the time in 2022 when you were contacting Valve?
A. I may not have. I -- I'm not sure.
Q. All right. And so it is correct that if you looked for the '723 Patent on the two lists that were attached, you would not find that particular number on that list, correct?
A. That's correct.
MR. ZITO: Now, if we could republish the '723, which is part of Exhibit A-6. It's on Page 7 of A-6. Can we zoom in on the related U.S. application data?
Q. (By Mr. Zito) All right. Do you have an understanding of what this means?

A. Generally.
Q. When did you come by that understanding?
A. There's a lot of details to patents, which -- it's hard to say exactly when, but over the course of the past few years; I know a lot more now than I did when I first started.
Q. Did you know what this Section 63 of a patent meant in the 2022 time frame when you were contacting Valve?
A. I'm not sure, but --
Q. All right. Do you see reference to a Patent No. 8,671,195?
A. Yes.
Q. Okay. If we could go back to Exhibit A-4 and the lists there, and you can look at it.
A. Yes.
Q. Do you find that patent number on the list?
A. Was it the '195 Patent?
Q. Correct.
A. Yes.
Q. Okay. That's listed as No. 3?
A. Yes.
Q. Okay. Why didn't you notice that in 2022, before PAM filed the first suit we looked at in Exhibit A-6?
A. That was hard to notice, objectively, on its face.
Q. Okay. You just missed it?
A. It seems so.
Q. Okay. And not to belabor the point, as soon as you filed

suit, Valve contacted your attorney and mentioned that the '195 was in the list and on the '723; is that correct, to your understanding?
A. Yes, to my understanding.
Q. And then what did PAM direct their counsel to do?
A. Immediately dismiss.
Q. Thank you. What is your current position at Patent Asset Management?
A. Chief operating officer.
Q. And that's different from your position when you first got there?
A. Yes.
Q. Okay. Have you had any other positions in between?
A. No.
Q. Okay. Can you briefly describe your duties when you first got there, any changes, all the way up to your duties now?
A. Sure. When I first got there, it was primarily to, you know, become accustomed to our patent portfolio and identify areas where we may feel licensing opportunities could exist, conduct outreach to various parties that may be interested in licenses, things like that.
Now it consists of a lot of things -- managing staff, conducting reports, implementing policies, and overall improving operations on a day-to-day basis.
Q. What's one of the improvements to operations you're --

you're making? Give us some examples.
A. Well, a lot more organization. We use product -- product -- or task management software. We have better file management and storage. We have, you know, checklists to ensure that we're going through certain procedures as we identify infringers of patents or -- so a lot of procedure, communicating better internally and with outside counsel, tracking orders with vendors, things like that.
Q. Does PAM make less mistakes now than they made in the 2022 time frame?
A. I believe it definitely does.
Q. Do you -- are all of the patents that PAM and its associated companies own or control, are they all invented by Mr. Rothschild?
A. No.
Q. How many other inventors, if you know, does Patent Asset Management represent?
A. A good amount. Dozens. I've talked with a lot of them.
Q. Okay. Do you have any involvement in bringing in new inventors?
A. Yes.
Q. Okay. Could you tell us, generally, about that.
A. Sure. Many times they, you know, may contact us, having heard about us or knowing about us. In many cases, they could be even patent attorneys themselves that have invented things

and have patents. You know, they could -- they're -- they're inventors, so they're just exciting about -- excited about their technology. They feel that it -- they've brought something useful to the world. And so they, you know, typically enjoy the idea of partnering with a well-known inventor such as Mr. Rothschild and working with PAM.
Q. Okay. Do you only accept solicitations, or do you do any outreach to inventors?
A. We -- we -- we do outreach, too.
Q. Okay. I'm going to get you to look at Exhibit A-25, if you could. That's in the red book you have.
A. It seems that section is actually missing from this book, but I see it on the screen.
Q. Okay. Do you recognize that document?
A. Yes.
Q. Okay. Can you tell us what it is?
A. It looks like the first page to marketing material.
MR. ZITO: Okay. Can you flip through the pages?
Q. (By Mr. Zito) And do you know who prepared this document?
A. I believe I did.
Q. Okay. All right. And do you know about when it was prepared?
A. Not exactly.
Q. Okay. Have there been different versions of it?
A. Yes.

MR. ZITO: Okay. Flip to the last page.

All right. We'd like to offer Exhibit A-25 into evidence.

THE COURT: Any objection?

MR. MACHLEIDT: No, Your Honor.

THE COURT: Exhibit A-25 is admitted. You may publish.

(Defense Exhibit A-25 admitted.)

MR. ZITO: All right. Flip back to the beginning.

Q. (By Mr. Zito) Could you -- can you tell us what this document is?

A. It's a marketing -- I think it's a marketing brochure.

Q. Okay. And who does it go to?

A. I don't have the full document in front of me, but it goes to partners and people that would like to work with us.

Q. Okay. Is that patent owners or licensees or who?

Do you need to flip through it?

A. Yeah, flip -- if you could flip through it.

Yes, it looks like it would -- it would be marketed towards patent brokers or inventors.

Q. Inventors. Okay. And that's you at the -- on the last page, that's you; is that correct?

A. Yes.

Q. Okay. Why -- let me ask you, did you send this brochure to Valve in 2022?

A. I don't think so.

Q. And why not?
A. Because they would have been sort of a -- I don't know. I don't think it was -- I had --
Q. It wasn't created in 2022?
A. No.
Q. Okay. But you indicated it was -- this document is directed in the other direction, towards inventors and people that owe?
A. Right. That's the other logical answer.
MR. ZITO: Okay. Could you go to the second page?
Q. (By Mr. Zito) All right. Can you briefly tell us what's on the second page and what's intended, the message intended by this information?
A. Sure. It is pointing out our industry knowledge and what PAM does and its well-established reputation, for people that may want to work with us.
Q. All right. There's a point on there. It says, "Strategic and diligent IP management."
Do you see that?
A. Yes.
Q. Okay. The description that follows that bullet point, is that accurate?
A. Yes.
MR. ZITO: Could you go to the next page?
Q. (By Mr. Zito) And what is this -- what information is this

page intending to convey?
A. I would say just outreach in the industry, generally.
Q. And does your reach include the 4,208 campaigns by IP Edge?
A. No.
Q. So that's -- that's not PAM --
A. No.
Q. -- the first column?
And I see a Brian Yates, a Jeffrey Gross, an Equitable IP Corporation, is that -- are those parts of PAM or PAM subsidiaries?
A. No.
Q. So those are other people that monetize patents, correct?
A. Correct.
Q. Okay. Or not -- did I say people? Organizations or groups or companies. Okay.
And do you know when the 1,234 number -- what -- what date that represents?
A. I believe when I pulled this graphic -- and there's a link there -- probably a few years ago from today.
Q. So 2024 time frame?
A. Maybe a little earlier than that, but around.
Q. Okay. And has that number increased since then?
A. Yes.
Q. Okay. And other than the Valve suit in October of 2022, *DTI v. Valve*, and the suit that Mr. Garteiser talked about, do

you recall any other suits in the 12-, 1,400 suits where you sued a company that had been licensed before?

A. I don't recall.

Q. Okay. And I will note that your recollection only goes back to 2018, correct?

A. No. I started in 2021.

Q. I'm sorry, 2021. My -- my mistake. Does it go -- your recollection, then, is for the last four years?

A. Pretty much.

Q. Okay. Have you heard about anything prior to your joining?

A. No. No, I -- I can't specifically recall.

MR. ZITO: Okay. Go to the next page.

Q. (By Mr. Zito) What is this page intending to convey to inventors?

A. It is a short bio of Leigh Rothschild, which conveys his background and knowledge in the industry and highlights some of his moments in his career.

Q. And then the next page, what is this information supposed to convey?

A. This gives a general example of different categories of technology that Patent Asset Management would control.

Q. When you sent the information to Valve that was not responded to, did you select particular categories from these categories, or did you send information from all categories in that long list of patents at the end?

A. It was all categories. In that list at the end was everything that we had under our control or our management.
Q. Why would you not keep some patents from being -- being offered to Valve?
A. Typically, we just say here's -- here's our list of patents we have under management. You tell us your interest.
Q. Were you intending to threaten to sue Valve on patents in the beverage dispensing category?
A. No, I don't think so.
Q. In the firearm analytics category?
A. No.
MR. ZITO: Okay. Go to the next page.
Q. (By Mr. Zito) What is this intending to convey to the inventor?
A. It's a list of different industries that have taken up licenses from patents under PAM's control.
Q. And there's no specific companies listed here, is there?
A. Not that I see.
Q. Okay. Why is that? Why would you not list the companies that have licensed?
A. Most licenses have pretty strict confidentiality terms. Some might be able to be divulged, but for purposes of being careful, we just listed the type of technology or -- or company.
Q. So you don't breach those confidentiality clauses of the license agreements, correct?

A. No.

MR. ZITO: Next page.

Q. (By Mr. Zito) And what's this page intending to convey?

A. It's kind of just a summarization of the types of licensing deals that PAM enters into.

Q. And there -- that's your -- you in the picture, correct?

A. Yes.

Q. Okay. And your contact information?

A. Yes.

Q. Do -- was that -- is that because you want potential inventors who are going to sign up to contact you directly?

A. Yes.

MR. ZITO: I have no further questions, Your Honor. Pass the witness.

THE COURT: Thank you, Mr. Zito.

Redirect?

MR. MACHLEIDT: Yes, Your Honor, briefly, please.

Dario Machleidt on behalf of Valve.

Ms. Gray, could you put up A-25? And let's start where Mr. Zito ended, please.

REDIRECT EXAMINATION

BY MR. MACHLEIDT:

Q. Mr. Falcucci, you have -- do you have A-25 in front of you?

A. Like I said, it's actually missing, so no.

MR. MACHLEIDT: Give me 10 seconds on technical

issues, and we'll see if it remains missing.

THE WITNESS: Okay.

MR. MACHLEIDT: And, Your Honor, I should say, because this is in evidence but we haven't been able to publish it, if it does show up, permission to publish?

THE COURT: Of course, yeah. It's admitted.

MR. MACHLEIDT: We have A-25 in front of us. Thank you, Ms. Gray.

Q. (By Mr. Machleidt) Mr. Falcucci, did you call this a marketing brochure?

A. Generally, yes.

MR. MACHLEIDT: Ms. Gray, could you get us to Page 3, please?

Q. (By Mr. Machleidt) Do you recall Mr. Zito asking you some questions about what's reflected on this page?

A. Yes.

Q. The heading is "Top Five Patent Plaintiffs" -- I'll stop there. Do you understand a patent plaintiff to be the same as a patent owner?

A. No.

Q. When you -- when you see "plaintiff," do you understand that that is the same as the party that is bringing the patent infringement lawsuit?

A. Yes.

Q. And Mr. Zito asked you for a moment about IP Edge. Right

next to it, you see the bar graph at the bottom is titled "PAM Affiliates"?
A. Yes.
Q. Display Technologies, RBDS, those types of companies, are they -- or do they fit within the category of PAM affiliates?
A. They may.
Q. This bar graph shows 1,234 right above PAM Affiliates. Do you see that?
A. Yes.
Q. Did I hear you correct that since the date of this document, which may have been a few years ago, that number has since increased?
A. Yes.
Q. Do you understand that this bar graph reflects the top five patent plaintiffs from biggest to smallest?
A. It seems that way.
MR. MACHLEIDT: Ms. Gray, you can take that down. Thank you.
Ms. Gray, will you please put up -- I think just to be consistent, can you put up A-4, please, which is the second entry of the GSLA. I should say the second entry in this case. And, Ms. Gray, will you please call out the top paragraph.
Q. (By Mr. Machleidt) Mr. Falcucci, do you understand that the Global Settlement and License Agreement between Valve, on the one hand, and Mr. Rothschild, on the other, it went into

effect on January 11th of 2016?
A. Yes.
MR. MACHLEIDT: Ms. Gray, you can take that down. And, Ms. Gray, would you please put up -- I believe it is A-6, and you can get us to Page 7, please. For now, just keep it here.
I apologize, Ms. Gray. Actually, if you could call out the first third, the top third of this document.
Q. (By Mr. Machleidt) Mr. Falcucci, do you remember getting some questions about the '723 Patent?
A. Yes.
Q. Are we looking at part of the '723 Patent?
A. Yes.
Q. Do you see on the top right, it says "Date of Patent," and then March 29, 2016?
A. Yes.
MR. MACHLEIDT: Ms. Gray, could you move us to Page 46 of this same exhibit, please? And if you could, Ms. Gray -- exactly. Thank you.
Q. (By Mr. Machleidt) Mr. Falcucci, do you remember being asked questions about the '365 Patent?
A. Yes.
Q. Are you looking at the -- at least part of the '365 patent?
A. Yes.
Q. Do you see, once more, where it says "Date of Patent,"

February 16, 2016?

