# EXHIBIT 43

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

DIGITAL VERIFICATION
SYSTEMS, LLC,

Plaintiff,

v. No. 5:22-cv-00686-JWH-SP

ENCYRO, INC.,

Defendant.

ZOOM DEPOSITION OF LEIGH ROTHSCHILD

VOLUME 1 - PAGES 1-130

WEDNESDAY, OCTOBER 12, 2022

NORTH MIAMI, FLORIDA

Reported by: Marilynn Hoover, RPR
California CSR No. 8841

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the Zoom video deposition of LEIGH ROTHSCHILD was taken before Marilynn Hoover, California CSR No. 8841; on Wednesday, October 12, 2022, commencing at the hour of 1:06 p.m.; the witness testifying from North Miami, Florida.

APPEARANCES

PALAVAN & MOORE, PLLC
BY MR. SHEA PALAVAN
5353 West Alabama Street, Suite 303
Houston, Texas 77056
Telephone: 832-800-4133
E-mail: Shea@palavan.com
On behalf of Plaintiff

LAMKIN IP DEFENSE
BY MS. RACHAEL D. LAMKIN
One Harbor Drive, Suite 300
Sausalito, California 94965
Telephone: 916-747-6091
E-mail: RDL@lamkinipdefense.com
On behalf of Defendant

ALSO PRESENT: Sugouri Batra, in-house counsel

EXAMINATION INDEX

| | PAGE |
|---|---|
| Examination by Ms. Lamkin | 5 |

* * *

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | U.S. Patent No. 9,054,860 | 15 |
| Exhibit 2 | USPTO patent assignments | 34 |
| Exhibit 3 | Patent assignments | 36 |
| Exhibit 4 | 2009 LLC annual report | 36 |
| Exhibit 5 | Patent assignment | 39 |
| Exhibit 6 | Patent assignment | 40 |
| Exhibit 7 | Texas franchise tax public information report | 43 |
| Exhibit 8 | Patent Asset Management team | 45 |
| Exhibit 11 | 2021 Florida limited liability company annual report for Patent Asset Management | 67 |
| Exhibit 12 | 2021 Florida limited liability company annual report for Matthew Inventions | 70 |
| Exhibit 13 | Appeal brief | 74 |
| Exhibit 14 | Excel file: Rothschild cases | 73 |

EXHIBIT INDEX (CONT.)


| EXHIBIT NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 18 | Certificate of formation of Rothschild Connected Devices Innovations LLC | 80 |
| Exhibit 19 | Texas secretary of state document in re Rothschild Connected Devices Innovations LLC | 82 |
| Exhibit 20 | Declaration of Leigh Rothschild | 83 |
| Exhibit 21 | Motion for order to show cause | 87 |
| Exhibit 22 | Report and recommendation | 87 |
| Exhibit 23 | Complaint for patent infringement | 98 |
| Exhibit 24 | Texas secretary of state document in re Rothschild Digital Confirmation LLC | 100 |
| Exhibit 25 | 11/01/2021 letter | 102 |
| Exhibit 26 | 11/01/2021 letter | 104 |
| Exhibit 27 | 2021 Florida limited liability company annual report for LMR Inventions LLC | 41 |
| Exhibit 28 | Plaintiff's objections and responses to defendant's first set of written discovery | 120 |
| Exhibit 29 | Affidavit of Leigh Rothschild | 121 |
| Exhibit 30 | Initial infringement chart | 124 |

WEDNESDAY, OCTOBER 12, 2022; NORTH MIAMI, FLORIDA

LEIGH ROTHSCHILD,

called as a witness, being duly sworn on oath, was examined and did testify as follows:

THE STENOGRAPHIC REPORTER: Thank you. You 13:06
may begin. 13:06

EXAMINATION 13:06

BY MS. LAMKIN: 13:06

Q. Good morning, and afternoon, Mr. Rothschild. 13:06

A. Thank you. 13:06

Q. My name is Rachael Lamkin and I represent 13:06
the defendant in this action. 13:06
I see you have two attorneys with you here 13:06
today; is that correct? 13:06