A. Yes.

MR. MACHLEIDT: Ms. Gray, you can take that down. Thank you.

Q. (By Mr. Machleidt) Mr. Falcucci, I don't have a transcript of your testimony, so if I say anything wrong, certainly correct me. Does that work for you?

A. Yes.

Q. Somewhat earlier, during Mr. Zito's examination, did you say that Patent Asset Management relies on professional groups to prepare claim charts?

A. Yes, I think that's accurate.

Q. Did you also say that lawsuits by subsidiaries, we -- like Display Technologies, like RBDS, PAM subsidiaries -- they are only acted upon when all parties are fully satisfied?

A. I would say that's generally correct.

Q. I'm going to try one more time because I think my question was pretty jumbled. Does that work for you?

A. Yes.

Q. Lawsuits that get acted upon by PAM subsidiaries, do those lawsuits only get acted upon once all parties are fully satisfied?

A. Yeah, typically. "Parties" being the patent owner, which turns into the client, and the attorney.

Q. In some instances, is Mr. Rothschild one of the parties

that must be fully satisfied before a lawsuit can be acted upon?

A. In some instances.

MR. MACHLEIDT: Your Honor, no further questions. Thank you, Mr. Falcucci.

THE COURT: All right. Any recross? You don't have to. I'm just asking.

MR. ZITO: Thank you for the opportunity, Your Honor. No, thank you.

THE COURT: All right. Thank you, Mr. Falcucci.

THE WITNESS: Thank you.

THE COURT: Your next witness.

MS. KARAS: Your Honor, Marianthi Karas for Valve Corporation. Valve calls Ms. Sugouri Batra by video deposition.

THE COURT: Very good.

(Video deposition of Sugouri Batra is played.)

MR. DAMITIO: Your Honor, Valve calls Ms. Nicolle Lafosse by video deposition. Ms. Lafosse was the litigation manager for Patent Asset Management from 2021 until 2022.

THE COURT: Very good. And, Counsel, how long will this video be? Of course, we're taking our lunch recess at noon.

MR. DAMITIO: This video is 9 minutes and 25 seconds, Your Honor.

THE COURT: Very good. Thank you.

(Video deposition of Nicole Lafosse is played.)

MR. REED: Your Honor, David Reed for Valve. Valve calls as its next witness, Christina Arias.

THE COURT: Mr. Reed, we're not going to get very far with Ms. Arias. So what I'm proposing, we'll take our lunch recess four minutes early, and we will be back at 1:30.

There's a lot going on outside. If you choose to observe, and I don't blame you if you do, please be safe. We will begin, like I said, at 1:30. Remember my instruction about recesses.

Thank you.

(Jury absent.)

THE COURT: Ms. Arias, I'm going to excuse you from the room. Thank you. Sorry to call you in like that.

Please be seated.

Just as a point of clarification as it relates to Mr. Lobbin, is he a live witness or is this a deposition designation?

MR. MACHLEIDT: Dario Machleidt on behalf of Valve. Initially -- he's a third party. Initially, we thought he was going to be just a designation, which is why we -- he's in California. We went and deposed him. We were informed by the defendants that he's actually here this week. He intends to be here and he'll be live, and that's the last we've heard of it.

THE COURT: All right. Very good. So as it relates to the evidentiary rulings that I've reserved on this morning, I'm going to overrule the objection as to Exhibit 592. I still

expect that the exhibit be offered in trial. But for now, I have overruled the objection on 592. I'm going to continue to reserve on Exhibit 322 and 550. As to Exhibits 19 and 12, the objections are sustained.

Give me a time check. What else do we have planned here for today, Mr. Machleidt?

MR. MACHLEIDT: Your Honor, we have at least Ms. Arias and then Mr. Meyler. And then depending on crosses and how those go, I believe we have another video. We have another video of -- we have a depo clip of Ms. Kazanjian.

THE COURT: All right. And I take it you still intend to call Mr. Rothschild. We've got expert witnesses. So in terms of where you are in your case, are we past the halfway point?

MR. MACHLEIDT: Not quite, not on timing, but -- the answer is no.

THE COURT: All right. Well, let's catch up.

Mr. Zito, I won't hold you to it, but there was an issue about whether or not you would be recalling witnesses or doing double duty with witnesses. As it relates to Mr. Falcucci, I offered you an opportunity for recross because I wasn't quite sure whether or not he was a witness that you were planning to recall or if he was serving double duty. But do you have any sense right now as to whether or not you're going to recall any witnesses in the defendants' case-in-chief.

MR. ZITO: Right now, without committing or waiving --

THE COURT: I won't hold you to it.

MR. ZITO: I doubt we will call anyone except maybe one witness to be a clean-up on some things that may be lingering. I don't -- probably either be Mr. Falcucci or Mr. Rothschild. But I don't think we're going to call anyone beyond that, again, reserving.

THE COURT: All right.

MR. ZITO: I had a question.

THE COURT: Yes.

MR. ZITO: Mr. Machleidt mentioned a video from somebody between Mr. Meyler and Mr. Rothschild. I didn't catch the name.

MR. MACHLEIDT: Constance Kazanjian.

MR. ZITO: Because she wasn't -- was she on their list? I know why she -- I'm sorry. She's not on their list that indicates witnesses and exhibits because it's video; there's not witnesses and exhibits. Okay. So she is on your list. Thank you.

THE COURT: She is.

MR. ZITO: Okay.

THE COURT: All right. With that, enjoy your lunch. If you all enjoy the festivities, please be safe. Please be back on time.

(Court in recess 12:00 p.m. to 1:29 p.m.)

THE COURT: All right. Over the lunch break, I was working on the jury instructions. You will have a copy, a discussion copy of the final jury instructions here soon, but I wanted to flag by number several objections that I would appreciate the parties' take on.

Instruction No. 13, it deals with the alter ego issue. There are two formulations, as I'm seeing it under Washington law: sort of the classic construction of the corporate veil piercing; there's the other about whether or not they're -- the principal and the entity are so entwined that they're the same.

But under the -- the first theory, there are two elements. The first being about misuse of the corporate form. There's the second element about whether it was necessary to disregard the corporate form as a matter of equity and preventing injustice.

I'm curious what your take is on whether or not that second question is a jury question or if that's a question reserved for the Court. That's Instruction 13.

Instructions 28, 29, and 30 deal with the PTPA. I'm sort of in uncharted territory on that, so I'd like for you all to look closely at those instructions.

Twenty-nine, I -- I do have a question about that, about the *Noerr-Pennington* defense and whether or not defendants are seeing it. It was an issue, obviously, in the summary judgment briefing, and the Court has -- has ruled in the summary judgment context, but for purposes of instructions to be given to the

jury, is *Noerr-Pennington* on the table for all defendants, or is it just as it relates to the Meyler defendants? So take a look there.

The question of treble or enhanced damages, Instruction No. 36, is that a jury question? I think it is, but I wanted to flag that for the parties.

And then, finally, whether or not an agency instruction is warranted. There's an instruction proposed by Valve that's based on Ninth Circuit Model Instruction 4.10. I think it should be based off of instruction 4.9 or 4.11, to the extent that the instruction should be given. And then to defendants, is it the idea of an agency instruction at all or just needing specificity clarifying who the agency relationship is between?

So that will all make sense or more sense, I should say, when you look at the Court's discussion copy of the instructions. But I wanted to give that to you all now because, obviously, the final instructions matter a lot. So what I will say is please meet and confer, talk about the instructions, see if there are any agreements that can be reached or joint proposals, right? I'm all ears. If you think, no, you know, Judge, you got it right, you could say that too.

But please meet and confer about the instructions. I'll give you all an opportunity, if you want, to put it in writing, not only any agreements that are reached between the parties but if you have different takes on those instructions. So, you

know, we're at trial. There are a lot of lawyers in the room. I'm going to say can you give me a brief not to exceed 10 pages. Get it to me tomorrow morning, because we are going to resume the discussion about jury instructions tomorrow during the lunch recess.

All right. Any questions about what I've just said there?

MR. MACHLEIDT: No, no questions from Valve on jury instructions. One question about an unrelated matter.

THE COURT: Go ahead.

MR. MACHLEIDT: We believe -- Dario Machleidt on behalf of Valve. We believe that Mr. Falcucci went beyond the scope of my initial examination. I made the decision not to object because, frankly, I did not care about the testimony. He's a nontechnical witness being asked quite a few technical questions.

The reason I bring this up is because we have Ms. Arias, Mr. Rothschild, Mr. Meyler. We have, certainly, many other adverse witnesses coming up in Valve's case-in-chief. If we continue to do those exams the way Mr. Falcucci went, Mr. Falcucci's exam -- essentially, the defendants are trying their case-in-chief in our case with no disclosures, and that's kind of why I stood up when I did.

We don't know -- they have not disclosed any exhibits because of -- I'm sure that's their contention; they don't need to. This is part of the reason why we had the initial proposal,

to avoid exactly what happened with Mr. Falcucci.

As you said, it's trial, and we have limited time. We simply are looking for a little bit more fairness than what happened with Mr. Falcucci. We're happy to object to scope, and then they can actually do the case they want in their case-in-chief. We're happy for any other alternative as well.

THE COURT: Yes, you raise a fair point. I can't rule on objections that aren't made. So from that standpoint, if you feel like there's an objection, there's a basis for it, make your objection, and I will rule on it.

But as you could tell by my offer to Mr. Zito for a recross opportunity, I got the sense that, you know, maybe some of that was going on, that this was a witness serving dual purposes.

So, you know, we discussed this. There was an agreement between the parties. That agreement blew up, and then I just said we're going to follow just the rule, 611, in terms of the presentation of the witnesses.

So Mr. Zito, if, you know, there are different thoughts as to how that goes, then there is a bit of a different protocol that we're going to need to follow if you're calling your witnesses in Valve's case-in-chief.

MR. ZITO: We provided designations of exhibits last night for these witnesses, so that's not a correct statement. We designated -- we only have 32 exhibits in the whole case. Okay? It can't really be a surprise.

Now, if you want to talk about fairness, they gave us a book with, I don't know, 50-some exhibits scattered backwards and forwards and numbers -- and he used four of them. I'm not accusing them of playing games, but I gave them designations for all of our witnesses, and I designated exhibits for each of the witnesses.

If he wants me to cut it down from the 32, I can do that. So what I'm trying to do is help this move along. If I've got to recall him and say, Do you remember yesterday he asked you this, and -- I don't think we tread any new ground. We treaded the same ground.

THE COURT: All right.

MR. MACHLEIDT: We treaded the same ground the whole case, so -- but if you want to do it differently, I'm willing to do it differently.

THE COURT: No, I mean, I want to do it the most efficient way as possible. I'm not going to accuse anyone of operating in bad faith. Frankly, as the court, I don't know who to believe, what's going on; and frankly, I don't want to hear it. I mean, I want you all to work it out as parties and be the professionals I know you to be.

So, I mean, this is a civil case. You know, trial by ambush, it just didn't happen in cases like this where you all have been litigating for a while.

Mr. Zito, I do appreciate your discretion in terms of the

limited number of exhibits you offered. But to the specific point about whether or not there have been any exhibits disclosed for witnesses that might be worked by Mr. Zito today, has that happened?

MS. GEYER: Your Honor, Kate Geyer on behalf of Valve. The disclosure was all exhibits for all witnesses; so technically yes, but not specifically where we actually know which of their exhibits they might use.

THE COURT: All right. Well, you know, again, I'm not going to figure this out right now. I mean, we're losing time, as it stands, with our jury. So Mr. Machleidt, if you feel that Mr. Zito is drifting outside the bounds of the direct in a way that matters, make your objection and I will rule on it.

There were -- I don't know where -- what's the witness's name? Mr. Lobbin. I don't -- forgive me if I just got that wrong. But the two exhibits that I'd reserved ruling on, to the extent that those exhibits are offered and to the extent that, Mr. Zito, you are maintaining your objection, you can just stand and say, "Objection, Your Honor; I believe that was a subject of a previous motion." Okay? And then, you know, I'll rule.