A. Yes. 13:06

Q. Okay. Mr. Palavan is your outside counsel; 13:06
correct? 13:06

A. That is correct. 13:06

Q. Okay. And Ms. Batra, can you please state 13:06
her role for the record. 13:06

A. Yes. She is general counsel to the company. 13:06

Q. "The company" being plaintiff, what I will 13:06
call DVS for your deposition. Is that okay? 13:06

A. Yes. She's general counsel to the 13:06
plaintiff. 13:06

A. It is. 13:24

Q. Is this the patent that you reviewed on your Zoom call with your counsel, Mr. Palavan and Ms. Batra? 13:24

A. It is. 13:24

Q. If you could please turn to the column 1 of the '860 patent, Mr. Rothschild. 13:24

Mr. Rothschild, who drafted -- 13:25

A. Excuse me, Ms. Lamkin. I need time to get there. I'm not quite there. Thank you. 13:25

Q. Um-hum. 13:25

A. I'm there now, Ms. Lamkin. 13:25

Q. Mr. Rothschild, who drafted column 1 of the '860 patent? 13:25

A. The draft was done by patent prosecution counsel. 13:25

Q. Did you review column 1 of the '860 patent during prosecution? 13:25

A. I do not recall with specificity. 13:25

I would point out, I would add to that answer, if I may, Ms. Lamkin: That was many, many years ago, I believe 2008, so -- I believe, so many years ago. More than ten? Yes, 2008. I'm looking at the patent to get that date. So that is, by my calculations, approximately 14 years ago. 13:26

Q. You did review this patent with your counsel and last night; correct? 13:26
A. We looked at the patent last night, Ms. Lamkin. We -- We reviewed the patent last night. 13:26
Q. And you also reviewed the patent on your own last night? 13:26
A. Yes. 13:26
Q. Okay. Mr. Rothschild, how would you explain what a module generating assembly in the '860 patent is to a jury? 13:26
A. I would have to look, Ms. Lamkin -- Well, I would answer by telling you that -- I'm sorry. Could you repeat the term again, Ms. Lamkin. I'd appreciate that. 13:26
Q. Module generating assembly. 13:26
A. I would say that a module generating assembly is what it says in the specification of the 9,054,860 patent. 13:26
Q. Yes, sir. I'm asking, in your words, how you would explain that term to a jury. 13:27
A. I would explain it to the jury that it is what it says in the specification as published in the 9,054,860 patent. 13:27
Q. So you have -- Other than how a module generating assembly is in the patent, you have no 13:27

other -- Strike that. 13:27
You will solely rely upon the patent's description for module generating assembly in this litigation? 13:27
A. Could you rephrase the question, please, or repeat the question. 13:27
Q. You will solely rely on the '860 patent's description of a module generating assembly in this litigation? 13:27
A. I will answer your question by saying: What is -- What is that module? That the module is what it says it is in the patent specification of the 9,054,860 patent, the asserted patent, the patent used in the complaint, filed in the complaint. 13:28
Q. Sir, my question is this: My client is entitled to know how you, as the named inventor, would describe a module generating assembly to the jury. 13:28
You understand that? 13:28
A. I'm not an attorney, Ms. Lamkin, so I don't know what your client is entitled to or not. I honestly don't. So my counsel may know, you may know, but I don't have any idea what your client is entitled to. 13:28
I will tell you that the specification speaks to all kinds of terminology, and I would tell 13:28

line 46. 14:00

Q. I want to be perfectly clear that what I'm asking for is not where in the specification the term "module generating assembly" is mentioned. 14:00

What I'm asking for specifically is: Where in the specification is the teaching or the description that corresponds to the claim limitation I've read into the record at column 9, lines 9 through 11? 14:01

That's the only thing I want, is: Where in the specification is the teaching that corresponds to the limitation at column 9, lines 9 through 11? 14:01

A. Great. Great. I would tell you, in answer to your question, that I find information -- I don't know whether -- what the term -- not being an attorney or a patent attorney, what the term "teaching" means; but I find information on module generating assembly in column 1, line 46, where it says -- and I will read slowly. 14:01