I know the issue, so we don't need to do another sidebar or any of that stuff. I'll know with the benefit of trial context how to rule on those objections.

Is that clear?

MR. ZITO: Yes, Your Honor.

MR. MACHLEIDT: Yes.

THE COURT: All right. Anything else?

MR. MACHLEIDT: Not from Valve, Your Honor.

THE COURT: All right. Let's go to work. Get our jury.

(Jury present.)

THE COURT: All right. Welcome back. Please be seated.

Happy to see that everyone made it back on time and in one piece. We are going to pick up here with Valve's case. I believe it is Ms. Arias; is that our next witness?

MR. REED: That's correct, Your Honor. Valve calls Christina Arias as our next witness.

THE COURT: All right. Let's have Ms. Arias.

Ms. Arias, if you could make your way up front and Mr. Cogswell will swear you in as a witness. Thank you for your patience.

CHRISTINA ARIAS,
having been first duly sworn, testified as follows:

THE COURT: All right. Ms. Arias, if you could state and spell your name for our court reporter here, please.

THE WITNESS: Christina Arias, C-h-r-i-s-t-i-n-a A-r-i-a-s.

THE COURT: Please make your way to the witness box. Take a moment to get settled. You've got a chair there. You

can adjust it as you need to, up or down.

THE WITNESS: Yeah, sure.

THE COURT: There's a tissue box.

THE WITNESS: You may not be able to see me after this.

THE COURT: There's some water. You'll also see two binders. They're exhibits. Probably your deposition transcript is in there as well.

There's a monitor to your right there. Exhibits might show up on that from time to time. I see you already adjusting the microphone. That's good. Please speak slowly and clearly into the mic. Okay?

THE WITNESS: Okay.

THE COURT: All right. With that, Counsel, you may inquire.

DIRECT EXAMINATION

BY MR. REED:

Q. Good afternoon, Ms. Arias.

A. Good afternoon.

Q. We've not met before. My name is David Reed.

You work for Patent Asset Management, correct?

A. Correct.

Q. Is it okay with you if I refer to Patent Asset Management as "PAM"?

A. Yes, sir.

Q. And you've worked for PAM as a paralegal since 2021?
A. Correct.
Q. You're not a lawyer?
A. No, sir.
Q. And you do not have any legal training?
A. No, sir.
Q. Now, as part of your job at PAM, you research potential targets for patent infringement, correct?
A. Yes.
Q. Let's talk about PAM's process to identify potential targets.
PAM has what you call research groups; is that right?
A. Yes.
Q. And part of the work that these research groups do for PAM is to identify potential infringers?
A. Correct.
Q. Okay. And Mr. Rothschild picks which patents to send to the research group to find targets for infringement?
A. Collectively as a team, yes.
Q. PAM's research group includes two companies that are called Copperpod and Pitch Scientific; is that right?
A. Correct.
Q. Okay. Am I correct that Mr. Rothschild does not own Copperpod or Pitch Scientific?
A. That's correct.

Q. They're third-party companies?
A. Yes.
Q. And Copperpod and Pitch Scientific are not located in the U.S.; they're offshore companies, correct?
A. Correct.
Q. They're based in India?
A. Yes. I do believe Copperpod -- I'm not sure if he has an office, but one of their representatives is sometimes in the U.S.
Q. Okay. These companies charge PAM for each target for patent infringement that they identify for PAM; is that right?
A. Yes.
Q. Okay. And Copperpod charges about $30 per target?
A. Yes.
Q. Okay. And Pitch Scientific is even cheaper than Copperpod; is that right?
A. Yes.
Q. Now, before Pitch Scientific and Copperpod, PAM had another research company called Prism; am I right?
A. You are right.
Q. And that research group called Prism was used to identify targets for patent infringement?
A. Yes, sir.
Q. But PAM stopped using Prism because they were not giving PAM enough targets; is that right?

A. I believe that was...
Q. I'm sorry, I couldn't --
A. Yeah, that's was one of the reasons -- that's the reason why we stopped.
Q. Thank you.
Now, when Pitch Scientific or Copperpod, when one of these research groups comes back to PAM with a list of targets for patent infringement assertions, part of your job is to do research on those targets.
A. Yes.
Q. Okay. And your research includes checking the company's revenue and who those targets have previously been represented by?
A. Yes.
Q. And you also check to see if those targets have prior agreements with any of the Rothschild-related entities?
A. Yes.
Q. So after your research and before making a patent assertion, PAM will go back to Copperpod to provide claim charts for PAM?
A. Yes.
Q. Okay. And sometimes PAM will go to Pitch Scientific for those claim charts, correct?
A. In the past we have, yes.
Q. And those companies, Copperpod and Pitch Scientific, they

charge PAM in the low hundreds of dollars for the claim charts. Would you agree with that?
A. Yes.
Q. So, would you say less than $500?
A. Correct.
Q. And those claim charts from Copperpod or Pitch Scientific, they may be used by PAM or PAM entities, subsidiaries, in demand letters or in patent infringement filings, correct?
A. Yes.
Q. Okay. Now, Ms. Arias, you're not the one that approves sending demand letters; is that right?
A. Correct.
Q. Either Mr. Rothschild or Mr. Falcucci must approve a demand letter before it's sent?
MR. CUDLE: Your Honor, objection. These are a series of leading questions.
THE COURT: Overruled.
Q. (By Mr. Reed) Okay. Either Mr. Rothschild or Mr. Falcucci must approve a demand letter before it's sent; is that correct?
A. I believe it -- yes.
Q. Okay. And before PAM or a PAM patent assertion subsidiary files a new lawsuit, Mr. Rothschild must approve of that lawsuit; is that right?
A. Yes.
Q. So he approves every lawsuit before it's filed?

A. Yes, he reviews the complaints.
Q. So switching gears, in addition to your senior paralegal position with PAM, you're also office manager; am I right?
A. Correct.
Q. Okay. I'd like to ask you about what happens when one of the PAM company's subsidiaries receives a settlement payment from one of the targets.
My first question is, you understand that PAM has a bank account in two different banks: First Horizon Bank and TD Bank?
A. That's correct.
Q. And at the First Horizon Bank, there are also accounts for the various Rothschild subsidiaries, correct?
A. Yes.
Q. Okay. So, for example, RBDS and Display Technologies, the defendants here, have their own accounts at First Horizon?
A. Yes.
Q. And when a target, a company that one of the Rothschild subsidiaries is accusing of infringement -- when they make a payment as part of a settlement, for example, the money is first deposited into that subsidiary's account at First Horizon?
A. Correct.
Q. Okay. So, for example, if Display Technologies receives a settlement, the money goes into the Display Technologies account?
A. Correct.

Q. And that's the account set up for the company to -- for the company that's set up to own and assert the patent?
A. Yes.
Q. And then money may be moved from that subsidiary account, where it first goes, to the PAM account at First Horizon?
A. Yes.
Q. And then that PAM account at First Horizon, in turn, is used to pay expenses like attorneys or vendors?
A. Correct.
Q. Now, you have access to the First Horizon account?
A. I do.
Q. So you can log in and view transactions for the First Horizon account?
A. Yes.
Q. Like how much money has been received from settlements?
A. Yes.
Q. But you're not able to make payments from that account or any of the accounts yourself without Mr. Rothschild's final approval?
A. Yes.
Q. Okay. Now, turning to TD Bank, that's a different bank account than First Horizon Bank, correct?
A. Yes.
Q. And -- so, from time to time, money from that PAM account we talked about at First Horizon Bank gets moved to TD Bank?

A. Yes.
Q. And Mr. Rothschild authorizes those transfers?
A. Yes.
Q. And am I right that you do not have access to the TD Bank account?
A. Online access? No.
Q. So you don't have the ability to look up any bank statements for that account or to see what the balance is?
A. Online? No.
Q. Do you have any other access to that account?
A. I can call and check the balance.
Q. Okay. To your knowledge, Mr. Rothschild is the only person who has access to view the transactions at that TD Bank account; is that right?
A. Yes.
Q. Okay. So what happens in terms of transactions within that account, that's a mystery to you?
A. I don't know. I know it's just for payroll, but I'm not sure.

MR. REED: Okay. At this time, we have no further questions. We pass the witness.

THE COURT: Thank you.

CROSS-EXAMINATION

BY MR. CUDLE:

Q. Hi, Ms. Arias.

A. Hello.

Q. You stated earlier that part of your job at Patent Asset Management is to request items from vendors like Pitch Scientific and Copperpod; is that correct?

A. Correct.

Q. Were you ever asked to provide any technical analysis on those claim charts that you received from them or any other information that you received from them?

A. No.

Q. Were you ever asked to provide a legal opinion on any of those items that you received from them?

A. No.

Q. If you had been aware at the time when you ordered certain claim charts that there was a current license for a specific patent that you were requesting information on, would you have ordered that claim chart?

A. No, sir.

MR. CUDLE: Okay. No further questions, Your Honor.

THE COURT: All right. Redirect?

MR. REED: No, Your Honor.

THE COURT: All right. Thank you, Ms. Arias. You may be excused.

THE WITNESS: Sure. Take it with me?

THE COURT: Yeah, take the water with you.

All right. Ms. Geyer, your next witness?

MS. GEYER: Valve calls Mr. Samuel Meyler.

SAMUEL MEYLER,
having been first duly sworn, testified as follows:

THE WITNESS: Samuel Meyler, S-a-m-u-e-l M-e-y-l-e-r.

THE COURT: All right. Mr. Meyler, if you could make your way to the witness box. And you know the drill, but I'm going to say it to you anyway.

Please take a moment and get yourself situated there. Adjust your chair as you need to. It should be the exact same model that you heard sitting in here at counsels' table. You have water, a tissue box, a monitor. I think the exhibit binders are about to make their way to you.

Mr. Machleidt, you may approach.

MR. MACHLEIDT: Thank you, Your Honor.

THE COURT: Mr. Meyler, last thing, please speak slowly and clearly into the microphone.

THE WITNESS: I will try and do so.

THE COURT: All right. Thank you.

With that, Ms. Geyer, you may inquire.

MS. GEYER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. GEYER:

Q. Good afternoon, Mr. Myler.

A. Afternoon.

Q. Are you an attorney?

A. I am.
Q. Are you licensed in the state of Washington?
A. Yes, I am.
Q. You're not a patent attorney, though, are you?
A. No, I don't hold myself out as a patent attorney.
Q. You don't tell people that you're a patent attorney?
A. No.
Q. Your firm, Meyler Legal, PLLC, it doesn't tell people it represents clients in patent matters?
A. It does not.
Q. You've never advertised any patent services?
A. Correct.
Q. Nor has Meyler Legal, PLLC?
A. No, it has not.
Q. Okay. Previously, you were an attorney for a number of Mr. Rothschild's companies, correct?
A. That is correct.
Q. You were attorney for defendant RBDS?
A. Yes.
Q. You were an attorney for defendant Display Technologies?
A. Yes. As local counsel, correct.
Q. You were an attorney for Quantum Technology Innovations?
A. Yes. To the -- I'm -- I'm thinking about the scope of my representation, but, yeah, I provided some services, correct.
Q. You were also an attorney for Symbology Innovations?

A. I did provide some services for Symbology Innovations, yes.
Q. And you were an attorney for Social Positioning Input Systems, correct?
A. Yes, I provided some services for SPIS as well.
Q. I was about to ask a that. Are you good if I call Social Positioning Input Systems "SPIS"?
A. Yes, that's fine. Thank you.
Q. And are you also good if I call Quantum Technology Innovations "QTI"?
A. Yes.
Q. Thank you.
For those matters for Mr. Rothschild's companies related to patent enforcement, you were paid on a contingency basis, correct?
A. That's not exactly correct. We're talking specifically about patent enforcement matters, correct? Is that what you asked?
Q. Correct.
A. Yeah, so that's not exactly right.
Q. For at least defendant RBDS, when you were working on patent enforcement matters, you were working on a contingency basis, correct?
A. It was not strictly a contingency basis, no.
Q. Mr. Meyler, setting aside a $300 retainer and a $600 service fee that might be advanced for each case, Meyler Legal,

PLLC, was compensated on a contingency basis of 5 percent of net recovery as defined in your engagement agreement with RBDS; is that correct?
A. Yes. So there was a $300 flat fee. And then, as you mentioned, there was $600 that was advanced for a filing fee and for service of process costs. And then there was a 5 percent contingency as well.
Q. So setting aside that service fee and the retainer amount, you were compensated on a contingency basis for the patent enforcement work you did?
A. When you're saying I was compensated -- I received the $300 that you're talking about, that we just mentioned, and I received the $600 advanced costs, but I didn't receive any 5 percent contingency on top of that. That was -- would have been part of the agreement, so...
Q. Was that also part of the agreement with Display Technologies?
A. For local counsel services, yes.
Q. Display Technologies filed a lawsuit against Valve in September of 2022, correct?
A. That is correct.
Q. And you were counsel for Display Technologies in that lawsuit?
A. I was engaged as local counsel, correct.
Q. You filed that lawsuit in the Western District of

Washington?