Q. It's okay, Mr. Rothschild. It's okay. You don't have to read into the record. 14:01

If you'll just give me the citations. Column 1, starting at which line? 14:01

A. Line 45 to 48 -- to 49. 14:01

Q. Okay. And can you please provide any other 14:02

citations to the specification that describe the 14:02
limitation disclosed at column 9, lines 9 through 11? 14:02
A. Yes. I find the term "module generating 14:02
assembly" in line -- approximately line column 2, 14:02
line 17 through 24. 14:02
Q. Great. Others? 14:02
A. I find the term "module generating assembly" 14:02
in column 3, line 46 to 55. 14:02
Q. Thank you. Any others? 14:03
A. I find the term "module generating assembly" 14:03
in the specification of the '860 patent in column 5, 14:03
line -- approximately line 5 through line 15 -- I'm 14:03
sorry -- line 14. 14:03
Q. Thank you, sir. Any others? 14:03
A. I find the term "module generating assembly" 14:03
in column 5 of the '860 patent, in line 22 -- 14:03
approximately line 22 to line 26. 14:03
Q. Thank you. Others? 14:03
A. I find the term "module generating assembly" 14:03
in the '860 patent -- asserted patent, in column 5, 14:04
line 30 through line 35. 14:04
Q. Thank you. Any others? 14:04
A. I find the term "module generating assembly" 14:04
in the '860 patent in line, approximately, 53 -- 14:04
column 5, line 53 through line approximately 60 -- 14:04

fifty -- correcting that to line 59. 14:04
Q. Thank you, Mr. Rothschild. 14:04
And any other discussions of citation -- 14:04
Sorry. Strike that. 14:04
Any other discussions in the specification 14:04
of the '860 patent for the limitation disclosed at 14:04
column 9, lines 9 through 11? 14:04
A. Ms. Lamkin, I can't say with specificity if 14:05
there's any others; but those are ones that I noted 14:05
when I reviewed the patent a few minutes ago during 14:05
our break, that are contained within the 14:05
specifications. To be clear, there may be others. 14:05
Q. Okay. Please take your time, sir. I need 14:05
you to highlight all of them. Take it -- This is why 14:05
we're here: You're the named inventor on this patent 14:05
and we need to understand it. 14:05
So I need to know, in your opinion, all 14:05
discussions in the specification for the limitation at 14:05
column 9, lines 9 through 11. 14:05
A. Those are the ones, Ms. Lamkin, that I've -- 14:05
that I have found. 14:05
Q. Okay. Thank you. And in the citations that 14:05
you have just provided, can you find any discussion of 14:05
the specific language -- not just the term "module 14:05
generating assembly," but the specific language -- 14:05

appearing in the limitation at column 9, lines 9 14:05
through 11? 14:06
A. I would believe the answer -- Strike that. 14:06
The answer would be that the teaching or 14:06
that the wording is as contained in the specification. 14:06
Q. I'm sorry. I don't understand. I don't 14:06
understand that. 14:06
MR. PALAVAN: One second. One second. 14:06
Leigh, can you just move your camera to your 14:06
right. You keep leaning to the right, so if you could 14:06
just move it to the right. 14:06
THE WITNESS: I'm leaning to the right, 14:06
Mr. Palavan, because I'm looking at the patent. 14:06
MR. PALAVAN: Yeah, that's what I'm saying. 14:06
So can you just shift your thing to the right? Yeah, 14:06
there you go. Perfect. 14:06
THE WITNESS: Does that help? 14:06
MR. PALAVAN: Yeah. That way, Ms. Hoover is 14:06
not having to go like this in following you. 14:06
THE WITNESS: Perfect. Happy to 14:06
accommodate. 14:06
Could you rephrase the question. Could you 14:06
restate the question, Ms. Lamkin. 14:06
Q. BY MS. LAMKIN: I'm asking you to explain 14:06
your response to the question. 14:06

Ms. Hoover, can you reread his response.

(Record read.)