A. That is correct.

MS. GEYER: Your Honor, permission to publish A-6, which is already in evidence.

THE COURT: Yes.

MS. GEYER: Ms. Gray, if you could please publish Exhibit A-6. If you could please turn to Page 5 of that exhibit.

Mr. Myler -- Ms. Gray, I'm sorry, can you please go back to the first page?

Q. (By Ms. Geyer) This is the complaint for that 2022 *Display Technologies versus Valve* case we were talking about, correct?

A. It is, yes.

MS. GEYER: And, Ms. Gray, can you please now go to Page 5.

Q. (By Ms. Geyer) You're the only attorney who signed this complaint, correct?

A. Yes. I was required to sign it by local civil rules, yeah.

MS. GEYER: Ms. Gray, you can go back to the first page.

Q. (By Ms. Geyer) Mr. Meyler, you didn't draft any part of this complaint, did you?

A. I was not the original drafter, no.

Q. You received a draft of the complaint from Mr. Johnson?

A. From Jay Johnson, correct.

Q. You read the complaint after you received it from Mr. Johnson, correct?
A. Yes, I did.
Q. You claim you did some research on the allegations made in the complaint; is that correct?
A. That is correct, yeah.
Q. You also claim that you did some due diligence to investigate the allegations in the complaint, correct?
A. That is correct.
Q. You're not going to tell us the specifics of any of that research, though, will you?
A. Well, I believe I can -- you know, I take my duties seriously, and I have duties of confidentiality to clients that I have. I believe I have the ability to discuss certain actions taken without necessarily disclosing attorney-client privileged communication, and I'm happy to do so to the extent that I can, so...
Q. You won't tell us the specifics of any due diligence and research that you did into the allegations of the complaint, because you believe that's work product, correct?
A. Well, some of it -- I mean, some parts of it might be work product. My mental impressions, I think, and certain -- certain parts of it might be work product, yeah.
Q. Is all of it work product?
A. I'm not sure. If you ask specific questions, I'm -- I can

see if I can answer.
Q. Mr. Meyler, do you remember when I deposed you a few months ago?
A. I do.
Q. And just like today, I asked you questions?
A. Yes.
Q. And you gave answers to my questions?
A. I did.
Q. Like today, you gave an oath to tell the truth?
A. Yes.
Q. And there was a court reporter who wrote down everything you said at your deposition?
A. Yep.
Q. Can you please pull out the red binder.
Mr. Meyler, in the red binder is this the written transcript of your deposition?
A. I believe so.
Q. Can you please turn to Page 75, starting on Line 24. And I'm going to read through 76, Line 10.
A. I'm sorry. Where were you?
Q. I'm going to start on Page 75, Line 24.
A. Okay.
Q. I'm going to read through Page 76, Line 10. And I'd like you to follow along with me.
A. Okay.

Q. "QUESTION: What due diligence and research did you do into the allegations?

"ANSWER: That's work product.

"QUESTION: You did some due diligence and research into the allegations in the complaint, but you won't tell us what you did because it's work product; is that correct?

"ANSWER: Well, I mean, I can -- I can tell you what my practice would have been and, you know, what I would do. But I don't know that I can tell you what specific research I did in support of a client, the client's pursuit of the claim, or the claims."

Did I read that correctly?

A. You did read that correctly. It says "specific research," and I believe that there has been some other activity within this case that addresses some of this as well, so...

Q. You also can't confirm which of the steps in your general practice you did or did not do prior to filing the complaint in the 2022 *Display Technologies versus Valve* lawsuit; is that correct?

A. Well, I think there -- I'm -- I'm happy to try and answer questions about specifies and if -- if I can answer them with maintaining my -- my duties and my ethical obligations, then I'm happy to do so.

Q. And just so it's clear, I'm asking just a yes-or-no question. You can't confirm which of the steps in your general

practice you did or did not do prior to filing the complaint in the 2022 *Display Technologies versus Valve* lawsuit; is that correct?

MR. ZITO: Objection, Your Honor.

THE COURT: Basis?

MR. ZITO: I don't know if you want to -- this has been argued, and she's trying to reargue a motion that's been decided by the Court with a witness. And I don't think that's proper.

THE COURT: I'm going to sustain the objection.

MR. ZITO: Thank you.

Q. (By Ms. Geyer) Mr. Meyler, you can't make any conclusions about whether or not Valve infringes any patents, correct?

A. Well, I can -- when you said can't make conclusions, can -- can you clarify what you mean exactly?

Q. You're not an expert who makes the conclusion whether Valve is infringing on any of the patents in Mr. Rothschild's portfolio, correct?

A. No. Just like Mr. Schenck said yesterday that he had to go and talk to his engineers in order to determine whether or not there was an actual claim there, I also rely on third parties and experts the same way, so...

MS. GEYER: Ms. Gray, I apologize. You can take that exhibit down.

And, Your Honor, Exhibit 94 is already in evidence.

Permission to publish?

THE COURT: Yes, you may.

MS. GEYER: Ms. Gray, can you please publish Exhibit 94.

And I apologize. I meant Exhibit 95. My -- my notes are incorrect. And that is, I believe, also already in evidence.

THE COURT: It is.

MS. GEYER: Actually, Ms. Gray, you can take this down. Thank you.

Q. (By Ms. Geyer) After filing the *Display Technologies versus Valve* lawsuit, Valve's in-house counsel, Mr. Schenck, emailed you on October 5th, 2022, correct?

A. I'm sorry. Give me the date one more time.

Q. October 5th, 2022 -- or early October, if you don't remember the exact date.

A. After I filed the *Display Technologies* lawsuit?

Q. Correct.

A. Yes, that's correct.

Q. Mr. Schenck told you that Valve was already licensed to the Display Technologies patent, correct?

A. He said something to that effect in -- in an email. That's correct.

Q. And with that email, Mr. Schenck sent you a copy of the Global Settlement and License Agreement between Valve and Mr. Rothschild?

A. Correct. He did.
Q. When you received a copy of that agreement, you read it, right?
A. I did review it, yeah.
Q. But you didn't come to any conclusion about whether or not Valve was, in fact, already licensed to the '723 Patent, correct?
A. I did not, because the '723 Patent wasn't listed there, and I did not come to that conclusion, no.
Q. After Mr. Schenck informed you that Valve was already licensed to the '723 Patent, you dismissed the *Display Technologies versus Valve* lawsuit?
A. After investigating the matter and looking into it, then the -- it was promptly dismissed, yes.
Q. And you dismissed that lawsuit without prejudice?
A. It was dismissed without prejudice, yes. That is correct.
Q. You were the only attorney who signed that dismissal without prejudice, correct?
A. Yeah, but there was lead counsel involved in the matter. And I understand that you want to say that I was the only one that signed it, but I was local counsel, and I was working with lead counsel on the matter.
MS. GEYER: Your Honor, move to strike that answer as nonresponsive.
THE COURT: Overruled.

MS. GEYER: Mr. Meyler, now can you please turn to your binder, to Exhibit 95.

And, Your Honor, I brought this up before, but did it too early. Exhibit 95 is already in evidence, so permission to publish.

THE COURT: You may.

MS. GEYER: Ms. Gray, could you please put up Exhibit 95?

Q. (By Ms. Geyer) Mr. Meyler, you received this letter from Mr. Schenck on December 22nd, 2022?

A. Yes. After a couple of months of some back-and-forth emails, this is a letter that was addressed to me and copied to the lead counsel that you see there, Jay Johnson of Kizzia Johnson, and his paralegal.

Q. This letter is two pages and has an attachment, correct?

A. Yeah, that is correct.

MS. GEYER: Ms. Gray, can you please turn to Page 3 of Exhibit 95?

Q. (By Ms. Geyer) The attachment with this letter is a copy of the Global Settlement and License Agreement between Valve and Mr. Rothschild, correct?

A. That is correct.

Q. And this is the second time Mr. Schenck sent you a copy of the 2016 agreement?

A. Yes, that is correct. It was previously provided to us, as

we indicated.

MS. GEYER: Ms. Gray, you can take that down.

Your Honor, Exhibit 97 I believe is also already in evidence. Permission to publish.

THE COURT: You may.

Q. (By Ms. Geyer) And, Mr. Meyler, if you could turn to that in your binder.

A. Yes.

Q. In the second paragraph, I believe, the second sentence, you confirm that SPIS has carefully reviewed the 2015 license agreement. Do you see that language?

A. I'm sorry. Can you tell me again, one more time, where you're at?

Q. Yeah. It's on the screen, too, if that helps you out a little bit.

In the second paragraph, in the second sentence, you -- in your letter, you state that SPIS has carefully reviewed the 2015 license agreement.

A. Yes. And I think that we were referring to the 2016 license agreement. That -- that is correct, yeah.

Q. That was my next question. Thank you.

After Mr. Schenck sent the agreement to you a second time, you also reviewed that agreement, correct?

A. I -- I did review that agreement and saw that the patent that he was referencing was not identified there.

Q. Okay. In fact, you said you carefully reviewed that agreement, correct?
A. Yeah, about in -- on around December 22nd, when I received it, yeah.
MS. GEYER: Ms. Gray, you can take that down.
Your Honor, one more time, Exhibit 93 is also already in evidence. Permission to publish.
THE COURT: Yes.
Q. (By Ms. Geyer) And, Mr. Meyler, if you could please turn to Exhibit 93 in your binder as well.
A. Yes.
MS. GEYER: And, Ms. Gray, could you publish to the jury. Thank you.
Q. (By Ms. Geyer) Mr. Meyler, this is the June 2023 letter that you sent to Mr. Schenck at Valve, correct?
A. I did send this to Mr. Schenck at Valve after having attempted to talk with Mr. Machleidt, yes.
Q. This letter was sent on behalf of three different Rothschild companies, correct?
A. That is correct.
Q. And that's SPIS, RBDS, and QTI?
A. That's correct.
Q. And this letter attaches three claim charts?
A. That is correct, yes.
Q. In this letter, you asked Mr. Schenck to respond to you by

June 30th; is that correct?
A. That is correct, yes.
Q. And Mr. Schenck ultimately responded to you on June 29th?
A. He did.
Q. You never responded to Mr. Schenck's June 29th email, though, did you?
A. No. He had indicated that he would be back sometime in later July, and I did not want to bother him while he was on a family vacation.
Q. The three claim charts attached to this letter were prepared in anticipation of litigation; is that right?
A. Yes. I believe so, yeah.
Q. And that litigation was anticipated to be filed in the Western District -- District of Washington, correct?
A. Well, to the extent that I was going to serve as local counsel, that was initially what I was intending with lead counsel there, yeah.
Q. After Valve filed this current lawsuit, though, QTI and SPIS sued Valve in the Eastern District of Texas, right?
A. That is correct.
Q. They didn't sue Valve in the Western District of Washington?
A. They -- they did not, no.
Q. You were involved in the Texas cases against Valve; is that correct?

A. When you say "involved," can you explain what you mean?
Q. You were involved in and were consulted for legal advice and opinions, including in the Texas cases; is that correct?
A. To some extent. I -- I -- I had some conversations.
Q. And you were asked to -- you were asked to act as local counsel if the Texas suits would have been filed in Washington, correct?
A. Yeah, that's part of why I had the conversations. Because, initially, I was going to be local counsel here in Washington, and so I had some information.
Q. You were involved in the review of materials drafted by lead counsel in Texas, correct?
A. I was involved in the review -- when you say "materials," what are we talking about?
Q. Mr. Meyler, can you please turn to Docket 222, which should be at the back of your binder.
MS. GEYER: And, Ms. Gray, this is not being published to the jury, so you can take that exhibit down.
THE WITNESS: Okay.
Q. (By Ms. Geyer) This is a joint submission by the parties to this court, correct?
A. I will take your word on that. Sure. That's what -- that's what it's captioned, LCR 37 Joint Submission, yes.
Q. On Page 4, Line 22 --
A. Okay.