THE WITNESS: I'm asking Ms. Lamkin to repeat the question, not my answer, Ms. Hoover and Ms. Lamkin.

MS. LAMKIN: Okay. I'll do it.

Q. BY MS. LAMKIN: In the citations that you just provided, please point out any discussion of the specific language in column 9, lines 9 through 11.

A. My answer would be that the wording in the specifications speaks for itself. I have no interpretation to provide.

Q. I'm not asking for interpretation, sir. I'm asking you to point to a specific discussion of the language in column 9, lines 9 through 11, in the citations you've provided.

A. My answer would be that the wording in the specification speaks for itself.

Q. And can you point to any language in the specification that discusses "a module generating assembly structured to receive at least one verification data element corresponding to the at least one entity"?

A. My answer would be, as I repeat it again, Ms. Lamkin -- I'll repeat it again -- that the wording

Q. Is that an accurate statement in your declaration?

A. Yes.

Q. Just read it into the record: "I have more than 20 years of experience involving claim construction and claim charts in connection with patent litigation. I also personally analyzed the claims and the claim constructions in this case prior to the filing of the lawsuit," unquote.

That statement's accurate, Mr. Rothschild?

A. I believe it's accurate as to this case, as to the --

Q. Do you -- Please, sir.

A. I believe it's accurate -- Thank you. I believe it's accurate as to this case, in the case of -- and accurate as to this patent, 8,788,090.

Q. Okay. And then the next page, let me know when you've read that.

A. I've completed reading it, Ms. Lamkin.

Q. Okay. Is there anything in this declaration that you -- that is inaccurate, to the best of your recollection?

A. There is not, to the best of my recollection.

Q. Okay. Do you recall in the RCDI matter that

the District Court ultimately awarded attorneys' fees against RCDI?

A. I recall that in the -- in this matter, the District Court did not award attorneys' fees against RCDI. Your statement is not correct.

What happened, to the best of my recollection, is the court denied attorneys' fees. The other side appealed, to the best of my knowledge, to the federal circuit. The circuit came back and contradicted or disagreed with the federal district judge and told the district judge -- told the district judge to award attorneys' fees. And, at that point, the attorneys -- I'm sorry -- the federal district judge followed the circuit's recommendation and awarded attorneys' fees against the plaintiff, Rothschild Connected Device Innovation.

Q. And then when the District Court awarded attorneys' fees against RCDI, did RCDI pay the attorneys' fees?

A. RCDI attempted to negotiate to pay the attorneys' fees with the plaintiff. The plaintiff did not accept, to the best of my knowledge -- I'm sorry. The defendant. Excuse me. The defendant did not accept our offer to pay.

RCDI was prepared to pay attorneys' fees in

some amount, and was negotiating back and forth for lower amounts, which was agreed to at some point by the defendant. But a solution -- We were in negotiations, continual negotiations. A settlement was never reached. RCDI never refused to pay attorneys' fees at any point, to the best of my knowledge. That was done by my general counsel, at the time, in the negotiation process. 16:30

So your statement about refusing to pay attorneys' fees, or didn't pay them, is not correct, Ms. Lamkin. 16:31

MS. LAMKIN: I'm going mark as Exhibits 21 and 22 -- 16:31

THE WITNESS: I'd also point out for the record, for your further knowledge, Ms. Lamkin, that a judgment was never obtained, to the best of my knowledge, against the company. 16:31

The court was in fact inquiring, the federal district court, why the -- why the defendant did not go for a judgment in this matter, and the defendant said at this point they didn't want a judgment. It might have been because there was negotiations ongoing and that the matter was supposed to be settled between the parties -- which is what the court, I believe, from my point of view, was hoping for. 16:32