Q. -- do you see where it says "Defendants' Response"?
A. Yes.
Q. If you turn to Page 9.
A. Sorry, 9.
Okay.
Q. That's Mr. Joseph Zito's signature, correct?
A. It is Mr. Joseph's Zito's signature at the top, yeah.
Q. He's your attorney?
A. Correct. One of them, yeah.
Q. And he's one of your attorneys for your law firm too, correct?
A. Yes.
Q. Could you please turn to Page 7.
A. Okay.
Q. And please read to yourself the paragraph at Line 6 through 10. It's a little off-center. It starts between Lines 5 and 6.
A. Okay.
Q. I'm going to ask my question again.
You were involved in the review of materials drafted by lead counsel in Texas, correct?
A. And I'm -- I'm sorry. I think my answer was something to the extent of wanting more information on what you meant by "materials," and I'm still -- you know, I -- I reviewed some materials, yes. And if you, you know -- I'm not sure what you're trying to get at in terms of what my involvement was.

But did I review some materials? Yes.
Q. Were some of the materials you reviewed drafted by lead counsel in Texas?
A. Yes.
Q. Were you also involved in the venue-related issues in those Texas lawsuits?
A. Again, when you say "involved," I -- I didn't make a decision. Did -- was there input and was my advice sought related to that? Yes.
Q. Those three Texas cases were dismissed because the court found that venue was improper, correct?
A. That's my understanding.
Q. And the Texas court, in fact, found that the venue allegations were sanctionable, correct?
A. That's my understanding, yeah.
Q. Mr. Meyler, can you please turn to your binder, to Exhibit 628.
A. Okay.
Q. Are you there?
Mr. Meyler, do you recognize this document?
A. It appears to be an email chain. The top of the email, January 6, 2023, at 7:39 a.m.
Q. And you were a recipient of that top email, correct?
A. Yes. It appears so, yeah.
Q. And if you flip through the exhibit, I believe you were

either in the "to" or "from" or "cc" line to all of those emails, correct?

A. Yes. It looks like this goes all the way back to when Mr. Schenck first emailed me.

MS. GEYER: Your Honor, we offer Exhibit 628 into evidence.

THE COURT: Any objection?

MR. VAZQUEZ: No objection, Your Honor.

THE COURT: Exhibit 628 is admitted. You may publish.

(Plaintiff Exhibit 628 admitted.)

MS. GEYER: Ms. Gray, could you please go to Page 2. And if you could please call out the paragraph there below the redactions.

Q. (By Ms. Geyer) Mr. Meyler, starting on about the third line towards the end, you say that your involvement is going beyond filing and serving the complaint. Do you see that?

A. I do.

Q. And the scope of your engagement was limited to filing and serving the complaint originally, correct?

A. For the most part, yeah.

Q. You also state in this email that you need to adjust the terms of compensation moving forward for services that you need to provide in connection with the matter, correct?

A. I mean, not -- if -- if I -- if I'm going to need to continue to work on other matters. You can see the follow-up

there.
Q. Specifically, you say if you're going to need to work on negotiating with the defendant or otherwise providing services beyond the scope of your engagement, you were happy to do so at your regular hourly rate "or on other terms that are acceptable to both of us." Do you see that?
A. Yes.
Q. And "the defendant" in this email is referencing Valve, correct?
A. Yes, that is correct.
MS. GEYER: Ms. Gray, you can take that down.
Q. (By Ms. Geyer) Mr. Meyler, could you please turn in your binder to Exhibit 678.
A. Sorry. This binder is coming apart.
Q. Take your time.
A. Okay.
Q. This is a letter from you, correct?
A. It is, yes.
Q. That's your firm's letterhead at the top?
A. Correct.
Q. And you sent this letter on behalf of Symbology Innovations, LLC, correct?
A. That was my client with regard to this particular matter. That is correct.
Q. And you sent this letter to Norwegian Cruise Line Holdings

Ltd., or Limited, correct?
A. That is the addressee, yes.
Q. This is dated March 16th, 2023?
A. Correct.
MS. GEYER: Your Honor, we offer Exhibit 678 into evidence.
THE COURT: Any objection?
MR. ZITO: No objection, Your Honor.
(Plaintiff Exhibit 678 admitted.)
THE COURT: And I'm sorry. Whose witness is this?
MR. ZITO: It's -- you need to make the objections.
THE COURT: All right. So I need to hear the objections from Mr. Vazquez. Thank you.
All right. There are no objections to Exhibit 678. It is admitted into evidence. Ms. Geyer, you may publish.
MS. GEYER: Thank you, Your Honor.
Ms. Gray, if you could help me out with that. Thank you.
Q. (By Ms. Geyer) Symbology Innovations is one of Mr. Rothschild's companies, correct?
A. It is -- I -- I guess it's managed by PAM and owned by Patent Asset Management.
MS. GEYER: Ms. Gray, could you please go to the bottom of the page and highlight the tab -- the text of the last full sentence of the letter starting with "it appears."
Q. (By Ms. Geyer) And, Mr. Meyler, in this letter, you're

telling Norwegian Cruise Line that their current use of QR code technologies may constitute infringement upon one or more of Symbology's patents; is that correct?
A. That's what it states, yes.
MS. GEYER: Ms. Gray, can you please go to the second page.
Q. (By Ms. Geyer) And if we look at the very top of the page, Mr. Meyler, you told Norwegian Cruise Line that they may be required to pay considerable legal expenses if you're unable to resolve the matter at this stage. Do you see that?
A. I do.
Q. And if you look at the second full sentence of the second paragraph on that page, you also told Norwegian Cruise Line that it has a responsibility to ensure that it has secured all necessary rights to utilize the described technology.
Do you see that?
A. I do see that, yes.
MS. GEYER: Your Honor, may I have 10 seconds to confer with my colleague?
THE COURT: You may.
MS. GEYER: Your Honor, no further questions, subject to redirect.
THE COURT: Very good.
Mr. Vazquez?

CROSS-EXAMINATION

BY MR. VAZQUEZ:

Q. René Vazquez on behalf of the defendant.

Mr. Meyler, could you please kind of describe your -- your educational background?

A. Sure. So I earned my associate's degree at Bellevue College. I went to the University of Washington for undergrad. And then I went to law school in San Diego at Thomas Jefferson School of Law.

Q. And how long have you practiced law?

A. A little over 18 years now.

Q. Can you describe for us what your practice -- your practice during the -- during the time period involved in this case?

A. Yeah. And so my practice has primarily been real estate business, general civil litigation, and debtor-creditor law. It's been kind of a wide range of legal areas, so...

Q. Other than the U.S. District Court for the Western and Eastern District of Washington, are you admitted to any other -- any other courts?

A. I am. So I'm admitted to this court, the Eastern District of Washington; the Northern, Southern, and Western Districts of Texas; the Eastern District of Michigan; the Ninth Circuit Court of Appeals.

Q. When did you first start serving as local counsel in federal courts?

A. So in about 2012 or 2013, I was contacted by a colleague from -- from -- from law school who was working at a law firm, Price Law Group, that had some matters that they had here in the Western District of Washington. He knew that I was up here in the Seattle area and reached out to me to see if I was admitted in this court, first off, and if I was interested in working with them.

They were handling consumer protection -- federal consumer protection claims for the -- like, Fair Debt Collection Practices Act claims and Telephone Consumer Protection Act claims and Fair Credit Reporting Act claims and things of that nature. And they were looking for local counsel. So I met with the supervising attorney that was handling those matters and started serving as local counsel with them.

I was local counsel in about 25 cases for Price Law Group. And, yeah, so that -- that's kind of how it started there.

Q. So we've been hearing the term "local counsel" a lot. Can you describe for me what -- what local counsel -- what it is, what the duties of local counsel are?

A. Yeah. It -- it -- honestly, it varies from matter to matter and from client to client. There isn't necessarily a specific scope that is -- that, you know, like, lead counsel or having a lesser role. It -- it depends on what the specific relationship is with the particular client in the matter.

There are certain requirements for local counsel. It

varies by court. But -- and, for instance, in -- here in the Western District of Washington, if I'm local counsel, I'm required to sign an application for the out-of-state attorney that's applying to come into Washington here and wants to practice in this court for a specific matter, if they're not admitted to the Washington State Bar and not admitted to this particular court.

So I -- I sign the application. I'm required to sign all pleadings that are going to be filed in the case. I'm required to be prepared to appear for hearings or trial if the attorney is not available for some particular reason. Of course, I have to adhere to whatever orders a judge may enter in the matter related to that.

That's kind of the general gist of local counsel, of what is specifically required. And it may -- like I said, depending on what you agreed to with your client and the out-of-state attorney that's coming into the matter, the scope of what you do is going to vary from matter to matter.

Q. And you said you're allowed to limit the scope of what your responsibilities would be as local counsel on a case-by-case basis?

A. You are, subject to it being reasonable and -- and with a client's informed consent. You know, if -- I -- I can take a -- a limited role or -- or have specific duties within a particular case, rather than being lead counsel that's responsible for the

entire case, for instance.

Q. Mr. Meyler, did you continue serving as local counsel in the consumer protection litigation cases?

A. I -- after Price Law Group, I did a couple of additional local counsel roles for the supervising attorney that left Price Law Group. He went and started his own practice. So I did a couple more serving as local counsel in -- in those matters.

And I had other parties serve for local -- as local counsel for me when I applied to some other courts, and -- and so I have some experience there.

Q. How did you come to be connected to Patent Asset Management and the others involved in this case?

A. So at, actually, around that time that I was serving as local counsel for Martin & Bontrager and -- they had left Price Law Group, and I was serving there. I had been in contact with a friend from law school, and he was working on -- he had started a practice in Austin, Texas, and was working on some matters there. And I -- the -- the consumer protection stuff kind of blended well with what he was working on and helping others there. And we decided to join forces and started working on a firm down in Austin. And Mr. Falcucci was an -- an early attorney employee there.

I think you guys heard earlier, he previously did some work as -- on criminal record expungement, which was the other side that my partner down there was working on. And so I met

Mr. Falcucci there, and he was initially an attorney there and then a supervising attorney before he went off to do other things.

Q. Before this, what experience, if any, did -- did you have related to patents or intellectual property in general?

A. My experience with intellectual property up until that point was pretty much limited to some transactions where I represented clients in, you know, the -- like, the sale of -- of -- of assets, for instance, and trademarks or things of that sort, intellectual property, certain litigation and legal disputes with -- you know, involving businesses where they may have had intellectual property that they owned. But that was kind of the -- the extent of it up until that point.

MR. VAZQUEZ: Your Honor, I just need 15 seconds to consult with my co-counsel.

THE COURT: Of course.

Q. (By Mr. Vazquez) Mr. Meyler, when you consider a new engagement, what steps, generally, do you -- do you take before proceeding with that engagement?

A. So usually, if it's a new potential client, I'll -- I think before any matter, if there are other parties involved, you run a conflict check, make sure that you don't have a conflict of interest that would preclude you from representing the party or being involved and -- and conduct some preliminary research, potentially, regarding the matter.

Look into information regarding -- if it's a new client, look into some information regarding the -- the potential new client, doing some searching. Potentially, if it's relating to a legal dispute, looking at some litigation history related to the party; and if it is a dispute, perhaps researching some information regarding the other party involved, looking a bit into the claims, to the extent that you might know them initially.

And, you know, there's -- obviously, you know, before moving forward, you know, typically, you might -- you'll meet with the individual, gather information, learn about it more. So that's kind of the process in getting started.

Q. With regards to the Patent Asset Management entities that you're involved with, did you conduct your own research and due diligence prior to those engagements?

A. I did conduct my own, yes.

Q. Based on this research, what did you learn about Mr. Leigh Rothschild and -- and his affiliated entities?

A. Well, I -- I -- I had met with Mr. Falcucci, and I had met with -- and when I say "meet," it was virtual. At the time, we were post-COVID, so the Zoom thing was -- was an acceptable way of meeting with -- with people.

And I met with Mr. Falcucci. I met with Sugouri Batra. I met with Mr. Rothschild. I looked into just general information, gathered details. So I -- I got info there.

Q. Did you do research with regards to the lead litigation counsel you'd be working with in these matters?

A. Yes, when I found out who that was. So I -- I did research into Jay Johnson, Kizzia Johnson as well, and they were going to serve as -- as lead litigation counsel and, I understood, were serving as lead litigation counsel, generally speaking, yeah.

Q. Before you established any communications with Valve, what work did you do regarding the patents and the infringement contention -- or, rather, infringement allegations?