A. Correct. 16:33
Q. Okay. Exhibit 21 goes on to say at 16:34
paragraph 2: "As part of the fee submission, ADS 16:34
requested that this court hold Mr. Rothschild jointly 16:34
and severally liable with RCDI." 16:34
Quote: "So as not to require further 16:34
unnecessary litigation, ADS seeks the award of fees 16:34
and expenses to be entered jointly and severally 16:34
against the entity RCDI and its sole member, Leigh M. 16:34
Rothschild, as the two are one in the same." 16:34
Does that refresh your recollection that ADS 16:34
tried to name you as a party in this matter, 16:34
Mr. Rothschild? 16:34
A. That's correct. 16:34
Q. And then in paragraph 3 of Exhibit 21, it 16:34
says: "On November 8th, 2017, the court ordered the 16:34
fee order." 16:35
Quote: "It is ordered that Rothschild 16:35
Connected Devices Innovations ('Rothschild') shall pay 16:35
ADS attorneys' fees and costs." 16:35
Again, is that consistent with your 16:35
recollection that ADS -- that RCDI was ordered to pay 16:35
attorneys' fees and costs in this matter? 16:35
A. That's correct. 16:35
Q. In paragraph 4, it says: "This court 16:35

and five dollars as its assets? 16:36
A. I do not recall that. I do not know if that's correct. 16:37
Q. Okay. Do you have any reason to doubt that representation by RCDI at the time? 16:37
A. I have every reason to doubt it, because I don't have any knowledge of it. 16:37
Q. Okay. "As of the date of this motion, RCDI has failed to comply with the fee order, as RCDI has neither paid the amount directed to be paid ... nor has RCDI made any notification to this court." 16:37
Is that consistent with your recollection of the matter, sir? 16:37
A. It is not consistent, in the fact that I testified earlier that negotiations were ongoing, where we made several offers to pay from our general counsel at the time to the company. Numerous discussions, in my memory, were held and negotiations went back and forth in terms of payment, right until the case ended. 16:38
Q. Do you have any recollection of RCDI ever paying to ADS the ordered fee award? 16:38
A. I do not. 16:38
Q. Turn to Exhibit 22. 16:38
A. But I would add to the statement that a 16:38

judgment was never entered in this matter, as I testified to earlier, that the court was asking why the plaintiff was -- why the defendant, excuse me, was not seeking a judgment. No answer, to my knowledge, was given. And I again repeat for the record that negotiations were ongoing, where offers were made to pay this amount from RCDI to the defendant. 16:38

Q. Mr. Rothschild, I've personally reviewed the docket. I don't see any evidence of that. 16:38

Do you think you can produce that evidence, sometime after this deposition, for my review? 16:38

A. Many years ago. I have no knowledge whether it would be evidence or not. The person that was the general counsel at the time no longer works for us and hasn't for many, many years. He would hold those records, if there were any records. What happened to them, I don't know. I've never seen anything in that regard. But I am testifying hereto that there were numerous conversations that were held, as reported to me by counsel, to pay. 16:39

Q. Looking now at Exhibit 22, an order dated August 13th, 2019. 16:39

Do you understand, sir, that a report and recommendation is an order from the court? 16:39

A. I'm sorry. Say again. 16:39

I do know that the court specifically told, 16:43
as I previously testified, that I would not be brought 16:43
into the case until service was effectuated and a 16:43
hearing would be held on the matter to determine the 16:43
merits of bringing me in. And -- 16:43

Q. And -- 16:43

A. Excuse me. And I believe the record 16:44
supports that. 16:44

Q. Did either RCDI or you personally ever pay 16:44
any portion of the court order awarding attorneys' 16:44
fees in this matter? 16:44

A. I repeat my testimony that no payment was 16:44
made for RCDI, and that ongoing negotiations were 16:44
being held to effectuate payment, but a judgment was 16:44
never filed by the court, even though the court was 16:44
wondering if they were going to seek a judgment. 16:44

I also repeat my testimony -- I also state 16:44
for the record that I was never asked by the court to 16:44
pay anything; that the court was -- the court was 16:44
asking for me to be served, to decide whether they 16:44
were to bring me into the case. 16:44

Q. Mr. Rothschild, you have a right, and I'm -- 16:44
I'm perfectly happy to let you explain your answer, 16:44
but I first need an answer. 16:44