MS. GEYER: Your Honor, we renew our motion in limine at this point in time.

THE COURT: I agree. We'll take that up on a break.

Q. (By Mr. Vazquez) What was your understanding about the history of license -- licenses or settlements involving the patents at issue or similar patents?

A. I didn't have much history in the patents and the -- the settlement history, and I didn't know that there was any past settlement with Valve at the time that I was retained and when the complaint was filed, so that was news to me.

Obviously, if I was aware that there was an agreement that was in place and it was effective, that -- there would be no reason to file a complaint. And I wouldn't have filed the complaint if that was the case. So I didn't know that there was a settlement agreement that had been entered into previously at the time.

Q. What was your understanding with regards to how your clients -- for example, RBDS, Display Technologies -- handled license screening before proceeding with -- before referring out to outside counsel?
A. Well, I knew that they had a team in place that had, you know, duties and roles and relied on the team. They had -- they had -- as -- as you heard previously, you know, outside consultants that handled particular matters and, you know, internal procedures and systems in place that were there.
And you have to rely on clients and on third-party consultants a lot of the time in -- as an attorney in -- in all types of legal matters, not just patent. You know, you need to get information from your clients, and you need to rely on their systems and their information that they provide, so...
Q. With regards to RBDS, you were retained in a limited local counsel role; is that correct?
A. I was retained as -- by RBDS in a limited local counsel role, yes.
MR. VAZQUEZ: I'd like to put up Exhibit 4. This has not been admitted, so it's not published at this point, but I'd like to show the witness.
THE COURT: And Mr. Vazquez, for identification purposes, are we talking about A-4 or 4?
MR. VAZQUEZ: No. No, Your Honor.
THE COURT: Number 4.

MR. VAZQUEZ: Number 4.

THE COURT: All right.

Q. (By Mr. Vazquez) Mr. Meyler, do you recognize this document?

A. I do.

Q. And what is it?

A. It is the -- that's not it. There we go.

It is an engagement, local counsel engagement agreement with RBDS, Rothschild Broadcast Distribution Systems.

MR. VAZQUEZ: Your Honor, I would like to offer Exhibit 4.

THE COURT: Ms. Geyer, any objection?

MS. GEYER: No objections, Your Honor.

THE COURT: Exhibit 4 is admitted.

(Plaintiff Exhibit 4 admitted.)

THE COURT: You may publish.

MR. VAZQUEZ: Thank you, Your Honor.

Q. (By Mr. Vazquez) Mr. Meyler, what did this local counsel engagement agreement say about the scope of your work?

A. So this particular engagement with RBDS was identified as regarding the '221 Patent and provides that my role and my firm's role will act as local counsel only to the client. We'll be responsible for filing and serving the complaint in accordance with applicable local and state rules and procedures. The firm understands that the client's lead counsel is Kizzia

Johnson and its attorneys. They will have the primary responsibility for representing the client in the matter in connection with enforcement of their IP.

So the -- my -- in summary, I guess, my -- the scope of my engagement was to serve as local counsel on a limited basis there, for -- with Kizzia Johnson as lead counsel and serving as kind of the supervising attorney there.

Q. In your role as local counsel as spelled out in this agreement, were you responsible for identifying those potentially infringing one of your client's patents?

A. No, I was not.

Q. Were you responsible for vetting a potential infringer to confirm whether they already had a license for a patent that they were being accused of infringing?

A. I was -- it was not within my scope to determine whether or not they had a -- a license. I -- I relied on the team that had the data and the historical information to perform that work and -- and confirm that information or not confirm that information.

THE COURT: Mr. Vazquez, it is 2:45. We will take our afternoon recess.

To our jury, please remember my instruction about recesses, and we will be back at 3:05.

(Jury absent.)

THE COURT: Please be seated.

Ms. Geyer, you had an objection. I said we would address it during the break.

MS. GEYER: Yes, Your Honor. Mr. Vazquez was asking Mr. Meyler about specifics that he did related to patent infringement claim charts, allegations of infringement. In his deposition that's where Mr. Meyler drew the line and said any specific allegations, things he had related to claim charts, allegations in the complaint -- he said those were completely work product and those were privileged.

So some of the stuff we had touched on about background research into local counsel, into the companies, whether or not they were licensed, that was all given to us in deposition. Anything once we got into specifics about infringement complaints, claim charts, Mr. Meyler drew the line at privileged, and I don't think we should hear those answers for the first time in court.

THE COURT: All right. Mr. Vazquez, your response.

MR. VAZQUEZ: Your Honor, we're not -- what we're asking -- what we're asking to do is ask the questions that would not implicate the work product privilege or attorney-client privilege. So we're not doing a blanket -- we're not asking for, you know, carte blanche here.

THE COURT: I understand that's not your intention. How about this: I mean, were there more questions with that line of examination that you had planned?

MR. VAZQUEZ: There were, Your Honor.

THE COURT: There were?

MR. VAZQUEZ: Or there are, yeah.

THE COURT: Okay. And tell me the questions, I mean, in terms of the nature of the inquiry there; is it about just the due diligence?

MR. VAZQUEZ: Yes. I mean, they would touch on some steps that he took internally in terms of due diligence that don't necessarily fall within the work product scope. It's not talking about his mental impressions; it's not communications with clients, that type of --

THE COURT: And, Ms. Geyer, you were telling me that during Mr. Meyler's deposition, these questions were put to him and he refused to answer on the basis of privilege?

MS. GEYER: Yes, Your Honor. I believe I used some of these, actually, during my direct examination. But when we asked the broad question about due diligence and research into the allegations in the complaint or in claim charts, we got the answer that he could say his general practice, but he couldn't tell what specific research he did for each specific client.

And even when he disclosed his general practice, he would not say and could not say, due to privilege, whether he did any of those general practice steps in specific to any complaint or claim chart.

THE COURT: Point me to page and line.

MS. GEYER: Yes, Your Honor. I'm looking at Page 75, Line 24, through 76, Line 10.

And I have a few other citations I can give you as well.

THE COURT: Yeah, give me them all, please.

MS. GEYER: Yep. Some on Page 79, Lines 12 through 18.

THE COURT: All right.

MS. GEYER: Page 146, Lines 12 through 18; Page 147, Lines 1 through 16.

THE COURT: All right. I'm going to review these portions of Mr. Meyler's transcript. What would you have the Court do? Is it that you are asking for permission to inquire, or are you looking to lock his testimony into what we have here in the deposition transcript?

MS. GEYER: I'd like to lock his testimony into what we have in the deposition transcript.

THE COURT: All right. Mr. Vazquez?

MR. VAZQUEZ: I would prefer to, as I indicated before, to do some limited questioning.

THE COURT: I understand your preference. I mean, this is something that was flagged as a motion for the Court. I said that I needed an opportunity to see the trial context as to how this testimony would come out, and I think it's clear to me right now where we are.

So let me go ahead and look at the deposition transcript,

and I will come back with a ruling.

MR. VAZQUEZ: Thank you, Your Honor.

MS. GEYER: Thank you, Your Honor.

THE COURT: We're at recess.

(Court in recess 2:50 p.m. to 3:09 p.m.)

THE COURT: All right. There was an objection to Mr. Meyler's testimony. It was related to due diligence. I've had an opportunity to review not only the previous motion on the subject but the excerpts that Ms. Geyer has pointed out. I feel like it paints a pretty clear picture to me in terms of what the balance of the testimony should be here.

So here's the ruling of the Court: I'm going to sustain the objection by Ms. Geyer.

As I'm reading the testimony here, looking in particular at Page 77, Line 8, through 79, Line 1, I see that there's a description there about the general practice of doing due diligence before filing, but a refusal to answer or confirm whether and which steps were used for the relevant events here.

Mr. Meyler is locked into that testimony. So Mr. Vazquez, if you want to ask questions about the general practice, that's fine; but anything further than that will draw another sustained objection.

Ms. Geyer, obviously you can follow up on redirect with anything that you see fit.

In terms of what the jury heard, I don't think there was

anything in terms of testimony that came out that would warrant any sort of curative instructions. It seems to me to be the sort of thing where if I bring it up, it will call more attention to the issue than it really merits.

So that's where I'm at. Any questions?

MS. GEYER: Your Honor, I have one clarification.

THE COURT: Yes.

MS. GEYER: When you said I could follow up, I believe you sustained an objection when I tried to get in testimony similar to what is at Page 79, Lines 12 through 18. So if Mr. Meyler can talk about his general practice, am I allowed to redirect and say, You can't say which steps you did for specific things in this case? Or is it --

THE COURT: That's correct.

MS. GEYER: I believe you sustained that objection.

THE COURT: The objection that I sustained was more about the form of question.

MS. GEYER: Okay.

THE COURT: And the question as it was phrased -- and I have my notes here -- it was more along of lines, "You won't answer my question because of privilege," or something along those lines. But Mr. Meyler was answering the question. It was a little more nuanced than that.

I think if the question had been phrased as: I deposed you previously. In a response to this question, you refused to

answer -- that would have been a different story, I think, in terms of the Court's ruling. But you are free to do whatever follow-up you feel is necessary, to the extent Mr. Vazquez even goes there again about the general practice.

MS. GEYER: Thank you for the clarification.

THE COURT: All right. With that, let's go to work. Let's get our jury.

(Jury present.)

THE COURT: Welcome back. Please be seated. We are in the home stretch for today.

We still have Mr. Meyler on the stand here. Mr. Vazquez will continue with his inquiry.

Q. (By Mr. Vazquez) So Mr. Meyler, just to confirm, you were engaged to serve as local counsel for Display Technologies and SPIS for matters involving patent infringement claims against Valve; is that correct?

A. That is correct, yes.

Q. When did you enter into those engagements?

A. With -- sorry, with which ones in particular?

Q. Display Technologies and SPIS.

A. With Display Technologies and SPIS, I believe it was in September of 2022.

Q. And do you recall when the complaints were filed against Valve?

A. Within a couple of weeks of being engaged to serve as local

counsel, I had draft -- gotten the complaints and gotten them filed.

Q. And just to -- you first learned about the GSLA when you received an email from Mr. Schenck, from Valve's counsel, correct?

A. That is correct. That -- that was the first time that I had learned about the GSLA.

MR. VAZQUEZ: Your Honor, I'd like permission to publish Exhibit 132 that's already been admitted, please.

THE COURT: If it's already been admitted, you may publish.

MR. VAZQUEZ: Can you scroll all the way down, please.

Q. (By Mr. Vazquez) Mr. Meyler, do you recognize this email?

A. Yes. This is email correspondence with Chris Schenck. The -- the email at the bottom there is the initial email that he had sent to me.

The complaints had been filed, and they hadn't been served yet, but he reached out to me -- and we hadn't served them or communicated with them in any way or anything, but he had received some kind of notification that alerted him and contacted me.

So I got that email, and I forwarded it over to lead counsel, Kizzia Johnson, Jay Johnson. And you can see that in the email at the top there, I had introduced him to Jay Johnson. I indicated that a first amended complaint had been -- already

been filed several days earlier, September 29th, to correct the claim chart on the SPIS complaint that had been filed, and that Jay Johnson will appear pro hac vice, which is the Latin term for -- that I was talking about earlier with the out-of-state counsel applies that the court. And with me serving as local counsel, he would be lead counsel in these cases. And we'll get back to you there.

MR. VAZQUEZ: And if you could scroll up, please, to the October 17 email.

Q. (By Mr. Vazquez) So that initial email from Mr. Schenck was on October 5. And then I see on October 17th you informed Mr. Schenck that the dismissal was filed?

A. Yeah. So, obviously, like I said, I sent it over to Mr. Johnson. And he was serving as lead counsel; I was taking instruction from him. And the determination was made to go ahead and dismiss that matter.

Q. So it looks like there was a time period of eight days between the time that Mr. Schenck sent you the -- informed you of the GSLA and the time that the case was dismissed; is that right?

A. That looks about right, yeah.

Q. Okay. What role, if any, did you have in the decision to dismiss the case?

A. I didn't have a role in the decision, really. You know, he was lead counsel. And like I said, I had forwarded it over to

Mr. Johnson to look at, and the decision was made that the matter should be dismissed and that was the appropriate thing to do at that time, so...

MR. VAZQUEZ: You can take that exhibit down.

Q. (By Mr. Vazquez) What happened with regards to the SPIS case at that time?

A. The SPIS case continued. I think, you know, Mr. Schenck's email had initially indicated there that -- you know, take a look at it, I believe. But in -- in reviewing it, you know, the decision was made that the -- that particular case would continue on there.