So it's a yes-or-no question, and then, 16:44

please, you have a right to explain yourself. 16:45
Did RCDI ever pay any attorneys' fees pursuant to the order ordering attorneys' fees to be paid? 16:45
A. No, we did not. 16:45
Q. Okay. And did you personally ever pay any attorneys' fees based on the order from the court ordering that attorneys' fees be paid? 16:45
A. No. And to explain, as you said you would currently allow me to explain: I was never ordered by the court to pay anything to RC -- from RCDI or pay anything to -- I'm sorry. I was never ordered by the court, me personally, to pay any sum of money to the defendant. 16:45
Q. And your recollection is that's because you were not properly served; right? 16:45
A. My recollection would be that I was not properly served, and the court had stated that I would need to be properly served and that the court would have a hearing to determine the merit of bringing me into the case. 16:46
Q. You could have paid the money; right? You knew the court ordered attorneys' fees paid, and either you or RCDI could have paid the money; right? 16:46
A. Absolutely incorrect. 16:46

Q. Why not? 16:46

A. As far as me paying the money, I had no obligation, as I just said, to pay any money. It would be absolutely not the case that I had any obligation, any legal obligation, at that point, to pay. And as I've testified -- So that's the answer to the second question, as to why I didn't pay. I had no legal obligation to pay. 16:46

Your first question, I believe, Ms. Lamkin, is why RCDI did not pay. As I've testified to now numerous times today, RCDI was in negotiation with the defendant as to effectuate a payment settlement. 16:46

Q. The court issued an order ordering RCDI to pay attorneys' fees; correct? 16:46

A. I believe so. 16:46

Q. And RCDI did not honor that order; correct? 16:47

A. I don't know if the order was not honored. That would be a legal determination. But I will tell you, and I've testified and I will testify again, that the company RCDI was in negotiation to pay to the defendant an amount of money that would satisfy them in this matter. 16:47

MS. LAMKIN: I'm going to mark Exhibit 23 the complaint from case number 1:19-cv-01109, Rothschild Digital Confirmation v. CompanyCam. 16:48

(Exhibit 23 marked.) 16:48

Q. BY MS. LAMKIN: Have you ever seen Exhibit 23 before, Mr. Rothschild? And I'm happy to flip through it if that would help you. 16:48

A. Well, Ms. Lamkin, for the record, I'm only seeing the first two sentences after the title page, "plaintiff ... through its undersigned attorneys" -- and now you're scrolling. 16:48

Q. Correct. Would you like me to scroll through the document for you, sir? 16:48

A. Yes, I would. Yep. 16:48

Q. Okay. I'll just do it page by page, and you tell me when you're ready for the next page. 16:48

A. Ms. Lamkin, are you asking me to read each page, or you just want me to kind of quickly scroll through it? 16:48

Q. I'm sure not, sir. I'm just -- Whatever you need to tell -- to ascertain whether or not you've seen this document before. 16:48

A. I don't recollect with specificity whether I've seen the document before. 16:48

Q. Okay. In general, do you review the complaints before they're filed? 16:49

Let me ask that a better way, sir. That's a terrible question. 16:49

A. Sometimes I do, sometimes I don't. I will tell you that I rely upon my attorneys to file a correct complaint. 16:49

Q. Do you recall this case, RDC v. CompanyCam? 16:49

A. There is a recollection but not with specificity. 16:49

Q. What do you remember about this case? 16:49

A. I remember that you were counsel, I believe, for the defendant. 16:49

Q. Do you remember anything else? 16:49

A. I remember that a settlement was achieved, no money was paid by either side; that counsel -- my counsel negotiated with you, Ms. Lamkin, and I guess on behalf of the client -- 16:49

Q. Wait, wait. Don't -- If you're about to -- Don't say any of the terms on the record, because it's a separate matter. 16:49

A. Hmm. Settlement was achieved -- 16:49

Q. Okay. Fine. 16:50

A. -- to the full satisfaction of all action. 16:50

Q. I'm going to move to strike that. It's a confidential, unrelated matter; so let's just not have that on the record, please, sir. 16:50

Do you recall which entity or persons are the manager, or were the manager, of RDC? 16:50