Q. After October of 2022, what did you observe about lead counsel Jay Johnson's responsiveness?

A. Yes. So sometime about mid-October, the responsiveness of Mr. Johnson started to become an issue. And, frankly, I didn't know what was going on at first. So he -- I had -- there was -- there was a previous matter that I had been engaged on initially. That was the RBDS matter that was already mentioned where also I was local counsel.

Mr. Johnson was lead counsel, and he was -- he was prompt and involved. And there was some overlapping time in these matters, but it kind of -- right about mid-October, he stopped responding with regard to this particular matter, the SPIS case.

And -- and so I, you know, was in a position where I was local counsel. And, as I said before, you know, local counsel

does need to be prepared in the event of something going on, if lead counsel is not available for hearings and things like that. So I still owe a duty, and, you know, to the extent that I was available and -- and whatnot, I had to continue to -- to assist in moving things forward there, so, yeah.

MR. VAZQUEZ: Could you please put 132 back up, please. And scroll to the October 17th emails just above the one that's shown there. Okay. Oh, no, I'm sorry, go down a little bit. There you go. Down one more, please. Okay.

Q. (By Mr. Vazquez) Down towards the bottom of the page, you see an email dated October 17th from Mr. Schenck.

A. Yeah.

Q. And he was -- just explain what that email was about.

A. On October 17th, Mr. Schenck sent an email there and said after reading the corrected claim chart that "the patent seems far afield from what we're doing with our technology."

And there hadn't been a response for some time from Mr. Johnson's office. And so eventually I got the instruction to present the settlement offer that you see there, from lead counsel and his office.

And so the settlement offer was presented, and I sent the follow-up email correspondence. And the communication was kind of sporadic there at that point, every couple of weeks. And it got to the point where I think Mr. Johnson's office had presented another settlement offer of $70,000. And after there

was some lull in the correspondence there, I received the December 22nd letter from Mr. Schenck and received that and forwarded it over to lead counsel and the team at PAM to examine there. So, yeah.

MR. VAZQUEZ: Please take this down.

And Your Honor, I'd like permission to publish Exhibit 95, which has already been admitted.

THE COURT: You may publish.

Q. (By Mr. Vazquez) Mr. Meyler, is this the December 22 letter you just referenced from Mr. Schenck?

A. It is, yes.

Q. Okay. And what did you do after you received this letter?

A. So I received it, and I had forwarded it over to the team and Mr. Johnson to review. Obviously, the letter was directed to me specifically; it was addressed to me, even though Mr. Johnson was copied on it, so I took it seriously. You know, I reviewed the letter.

It had indicated that, you know, if -- I believe Mr. Schenck had indicated here that the patent at issue, the SPIS patent, was subject to the global license settlement agreement. That was, again, analysis that the team, PAM, would have conducted. So took a look at that and what was being stated here. And, you know, I think that it was -- you know, a determination was made that a response was appropriate.

So after the team reviewed it and considered all of it, I

prepared a response, because it was addressed to me and I was having trouble communicating with Mr. Johnson still.
Q. And that suit was ultimately dismissed; is that right?
A. Down the road, yeah. So I responded to this letter in -- at the beginning of January. Mr. Schenck had requested a response, and I responded to that. I think we looked at it earlier. The letter that I had drafted presented the client's position, SPIS, and the technical analysis that had been performed by the consultants.
And we -- it was at that point that Mr. Johnson -- I knew -- I first learned that he was ill, I believe, right about that time. It was the very end of December or the very beginning of January, right about the new year -- and knew that he had cancer. I didn't know that he was terminally ill until, I believe, the end of January or near there.
So initially the thought was that he was still going to be involved in the matter and that he may still be providing services as lead counsel, that I may take on a greater role than serving in an extremely limited capacity as local counsel. And I was willing to do so, if I -- it was going to take more time, but I was willing to look at that as an option.
And at -- again, I think it was around the end of February that we learned he was terminally ill and that was not going to work, obviously. So considering where we were and what the situation was with Mr. Johnson's health and being terminally

ill, the decision was made to go ahead and dismiss the SPIS -- excuse me -- SPIS case.

Which Mr. Machleidt had filed -- so he had filed a notice of appearance near the end of December and appeared in that matter. And so my communication, because SPIS -- excuse me -- because Valve was now represented by an attorney, my communication needed to go to the attorney, which is why I did not communicate directly with Mr. Schenck thereafter. I didn't just stop communicating with him.

I received a notification -- I actually received an email directly from Mr. Machleidt on -- I can't recall if it was the very end of December or the beginning of February, but I responded to Mr. Machleidt's email letting him know that Mr. Johnson was terminally ill and that was the primary reason for dismissing the matter, and SPIS still felt strongly about its claim, and inquiring as to whether, you know, there was still any kind of interest in attempting to resolve the matter while the team at PAM was attempting to identify and secure new lead litigate -- litigation counsel in the matter.

Q. So in March 2023, SPIS engaged Randall Garteiser at Garteiser Honea; is that right?

A. That's correct.

Q. Okay. And they provided you three claim charts -- is that right? -- in anticipation of litigation.

A. In -- yeah. In March -- to my understanding, I think I

first became aware that the team at PAM had engaged new lead litigation counsel at Garteiser Honea -- Honea, I think it is. And I think that there was, you know, a time period in kind of getting them caught up and transferring files and whatnot. So that was kind of happening there.

And I believe in April is when they had -- the team had decided to move forward on matters that they felt were appropriate to move forward on for claims against Valve.

Q. One of those claim charts was the '221 claim chart; is that right?

A. That is correct. That is --

Q. Sorry.

A. Go ahead.

Q. And at the time that you received that claim chart, you did not know that Valve had a license for the '221 Patent; is that correct?

A. I relied on a team to conduct the investigation. You know, I was local counsel, and they had processes and procedures. As you've heard, there had been -- you know, this was a business that had been actively in business for many, many years, that has the historical data and the records and information that is available to determine whether or not somebody has a license or -- and to make a -- you know, they work with a team to conduct a technical analysis, and to determine whether there's an infringement claim. So I was relying on the team to make

that determination.

And I received the claim charts and moved forward with -- I had -- initially, I had actually reached out to Mr. Machleidt, and I sent an email and I did not include the claim charts. Sent an email at the end of May and inquired as to whether or not he was still representing Valve, and I didn't get a response.

So I sent a follow-up email several days later asking if he had received my email. And I once again did not receive a response. And at that point, I drafted a letter, at the end of May, addressed to Mr. Machleidt at Kilpatrick. And I had attached the three claim charts to the letter along with copies of my email correspondence to him, showing him that, Hey, I've been trying to reach you and you're not responding to my correspondence.

And I had sent that over to him by fax and First-Class Mail, rather than emailing trying to get in touch with their lead outside counsel. So I was -- I included the claim charts to Mr. Machleidt there, and I believe that was -- it was at the end of May of 2023.

Q. Okay. Let's move to the letters and communications in May and June of 2023. Actually, you've covered a lot of that just now with regards to your attempts to contact Mr. Machleidt and then, ultimately, the letter to Mr. Schenck.

MR. VAZQUEZ: I just need 15 seconds, Your Honor.

I'd like to present Exhibit 93, but, Your Honor, I'm not a hundred percent sure if this has been admitted yet or not.

THE COURT: Yes, 93 is in.

MR. VAZQUEZ: Okay.

Q. (By Mr. Vazquez) Mr. Meyler, do you recognize this letter?

A. I do, yeah.

Q. This is the letter that you sent to Mr. Schenck in June 2023, correct?

A. Correct, yeah.

Q. And is this the letter in which you attached the preliminary claim charts?

A. This is -- the second one. As I said, before this I had drafted a letter that I sent to Mr. Machleidt in May of 2023 that was kind of similar to this, except asking are you still representing Valve and did you receive the emails? I've been trying to reach you.

And Mr. Machleidt, after I had sent the letter by First-Class Mail, had sent me an email stating that my emails had been going to his spam and that -- I would need to see the email to know the exact words, but it was something to the extent of: I'm no longer -- I'm not representing Valve on this and I have not sent your letter to Mr. Schenck, which I thought was strange.

Q. In your practice, how often do you send letters like this prior to initiating a lawsuit?

A. Almost in every matter that I have been involved in over the 18 years that I've been practicing law, there's some sort of correspondence before litigation occurs between either the attorneys or the parties.

There's always some sort of -- almost always. There's a rare occasion if there's some kind of emergency matter and you need to seek a, you know, emergency temporary restraining order or something, then, you know -- even in that case though, you still are generally obligated to try to contact the other party and give them notice that you're going to move for a temporary restraining order. But there's almost always also some sort of written correspondence between parties before a lawsuit is actually filed, in my experience.

It would be a very rare situation that you weren't advising somebody in advance of filing a lawsuit that, Hey, you know, there's a claim potentially there, and, you know, there's the potential of resolving the claim as well.

And you may present the facts and what your legal arguments are and look for some kind of a response to advise if they may think that they have a defense to the matter. But there's always -- almost always -- like I said, it would be a rare occasion that there wasn't some sort of written correspondence, in my experience.

Q. And again, the '221 claim chart was one of the claim charts that you included with this letter; is that right?

A. Yes. I had received the '221 claim chart, and after sending it to Mr. Machleidt and being advised that he was no longer representing Valve, I attached it to this letter and sent it to Mr. Schenck.

Q. And you didn't know that the GSLA covered this patent at the time?

A. I did not know that. Like I said, I relied on the team at Valve to go through their process and procedures. They had the historical data, they had the information that was available, and I relied on the client there to do that, even though ultimately there was obviously an error that occurred there.

Q. So the intent here was not to repudiate the GSLA?

A. No, I don't think that there was any intention to repudiate a contract that there were two claim charts --

MS. GEYER: Objection; move to strike; MSJ.

THE COURT: Overruled, but -- I'm sorry. Sustained. My apologies. Sustained.

And also, Mr. Meyler, many of these questions are yes-or-no questions. There's a lot more than a yes-or-no response that's coming from you. So mindful of where we are in the day, please make sure that you're listening closely to the question that is being asked of you.

THE WITNESS: Yes, Your Honor.

MR. VAZQUEZ: Can you bring up Exhibit 639, please? Don't -- don't publish yet.

I believe this has been admitted, Your Honor, so I'd like to publish.

THE COURT: It has been, yes. You may publish.

Q. (By Mr. Vazquez) Mr. Meyler, you see the -- the May 10th email from Daniel Falcucci at the bottom of the page?

A. I do, yeah.

Q. And you see at the bottom where it states that defendants sometimes receive a notice letter before you file complaints depending on the laws of the jurisdiction and specifically the presence or absence of any anti-trolling --

(Court reporter interruption.)

MR. VAZQUEZ: I'm so sorry.

Q. (By Mr. Vazquez) And specifically the presence or absence of any anti-trolling type law.

A. I do see that --

MS. GEYER: Your Honor, objection to this as outside the scope.

THE COURT: Sustained.

MR. VAZQUEZ: That's all I have, Your Honor.

THE COURT: All right. Redirect?

MS. GEYER: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. GEYER:

Q. Mr. Meyler, I don't have a transcript of exactly what you said, so if I say something wrong, please correct me. Okay?

A. Okay.
Q. You testified that you didn't know that the '221 Patent was licensed when you sent that June 2023 letter to Mr. Schenck; is that correct?
A. I relied on the team at PAM to -- to determine whether or not that was the case, so, yes.
Q. And you relied on the PAM team because you said they had historical data; is that correct?
A. And systems and procedures in place and historical data, and yeah.
Q. You also had a copy of the GSLA, though, didn't you?
A. I received it several months prior, yes.
Q. You received it twice from Mr. Schenck?
A. That's correct.
Q. And you carefully reviewed that agreement?
A. When I had received it, I had reviewed it, yes.
Q. And the '221 Patent is listed on the face of Exhibit C in that agreement, correct?
A. I know that today, yeah.
MS. GEYER: No further questions, Your Honor.
THE COURT: Very good. All right. Thank you, Mr. Meyler. You may be excused.
MS. KARAS: Your Honor, Valve will call Ms. Constance Kazanjian by video deposition. Ms. Kazanjian worked for Mr. Rothschild's former companies from 2011 to 2015.

THE COURT: Ms. Karas, how long are we expecting this video to run?

MS. KARAS: Apologies, Your Honor. It's 16 minutes long.

THE COURT: Very good. Thank you.

(Video deposition of Constance Kazanjian is played.)

MR. MACHLEIDT: Your Honor, Valve's next witness is Mr. Leigh Rothschild.

THE COURT: All right. Mr. Rothschild, you've heard my speech on this, but if you can come up front here, Mr. Cogswell will swear you in.

LEIGH ROTHSCHILD,
having been first duly sworn, testified as follows:

THE COURT: If you could state and spell your name for our court reporter, please.

THE WITNESS: First name Leigh, L-e-i-g-h, unusual spelling, and the last is Rothschild, R-o-t-h-s-c-h-i-l-d.

THE COURT: Mr. Rothschild, please make your way to the witness box here. And you know what I'm going to say, but I'm going to say it anyway.

THE WITNESS: Thank you, sir.

THE COURT: If you could -- you've got water there. There's a tissue box. Mr. Cogswell here is going to work out the exhibit and transcript binders here with the attorneys. You'll see the monitor there to your right, and of course the

microphone. Please speak slowly and clearly into the mic.

THE WITNESS: Thank you.

MR. MACHLEIDT: Permission to approach?

THE COURT: Of course.

MR. MACHLEIDT: Thank you.

THE WITNESS: Thank you.

THE COURT: Mr. Machleidt, you may inquire.

MR. MACHLEIDT: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MACHLEIDT:

Q. Good afternoon, Mr. Rothschild.

A. Good afternoon.

Q. Are you the current CEO of Patent Asset Management?

A. Yes, I am.

Q. Are you the manager of Display Technologies?

A. Yes, I believe I am.

Q. Are you also the manager of Rothschild Broadcast Distribution Systems?

A. Yes, I believe so.

Q. The focus of -- and I know we did this before. Is it okay if I just refer to that company as RBDS?

A. It makes it easier. Please do.

Q. RBDS, is the focus of that company to try to monetize patents?

A. Right, monetize meaning sell them, license them, yes, or --

or put out products based on the technology.
Q. Your companies that you're either a manager of or that you own or control, they don't put out products based on your patents, correct?
A. That's not correct. In the past, I've had companies, including a company called Qimage, that did put out products based on my patents. I've also had companies, including BarPoint, which was a public company, Nasdaq traded -- BarPoint, trading symbol BPNT. It was traded on Nasdaq. And we put out many products with many major clients. So, yes, I've -- I've run public companies, and I've run private companies.
THE COURT: Mr. Rothschild, I'm going to ask you just to slow down a little bit for us.
THE WITNESS: Okay, Your Honor, I will. I'll try.
THE COURT: All right. Thank you.
THE WITNESS: Thank you, Your Honor.
Q. (By Mr. Machleidt) Is it fair to say that Patent Asset Management is a nonpracticing entity?
A. That's a fair statement, sir.
Q. Would you say the same for RBDS and Display Technologies?
A. Currently, they are nonpracticing entities.
Q. In terms of companies like Display Technologies and RBDS, do you have -- or are there on the order of about two dozen such assertion companies that are owned or controlled by Patent Asset Management?

A. Good question. I don't know the exact number, but there's several companies, as you've indicated, that are owned by subsidiaries that are wholly owned by Patent Asset Management.
Q. Is Symbology one of those companies?
A. Absolutely.
Q. QTI, is that another one?
A. Right, Quantum Technology -- Quantum Technology Innovations, right, QTI, yes, that is also one of them.
Q. SPIS -- and we've heard it a few times, but I'll just keep it to the acronym -- is that also one of the assertion companies that you refer to?
A. Right. Social Positioning, that is one.
Q. Patent Asset Management, does it make its money through the licensing of patents under its control?
A. Well, not only licensing. But Patent Asset Management, as you may or may not know, it sells patents as well. So licensing, sale of -- sale of our patents, yes, that would be it, and -- and possibly in the future, as we've done in the past, putting out products.
Q. As of today, Patent Asset Management is not, as you've put it, putting out products?
A. A connected company, as I said earlier, as I testified to earlier, Qimage, did put out products.
Q. Fair point. And I just mean specific to Patent Asset Management, it is not currently putting out products?

A. That is absolutely correct.
Q. Does Display Technologies earn the entirety of its revenue from license agreements?
A. Licensing agreements would be to date what it's earned its revenue on. I don't remember, sir, whether or not that company has sold patents. I don't think so, but there's certainly that opportunity in the future.
Q. Defendant RBDS has the entirety of its revenue come from the licensing of patents owned by the company?
A. It would be the same answer. Currently, I believe so. I don't know if that company has also sold patents. I don't think so, but...
Q. The taxes of companies like Display Technologies and RBDS, are they reported on the taxes of the parent, Patent Asset Management?
A. Yes. I believe that all of the subsidiaries -- well, the way my accountants decided to do it, upon their advice, a -- a tax return, I should say, is filed under Patent Asset Management with all the subsidiaries reporting on that tax return. That is correct.
Q. Does the tax return or do the taxes of Patent Asset Management then get passed on to your personal taxes?
A. Yeah, it's what the accountants call the flow-through. So under the law, as it's stipulated, the PAM tax return then is reported on my personal tax return, my 1040, right, with

accounting principles, quite honestly, I'm not sure I totally understand.

Q. Mr. Rothschild, sticking with Display Technologies for a moment, it does not have anybody by the title of vice president, does it?

A. No, it does not.

Q. Does Display Technologies have a secretary?

A. I don't know whether the articles of incorporation in the state that it's incorporated on include a secretary. I believe that there is in terms of the public filings, but I'm not sure.

Q. What about a treasurer? Does Display --

A. I'm not sure how it was filed as a subsidiary to Patent Asset Management.

Q. What about RBDS? Does anybody hold the title of president with respect to RBDS?

A. Not to my knowledge.

Q. And I'll do this hopefully quickly. Carve it up if you need to, but the titles of vice president, secretary, and treasurer, is there anybody at RBDS that holds those titles?

A. Not to my knowledge, same as the previous answer.

Q. Understanding that you are the manager of RBDS, is it true that RBDS does not have any direct employees?

A. Right. It's managed by Patent Asset Management through a management agreement. That's the way it was set up and continues to operate in that fashion.

Q. All of what you just said, does that also apply to Display Technologies?
A. Absolutely.
Q. Meaning Display Technologies also does not have any direct employees?
A. Managed by Patent Asset Management, 100 percent owned.
Q. Simply because -- and I'm not saying you didn't answer the question, but does Display Technologies have any direct employees?
A. No. I thought I did answer the question, but the answer is no direct employees.
Q. Thank you. I -- I missed the "no." I apologize.
A. No, not a problem. I might not have said it, so...
Q. Do you consider Patent Asset Management to be your company?
A. I don't know. That's such a broad question. I certainly love the company in terms of the emotion, if it's an emotional question. I am the chief -- proud to be the chief executive officer of the company. So I can't really answer more -- more than that. I'm certainly CEO. I'm proud of the company and proud that I'm an officer of the company.
Q. Mr. Rothschild, when a PAM subsidiary like RBDS decides to file a lawsuit, are you required to approve the filing of that lawsuit?
A. Yes. Any of the lawsuits that were filed, I would have the ultimate and final approval on anything that the company does in

terms of filing lawsuits, based, of course, before that, on the diligence that we've done on that lawsuit by the team that we have.

Q. Does the same apply to Display Technologies?

A. Absolutely the same.

Q. The same would also apply to QTI, Symbology, and SPIS?

A. Right. And any others that you could mention that is a subsidiary, yes, that is the case.

Q. In other words, when any subsidiary of PAM, Patent Asset Management, decides to file a lawsuit, you must first approve the filing of that lawsuit?

A. Pretty much without exception. I don't know if there's been any lawsuits filed that I haven't approved, and I certainly want to approve them before they're filed.

Q. Mr. Rothschild, when it comes to those lawsuits -- yeah, please, no, take your time if you're readjusting.

A. A little readjustment, not a big one.

Q. When it comes to the filing of the lawsuits by PAM subsidiaries, are the engagement agreements with outside lawyers -- are they generally on a contingency basis?

A. You know, we have -- yeah, generally, it would be the case. But we have had, from time to time, engagement agreements both with local counsel, and I know that the court -- we've talked in the court what a local counsel -- and with primary counsel that are not -- that are on an hourly basis there, so -- but most of

the time, it would be a fair statement to say they are on contingency basis, with the exceptions that we have paid on an hourly basis.
Q. You've been in the courtroom during the course of the entire trial so far, correct?
A. Absolutely, been here the whole time.
Q. Whether from being in the courtroom or your own knowledge, in September of 2023, are you aware that SPIS, QTI, and Symbology held patent infringement lawsuits against Valve in Texas?
A. I absolutely am aware of that.
Q. Did you authorize the filing of those three patent infringement lawsuits in Texas?
A. I certainly did.
Q. Do you recall in total, across all three of those cases, how many patents Valve was being accused of infringing?
A. You know, each of those companies holds different patents in their portfolios. They're called families. And I don't know, as I sit here today, the total number that each of the companies had in -- in their portfolio, in their families. So I can't answer it, but it would have been, you know, a few.
How many were accused, on the other hand, in terms of the lawsuit -- the actual lawsuits were filed, you can have patents in the family that are not accused, and you can have patents in the family that are. So I don't know the number in the

lawsuits, but I do know that those companies held multiple patents.

Q. I understand the companies that were the plaintiffs in the Texas lawsuits held multiple patents. But just to sort of reset, you're not aware at the outset of those cases how many total patents they were accusing Valve of infringing. Is that a fair statement?

A. As I sit here today, I would not be aware out of that. As the cases were filed, I'm pretty sure that I was aware of it.

THE COURT: It's 4:15. We are going to adjourn for the day. To the jury, thank you so much for your attention. You all have been great. I know it's been a long day, so thank you. We will get started tomorrow morning at 9:00 a.m., so please be on time. We can't get started until everyone is here. Remember my instruction about recesses. Don't do any independent research. Don't talk to anyone about the case. With that, I'll see you tomorrow.

(Jury absent.)

THE COURT: All right. I spoke to you all about the jury instructions. The order regarding the scope of the invalidity case talked about redoes or any updates, supplements, amendments, whatever you want to call it, to the verdict form, so that's still out there as well if you'd like to give an updated submission regarding that.

Is there anything else to address before we adjourn?

MR. MACHLEIDT: Not from Valve, Your Honor.

MR. ZITO: Neither from defendants, Your Honor.

THE COURT: All right. Take care, all. Have a good night.

(Proceedings adjourned at 4:18 p.m.)

INDEX OF EXAMINATION


| EXAMINATION OF | | PAGE |
|---|---|---|
| RANDALL GARTEISER | VIDEO DEPOSITION | 18 |
| DANIEL FALCUCCI | DIRECT EXAMINATION BY MR. MACHLEIDT | 20 |
| | CROSS-EXAMINATION BY MR. ZITO | 43 |
| | REDIRECT EXAMINATION BY MR. MACHLEIDT | 77 |
| SUGOURI BATRA | VIDEO DEPOSITION | 82 |
| NICOLE LAFOSSE | VIDEO DEPOSITION | 82 |
| CHRISTINA ARIAS | DIRECT EXAMINATION BY MR. REED | 93 |
| | CROSS-EXAMINATION BY MR. CUDLE | 100 |
| SAMUEL MEYLER | DIRECT EXAMINATION BY MS. GEYER | 102 |
| | CROSS-EXAMINATION BY MR. VAZQUEZ | 124 |
| | REDIRECT EXAMINATION BY MS. GEYER | 152 |
| CONSTANCE KAZANJIAN | VIDEO DEPOSITION | 154 |
| LEIGH ROTHSCHILD | DIRECT EXAMINATION BY MR. MACHLEIDT | 155 |

INDEX OF EXHIBITS

PLAINTIFF'S EXHIBITS

| EXHIBIT | ADMITTED | WITHDRAWN |
|---|---|---|
| 4 | 132 | |
| 239 | 29 | |
| 270 | 36 | |
| 625 | 21 | |
| 626 | 41 | |
| 628 | 120 | |
| 639 | 38 | |
| 640 | 24 | |
| 653 | 37 | |
| 678 | 122 | |

DEFENSE EXHIBITS

| EXHIBITS | ADMITTED | WITHDRAWN |
|---|---|---|
| A-4 | 66 | |
| A-6 | 63 | |
| A-25 | 72 | |

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 11th day of February 2026

/S/ Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter
WSL#22003010