# EXHIBIT 47

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| VALVE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>LEIGH ROTHSCHILD; ROTHSCHILD BROADCAST DISTRIBUTION SYSTEMS, LLC; DISPLAY TECHNOLOGIES, LLC; PATENT ASSET MANAGEMENT, LLC; MEYLER LEGAL, PLLC; AND SAMUEL MEYLER,<br><br>Defendants. | CASE NO. C23-1016<br><br>Seattle, Washington<br><br>February 12, 2026<br>8:53 p.m.<br><br>JURY TRIAL, VOL. 4 |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMAL N. WHITEHEAD
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:
Dario A. Machleidt
Kathleen R. Geyer
Christopher P. Damitio
Kilpatrick Townsend & Stockton LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101

David A. Reed
Kilpatrick Townsend & Stockton LLP
100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309

Marianthi Karas
Kilpatrick Townsend & Stockton LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

For the Defendants:
Joseph J. Zito
René A. Vazquez
Robert B. Cadle
DNL Zito
1250 Connecticut Avenue, NW, Suite 700
Washington, DC 20036

For the Defendants: Matthew J. Cunanan
DC Law Group
12055 15th Ave NE, Suite B
Seattle, WA 98125

Reported by: Nancy L. Bauer, CCR, RPR
Federal Court Reporter
700 Stewart Street, Suite 17205
Seattle, WA 98101
nancy_bauer@wawd.uscourts.gov

Jury Trial, Day 4
8:53 p.m.

(Jury absent)

THE COURT: Yes, Mr. Machleidt.

MR. MACHLEIDT: Good morning, Your Honor. Dario Machleidt on behalf of Valve. I have a few updates that I think will help inform the Court about what the rest of the day looks like. On Valve's side, we have worked to streamline the rest of the case, the evidence presentation.

The first update, if I may, we are no longer calling Mr. Lobbin either live or by depo. One of the biggest sort of remaining fights between the parties, or evidentiary disputes, was about -- I'll call it a notice letter. There is -- we will go for that same information with Mr. Rothschild. In his binder right now, Exhibit 647 is one such notice letter.

The defendants did not object to the unredacted notice letter. However, last night, in light of the arguments and objections they had to Mr. Lobbin -- the letter that went to Mr. Lobbin, we have prepared, Valve has prepared a redacted copy of 647. I have provided a copy to Mr. Zito. If I may, I can provide it to you, Your Honor, and, of course, I have a copy for the witness. I believe the redactions will avoid, I believe, all of the concerns Mr. Zito had with the letter that was addressed to Mr. Lobbin.

THE COURT: All right. Let's turn to Mr. Zito.

Mr. Zito, are you satisfied with the redacted version of 647?

MR. ZITO: Yes, I just received it this morning, and I don't think we have any problems with this redacted version because it didn't -- it doesn't include the statements we're concerned about, so, no, no problem.

THE COURT: All right. Thank you for working together cooperatively to streamline the presentation. I mean it. We've got a great jury here. They seem dialed in. But anything that we can do to make their task easier is all for the good.

MR. MACHLEIDT: Your Honor, if I may, two minor things just to let the Court know. When we resume Mr. Rothschild's adverse direct or cross-examination, there's a short video clip from his deposition that the parties have gone back and forth on. We have our designation. We've included, of course, their counter. I just want the Court to know we will sort of begin with that to sort of get it out of the way. It's very short.

The last thing is an issue that may or may not arise with Mr. Rothschild. Yesterday, during the defense examination of Mr. Falcucci, they indicated through questioning something along the lines of, Of the more than 1,000 lawsuits filed by Rothschild companies, only one, two, or three have led to the -- you know, the breach and the error or the mistake, as they call it.

I won't rehash -- I won't rehash all of the discovery

fights, but what we know about other instances of exactly what happened here, violations of a license agreement by sending notice letters despite the -- you know, those agreements, much of what we know today, we learned within the past three weeks because of their 33,000 document sort of production.

My -- my request, Valve's request is -- there's no need to go back to any prior -- you know, there's nothing to correct, but what we ask is the defendants either be prevented from eliciting that same type of testimony from Mr. Rothschild or anybody in the rebuttal case and also from making that argument in closing.

Alternatively, if you don't want to put that restriction on them, we do ask that the discovery misconduct instruction be extended because the reality is we don't know what else is there.

THE COURT: Yeah, I mean, I'm not just going to haphazardly, you know, put a thumb on the scale with any sort of instruction in the way that you've proposed. I don't know the nature of the 33,000 emails that were produced -- or I should say documents that were produced. If any of them, you know, speak to the other 1,200 or so litigation cases that we saw in the chart, I'm not sure. So, I mean, I can't do a one-for-one in terms of trying to craft some sort of remedy when I don't even understand the extent of the problem.

So I get, generally, what it is that you're saying. We

will see if Mr. Zito opens a door such that cross-examination on the subject is necessary or that I need to take a closer look at the discovery request and go back into that morass, then that's what I'll do.

MR. MACHLEIDT: Thank you, Your Honor.

May I approach with redacted copies of the exhibit?

THE COURT: Yes, please.

MR. ZITO: One other comment, Your Honor. The problems we had about the prejudicial stuff is gone. We still have our relevance objection to this, and I understand -- we just want -- I want to make sure we're preserving the relevance objection.

THE COURT: All right. Well, hand me the document. I'll take a look at it. Again, relevance is a pretty low bar to clear, so if that is the extent of the remaining objection, I think I can take a quick look at the document and make a ruling on that.

MR. MACHLEIDT: And, Your Honor, if I may, when we did the exchanges and the disclosures, there were no objections to the unredacted version of this document. If you want, I'm happy to argue over the relevance of this document, but --

THE COURT: No --

MR. MACHLEIDT: -- may I approach?

THE COURT: Yes. Thank you.

All right. So thank you for streamlining your presentation

and forgoing any sort of testimony from Mr. Lobbin. We've got Mr. Rothschild, obviously. I think you may have one other lay witness and then the -- then there are the experts. So talk to me about when you think you will rest.

MR. MACHLEIDT: Your Honor, we actually do not have another lay witness. We do have the experts, three individuals. I can guess -- it's not a guess; it's an educated guess as to how much their direct will -- will take. It should be collectively under two hours. No one has yelled at me, so, collectively, it should be under two hours. And barring, obviously, redirect, anything like that, probably not too far past the lunch break, ideally, Valve will be able to rest its case.

THE COURT: All right. That's what I was hoping you would say.

Okay. Thank you very much for the data points. Again, thank you for working together to streamline the case. I will take a look at 647 right now. Give me a moment.

All right. I'm going to reserve ruling on it. I have a good sense of how I might rule, but let me hear the deposition -- I'm sorry -- the trial testimony. You can offer your exhibit. Mr. Zito, if you choose, you can make your objection and I will rule then.

MR. MACHLEIDT: Thank you, Your Honor.

MR. ZITO: Thank you, Your Honor.

THE COURT: Anything else?

MR. MACHLEIDT: Not from Valve.

THE COURT: Mr. Zito.

MR. ZITO: Nothing else, Your Honor.

THE COURT: All right. Let's get our jury and go to work.

(Jury present.)

THE COURT: Good morning. Thank you very much for showing up on time. It allows us to get underway as scheduled. So we are going to resume with the direct examination of Mr. Rothschild. So at this time, I'll call Mr. Rothschild back to the stand.

THE WITNESS: Thank you, Your Honor.

THE COURT: Mr. Rothschild, I'll remind you that you are still under oath.

THE WITNESS: Yes, Your Honor.

LEIGH ROTHSCHILD,
having been previously sworn, testified as follows:

THE COURT: All right. Mr. Machleidt, you may inquire.

MR. MACHLEIDT: Thank you, Your Honor.

DIRECT EXAMINATION continued

BY MR. MACHLEIDT:

Q. Good morning, Mr. Rothschild.

A. Good morning, sir.

Q. Do you remember a few months ago in, by my count, August of last year I took your deposition?
A. I do.
Q. And the deposition was somewhat similar to what we're doing today; I had the chance to ask you a series of questions?
A. Absolutely.
Q. And similar to today, there was an individual who was transcribing, was writing down everything that I said and you said?
A. I remember that.
Q. Do you also remember that there was a video camera there and a recording of the audio and then also yourself?
A. I do remember the video and the audio. Absolutely.

MR. MACHLEIDT: Your Honor, at this time, Valve would like to play the very short clip, designations and counter-designations.

THE COURT: All right.

MR. MACHLEIDT: Ms. Gray, and before you push play, including both designations and counters, this is Page 186, Line 6.

And, Mr. Rothschild, I should say there's a red binder there. If you'd like to see the text, turn to Page 186, Line 6. And this clip will end at Page 188, Line 17.

THE WITNESS: I'm on the page.

MR. MACHLEIDT: Wonderful. Ms. Gray, if you could

publish and play whenever you're ready. Thank you.

(Video is played.)

MR. MACHLEIDT: Ms. Gray, you can take that down. Thank you.

Q. (By Mr. Machleidt) Mr. Rothschild, do you stand by that testimony?

A. Yes, with the explanation that if it's an attorney involved and he's ready to file a complaint against someone, you'd certainly hope that, before he files the complaint, he'd read the complaint over. Yes, I think that's appropriate for the attorney.

Q. Mr. Rothschild, yesterday, I believe we ended with you and I talked, at least a little bit, about some of the lawsuits against Valve. Do you remember that?

A. Yes.

Q. You're the manager of QTI, correct?

A. Yes, as -- as I testified to yesterday.

Q. And as you testified to yesterday, QTI was one of the patent owners that filed a infringement lawsuit against Valve in September of 2023?

A. Is that a question?

Q. Did QTI file an infringement lawsuit against Valve in September of 2023?

A. I believe so.

Q. Mr. Rothschild, will you turn to Tab 636? And it should be

in your black binder to your left, I think.
A. Thank you for clarifying that. And where am I turning to, sir?
Q. Tab 636, please.
A. Okay. Lots of tabs.
I am there.
Q. Mr. Rothschild, do you see your name near the top of this tab -- or the document at Tab 636?
A. I do.
Q. Is this an email that you sent to a Ms. Arias?
A. It appears so.
Q. And Ms. Arias, did we hear from her yesterday?
A. Well, she testified yesterday, correct.
MR. MACHLEIDT: Your Honor, Valve offers Exhibit 636 into evidence.
THE COURT: Any objection?
MR. ZITO: No objection.
THE COURT: All right. 636 is admitted. You may publish.
(Plaintiff Exhibit 636 admitted.)
MR. MACHLEIDT: Thank you, Your Honor.
Q. (By Mr. Machleidt) Mr. Rothschild, in this email that is Exhibit 636, do you see that the date is March 21st, 2023?
A. I do.
Q. Looking at the callout on the screen, do you see reference

to ADT and, separately, to Valve?

A. I do. I do now, on the second paragraph.

Q. Mr. Rothschild, in about the middle of the document, there is a -- I'm going to call it a straight line, and below that, there's the name "Valve." Do you see that?

A. Right. On the second paragraph, underneath, right. Right.

Q. At the bottom of what we're looking -- and, by the way, Mr. Rothschild, certainly, look at the document, but if it helps, it should also be on the screen in front of you, so --

A. Okay. Thank you for that. Thank you.

Q. Do you see that under the name "Valve," there's the text, "SPIS previously sued and dropped"?

A. Correct.

Q. And if you scroll all the way to the bottom, do you see that there is the text, QTI -- I apologize, Ms. Gray. The bottom of the text. Thank you.

Looking at the bottom of the text right above the boilerplate, if you will, of the email, do you see where it says "QTI-failed"?

A. Right.

MR. MACHLEIDT: Ms. Gray, you can take that down.

Q. (By Mr. Machleidt) Mr. Rothschild, will you please turn to Tab 678 in your binder?

MR. MACHLEIDT: And, Your Honor, unless my team tells me otherwise, I believe this is already in evidence.

THE WITNESS: I am there. I have it.
THE COURT: Yes, it is.
MR. MACHLEIDT: Permission to publish, Your Honor.
THE COURT: Yes.
MR. MACHLEIDT: Ms. Gray, if you'd publish -- I'm going to call it the -- the first two-thirds of Exhibit 678, ending right below -- ending right above the last full paragraph.
Q. (By Mr. Machleidt) Mr. Rothschild, in this Exhibit 678, do you see the letterhead "Meyler Legal"?
A. I do.
Q. And right below the "Re:" line, do you see the statement, "Dear Norwegian Cruise Line Holdings Limited," and then there's a parenthetical, "NCL"?
A. I certainly do.
Q. The first sentence of the second paragraph, it refers to an inventor, and then it continues, "Leigh Rothschild." Is that you?
A. That, of course, would be me.
MR. MACHLEIDT: Ms. Gray, you can take that down. Thank you.
Q. (By Mr. Machleidt) Mr. Rothschild, please go to Tab 638 in your binder.
A. Big notebook. Okay. I am there. Settlement Agreement and Covenant Not to Sue.

Q. Are you familiar with the document at 638?
A. I'd want to look at it first. Lots of documents.
I briefly scanned it. It's a long document.
Q. Mr. Rothschild, will you turn to Page 11 of 638?
A. I am on that page.
Q. Is that your signature?
A. It certainly is. It is.
Q. I apologize. Was there more?
A. No, no. I'm confirming it's my signature.
Q. Thank you.
A. Of course.

MR. MACHLEIDT: Your Honor, Valve offers Exhibit 638 into evidence.

THE COURT: Any objection?

MR. ZITO: No objection.

MR. MACHLEIDT: And --

THE COURT: 638 --

MR. MACHLEIDT: I was going to say before publishing for Ms. Gray. I apologize.

THE COURT: Well, the exhibit is admitted. You may publish whenever you're ready.

(Plaintiff Exhibit 638 admitted.)

MR. MACHLEIDT: Thank you, Your Honor.

And, Ms. Gray, if you mind, don't publish just yet. I'm not going to focus on it just yet.

Q. (By Mr. Machleidt) I apologize, Mr. Rothschild. Will you go back to 678? It should be at the very end of your binder.
A. I'm flipping to it now.
MR. MACHLEIDT: Ms. Gray, if you could get us to essentially the top third of Exhibit 678, please.
Q. (By Mr. Machleidt) This letter that you and I were just looking at, do you see that the date is March 16, 2023?
A. I do.
MR. MACHLEIDT: Ms. Gray, you can take that down. And I do apologize. If you could get us back to Exhibit 638, and I think for our purposes, maybe just call out the top part above the background.
Q. (By Mr. Machleidt) Mr. Rothschild, do you see that the title of this document is Settlement Agreement and Covenant Not to Sue?
A. Correct.
Q. And do you see a little bit below the middle of this paragraph, there is a reference to "NCL"?
A. Yes.
Q. I had asked you to look at Page 11 just a moment ago.
MR. MACHLEIDT: Ms. Gray, will you take us to Page 11 as well so we can all see that?
Q. (By Mr. Machleidt) Mr. Rothschild, now that we can see it, is that your signature on this document?
A. As I testified to a minute ago, that is.

Q. Is the date of this document August 11, 2020?
A. Correct.
MR. MACHLEIDT: Ms. Gray, thank you. You could take that down.
Q. (By Mr. Machleidt) Mr. Rothschild, will you, in your binder, look at Tab 647, and let me know when you're done.
A. I'm -- I want to make sure, but, yes, I'm on 647 now, on the tab.
Q. I apologize, Mr. Rothschild. Six -- I will ask you to look at 647 in just a second, but will you please look at 646?
A. We're turning a lot of pages here.
Okay. I'm on 646. Heavily redacted.
Q. Next to you, hopefully, there should be another version of 647. Is that -- am I right?
A. I have 646 in the binder, sir, and then I have 647 in front of me, correct.
Q. In 646, do you see your name -- or I should say your email address in the "to" line?
A. It's one of the addresses in the "to" line. That's correct.
Q. And do you see that the "from" line references a Jay Johnson?
A. I see that.
Q. Okay. In the past, was he one of your lawyers?
A. Yes, Jay was one of our attorneys and a dear friend. As we

heard earlier in court, he passed away.
Q. And, Mr. Rothschild, the date of Mr. Johnson's message to you here is the year 2021?
A. Correct.
Q. Okay. And then if you could look at -- well, staying with 646, do you see there is a reference to two attachments? The top one begins 2020/12/07?
A. No. Could you point that out for me? I'm on -- first of all, let's make sure I'm on the same document. 646, correct?
Q. Correct.
A. Okay.
Q. And I will do my best to point it out to you because we don't yet have it on the screen because it's not admitted yet.
A. Perfect.
Q. In the top, essentially above all the redactions, do you see near the left where it says "attachment," and it actually says "attachment" two times?
A. Yes, I see that it has that.
Q. The first of the attachments, or the one that's on top, if you will, if you move to the right a little bit, do you see the numbers 2020, 12, and then 07?
A. I do.
Q. And Mr. Rothschild, if you turn -- actually, I think you're looking at -- if you look at the document to your right, to my left, which should be 647, do you see, at the top, December 7,

2020?
A. I do.
MR. MACHLEIDT: Your Honor, Valve offers Exhibits 646 and 647, as redacted, into evidence.
THE COURT: Any objections?
MR. ZITO: No objections.
THE COURT: 646 and 647 are admitted. You may publish.
MR. MACHLEIDT: Thank you, Your Honor.
(Plaintiff Exhibit 646 and 647 admitted.)
MR. MACHLEIDT: Ms. Gray, because we did a lot of talking there, just so everybody else can see, could you please take us to 646 and just call out all the non-redacted information at the top of that message?
Q. (By Mr. Machleidt) Mr. Rothschild, it's going to seem a little repetitive, but -- because now everybody can see it. Are we looking at, on the screen, the 2021 email from Mr. Johnson to yourself and others?
A. It appears so.
Q. And do you see in the subject line, there's a reference to *Rothschild v. CuriosityStream*?
A. I do see that.
Q. And now that we can all see on the screen, below that is what I was asking you about, namely 2020/12/07, and then it continues, "Letter to Rothschild regarding resettlement."

Do you see that text?

A. I do.

Q. Mr. Rothschild, will you please go to 647, or you can look at the screen.

MR. MACHLEIDT: Ms. Gray, will you publish -- and let's be very cautious here. I believe we have it labeled 647R. If you don't mind, would you please publish the first half or the top of 647? Perfect.

Q. (By Mr. Machleidt) Mr. Rothschild, do you see that the date on this letter is December 7, 2020?

A. I can see that.

Q. And the -- do you see where it says, "Dear Jay"?

A. I do.

Q. Below that, there is the text, "I write in response to your November 24, 2020 email extending Rothschild's standard early settlement offer of $75,000 to resolve the pending litigation."

Did I read that correctly?

A. You did.

MR. MACHLEIDT: Ms. Gray, can you get us to the second page? And I believe it should be near the top.

Q. (By Mr. Machleidt) Mr. Rothschild, in this part of the letter, do you see reference to -- and I -- I'll try to do this simply -- two parentheticals that say Hardin, and then the other is Monroe?

A. Correct.

MR. MACHLEIDT: Okay. Ms. Gray, can you take that down for a moment?
Q. (By Mr. Machleidt) Mr. Rothschild, turning to the present lawsuit with Valve, yourself, and others, at some point in time during the lawsuit, did RBDS file a counterclaim against Valve for infringement of the '221 Patent?
A. Right. RBDS did file a claim -- several patents involved, so I'm just thinking -- against Valve Corporation, correct.
Q. That claim that RBDS filed against Valve, was it for the alleged infringement of the '221 Patent?
A. I would assume it would be, yes.
Q. Mr. Rothschild, will you turn to the red binder of yours, and I'll cut to the chase. We talked about it at the beginning of today. That binder has the transcript of your deposition.
A. I'm just closing the black binder.
Q. Of course.
A. Big binder.
Q. Will you confirm for us that the red binder has a transcript of the deposition that you gave in this lawsuit?
A. Well, it purports to have my transcript in it, yes, that's the head -- headline on it, on the (inaudible) page, but -- excuse me -- but I haven't, obviously, gone through the whole transcript to verify that it is the correct transcript.
Q. You mean to say that the physical copy in front of you, you haven't had the chance to flip through the whole thing?

A. Yeah, since I was just called here to testify, right?
Q. Understood.
A. Yeah.
Q. Will you please turn to Page 298 in the red binder, and let me know when you're there?
A. I believe I am there.
Q. Mr. Rothschild, I'm going to read from Lines 17 to 21 on Page 298. Please follow along.
"QUESTION: The reason I asked about the infringement in the Texas cases, you are aware that in the current Washington case, RBDS has a counterclaim of infringement against Valve of the '221 Patent.
"ANSWER: I am."
Did I read that correctly?
A. You did.
Q. You're aware that the '221 Patent counterclaim has been dismissed?
A. Correct.
Q. In this lawsuit, did Display Technologies also counterclaim against Valve for the alleged infringement of its '195 Patent?
A. Right. In the case of Display, as we heard testimony earlier, there was a mistake made. We filed that patent, right? We filed a patent infringement case against your company -- that you represent, I should say, Valve. Within just a few days, it was definitely a mistake. We admitted the mistake.

I just want to be on the record as saying we apologized for the mistake immediately. Jay Johnson was dying at the time, so that was the reason -- one of -- one of the reasons for the mistake. And within, I believe, eight days, we dismissed that case. Right? Told Valve we were sorry. I ordered them to tell Valve that we were sorry.

It was a definite big mistake that, obviously, we regret. Told Valve we were sorry. We dismissed the case after eight days.

Q. Mr. Rothschild, I'm going to apologize. I'm going to try to make my question a little bit more clear. The lawsuit you mentioned that you just described as a mistake, was that the Display Technologies lawsuit that was filed against Valve in 2022?

A. I know there was a lawsuit filed against Valve for Display, which Display had rights to under the previous Global Settlement Agreement. It shouldn't have been filed. It was filed. Right? As soon as we realized we had made the mistake, we withdrew the lawsuit and, of course, apologies were made to -- to your client, to Valve.

Q. Mr. Rothschild, in the current lawsuit that Valve has filed against yourself and Display Technologies and others, are you aware that as part of this lawsuit filed by Valve, at some point in time, Display Technologies counterclaimed or countersued Valve for infringement of the '195?

A. Right. I'm somewhat aware of that, but that's a bit complex. I believe that our attorneys are taking the position that since Valve is now abrogating the agreement, saying the agreement for the general license agreement that we signed doesn't exist, that there was a claim made --

MR. MACHLEIDT: Objection -- objection; nonresponsive; violation of the pretrial rulings. I ask for an instruction, Your Honor.

THE COURT: Overruled.

Q. (By Mr. Machleidt) You're aware that in this case, there is no allegation by any of the defendants that Valve has breached any agreement?

A. Would you -- sir, could you repeat the question so I can answer, please?

Q. Of course.

You're aware that in this lawsuit -- tomorrow, the jury will get the -- the case, very likely. You understand that the jury is not going to be asked to decide whether Valve has ever been in breach of the settlement agreement?

A. I don't know. That's a good question. But I can honestly tell you I don't know the legal complexities of what, you know, the jury is being asked to do or not to do in terms of the -- the overall agreement.

As I testified to earlier in regard to the earlier Display case, it was filed; it was a mistake; and we apologized for it

after eight days.

And in terms of the complex complaint that you guys served upon us in this current Washington case, which is why I'm here in the jury box today, there's a lot of back and forth, and it's complex. It was over -- it's been three years' worth of -- I guess three years' worth of litigation.

Q. Mr. Rothschild, sticking with patents but being a little bit general, is it fair to say that if a patent that is owned or controlled by Patent Asset Management, if it gets invalidated, you would not expect to receive any license or settlement revenue from that invalidated patent?

A. Absolutely, if a patent -- it's a bit complex because there's families, as we heard earlier. Nothing is ever that simple, I think. But there's families of patents, so you can have a whole family of eight patents, and one of the patents can be invalidated. And, of course -- and, as you know -- as I believe you know, sir, you have the rights to sue on the other -- the other seven.

But as far -- if you're suing on a singular patent -- let's say the patent number is -- ends in '195 and then the court determines or the patent office determines -- by the way, the patent office can -- as we probably both know, can invalidate a patent either -- or a district federal judge like this particular judge can, on his own volition, I believe, invalidate a patent for various reasons. Then you would absolutely not

want to sue on that patent -- on that patent that is invalid.
Q. Mr. Rothschild, I won't rehash Mr. Falcucci's testimony with you, but is it fair to say that companies owned or controlled by PAM, such as Display Technologies and RBDS, things like that, they have been involved in several hundred, at a minimum, license agreements?
A. Yeah, we're proud of the fact that -- very proud of the fact that I've been an inventor since I've been 17 years old. Over the past many years -- I currently have, by the way, in my own name about a -- it changes day to day, from the patent office issuing patents to me. But right now as I stand -- I guess I'm not standing; I'm sitting here. Sorry about that. As I sit here, I have 170 issued patents in my name.
The company has other patent holders, other patent assets as well, so we have hundreds of patents. But I'm proud of the fact that I have been issued 170 patents so far. I have another 40 pending at the patent office, by the way, in various technologies. So -- and by giving you that answer, I forget the question. So if you'd be so kind to give me the question, I'd appreciate it.
Q. Of course.
A. Thank you. Thank you. Sorry about that.
Q. Not a problem.
Have your companies entered into on the order of hundreds of patent settlement and license agreements?

A. We take our patent holdings, and we license -- sometimes without litigation, sometimes with litigation. And, yes, we've entered into, proud to say, hundreds of licensing agreements with major companies.

If -- I don't know if the jury saw or the Court saw the -- the brochure, but we've had major companies that we're proud to say that we're partners with in our licenses; people like Hewlett-Packard, people like Samsung, people like The Disney Company, people like Oracle, people like Microsoft. And I guess before this lawsuit, we would have been proud to say that we had a license agreement with Valve, who went to us after, you know, we litigated with them and decided to take a license on many of our patents -- 35, at that point, if I remember correctly.

So we're proud of that relationship. I don't know if I can say that anymore, but we were proud of that relationship with the Valve Corporation, so -- and Valve, by the way, was very, very nice in -- in working out that agreement with us. It wasn't contentious in manner, shape, or form, the original agreement. So we thought they were partners with us.

Q. Mr. Rothschild, in every one of the settlement agreements that you've been involved with, is it correct that there's a clause in there, or a provision, where the licensee -- the Valves of the agreements -- deny any infringement allegations by your companies?

A. Yeah, pretty much. Some of these settlement agreements, by

the way, as you would expect, are kind of boilerplate. And as you've pointed out correctly, we've done hundreds of them. And, yeah, the company that you -- if you're in litigation -- again, sometimes we have companies come to us, and they say because of our track record and standing in the industry, that they just want to -- we've had that happen, by the way, many times. They say, We don't want to litigate; we just realize you have a lot of holdings, and we'd like to take a license.

But in the case where we do litigate, the company has a standard agreement, whether it's -- I would venture to say whether it's us or any other company that's doing a settlement agreement. It's a standard clause that they say, Of course we're not infringing.

And, of course, reciprocally, we put in the agreement, I believe, that we believe that they did infringe. So we're saying you did infringe; they're saying they didn't infringe. But the good news is we don't have to be in court. We don't have to go through complex and expensive litigation. We then come to a settlement. Money is paid. They have license rights -- sometimes license rights, sometimes just the ability that we're not going to sue them. There's different kinds of agreements. One would be we won't sue you for a certain number of years; another is you have complete license rights.

Q. Mr. Rothschild, picking up with sort of the last part of your answer, is it true that sometimes you simply give a

licensee or a defendant a promise not to sue them?
A. Yeah, and I believe what you're saying is a covenant not to sue. We use the acronym for that -- everything's got an acronym, huh? We use the acronym of "CNS."
So we'll give a company a CNS, meaning -- and it could be for a certain number of years, by the way; it could be for two years or ten years, or it could be perpetual. But they don't have a license in that case.
So there's different kinds of settlements. There's where -- and this is not just with my company, it's with the whole industry. Anyone that knows the industry will know this is the case. So we'll do a license where they have the rights to use the intellectual property that we've provided, usually, pretty much without exception, the whole family of patents they have right to, that they've paid for. Or in a limited sense, it could be just a CNS, covenant not to sue, for a certain period of time. We've extensively done both agreements over the many years that we've been doing this.
Q. Unpacking a little bit of what you've said, Mr. Rothschild, is it correct that sometimes you give an alleged infringer just a covenant not to sue; other times, you will give them only a license to a certain number of patents; and then in some instances, you'll give them both?
A. Right. I didn't say both, but I was -- you read my mind. I was about to say that. Right. Sometimes the agreements are

both, right.

In fact, usually when there's a license it's also -- if I remember correctly, usually when it's a license it's also -- it also includes a covenant not to sue. So I think that's pretty standard, actually.

Q. Mr. Rothschild, specific to the Global Settlement and License Agreement between yourself, Display Technologies, and Valve, do you agree that Valve should never have been accused of infringing the '221 Patent under that agreement?

A. Right. As I testified to a minute or two ago, and as I said during the deposition, we made a mistake. As we've said -- as I've heard testimony during the last few days, part of the reason was Jay Johnson, a dear friend -- great attorney, by the way, formerly with Baker Botts, a big law firm -- just a really nice guy, by the way -- and he had -- I just want to say if I can, that the cancer that killed him didn't just come and go, it was a recurring, unfortunate situation. So he was ill for a number of years and had a bunch of operations around the country, actually, different places. And then it came back; the cancer came back. And in the final days, unfortunately, he passed away. But, you know, a good man. A good man.

Q. Mr. Rothschild, specific to the June 2023 letter sent by Mr. Meyler, where he accused Valve of infringing the '221 Patent on behalf of RBDS, do you agree that Valve should not have been accused of infringing the '221 Patent as part of that June 2023

letter?

A. Right, and that is absolutely correct. And as I testified to a few minutes ago, we felt really bad about that. We offered our apologies. I don't know what damage was done to Valve or what they're asserting here in this court. But the Court should know that it was eight -- I believe eight days, that we immediately told them that, you know, it was a mistake and we apologized. I had my staff apologize to Valve.

We had a great relationship with Valve. You know, Jay was dying at the time. Sam Meyler, who's a great guy, as well, here -- Sam was our local attorney. But Sam's not a patent attorney. Sam is the local attorney that files cases for us. You know, one would hope that -- or I would have hoped that I wouldn't be here today because Jay Johnson would have been, you know, responsible and able to handle that and that the mistake wouldn't have been made.

But it's everybody's mistake; I'm not just saying it's Jay's. So I don't want that to be reflected in my testimony. It was definitely a mistake by my company, definitely a mistake that Sam made. You know, we're all responsible, absolutely.

MR. MACHLEIDT: Your Honor, I do object to that as nonresponsive and move to strike.

THE COURT: I am going to -- it's your witness, so I am going overrule the objection to the extent that you are making it.

But I am going to tell Mr. Rothschild I've got a transcript here that's showing up live. Many of the questions that Mr. Machleidt is asking you are yes or no. That's what the responses call for. You're going pretty far outside of that. So please listen to the question that's being asked of you and answer that question. You'll have an opportunity to expand upon your testimony when your attorney asks you questions.

THE WITNESS: Thank you, Your Honor.

MR. MACHLEIDT: May I proceed, Your Honor?

THE COURT: You may.

Q. (By Mr. Machleidt) Mr. Rothschild, just to go back to my prior question, the June 2023 letter where Mr. Meyler, on behalf of RBDS, accused Valve of infringing the '221 Patent, do you agree that Valve should not have been accused of infringing that patent in June of 2023?

A. Right, and to give a short answer, absolutely correct. You are absolutely correct.

Q. Mr. Rothschild, you were in the courtroom, as you mentioned, throughout the entire trial, correct?

A. Absolutely. I've been here.

Q. Going back to when I took your deposition in August of 2025; at that time, was it correct that sort of your monetizing entities were responsible for more than 1,000 patent infringement lawsuits?

A. Right, probably that is absolutely correct. Probably more

than that. But we do want to say that that's over a period of time. That's not today. We didn't file a thousand cases today. That's over a 10- or a 12- or a 15-year period of time.
Q. Understood. No one is filing a thousand lawsuits in a day.
But you did mention that the number had gone --
A. We'd hope not.
Q. I apologize. What did you say?
A. I said we'd hope not.
Q. Fair enough.
It was at over a thousand back in August of 2025, and you agree that as of today the number of lawsuits brought by your monetizing entities has exceeded that number by potentially several hundred?
A. I don't have an exact count, in truth. I know that we've filed a bunch of lawsuits over the ten years, and that's -- the reason is that we have a lot of patents in our patent portfolio.
Q. In August of 2025 when you and I sat for your deposition, none of the lawsuits, none of the more than 1,000 lawsuits brought by your monetizing entities, had ever gone to trial; is that correct?
A. Right. In the industry, 98 percent of cases do not reach trial, including our cases.
Q. Is it still correct today that as of today, none of your patent infringement lawsuits have ever gone to trial?
A. Except for today, no, that is absolutely correct. We've

not been at trial. Again, the industry standard is 98 percent of patent cases do not reach trial.

Q. Do you consider today, the lawsuit brought by Valve, to be an infringement lawsuit by your companies against Valve?

A. Repeat that question. I didn't quite get that.

Q. I'll try to unpack it.

A. Thank you.

Q. Setting aside the lawsuit that of course brings us here today that Valve brought, is it still correct that none of the patent infringement lawsuit that you have filed, that your monetizing entities have filed -- none of them have gone to trial?

A. We've never had one go to trial. We've wanted to take them to trial, if possible. But we've never had the opportunity.

MR. MACHLEIDT: Your Honor, may I have 15 seconds or so to confer?

THE COURT: You may.

MR. MACHLEIDT: Your Honor, no further questions at this time, and Valve passes the witness.

THE COURT: Thank you, Mr. Machleidt.

Mr. Zito, your witness.

MR. ZITO: Thank you.

Permission to approach with the defendants' exhibit binder?

THE COURT: You may.

THE WITNESS: There's a bunch of binders.

CROSS-EXAMINATION

BY MR. ZITO:

Q. Good morning, Mr. Rothschild.

A. Good morning, Mr. Zito.

Q. Have you ever testified at a trial before today -- or yesterday, rather?

A. I don't think I have. This is my first opportunity.

Q. I'm going to go way, way back in time to a question that you were asked, and you answered that at 17 you had your first invention or your first patent?

A. Right. I would say at 17 I had my first one. But I was thinking about that last night in anticipation of testifying. My first invention was actually when I was, like, 9 or 10 years old, but I wasn't able to get a patent on it. I didn't try, actually, to get a patent on it. But it was an invention. That's kind of when I decided I wanted to be -- if I could be so lucky -- to be an inventor.

But the first one I filed, to answer your question directly, was on quadraphonic stereo, and I filed that, I guess, like, 17 or 18. And I was lucky enough to have the patent -- grant the patent when I was, like, 20 or 21.

Q. Out of curiosity, do you remember the number of the first patent?

A. No. But that's interesting because if you have a patent, you can get memorabilia celebrating your patents. I've never

done that except for my first one. So on my desk at home, my home office desk, I have a coffee cup that has that patent number on it. But I'm not smart enough to remember the number. Maybe I should.

Q. Again, what -- very briefly, what did you invent when you were nine?

A. Oh, okay.

Q. Again, very briefly.

A. Yeah, really quick. I had a real -- probably no one on the jury or anyone in the court may remember this, but in the old days, they had reel-to-reel tape machines. So you'd have to buy, like, reel-to-reel magnetic tape to record something -- audio only, of course. And I figured out a way to use both sides of the tape, instead of just one side, to double the storage capacity.

Q. Interesting. What is your education? Again, briefly.

A. I have a bachelor of arts from the University of Miami with a major in history, which I love, and a minor in biology. And then I have a graduate degree in business, which is kind of equivalent -- not exactly, but kind of equivalent -- it was an abbreviated MBA program. So equivalent to an MBA, but they called it a graduate degree in business --

(Reporter interruption.)

THE WITNESS: Sorry. Sorry.

A. Which is equivalent to a -- somewhat equivalent to an MBA.

And then I audited some law school courses, but did not go to law school.
Q. (By Mr. Zito) Okay. Thank you.
And, again, briefly, could you describe your employment history after graduation?
A. I started a company that was involved very briefly in custom electronic -- actually called Custom Electronic Designs, that did high-end audio and video installations. From there, we became one of the first companies in the United States to actually rent video -- video -- videos, which later on -- it didn't become Blockbuster but -- Blockbuster Video, but similar to Blockbuster. So we had a bunch of stores.
Then I got very interested, at the time of the computer revolution, in computers and started a company called IntraCorp Entertainment. And that company produced productivity software and gaming software that -- we had the honor -- I was chief executive officer and chairman, and we had the honor of distributing around the world. We had affiliate offices in Amsterdam and in Germany and in the United States, of course.
And we came out with a whole bunch of game software; like the movie version of *Home Alone*, we -- that was our game. We came out with a first-person virtual reality game. We had Bill Shatner, William Shatner, as our spokesperson. We did a number of games based on his books. He wrote a number of books called *TekWar*. We had the rights to that. We worked with Tom Clancy,

produced his first game ever, as a simulation.

And a bunch of other games. We had hundreds, I guess -- I don't want if I want to say "hundreds," but more than a hundred products out in terms of productivity software and gaming software -- and gaming software.

Q. And what time frame are we speaking?

A. Let's see. So that was probably nineteen -- these dates are not exact, but, like, 1970 -- '70 to, like, 1990 -- no, not 1970, sorry, that's wrong -- 1978 and close to 1980 to, like, 1994 or '5 -- approximate dates, by the way.

Q. Okay. And briefly, did you get patents during that time period?

A. Say again.

Q. Did you obtain any patents in your name during that time frame?

A. No, I did not. I had the first patent still. I was not really actively involved in patents till, like, 1980. So I guess, yeah, during that period of time I stand -- strike my answer. I guess during that period of time, yes, I did have some patents, come to think of it.

Q. And then what happened to that company? Again, briefly.

A. In terms of IntraCorp Entertainment, we suffered a bit when the hurricane came to Miami, because that was our main office. And after the hurricane -- and we were going to take the company public, we were not able to do that, and the company shut down.

Q. What did you do next?
A. I came up with the idea of scanning QR codes -- supermarket -- not QR codes, but barcodes, excuse me -- barcodes, scanning them and tying them to the Internet. And I was just at that point working from my home and had patents -- filed patents on that technology.
We went to a company called Symbol Technologies, which was the leader -- huge company, hundreds of -- well, I guess thousands of employees, out of New York. They had created the barcode scanning for -- that you'll see in all the -- that you saw in all the retail establishments. They were very interested in my patents and my technology, and they helped us go public. Put a bunch of money into the company. We raised a bunch of money.
That company was called -- I testified to this, I believe, yesterday -- it was called BarPoint, Inc. Our trading symbol on the Nasdaq exchange was BPNT. Our stock price started at -- I'm kind of proud this -- at, like, 40 cents, and went to, like, $30. And so we had close to, you know, many hundreds of millions of dollars valuation.
I was the CEO and chairman at the beginning, but then my board of directors thought that I would be better off as just chairman, and we brought in the president of Office Depot to become our president. So -- but I still was chairman. So that was pretty good.

Q. And that's the nineteen -- the early 1990s?

A. Yeah, you know, that company was maybe, like, into 1990 -- like, maybe, like, 1994 or '5 -- again, my dates are a little hazy here -- until 2003 or '4, something like that.

And I'm anticipating your question. We ended up selling the company.

Q. All right. And after you sold the company, what did you do next? Again, briefly.

A. Well, I still had -- at that point, I was really involved in patents and filing patents and fulfilling my love, which is inventing. So at that point, I had another company that was taking the patents, and we were going to put out -- because BarPoint had put out products. As I testified to earlier, BarPoint was not an NPE; BarPoint was a practicing company with clients, such as Office Depot and Sharper Image and just a number of other companies that were using our QR code and our scanning technology products.

After that, I decided to stick to inventing, had another company for a short period of time. And then Intellectual Ventures, which is a Washington-based company which was started by Nathan Myhrvold, with involvement from Bill Gates -- they came along, and to my great surprise and great honor, they said they were interested in working with me in terms of my inventions. And we've worked together for many years with Intellectual Ventures. Great people; great company here in --

here in Seattle, I believe -- Bellevue, I think. They bought a lot of my patents.

Later on in the relationship, they gave us patents that they had and asked us to help them monetize those patents, which we did. So we had a relationship which still goes on today.

Q. What time frame was that, when you started to help Intellectual Ventures monetize their patents?

A. I guess that was probably -- I'm not that great on dates today, but I guess that was probably two -- let's say two thousand and maybe, like, '10 or '11 or '12, something like that, for a period of time.

But -- and we were -- they were very active in helping us in monetizing our patents by purchasing them -- by purchasing them. And they own a lot of -- currently, they still own a lot of my patents, which they've licensed to companies like TiVo and some automobile manufacturers -- major automobile manufacturers like General Motors and Toyota, Honda, et cetera, et cetera.

Q. So we're roughly in the 2011, 2012 time frame at this point?

A. Yeah, but the relationship still goes on.

Q. Were you based in Washington at that point or still based in Miami?

A. Intellectual Ventures?

Q. No. You, personally.

A. Absolutely. I've always been -- we've had other offices,

but I've always made Miami my home.
Q. And I think you say some testimony -- we all watched testimony on video from Ms. Kazanjian. If you could pronounce her name?
A. Right, a hard name to pronounce. But the correct pronunciation is Kazanjian -- Connie Kazanjian, Constance Kazanjian.
Q. Okay. And you met her around this time frame?
A. What happened is after my company went public she was working at the University of Miami in terms of endowment. And she approached -- approached me and my family and asked for an endowment for the University of Miami. And I'm proud to say that we endowed part of the business school at the University of Miami in terms of entrepreneurial program. They set up a Rothschild entrepreneurial program for students, which still exists and which I'm very proud of.
Q. She mentioned another company name. Do you recall?
A. Yeah, we had a company at that point that was handling patents, and she's absolutely correct, called Inventaur, right. That was a company that was managing some of the patent holdings at the time.
Q. Okay. Could you spell that?
A. I hope so. Let's see. I-n-v-e-n-t-a-u-r.
Q. So Inventaur?
A. Inventaur, not "inventor."

Q. All right. Thank you.
A. A little confusing maybe, huh?
Q. And could you briefly describe how she worked with that company and you? Again, just briefly.
A. She had previously been involved in, I guess you could say, finance or raising money. She had worked previously for a hospital in Miami; I think Mount Sinai, maybe -- maybe. And then she joined us in trying to -- kind of an executive assistant but a little bit of a higher level -- in trying to help us, as she said, monetize our patents and, you know, make some contacts for us, helping managing -- helping managing the patents. We were never a large company. At that time, we might have had -- I don't know -- three or four employees. We've never been thousands of employees or a company as large as Valve, you know, with billions of dollars worth of revenue.
MR. MACHLEIDT: Objection; 403. Move to strike.
THE COURT: The objection is sustained. The jury will disregard the previous response.
Q. (By Mr. Zito) Ms. Kazanjian --
A. Kazanjian. We'll train you to say it.
Q. -- testified that you spoke often about being a patent troll and having a pride in being a patent troll; is that correct?
A. No, that -- I was shocked to hear that and kind of disturbed by that.

In the context now of today's world, it's not considered -- patent troll is not considered a complimentary term, as far as I know. I'm very, very proud, as I sit here today, to be an inventor. I'd like to think I'm an accomplished inventor. I've been doing it very long and had a history of success and -- with many of our patents.

No -- no, I never told her or anyone else -- what a silly, stupid statement, that I'm proud to be a patent troll. No. I hope that she meant to say -- unless it was just meant to be a cutting comment -- is that I'm proud to be an inventor. I've told her that -- and everyone else that -- many, many times. It's the love of my life.

Q. Fifteen years ago, if my mouth -- math is correct, was "patent troll" a common term? Was that something that was spoken about in the industry?

A. I think it's always had kind of a negative connotation, at least as far as I'm concerned. Today it seems like it's even more of a negative connotation, you know?

Q. Did Inventaur eventually evolve into what's now called Patent Asset Management?

A. Absolutely. And it was at the time that Ms. Kazanjian was working with us that we were working -- proudly working, still working, with Intellectual Ventures.

Q. And how many patents, roughly, did Inventaur have at the time it transitioned into Patent Asset Management, if you know?

A. It's a good question. Maybe 40 or 50 or something in that regard. As I testified to earlier, now it changes day to day. But my current count of my patents that I've been awarded solely is 170; 40 more pending at the patent office; and we're filing still -- I'm filing still on a regular basis.

So -- but we had additional -- now we have additional assets where we try to help other inventors. And they come to us, Mr. Zito, and we manage or purchase their patents. And then as we're successful, we reward them with compensation.

Q. And what is the current number, roughly again, of patents that --

A. You know, I don't know exactly, but I'd say that we manage approximately now, between my holdings -- meaning the ones that I invented -- and the ones we've acquired, approximately 300 or so.

Q. Okay. And I'm going to do a little math, because these numbers came up before. In the history where you say there's approximately 1,400 litigations, are you going back all the way to the 2011, 2012 time with Inventaur or are you starting at some later date?

A. No, I'd say going all the way back.

Q. And you have about 300 patents currently?

A. Correct.

Q. So rough math, that would average about one litigation per patent every three years?

A. I didn't do the math as successfully as you just did, so I'll defer to your math.
Q. All right. There's been some discussion, both in your testimony and elsewise in the court, about that the fact that PAM and one or more of its subsidiaries has, on at least three occasions, filed suit on a patent that was already licensed to the defendant. Are you aware of the testimony?
A. Absolutely.
Q. Now -- and we heard testimony that in each of those cases, the suit was very quickly dropped.
A. That is correct. With apologies.
Q. As a businessman, putting your businessman hat not your inventor hat on, would that be a good business plan to make money?
A. Well, I would point out, no, it would be a terrible plan. And I'd point out that when we make that mistake, it costs us resources in the fact that we're paying to file lawsuits that we shouldn't have filed. We made that mistake. So it's costly to us -- and embarrassing, as well, clearly.
Q. So is it part of PAM's business strategy to re-sue companies on patents they already have a license on?
A. Absolutely not. Our strategy is to look carefully at our patents, to do with our team due diligence on our patents to find out who's infringing, to ask them -- you know, in whatever forum we would want, whether it's a letter or whether it's a

lawsuit -- to compensate us for their infringement in a fair way, and then to proceed along those lines.

Q. If you heard of another patent owner re-suing a company on a patent they already licensed, would you come to the conclusion that that must be a good business method and I should adopt that?

A. I think it would be a terrible business method and not the right way to proceed with no gain, you know, to be involved and only -- only problems that would ensue.

Q. Would you make any assumption as to why or how that happened?

A. No, I wouldn't know why that happened. I would think the company made mistakes, obviously, that they shouldn't have made.

Q. Why does PAM have so many subsidiaries?

A. You know, each patent -- and then we talked about during the trial here, patent families. So you might have one patent and then we file continuations, so then maybe it becomes eight patents. We have families like our Symbology family that's nine or ten patents. We have some other families. I have patent family now involving hearing technology to help people hear better. That is --

Q. I'm going to get you to pause here. What's the name of the subsidiary that holds those patents?

A. These are good questions. Symbology -- Symbology is Symbology Innovations. And the hearing aid is Audio Devices, I

think. That could be wrong. I don't know the name of that subsidiary.

But to answer your question on point, we put each of the families in a separate entity so that they're not mixed between entities. That's a suggestion that I had, as well as our accountants and our corporate attorneys, to separate them into different families, to different practicing -- different entities. I don't know if you'd say "practicing entities," but to different entities, corporate entities.

Q. What is the technology area of Display Technologies?

A. That involves -- good question. That involves taking information and segregating the information in terms of encoding or encryption, decryption. Pretty much the technology was developed for -- and we have licenses in the automotive area, quite a few. I think, actually, with most of the major automobile companies: General Motors, Toyota, Mercedes, pretty much all of them. I'm -- you know, I'm not remembering all of the companies now, but pretty much all of the automotive companies -- so that the display header -- they call it the "header," I think, which is the display unit in the car -- can accurately receive and encode information that goes into that unit, into the head -- into the head unit.

Q. Okay. And the '221 Patent that we've talked about, that's owned by Display Technologies; is that correct?

A. When you refer to '221, is that Rothschild Broadcast -- is

that the Rothschild Broadcast patent --
Q. That's in -- that's in the Rothschild Broadcast --
A. Right.
Q. -- group?
Okay. What is the technology of Rothschild Broadcast?
A. That is streaming technology, how to stream video, and particularly -- you know, how to stream video, there's, like, you know, 100, 500 patents on -- on that technology. Our -- out -- technology, and I'm the proud inventor of that one, is how to store and commercialize that technology.
So let's say that you want -- and I guess we're seeing this now in practice. Well, I know we are. You want to store a movie for a certain period of time, or you store some data, you know, for a certain period of time. Maybe it's 1 minute, 10 minutes, 20 minutes. It covers the process of storing it and how the company would charge for that storage.
That's kind of the basic outline of what Rothschild Broadcast -- of what that particular patent, the '221 Patent, covers, which is in the Rothschild Broadcast entity.
Q. Okay. While we're on that, let's dig a little deeper into the '221 Patent.
Can you tell us a little bit about the process involved in obtaining that patent?
A. Well, any patent, it is a long process. First, there's conception, where you conceive of the -- the idea, whether it's

a hearing aid or -- we now have a pending patent on a cardiac device that I'm working with. Proud to say I'm working with the head of cardiology in Miami now at one of the hospitals for a new type of cardiac device.

So it's a matter of -- of conception. You can see the idea. It's funny because the conception can occur, you know, in 15 seconds, where you kind of have it all in your brain, or it can be -- you can be noodling on it for -- you know, for hours.

The example I like to give in the book area is with J.K. Rowling, where she said that -- which is just so amazing to me that with *Harry Potter*, it all came -- that whole story, those eight books -- I guess it's eight books. They came all at once into her brain, and she knew it all. I mean, that's just genius.

So in conception, it can be either a minute or I'll be thinking about something for, you know, a year, maybe. Once I'm satisfied that it could be an invention and I have notes on it, I'll do some research. Then the next step is to send it over to my patent attorneys. I'll do a disclosure and send it to the patent attorneys, and they'll tell me what they think. Is there prior art, meaning is it something that someone already has thought of? And I don't want to waste my time or -- and money, their time and money -- I guess my money, their time in -- in obtaining the patent.

But if it clears that hurdle, then they'll start with the

patent application, and they'll send me that application, and I'll work own it. Usually, it's a work in progress. We'll go back and forth.

We're taking about a period here of time, by the way, that could be, you know, several months from start to -- to finish. When the application is to -- to my liking and to theirs, we'll go into the patent office, and the patent office can normally take -- I think the cycle now is two or three years, but I've gotten a big break lately because I'm over 65 years old, and there's called expedition when you're over 65.

So you file an expedition notice, and then they -- I think by statute, they have to respond to it within a certain period of time. I think it's six months.

And normally, as you heard in the video, very, very rarely does the patent office grant the patent on the first go-around. They'll tell you what's wrong with it, and that's called an office action. So you have your first office action that'll we don't like this or that. And there's a whole bunch of reasons that they can give why they're not going to grant the patent. And your attorneys and yourself have to work on that to fix those reasons, as the video said, either convince the examiner that they're wrong and you're right -- it's tough, usually -- or you have to correct the patent. And you go back and forth.

The good news, again, is if you're over 65 and you -- you can even have coinventors. Usually, it's just me in this case.

In fact, pretty much 99.9 percent of the patents that I've filed for is just me. There's a new exception now with the one I'm working on in cardiology with Dr. Rosen. He's on it. He's younger, but we still get the 65-year-old break, which is nice.

And I think that the law says that you have to -- they have to answer within 90 days, normally, which is interesting to -- it me. It could be two years. If you don't have that expedition break because of age, they can take two years to get back to you and tell you what's wrong with your patent, to give you an office action, I believe, and that's tough.

So at some point, when everyone is happy, the examiner is happy, and we're happy -- it's a negotiation, by the way, on the office actions -- then the patent is -- you'll receive an NOA, an acronym, again, which stands for notice of allowance, and after the notice of allowance, you have to pay a fee to get the patent issued, so you'll send your money in.

I think now -- it used to be, like, a long time before they would grant -- publish the patent. It you used to be, like, a year. They've -- some reason -- I guess because they have more of it under control now, I think now it's only, like, 120 days from the time that you pay the fee until they issue the patent.

But it's interesting to note, for everyone to understand, during that period of time before they issue the patent, that's the only opportunity that you have to file a continuation or a continuation in part, as you heard from the video, which means

you're saying, okay, I have a continuing idea on this during that 120-day period. So you can file either of those, and you can expand the portfolio.

Some large companies, not us, they'll have a hundred patents in -- in their family, so in -- you know, for one idea, you know, companies like Apple or other large technology companies, they'll have hundreds -- a hundred patents revolving around one idea, which is pretty neat, and that gives them a lot of protection when they're, you know, telling other companies that they shouldn't be infringing.

Q. And focusing now, narrowly, back down to the '221 Patent, what did you think was unique, novel, unobvious, new about your idea?

A. Well, more importantly, what the patent office saw was unique was the idea of measuring storage and -- and quantifying the storage in terms of the monetization situation, what you would charge the customer per minute, or -- or I guess it's also -- I'd have to review the patent again, but not only per minute time-wise, but it also includes the amount of data that's being stored -- stored. And there's some other nuances as well. I haven't looked at it of late to give you a complete explanation, but that's the 30,000-foot, you know, discussion today.

Q. And in your understanding of the patent, you were talking about it -- you could be storing video, or you could be storing

audio. Could you also be storing game data from a video game?
A. I would assume so.
Q. All right.
A. It is one of the patents, I would note, that, right -- that Valve has a license on -- has a license on -- or had a license in the original Global Settlement Agreement.
Q. If you could pick up 647.
A. Is that -- Mr. Zito, is that this document --
Q. That one --
A. -- that's redacted.
Q. The one -- the one that's not in your notebook that you were looking at earlier.
A. No notebook here, just the document. I have it in front of me.
MR. ZITO: And we can go ahead and publish it because it's already been entered.
Q. (By Mr. Zito) And you were asked about a document referred to here as Hardin; is that correct?
A. I believe that's correct.
Q. And Monroe?
A. I believe that's correct as well. I see it on the screen, actually.
Q. Do you have any recollection of reviewing these two references?
A. No, no recollection, except the matter has come up now

during this trial.
Q. Okay. And could you tell us what a U.S. publication number is, if you know?
A. Yes. There's patent numbers, and then there's publication numbers. Usually, from a publication number, in fact, you can find -- if you type it in -- in -- in the search bar, you can find -- or an appropriate search bar, you could find the patent number.
Q. Okay. So, well, during the process that you were talking about where you submit an application, it goes to examination, and then you get issued a patent, are you aware of a step between that where your patent application is published?
A. Well, ask me that question again, if you would.
Q. Sure. Are you aware of a step in that process where the patent office publishes your pending application before granting you a patent?
A. Right. Applications are published, as a matter of fact, usually within 18 months, so your -- it doesn't mean they're approved at all. It just means that they're published for the public's, you know, purview. So after 18 months, you have an application, whether it's -- it's not approved at that point. They'll publish the application except in cases of national security, and those are -- are not published.
Q. And is it your understanding that Mr. Hardin had his application published in 2008?

A. It would seem so, from what I'm seeing here.
Q. And that would be before the filing date of the '221 Patent?
A. Correct.
Q. Okay. And that's why it's prior art, correct?
A. That's why it would be titled prior art, right.
Q. And the Monroe referenced there is -- is a patent?
A. Right, with a patent number, the '673 Patent we're talking about. Right.
Q. And that was also prior art before your invention?
A. That was created before my invention.
Q. Okay. Do you recall Mr. Johnson in the 2020 time frame sending you a copy of a letter from ArentFox indicating there's prior art?
A. Right. I recall it now because of the document in front of me.
Q. Okay. Do you recall reading that prior art, seeing that document from Mr. Johnson, present recollection?
A. I don't recollect to that period of time, no.
Q. Okay. What typically would you have done upon receiving prior art from Mr. Johnson that was sent to him from opposing counsel?
A. You know, in the -- it's an important question, so let me give you what will hopefully be a good answer.
In the case of a complaint being filed for infringement,

the opportunity exists, and should exist, for the other side that you're saying is infringing your patent to say your patent wasn't valid to begin with, and the reason it wasn't, Mr. Rothschild, was there's art that directly would anticipate or directly duplicate -- anticipate or duplicate your patent. So the patent office, in its divine wisdom, made a mistake. They did not look at this art, and they did not consider it, and as a result, your patent is invalid.

Now, who can -- who can make that determination? Can I just say that to a patent that Mr. Machleidt would have or that, you know, Valve would have or anyone on the jury would have? I can't say that. I have no standing. But I believe that the federal judge that's sitting here has that ability.

And in addition to that, it would be the United States Patent Office. You can file a petition called an inter partes review or an ex parte review, and you can ask the patent office to present the art that you say the patent office forgot. They forgot the art. And the patent office will say, Oh, my goodness, we made a mistake, and we're invalidating your patent.

If you don't want to do that, you can go to a federal district court, such as this court, and provide proof, and it would be up to the discretion of the court, and even the discretion of the court may not be enough. If you feel the courts made a mistake, it would go to the Federal Circuit, and the Federal Circuit can decide that -- in some cases, that the

district judge has made a mistake.

Long story short, when we litigate patents, one of the most common thing that we will see from the other side, the opposing counsel, we call them -- we call them -- is a defense why their patent is not being infringed. People are not going to say that, Oh, my goodness, 90 percent of the time that -- listen, you know, we're -- we're Valve or we're IBM or we're Hewlett-Packard; we admit we infringed your patent. Nobody says that. Let's be serious. What they say is -- they put up defenses, and there's various defenses.

There's a defense that the patent was abstract. That's called the *Alice* defense, Section 101, and that the patent office should have known better. They shouldn't be issuing abstract patents.

Q. Okay.

A. And that's many times a reason why your patent can be invalidated. In that case, it would be invalidated by the federal district court.

So we get -- the point I'm trying to make -- and maybe not making it as well as I'd like -- is that 90 percent of the time when we litigate patents, 95 percent of the time, the other side will allege that the patent was either abstract and we shouldn't be litigating it or that there's prior art for the patent, as these citations that you've given us today, and that we -- that the citations trump our patent and we should just give up.

And what we do, to answer your question on point, is we'll look at the prior art and decide whether it's, you know, bogus art, to use that term, or it's real art. If it's real art and they have a real case or in the case of the patent being abstract, we'll look at that very carefully as well, and we'll say, Guess what? We don't agree. We think your art is not -- not -- not, you know, good art, that it doesn't trump our patent, or we think our patent is not abstract.

We'll look at that very, very carefully, and if we think that -- conversely, that they have a good argument, we don't want to waste our time. We don't want to be killed in court. You know, we don't want to go to that expense. We'll just drop our case and just say okay. And we've had that happen numerous times because you don't know about art until it's presented, not usually, and you don't know how good the arguments are on an abstract basis for your patent and -- usually until they're made.

You hope when you file that you know this -- this stuff, but you don't usually. It depends. So when you find out that your patent is -- you know, when the other side makes a great argument, you -- you should be listening to it, and you should drop the case. If it's not a good argument -- usually, in many, many cases, it's an argument but not a good one. Then you'll let the -- you know, you'll let the patent office decide if they want to invalidate your patent with an ex parte or an inter

partes review, or you'll let a federal district judge in court decide whether to invalidate your patent.

THE COURT: Mr. Rothschild, I'm going to remind you to slow down.

THE WITNESS: Okay. Thank you, Your Honor. I have a tendency to -- to go fast.

THE COURT: Thank you.

THE WITNESS: I'll try to control it.

Q. (By Mr. Zito) Do you have any present recollection of whether or not you found the art that was presented by the attorneys at ArentFox to be invalidating?

MR. MACHLEIDT: Objection; pretrial rulings.

THE COURT: Sustained.

Q. (By Mr. Zito) Okay. Looking at your patent, the '221 Patent, which is Exhibit 31 in defendants' exhibit, which is the red book you have there.

A. Where do you want me to turn to, Mr. Zito?

Q. Tab 31.

A. Tab 31. Okay. I'm going. Big notebook.

Q. Do you see that, the document at Tab 31?

A. I do. I do see that.

Q. Okay. Do you recognize that document?

A. I recognize it as the '221 Patent that I invented. Yep, yep, yep.

MR. ZITO: Okay. We would ask that Exhibit A-31 be

entered.

THE COURT: Any objection?

MR. MACHLEIDT: No, Your Honor.

THE COURT: Exhibit A-31 is admitted. You may publish.

(Defense Exhibit A-31 admitted.)

MR. ZITO: I'll wait till it comes up.

THE WITNESS: It's not up yet.

Q. (By Mr. Zito) All right. Is this the '221 Patent we've been discussing?

A. I believe it is.

Q. Okay. And what -- if you see, it says, "References cited." Could you describe what's in that Section 56?

A. Right. The law is when they issue a patent, they're required, the patent office is required -- I testified to earlier, sometimes they make mistakes, but they're certainly required to do searches and see what patents previously -- you know, an invention advances the art. We don't ever stand alone. We build on the shoulders of others, of other inventions, you know. So what the patent office is doing is they're saying what inventions were similar that came before? What publications talk about what came before your patent, Mr. Rothschild? And they list those in Section 56.

Q. So is that the art that you discussed back and forth during the application process with the patent office?

A. It could be this art, and it could be additional things as well. I guess additional things. I don't know if they -- that's a good question. I don't know if everything that you discuss during an office action is -- is included -- that's a good question, actually -- is included in the references that they cite on the face of the patent. I don't know that. I'd have to -- I'd have to educate myself to that.

Q. And it's your understanding that your patent was issued over these references, correct?

A. Absolutely. The patent office is saying these are the things that came before -- and, in fact, we've had a case, once in a while, where the opposing counsel doesn't do their homework, and they'll actually list one of the citations that's on the patent, and then you just say, Did you look? Did you see the patent office considered that citation? And then they go, Oops, sorry about that. We made a mistake. And -- and -- and that discussion ends quickly. You would hope that that's all they have, but, usually, they have a lot of other art that they're going to challenge you with.

Q. But it could be true that, even though the patent office looked at that piece of art, they may have anyway made a mistake?

A. You're -- you're asking if they could have made a mistake?

Q. Yeah.

A. Oh, absolutely. They can make mistakes all the time, I'm

sure. They're just human, just like us.

Q. Okay. Has the '221 Patent been invalidated in a court or by the patent office or anywhere else?

A. As I said today, that patent is absolutely valid and continues to be enforced against companies that are infringing the patent. And we're proud to have many, many licenses for that patent, Mr. Zito, from major companies that have taken licenses to it. I presume they took the licenses because they realized that we had arguments that were good arguments and that they needed a license to the patent.

MR. MACHLEIDT: Objection; 602 --

THE COURT: Sustained.

MR. MACHLEIDT: Move to strike, Your Honor.

THE COURT: The jury will disregard the last statement. It is stricken from the record.

Q. (By Mr. Zito) There's been a lot of discussion about the fact that you pay your attorneys on a contingent basis. Do you recall that discussion during the trial?

A. I do, and I testified, too, that that wasn't always the case, just usually the case.

Q. Okay. Is there something wrong with paying an attorney on a contingency fee basis, in your opinion?

A. No, I think that a lot of litigation is done in that area. I know in -- from what I've read, in the area of personal injury, as well, it's all on a contingency basis you'd hire the

attorney, right? There's a firm, large firm that advertises a lot near us called Morgan & Morgan. They claim that they're the largest PI firm in -- in -- in the country. They have these huge ads that say that they handle cases only on a contingency basis.

Q. Okay.

THE COURT: Mr. Zito, we've reached our morning recess.

MR. ZITO: Okay. Thank you, Your Honor.

THE COURT: Please remember my instruction about recesses. We'll be back at 10:45.

(Court in recess 10:30 a.m. to 10:47 a.m.)

(Jury present.)

THE COURT: Please be seated.

We're going to resume the cross-examination of Mr. Rothschild.

Mr. Zito.

MR. ZITO: Thank you, Your Honor.

Q. (By Mr. Zito) Just to clear up a few more things on your testimony, you were -- could you look at Tab 22 in the red notebook you have?

A. Lots of tabs.

Q. That's A, which would be Exhibit A-22.

A. It says Defendants' Exhibits. Is that the notebook, Mr. Zito?

Q. Yes, the notebook --
A. Okay.
Q. -- says Defendants' Exhibits.
A. I'm on the tab, I think.
Q. Okay. Do you recognize the first page of that exhibit?
A. Where it's the email from Ms. Schenk. It says, "Please see attached correspondence." Is that it, Mr. Zito?
Q. Yes, that's the one I'm referring to.
A. Okay.
Q. Okay. And the next page.
A. It's headed with the words -- legal stationery -- Meyler -- "Meyler Legal," correct?
Q. And do you understand that to be the June 21, 2023, letter that you were asked about?
A. Give me a second to look at it, please.
Yes, I -- I've scanned it.
Q. Okay. And is -- do you understand that to be the letter you were asked about earlier regarding the assertion of the '221 Patent?
A. I believe so.
MR. ZITO: Okay. We would ask that A-22 be entered into the record.
THE COURT: And, Mr. Zito, is this also Exhibit 93?
MR. ZITO: I don't believe 93 has all of the same attachments, but let me check.

THE COURT: All right. To the extent they're different, that's a sufficient basis to enter in another exhibit.

Mr. Machleidt, any objection?

MR. MACHLEIDT: None, Your Honor.

THE COURT: All right. A-22 is admitted. You may publish.

(Defense Exhibit A-22 admitted.)

MR. ZITO: If we could look at the second -- thank you. All right.

Q. (By Mr. Zito) Do you recall you were asked, did this letter improperly assert the '221 Patent against Valve?

A. Would you repeat that question, Mr. Zito --

Q. Sure. When you were being asked by Mr. Machleidt, he was referring to the assertion of the '221 Patent against Valve. Do you recall that?

A. I recall his question, yes.

Q. Okay. Is this the letter that made that assertion in June of 2023?

A. This concerns several patents, as we can see, including the '221 Patent.

Q. Okay. All right. So there's a total of three patents being asserted here?

A. It purports to be that, correct: SPIS, RBDS, and QTI.

Q. Okay. Did the other two patents being asserted also have

the same problem, that they'd been previously licensed to Valve?
A. No. To the best of my knowledge, absolutely SPIS was never -- never licensed to the Valve Corporation, and -- and then we go to QTI, which I believe was obtained well after the 2016 Global Settlement Agreement, was never licensed to the Valve Corporation.
Q. All right. So is it correct to say when you said the '221 was wrongfully asserted or improperly asserted, that it was only one of the three that were in this letter, correct?
A. That would be a correct statement.
Q. And the other two were not improperly asserted?
A. We had every right to assert those patents, the other two, against Valve because they had elected not to take a license to those patents, or at the time this letter was written, they didn't have a license to those patents, and we believed that they were infringing those patents.
Q. All right. And is it correct that were some Texas lawsuits that were filed on the other two patents in this letter?
A. Right. And, in fact, I directed those, but -- those lawsuits to be filed.
Q. Okay. Was there also a lawsuit filed in Texas against Gearbox under the '376 Patent, which is one of those two patents?
A. Same answer. I directed that lawsuit to be filed.
Q. What was the resolution of the lawsuit against Gearbox, if

you recall?
A. Right. It was handled by Garteiser Honea, and a settlement was made. As of the date that I sit here -- as of now that I sit here, I should say, I -- I don't know the amount, but I know that my -- recollecting this, I was told that Gearbox wished to settle as opposed to going through, you know, further court proceedings, and a settlement was reached. A settlement agreement was signed and Gearbox paid us.
Q. Who is Gearbox?
A. I don't know exactly who Gearbox is, but I know that they're -- I don't want to say "affiliate," but I guess a customer, an affiliate, some relationship to Valve. I don't know more than that.
Q. Was the assertion -- if you know -- was the assertion of infringement against Gearbox based upon the same infringement theory that the assertion is against Valve?
A. I don't know that.
Q. Okay. Do you know why the Gearbox was settled and the cases against Valve were dismissed?
A. Yeah, that's a good question. Right -- Gearbox was settled simply for the reason that Gearbox made what I hope was a wise decision on their part, and I hope a wise decision on our part -- to come to a settlement rather than going through lengthy court proceedings. I want to point out that we settle cases, as the defendants do, to avoid a situation which costs

both of us a whole bunch of money. So they settled, and that was great. Much appreciated.

Now, as to the other cases that you're talking about -- that we filed those cases in Texas, in the Eastern District of Texas. As to those cases, the federal district judge there -- I think it might have been Judge Gilbright [sic] -- decided that we didn't have proper venue. And what that means, as I understand, is that we -- he was saying that we made a mistake, and we didn't have the right to sue in that jurisdiction. What he didn't say, and what we understand currently, is we have the right to sue on those cases in a different jurisdiction. Jurisdiction depends on a whole bunch of factors. As I testified to earlier, I'm not an attorney, but the attorneys tell me --

Q. I'm going to cut you off there.

Do you know where Gearbox is located?

A. No, you know. I don't.

Q. Okay. Do you know if they suffer from the same jurisdictional issue?

A. I don't think they do. I don't think they do. But can I complete my other, Mr. Zito --

Q. No. That's okay, I think.

A. Okay.

Q. We touched earlier on the pact that PAM, Patent Asset Management, has a number of subsidiaries, correct?

A. That is correct.
Q. And if I recall your testimony, you're not sure of the exact number?
A. That's correct. I don't -- as of this time, I don't know the exact number of subs that we have.
Q. Do you know the approximate number?
A. It's less than 25. It's probably in the 20 range. Something like that.
Q. Between 20 and 25?
A. Yeah, it may be -- that's the approximate. That may not be exact.
Q. And they all have different areas of technology; is that correct?
A. Well, as I testified to earlier, they're all holding unique families of patents that are connected by priority by the patent office. So that's an asset that each of those companies have, and each of those patents represents a different technology area; for instance, as we talked about today, streaming video; as we talked about today, encoded -- encoded technology, which is our Display Technology; as we talked about today, hearing aid technology.
Q. Are those patent families owned by the subsidiary?
A. Yes. Each of those families, when they're put in that corporate structure, are totally owned by the subsidiary.
Q. Do those patents have any value?

A. Oh, they have great value, as a matter of fact. A, we paid a lot of money and a lot of time with our company to, as I testified to earlier -- to secure the patents. Patents are not issued for free. It's a long process and paying the patent attorneys and paying the staff -- my staff, company staff -- and paying for issuance.

And then the other valuation is the fact that they have value because, as we heard from the video at the beginning of the trial, it is a -- the ability to, for a certain period of time -- normally 20 years -- to have the rights to enforce that technology against companies that are infringing that technology. So that's a huge asset.

Q. And would that -- putting on your businessman hat again, would that be considered a valuable asset held by -- would each patent family be considered, by you, a valuable asset held by each subsidiary?

A. Not only us, but patents are considered and put on balance sheets for public companies. I know, having run a public company, that they're considered absolutely tangible assets, monetary assets that have valuations.

I think I read an article the value of patents in the United States exceeds -- the overall value of intellectual property exceeds a trillion dollars.

Q. Is the value of your intellectual property exceeded a trillion dollars?

A. Not at all. But I wish it was.

Q. Do you list these as assets of the company? Do you do depreciation of these assets or anything like that?

A. My accountants absolutely account for these assets. And under accounting regulations, which -- I'm not an accountant, so it gets a little fuzzy for me. But, yes, we have to account for depreciation, and we have to account for the monies that we paid to issue the patents. All of it's covered in our federal income tax -- PAM's, Patent Asset Management's, federal income tax return. That is correct.

Q. Going back to the time period -- I think we were around the 2011 time period -- where the public company you had was sold off and you continued to invent, I believe, in that time frame, worked with Intellectual Ventures and the like. Did you make a conscious decision to be a non-practicing entity moving forward? Simple question.

A. I've had times in my career where we've practiced, brought out a bunch of games, as we've talked about earlier. I've had times where we've brought out products related to Symbology, as I testified to -- area of practice. And in fact, now, we're contemplating putting out some products based on our inventions currently. We're working on that.

Q. Okay. But did you make a conscious decision at that time not to ever be a practicing entity, just to be a non-practicing entity --

A. No.
Q. -- for any particular period of time?
A. Sorry. I answered prematurely --
Q. I'm sorry. For any particular period of time.
A. No, I never decided not to be -- to be for the rest of my life a non-practicing entity. As I've testified to today, at times I have been; at times I haven't been. And currently my desire actually is to take some of these inventions that I think can help society and get them out into society. And as I said, we're working on that now at the company.
Q. How did it come to be that, at least for some period of time, you were only a non-practicing entity?
A. Well, I mean, it's an ebb and flow. We went from games where I was practicing, to, you know, Symbology where I was practicing, to a period where I just came up with a whole bunch of inventions -- which I'm still doing. But it's really nice and rewarding to see the inventions actually, you know, materialize and be in the marketplace to -- to add value to, you know, the marketplace, to society. So it's just an ebb and flow.
Q. Can you tell us a little bit more -- again, not too much, briefly -- about the cardiology invention? And if it's still confidential, please don't reveal anything that's confidential.
A. Right, and it is because it's still at the patent office. It's not yet a U.S. patent. We hope that it will be any day

now. But I don't know. The patent office has its own ebb and flow as well.

But it's a great opportunity for me in the fact that I got to work with a renowned cardiologist and then came up with an idea in terms of -- I'll give you just the basics, because a lot of it is confidential -- detecting cardiac events using a device, and the metrics of doing so, and then providing a warning to someone. So many people -- and I have people that I knew; one of my best friends was playing tennis with his tennis partner and all of a sudden his tennis partner, literally in the middle of a game -- this was a couple of months ago, terrible situation -- and he just collapsed on the court, and he died right there, right on the court, right in front of his wife.

So you would hope that this device that we're coming up with -- with Dr. Rosen, with Eric's help, and mine -- we'll be able to detect in advance a situation where he should have gone to his cardiologist, and he should have -- the warning signs would have been is there, and hopefully that would have prevented this cardiac event.

Q. Thank you.

Are there any companies currently making a device that you believe would infringe your patent, were it to issue?

MR. MACHLEIDT: Objection; 403 and 402.

THE COURT: Yes. Sustained.

Q. (By Mr. Zito) You talked a bit about a Mr. Sam Meyler and

Meyler Legal, and we looked at some letters.
MR. ZITO: You can stop publishing that.
Q. (By Mr. Zito) Does Mr. Meyler currently represent PAM or any PAM entities?
A. Not to my knowledge.
Q. Do you know when -- the last time he represented or did legal work for PAM or a PAM-related entity?
A. No, I think his representation of us, because of any potential conflicts, ended at the time that Valve served upon this lawsuit that is the subject that we're here on today.
Q. So it ended shortly after that?
A. I think so, yeah.
MR. ZITO: One moment. I'm going to check and see if I've checked everything off.
Q. (By Mr. Zito) Has PAM or any of PAM entities ever sued on a patent that had been invalidated?
A. No, not to the best of my knowledge. Not at all. We certainly wouldn't want to do that.
Q. Has PAM or any PAM entities ever sued on a patent that you believed to be invalid?
A. No, we would never sue on a patent that was invalid.
Q. One last question: Do you consider yourself or your inventions or the technology you work in to be disruptive?
A. I think every inventor wants to think that his inventions -- you know, "disruptive" is such a term now; it's

like AI, everyone tosses it around. So I think every inventor is going to want to think that what they're inventing is disruptive. I'm not sure what that means, to be honest.

But I'd like to think -- let me rephrase it. I'd like to think that the inventions that I've come up with and that I will come up with will make a difference to society and help people and be meaningful. That's really why I continue to invent and don't retire.

Q. Do you consider yourself part of the inventing community; and by that, I mean have you attended inventor conferences, advised on inventions or technologies, or anything like that?

A. Absolutely. In working with Intellectual Ventures, I've been part of the inventor community. In going to, you know, forums, I've been part of the inventor community with other inventors. And I love working with, you know, other people that are in the inventive area. It's really super rewarding, and I hope I get to continue to do that.

Q. Have you ever sat on any boards or advisory panels that dealt with inventions, technologies, that kind of business or anything?

A. Right. I had the honor of being on Governor Graham's gubernatorial technology board. I was an appointee. Had the honor of being on Governor Jeb Bush's technology board for the State of Florida. And I had the distinct honor of being a technical advisor on the technology board for the United States

as a presidential appointee for President George H.W. Bush.
Q. And those were back in the '80s and '90s when you ran --
A. Yeah, during --
Q. -- public companies?
A. Sorry, I answered prematurely.
Q. Sorry.
A. No, my fault.

Well, yeah, it was when Governor Graham was governor. I don't remember. He was originally a senator, but then, you know, state -- he became governor. He was senator and governor. And I don't remember the dates that Governor Bush was governor. It was during the time there was an overlap when his brother, George W. Bush, was the President. But I wasn't on George W. Bush's technology board; I was on his dad's. Official appointee to the technology board of the United States by George H.W. Bush.

MR. ZITO: All right. No further questions. I pass the witness.

THE COURT: Thank you, Mr. Zito.

Mr. Machleidt?

MR. MACHLEIDT: Yes, Your Honor. A few redirect questions.

REDIRECT EXAMINATION

BY MR. MACHLEIDT:
Q. Hello, Mr. Rothschild.

A. Hi, again.
Q. Did you mention a Judge Gilbright in one of your prior answers?
A. Yes, I did.
Q. Could it have been Judge Gilstrap who gave the order in the Texas cases?
A. I have made the mistake of mixing Judge Albright in the Western District of Texas, who we've appeared before, and Judge Gilstrap, who I think is the senior federal judge in the Eastern District of Texas -- I mixed their names together. For that I apologize to the Court and to them, right -- and to them.
Q. Now that we have the right judge's name, it's your testimony that Judge Gilstrap decided that what happened in Texas, in terms of suing Valve in the wrong venue, that that was a mistake?
A. I don't know if the term "mistake" -- what Judge Gilstrap determined was that -- I guess you could say it was a mistake, but he just determined that that the venue was -- after carefully considering it, that the venue there was not correct and that we could take our case somewhere else -- that we had to take our case somewhere else, that it wasn't proper for us to have brought it in the Eastern District of Texas.
MR. MACHLEIDT: Ms. Gray, would you put up Exhibit 463 just so Mr. Rothschild and everybody other than the jury and the gallery can see it for now?

Q. (By Mr. Machleidt) Mr. Rothschild, there are several pages to this document. I don't have a hard copy for you, so we can flip through pages if you need. But my question for you is do you recall you and I discussing this document during your deposition?
A. Vaguely recall it.
Q. Do you see the title is Memorandum Opinion and Order?
A. I do see that.
MR. MACHLEIDT: And, Ms. Gray, I think if you go to the very last page...
Q. (By Mr. Machleidt) Do you see Judge Gilstrap's signature there?
A. Absolutely see it.
MR. MACHLEIDT: Your Honor, Valve offers Exhibit 463 into evidence. We believe his testimony has opened the door to entry of this exhibit.
THE COURT: Mr. Zito?
MR. ZITO: I don't think his testimony went beyond the testimony already regarding this exhibit, and I think -- including the testimony of Mr. Garteiser, who was the attorney in this case, that was played. So I don't think there's any -- there's no new testimony that brings this exhibit in.
MR. MACHLEIDT: May I respond very briefly?
THE COURT: No.
The basis of your objection, then, is relevance?

MR. ZITO: Yes. It continues to be irrelevant.

THE COURT: All right. The objection is overruled; 463 may be admitted.

(Plaintiff Exhibit 463 admitted.)

MR. MACHLEIDT: Thank you, Your Honor.

And, Ms. Gray, you don't have to publish that to everybody else. It's admitted.

Thank you, Your Honor.

Mr. Rothschild, thank you for your time. I have no further questions.

THE WITNESS: Thank you so much.

THE COURT: Mr. Rothschild, you're excused.

MR. ZITO: Your Honor, I have one question about that exhibit --

THE COURT: Go ahead.

MR. ZITO: -- since it's now in.

THE WITNESS: Stay?

THE COURT: I'm sorry, question for me or question for witness?

MR. ZITO: Question for the witness, Your Honor. Recross.

THE COURT: All right. Briefly.

And, Mr. Machleidt, I'll give you an opportunity to ask a follow-up question. But let's keep this narrow, folks.

RECROSS-EXAMINATION

BY MR. ZITO:

Q. Do you recall Mr. Garteiser discussing the cases in his deposition that was shown in video?

A. Yes. I saw Mr. Garteiser's video a couple of days ago, I guess, right?

Q. Do you recall that he said that he was ordered by the judge -- and I think he mis-said to do community service, and then he changed his answer to continuing legal education. Do you recall that?

A. I absolutely remember the whole situation.

Q. All right. And do you recall the judge saying that he had gotten venue wrong?

A. Right, I do remember that.

Q. And that he had to do continuing legal education to better understand venue?

A. Legal education not for us, but for Mr. Garteiser.

Q. You anticipated my next question.

Were you or anyone else at PAM ordered to do some legal education regarding Valve?

A. No. As I fully -- as I believe I understand this, the sanction that was imposed was strictly to Mr. Garteiser, not at all directed to my company, to myself, or to any of my employees.

MR. ZITO: I appreciate your anticipating my next

question. That was my next question. Thank you.

THE WITNESS: Thank you.

THE COURT: Mr. Machleidt?

MR. MACHLEIDT: No further questions, Your Honor.

THE COURT: All right. Mr. Rothschild, you may be excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Mr. Reed?

MR. REED: Your Honor, Valve calls Dr. Adam Sorini as our next witness.

THE COURT: Mr. Sorini, if you could come up from here, Mr. Cogswell is going to swear you in.

ADAM SORINI,
having been first duly sworn, testified as follows:

THE CLERK: If you could please state and spell your name for the record.

THE WITNESS: Yes. Adam Sorini, A-d-a-m, S-o-r-i-n-i.

THE COURT: If you could make your way to the witness box, sir. Adjust the chair as you need to. You'll see water. There's a tissue box. You've been handed an exhibit binder. You'll also see a monitor here to your right. Exhibits may appear on that from time to time. But most importantly, you will see a microphone in front of you. Please speak slowly and clearly into the mic.

THE WITNESS: Okay.

THE COURT: With that, Mr. Reed, you may inquire.

MR. REED: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. REED:

Q. Good morning, Dr. Sorini. Could you please introduce yourself to the jury?

A. Sure. My name is Adam Sorini. I work for a company called Exponent, and I'm here to talk about the technology of the '221 Patent.

Q. Dr. Sorini, have you prepared demonstrative slides to assist with your testimony today?

A. Yes.

Q. And are these slides you see on your screen the slides that you prepared?

A. Yes.

MR. REED: And if we could publish those for the jury.

Your Honor, do we have permission to publish these demonstratives for the jury?

THE COURT: If they're demonstratives and not being offered as substantive exhibits, evidence, that's fine.

But I'm going to ask, Mr. Zito, is there any objection?

MR. ZITO: No objection as long as they're not being entered as evidence.

THE COURT: All right. As demonstratives.

MR. REED: Thank you, Your Honor.

BY MR. REED:

Q. Dr. Sorini, turning to Slide 2, could you please describe your educational background?

A. Yes. I got my bachelor's degree in physics from the University of Washington [sic] in Ann Arbor. Then I came out to Seattle and got my master's and PhD in physics from the University of Washington, where I was working on X-ray absorption software.

Q. Since graduating with your doctorate, could you please describe your work in experience in the field of software, computer science, and electronics?

A. Yes. At the University of Washington, I worked on a software product called FEFF, that the University of Washington sold to beamline scientists. After graduating with my PhD, I went down to Stanford and worked at the Stanford Institute for Materials and Energy Science as a post-doctoral researcher working on computational solid-state physics. So I was writing software --

THE COURT: Dr. Sorini, if you could slow down, please.

THE WITNESS: Sure.

THE COURT: Our court reporter is taking down everything that's being said, so if you could slow down, please.

THE WITNESS: I was writing software to simulate electronic systems and running that software on my group's

high-performance computing cluster, which is a bunch of servers interconnected on networks.

After that post-doc, I did a second post-doctoral research position at Lawrence Livermore National Lab, again writing software to simulate advanced materials and running that software on Livermore's supercomputers.

After that, I went to a company called Exponent. Exponent is a science and engineering firm. We have offices throughout the United States, including in Seattle and Bellevue. I work in our Menlo Park office. Exponent has been around for a while. It was founded in 1967. We help companies with their products and make them more reliable. I've been working at Exponent for the last 14 years, in the electrical engineering and computer science group. I should also say we employee about 900 PhD-level scientists and engineers in all sorts of academic disciplines.

Q. (By Mr. Reed) Dr. Sorini, we've heard discussion today about the '221 Patent. Do you understand that the alleged invention of that '221 Patent relates to systems and methods of storing and delivering media content?

A. Yes.

Q. Do you have experience with software, hardware, and communication protocols used in storing and delivering media content?

A. Yes, I do. And I think -- here we go on the next slide.

So this is an example of some of the areas that I work in, and I'll keep it brief and just talk about the most relevant ones.

I have some pictures here. So at the top, you can see a setup from my lab in Menlo Park, where we've got seven old computers all talking to each other over network switches. Those are clients and servers sending data back and forth. That's also a picture of me holding up a big network switch that would go into, like, a server rack. The last picture is an iPhone 4S, which came out in 2011. It's running some software I wrote to test the touchscreen.

With respect to the '221 Patent, I've worked on lots of different enterprise software; so media content management software like satellite and cable protocols. I've also worked on audio distribution software like multicast radio. And I've worked with web technologies like hypertext transfer protocol, and videos like MPEG, so trying to understand the content and the metadata in those video files and how they're transported over networks.

Q. In your work on this case, what question were you asked to answer?

A. I was asked to provide my independent and objective analysis of claim 7 of the '221 Patent, and to understand whether or not it's valid in view of what's called prior art.

Q. What information did you review in your analysis?

A. So I've read the '221 Patent in detail. I also read the

file history of the '221 Patent, which is all the documents that were exchanged back and forth between the applicant and the patent examiner. I've also looked at a number of different prior publications, prior art documents, patents, and patent applications from before the date of the '221 Patent. I've also reviewed documents that were produced by both parties in this matter and deposition testimony. There's also an agreed claim construction, which I'll talk about a little bit more, that I've reviewed. And I've been here all week listening to testimony at trial.
Q. Are you being compensated for your time working on this case?
A. I get paid a salary from the company I work for, Exponent, and Exponent bills out my time at my standard hourly rate to clients. So it's the same regardless of the clients or if I'm working for a company, like a startup, helping to improve their product, or if I'm working for a lawyer, trying to help them understand some complex technology. Exponent bills my time at an hourly rate, but I get a salary from Exponent.
Q. And what is your standard hourly rate that Exponent charges for your time?
A. It's $715 an hour.
Q. Does your compensation depend in any way on the testimony you're providing in court or on the outcome of this case?
A. No.

Q. Okay. Turning to the next slide, Dr. Sorini, do you understand that the validity of a patent is analyzed from the perspective of what is called ordinary skill in the art?
A. Yes.
Q. And with respect to the '221 Patent, how would you define the level of ordinary skill in the art?
A. It's on this slide, but I'll explain briefly why this is important. So we all watched the video at the beginning of this trial explaining what a patented invention is and some requirements that it has to be new and it has to be useful and it has to be not obvious to a person of ordinary skill. And so we have to define what we mean, what is a person of ordinary skill?
It's somebody who is working in the technical field. They're not a genius in the field, and they're not completely new to the field, but they have what we call "ordinary skill." And so that's what's being define here, that level of ordinary skill in the field.
And so I propose that a person of ordinary skill would have had a science degree, a bachelor's of science degree in a field like computer science or physics, as well as two years of work experience with network computer systems and content delivery protocols. And I've also suggested that the lack of a bachelor's degree could be made up for with an additional fours year of profession work experience. So this is what we mean

when we talk about, we're going to talk about a person of the ordinary skill in the art. That's what we mean by ordinary skill.

Q. How do your qualifications compare with those of a person of ordinary skill in the art as you have defined it?

A. Mine are higher than a person of ordinary skill, and that allows me to perform this subsequent analysis we're going to talk about at the level of ordinary skill.

Q. The '221 Patent is already in evidence, so let's turn our attention to that patent.

First, do you have an understanding of the relevant priority date of the '221 Patent?

A. Yes, I do. And just to explain this slide: On the left, it's the front page of the '221 Patent; on the right, it's the top part of the '221 Patent. You can see the patent number, 8,856,221 or that '221 Patent. You see the issue date.

But if you go down to the bottom, I have it circled in red, there was an original provisional application that was filed way back in August 29th of 2011, and I'm going to refer to that as the priority date of the invention of the '221 Patent. But we're going to be looking at art from before that priority date.

Q. Turning to Slide 9, could you please describe what the '221 Patent related to using Figure 1?

A. Yes. And I think this is the first time we've got to see any figures. So this is Figure 1 from the '221 Patent. It's

disclosing some parts of the system. On the left, you see what's called a consumer device -- actually, an array of consumer devices. You can think of that as, like, a smart phone or a laptop.

Up at the top, there's a broadcast server. A server is a computer with a network interface that takes in requests and sends out data back. And there's also an array of those broadcast servers. You can think of it like a television broadcast server that stores all the television content that in that content database you see there.

On the right, there's a remote server. So this is another computer that would be connected to a network. And it also has a media database that can store a subset of that content in the content database. And it has what's called, in this figure, a register database, that can be used to check if a consumer device is a registered consumer device.

Q. Does the '221 Patent claim to describe any new computer equipment such as new servers or consumer devices or networks, or is it making use of conventional commuter equipment?

A. So, no, there's no new hardware being claimed here. A computer, generically, has four components: Inputs, outputs, processor, memory.

Memory is where the processor instructions are stored. So you can see there's some memory there. You can see each of these computers has a processor.

A processor is like your Intel chip, the big chip you put in your motherboard that actually does the processing. It's sometimes called the CPU.

Transmitter and receiver, those are inputs and outputs that can send data over a network. So if you want to think of something from the time, it would be like a network interface card that you plug into your motherboard and has an Ethernet port that you would connect over to your cable modem or something like that.

So these are all well-known and conventional at the time as far as hardware components.

Q. Okay. Dr. Sorini, have you formed an opinion as to whether claim 7 of the '221 Patent is either valid or invalid as obvious?

A. So I've -- I'll present my opinions on the later slides. I'm going to summarize right now, and I'm going to talk about, in the first case, what I'll call a ground or a reason related to Hardin. Hardin is a prior art reference. And then I have a second opinion about a combination of Hardin and Monroe.

So as a summary, in the first case, it's my opinion that claim 7 of the '221 Patent would've been obvious to a person of ordinary skill in the art in view of Hardin.

Then, as a second opinion, it's my opinion that claim 7 of the '221 Patent would have been obvious to a person of ordinary skill in the art in view of the combination of Hardin and

Monroe, and, therefore, I understand claim 7 can be found invalid as obvious.
Q. Do you understand that Valve has the burden to prove obviousness by clear and convincing evidence?
A. Yes.
Q. And what is your opinion as to whether the evidence here is clear and convincing?
A. I think it is.
Q. Now, before we discuss the prior art, we need to get it into evidence, so if you could turn to Tab 350 of your binder, please.
Are you there?
A. Yes.
Q. Do you recognize Tab 350?
A. Yes. It's the Hardin reference.
Q. And do you rely on the Hardin reference, this document, in forming your opinions in this case?
A. Yes.
MR. REED: Your Honor, at this time, Valve would offer Exhibit 350 into evidence.
THE COURT: Any objection?
MR. ZITO: No objection, Your Honor.
THE COURT: Exhibit 350 is admitted. You may publish.
(Plaintiff Exhibit 350 admitted.)
Q. (By Mr. Reed) Next, please turn to Tab 348 in your binder.

A. Okay.
Q. Do you recognize this document?
A. Yes.
Q. What is it?
A. This is the Monroe reference.
Q. Did you rely on this document in forming your opinions in this case?
A. Yes.
MR. REED: Your Honor, at this time, we would offer -- Valve would offer Exhibit 348 into evidence.
THE COURT: Any objection?
MR. ZITO: No objections.
THE COURT: Exhibit 348 is admitted. You may publish when ready.
(Plaintiff Exhibit 348 admitted.)
Q. (By Mr. Reed) Next, could we please turn to Tab 553 in your binder?
A. Okay.
Q. And let me know, Dr. Sorini, do you recognize this document?
A. Yes.
Q. And what is this document?
A. This is the CableLabs Video-On-Demand Content Specification Version 1.1 that is incorporated into Hardin by reference.
Q. And is this a document that you relied on in your analysis

in forming your opinions in this case?
A. Yes.
MR. REED: Your Honor, Valve offers Exhibit 553 into evidence.
THE COURT: Any objection?
MR. ZITO: No objection.
THE COURT: 553 is admitted. You may publish.
(Plaintiff Exhibit 553 admitted.)
Q. (By Mr. Reed) Okay. Dr. Sorini, this slide shows the Hardin and Monroe prior art references. How do the dates of Hardin and Monroe compare with the date of the '221 Patent we looked at previously?
A. Well, they're prior to it, and I think we heard a little bit about this before. So on the left, I'm showing Hardin. That's the front page of Hardin, and I've blown up the top. And you can see that this patent application was public in June 26, 2008, so more than three years before the priority date of the '221 Patent. On the right, I'm showing the front page of Monroe, and I've blown up the date at the top. This patient issued March 23rd, 2010, so it was also public more than a year before the priority date of '221 Patent, which, to remind you is August 29th, 2011.
Q. You mentioned earlier that you reviewed the patent office file sometimes called the file wrapper for the '221 Patent; is that right?

A. Yes.
Q. Did the patent examiner ever look at these two references before granting the '221 Patent?
A. No, it's not -- these are not referenced anywhere in the file history, and they're not referenced on the face of '221 Patent where the examiner writes prior art references.
Q. Okay. This discussion may turn a bit technical. This slide shows claim 7 of the '221 Patent on the left, and my question for you is can you explain how you plan to analyze this claim?
A. Yes. And I think this is the first time we've had a chance to see this claim. So you can see a patent claim. This is claim 7 of the '221 Patent. It's one long sentence. It ends there in a period, but it's broken up by a bunch of colons and semicolons, and we're going to talk about this whole sentence. In order to do that in a clear way, I have broken it up into parts.
The very first part is often called the preamble, so I'm calling that "Pre" and then I'm calling the subsequent parts "A," "B," "C," "D," so -- so I'm going to break up the sentence that is the claimed invention into these parts, and we're going to talk about them one after the other.
Q. Okay. Dr. Sorini, here, you have a table that contains each of the elements of claim 7. Why have you highlighted all but one of these elements yellow?

A. It's my understanding there's no real dispute about some of these elements. There's no technical evidence of their nonobviousness in view of Hardin and Monroe, in fact, pretty much all of them. Although, I understand that when Valve asked defendants to point to which element might be nonobvious they pointed to the text of 7.g, so I'm going to focus a little bit more on that, and I'm also going to focus on that one a little more because there's a claim construction, meaning that the terms in this claim have been slightly redefined, so we have to understand that.

Q. So we, unfortunately, need to walk through each of these elements, and it's a lengthy claim, so let's start at the top with the preamble.

What is your opinion as to whether Hardin teaches the preamble of claim 7?

A. Hardin does teach this to a person of ordinary skill, and I'm going to -- just to orient everybody, at the top in the yellow there, I have the text of the claim -- part of the claim we're looking at from the '221 Patent. Everything else on this slide is from Hardin. Everything here is from the Hardin reference.

So on the left, you see Figure 1 of the Hardin reference from 2008. And then I'm going to have excerpts from Hardin. These are all paragraphs from the Hardin reference that relate to the figure I'm showing, and I've underlined some things to

remind me what I'm talking about, but -- so we've got a method here for media content storage and delivery.

You see on the right, there's a national content storage. That is like a large storage location located maybe somewhere far out in the middle of the country. In the middle, you see a set of regional service providers with a -- with a regional web server and their own storage locations for media content. We know it's media content because Hardin says, in the background of the invention, it's a system for media content delivery. He's working in that field. He's working in the field of video on demand. That's the background.

In the summary of the invention, Hardin is describing a system for on-demand content services, including video on demand. And then I also want to point out that there are multiple storage locations on these servers. One is the national content storage, which is a large storage location. The other is regional content storage, which can be smaller and can include temporary storage.

And then finally, this is a cable, an Internet system, and there's a home. That's called the customer premise over on the right, and that has -- it's showing a personal computer with a web browser, and it's showing three different television set-top box combos, which are consumer devices.

Q. Okay. Let's -- let's talk more about this video-on-demand system as we walk through the claims. Here, we have

element 7.a. What is this element, and, in your opinion, does Hardin teach it?

A. Yes, Hardin would teach this to a person of ordinary skill. And I'm showing the same figure on the left, but I've illustrated where a web request message would go from the web browser to the regional web server. And I've tried to color-code my excerpts. So we see the blue web request message, it's also disclosed in Paragraph 47.

There's media data, so this person running the web browser wants to stream media, video on demand, so they have to specify what they want to stream. So maybe they want to stream the movie *Iron Man* in 2008 or the *Titanic*, which came out in 1997, so they're sending a request message to the server.

Hardin also discloses multiple different consumer devices and talks about them as television set-top box pairs, also specifies a customer can have a web browser, and that, in addition, the customer premise device or devices corresponding to the customer are identified, so you see there's a consumer device identifier.

Q. What does Hardin teach regarding consumer device identifiers?

A. So Hardin has at least one explicit disclosure of an -- a device identifier, which is a MAC address. This would be a 6-byte identifier burned in the card. And it teaches using that. So MAC address identifying devices corresponding to the

service subscriber are stored in a customer record, which I'll talk about in the next slide. The stored information is available for future use; for example, when the customer orders and/or purchases video on demand content.

Q. Okay. Let's move to element 7.b. In your opinion, does Hardin teach this element of claim 7?

A. Yes, it does, and I'm illustrating the database, database 150 of Hardin's system. That's the database where the customer record I told you about on the last slide would be stored. That stores additional information as well. So Hardin, in paragraphs 53 and 74, is disclosing accessing customer information in its database and that it stores customer information, including user ID and password and program availability.

There's another disclosure of a username and password and that a subscriber has to validate themself to the system, so they enter their username and password to confirm they're a registered user. There are devices associated with them in the database, which are registered consumer devices.

Q. The next two elements are elements 7.c and 7.d, which you've included both of those on this slide. Why is that?

A. This is part of it -- if then -- if-then statement. We've already talked about the "if," so this is saying if -- if it's true, then what happens?

What happens is that some determination has to be made

based on the request message, and I've continued to illustrate where that request message can come into the regional web server. There's a flow chart on the right, which was also taken from Hardin, that shows what happens to that message. It flows through the system to a decision point where a decision is made. If the content is already available on that regional server, this is called a content request message and the content is delivered; if not, this is called a storage request message. I'm going to talk about these in a little bit more detail on the next two slides.

Q. Okay. Element 7.e describes what happens if the request message is the storage request message. Does Hardin teach this element?

A. Yes. Yes, it does. So here, we're talking about the storage request message. I indicated that that corresponds to what I highlighted as the green path, the "no" path at that decision point, 317, and Hardin describes exactly what's happening here in a complicated sort of signal flow diagram on the right.

So a customer can order a movie -- signal 214, customer orders movie. That signal goes to the regional web server. The regional web server checks its content store. And in this case, the example given is unavailable; the content is not available at the regional store. The regional store is the one that would be closer to the customer, like in the region of Seattle. The

national store is farther away and a larger store.

Okay. So the data is not available in the regional store. The request is forwarded to the national server. And the data is sent back to the regional store and stored there for later delivery. That's why it's called a storage request message.

Q. The next element, 7.f, describes, by contrast, what happens if the request message is the content request message. Does Hardin teach this element of claim 7?

A. Yes. So, again, we have a conditional. If the request message is the content request message, that corresponds to the purple path that I highlighted earlier and I've reproduced on the right side. So this means if the regional storage has the content requested, you just deliver it. That's what Hardin says.

Is the content already available from the server servicing the customer? If the answer is yes, complete order by initiating content delivery. So Hardin also discloses this.

Q. Okay. Let's skip forward to element 7.h, which recites a first processor that is further configured to determine whether the requested media content exists. In your opinion, does Hardin teach this element of claim 7?

A. Yes, Hardin also teaches this. So we skipped over 7.g, and we will return to it.

So the first processor, I want to explain what that is. That would be a processor in the '221 Patent on the remote

server. In the Hardin reference, the same functionality is performed by the regional server.

And then what does it mean for this media content to exist? It means whether or not -- so the media content is like a movie -- whether or not the movie the user requested is anywhere in the system, whether it could eventually be delivered to the customer.

And so how do you know if it exists? You perform a search. Hardin discloses explicitly that the user can perform a search either by their web browser or entering it in their set-top box. And I have a -- at the bottom, you can see on Paragraph 104 that there is actually a global search region, so we're searching the whole system to see if the contents exists. Global search can accept text input from the customer, e.g., title, so, like, the title of the movie, like *Titanic*.

Q. Okay. Element 7.i is the last element of claim 7. What does this element require or describe?

A. This is a fairly long element, but the first part, again, is a conditional, and we've already discussed it, and now this is what the processor is supposed to do if that conditional holds true. We want to try to determine if the requested media content is available and whether there are restrictions associated with that content.

Q. In your opinion, does Hardin teach this element of claim 7?

A. Yes, it does. And so you can see we've already discussed

availability, and I've reproduced two excerpts from Hardin: One where the content is found unavailable on the regional store; and the other, we can find where it is already available, yes or no. So Hardin discloses checking for availability of media content.

Restrictions are not quite the same thing. It's similar but not the same. So Hardin was in the cable industry and knew there were things like pay-per-view events that are restricted unless you pay for them, so he's describing those kinds of restrictions in this paragraph I've cited: Distribution of the content subject to rights, usage, and/or time restrictions.

Hardin was also aware and disclosed other restrictions like parental control filtering. You don't want your children to rent R-rated movies, and he says, "Parental control filtering restricting searching, ordering, and/or purchasing."

THE COURT: Dr. Sorini, slow down a little bit. Everyone -- not just you, but when people are reading from text, everyone speeds up, so let's slow down.

THE WITNESS: Okay.

THE COURT: Thank you.

Q. (By Mr. Reed) Okay. Let's turn back to your table with those yellow highlighted elements. Could you please summarize your opinion regarding whether Hardin teaches these elements by clear and convincing evidence?

A. Yes, Hardin would have taught these to a person of ordinary

skill in the art.

Q. Okay. Now let's turn to back to element 7.g, which we have not discussed just yet.

Do you understand, first, that the parties have agreed to what is called a "construction" of this term?

A. Yes.

Q. And what is the construction that the parties agreed to?

A. I'll explain what a construction is.

A construction is where the parties agree that a term has some meaning that might be different from what you would expect as just reading the patent, and so they've -- they've agreed that there's this term on the left-hand side, media data includes time data, et cetera. I won't read the whole term.

And so the agreed meaning, the agreed definition of this term is that the term does not include storage policies, document retention policies, emails, or any other data stored in a database.

So a document retention policy is like if you are doing your taxes, your accountant might have to keep your tax documents for ten years. That's a retention policy.

The -- there's a caveat about this in the construction, that, for clarity, the term is not excluded from the scope of the claim if such time data is included in the request message and subsequently stored in the database -- in a database. So that's basically saying that exclusion about things stored in a

database, don't worry about that if the time data is in a request message.

Q. Okay. Thank you for that explanation.

Have you applied this agreed construction, as set forth here, in your analysis?

A. Yes.

Q. Okay. Let's talk about that analysis.

Can you explain your opinion as to whether Hardin teaches or renders obvious element 7.g?

A. Yes. And I'll read the -- I'll read the element. It's wherein "the media data includes time data that indicates a length of time to store the requested media content."

So this is about time data and how long to store media.

So I'll have a number of excerpts from Hardin, but the first one is from Paragraph 20. This is related to the temporary content storage location on the regional server. Hardin discloses that the temporary store has a removal deadline being associated with the stored content.

In this other excerpt, at the top -- I'll say again that the national storage has a greater storage capacity. The regional storage has a smaller storage capacity and includes short-term and temporary storage. That temporary storage, again, indicates there's some time involved.

And if you go down to the bottom of that paragraph, it says, "Individual program content stored in short-term temporary

storage may, and sometimes does, have a cache time associated with maintaining the program content."

Q. Does Hardin teach to include the time data in a request message?

A. Yes, it does, and we can go to the next slide to -- to understand why we're talking about this -- that media data in 7.g was introduced into the claim way back in 7.a in the claim about the request message.

And I've illustrated there's a figure on the left which shows flow from the input, which was Figure 3A we saw a while ago up at the top, to a decision about the time control, and this is described on the right in Paragraph 82. I'll read the relevant passage.

"This timer is set to cause the content to be removed from the temporary data store at the end of a cache period or a rental period, whichever is later." So there's time data indicating a length of time to store associated with the media content.

There's another passage: "The rental period is a period for which the title is to remain available to a customer who has completed an order, e.g., by beginning to download the title."

Q. Does Hardin provide any further teaching about how to include the time data in a request message?

A. There is further explicit teaching. So on this slide, I'm showing a background paragraph from Hardin. Hardin was in the

cable industry, and Hardin is describing the background.

"Existing video-on-demand servers used by the cable industry tend to support standardize protocols."

Hardin goes on to list some of those standardized video-on-demand protocols, including one that is described in CableLabs Video-on-Demand Content Specification 1.1, and then Hardin expressly incorporates that document by reference, meaning Hardin didn't type it literally into his patent application but is assumed part of Hardin.

Q. What does the CableLabs specification teach about how to include time data in a request message?

A. I can show that on the next slide. So I read the CableLabs specification, and interestingly, it has a number of examples at the end in some appendices. So here, we're seeing an extended markup language data structure that a person of ordinary skill would understand as describing data structures that can include metadata describing media content.

So I've been mentioning the movie the *Titanic*. This data structure has a tag title -- a title tag, and the value is the *Titanic*, so we're identifying a piece of media by its name. There's other metadata, like a summary that might display on the screen when you click on this movie. And then, in fact, there's actually a explicit disclosure of time data. There's a start time and an end time disclosed in this example that was incorporated into Hardin.

Q. We've now, turning back to the table, have been through the entirety of claim 7. What is your overall conclusion regarding whether Hardin teaches or renders obvious each and every element of claim 7?
A. Hardin does render obvious to a person of ordinary skill in the art each and every element of claim 7.
Q. Okay. Let's turn now to the combination of Hardin and Monroe. Have you formed an opinion as to whether claim 7 would have been obvious or valid to a person of ordinary skill in the art based on the combination of Hardin and Monroe?
A. Yes, so a person of ordinary skill, I'm instructed that they know about the prior art; they know about all the prior art, so we take that as a given. Hardin and Monroe were prior art, so that person of ordinary skill, at the time, would know about Hardin and Monroe and would have been motivated to combine the invention of Hardin with an invention of Monroe that I'm going to describe on the next slide. And it's also my opinion that this combination of Hardin and Monroe would have rendered claim 7 obvious to a person of ordinary skill in the art.
Q. So here, we have element 7.g, and, Dr. Sorini, why are you jumping directly to element 7.g?
A. So this is a discussion of a combination that a person of ordinary skill in the art would be motivated to make, a combination of the known reference Hardin and the known reference Monroe. So Hardin already teaches the other elements,

so I'm just focusing on 7.g because Monroe also teaches element 7.g quite explicitly.

And so I'm only going to do one slide on Monroe and how it teaches 7.g to a person of ordinary skill, and that element is the media data and time data that's associated with maintaining the requested media content.

And so just briefly to describe Monroe, Monroe basically is a content addressable storage system on a network that multiple users can interact with to store content, but it's efficient because it only stores one copy of that content, and the way it does that is that every user has to interoperate with the system via this user interface on the right-hand side.

So the users have to specify the length of time they want to save that media content, so there's an explicit length of time in the user interface that's associated with an explicit media content indicator, Show 1, and that length of time is three days, and this would be the user interface that sends request messages to the network storage system of Monroe.

Q. So you've already touched on this, but would a person of ordinary skill in the art have been motivated to combine the teachings of Hardin with these teachings of Monroe for the inclusion of time data in a request message?

A. Yes, they would. The reason for that is that both Hardin and Monroe are in the same field of invention; they're both about media content storage and delivery. Both of them deal

with databases, and, in particular, databases where storage space is an issue, Hardin has its temporary storage, where it's trying to carefully not store too much stuff and to remove it.

Monroe discloses another type of efficiency, namely, that you only have to store one type -- one copy of the unique content. That was called a content addressable storage system. These things were known at the time, but it would have been an added efficiency to the system of Hardin that would have been desirable for a person of ordinary skill in the art to add.

Q. What is your overall conclusion as to whether claim 7 would have be been obvious to a person of ordinary skill in the art based on combination of Hardin and Monroe?

A. Yes, claim 7 would be been obvious to a person of ordinary skill in the art based on that combination of Hardin and Monroe as well.

Q. Why do you have two check box -- checks next to element 7.g in this table?

A. Because I explicitly discuss the two grounds for element 7.g. The Hardin alone rendering this obvious to a person of ordinary skill, and the combination of Hardin and Monroe rendering it obvious.

Q. Are you aware that anyone else has asserted that the '221 Patent is invalid based on Hardin and Monroe?

A. Yes.

Q. Where have you seen that?

A. I've seen it in two petitions filed with -- against this patent with the patent office.
Q. Were you here for Mr. Rothschild's testimony when he discussed IPR filings, which are patent validity challenges at the patent office?
A. Yes.
Q. When were the two IPR filings filed that you're aware of?
A. There was an IPR filing in 2015 challenging this patent at the patent office. There was another IPR filing filed in 2018 challenging this patent at the patent office.
Q. And what prior art was relied upon in those IPR filings?
A. Hardin and Monroe.
Q. And do you know what happened in those cases?
A. They settled before the patent office could make a decision.
Q. Has anyone ever decided if the '221 Patent is invalid based on Hardin and Monroe?
A. No. No one has ever had that chance until now.
MR. REED: Okay. We have no further questions. We pass the witness.
THE COURT: All right. We'll do five minutes of cross, and then we'll go to lunch.
MR. ZITO: Then I'll start.

CROSS-EXAMINATION

BY MR. ZITO:
Q. Good morning.

A. Good morning.
Q. Rather than start to dig deep into the technical assertions made here, let me start with some generalized questions.
So how often have you testified as an expert?
A. I think I've testified on about 50 occasions if you count depositions and trials and things like that.
Q. Okay. And have you testified only on behalf of the challenger of the validity of a patent?
A. No.
Q. Okay. Have you also testified on behalf of the owner of a patent as to its validity?
A. Yes.
Q. Okay. In any of the cases where you've been hired by the challenger of a patent, have you determined the patent to be valid?
A. I'm not sure. I'd have to think -- I don't do a lot of only patent things. I don't know.
Q. Okay. So the 50 times, you're not just talking --
A. You're talk about the -- my oral testimony only or other work?
Q. Well, let's started with oral testimony.
A. Okay.
Q. You said there was 50 occasions where you've testified as an expert?
A. Yes.

Q. Okay. How many of those were related to patents?
A. I don't know. A few of them.
Q. Okay. How many times did you testify on behalf of the patent owner?
A. Again, I don't know. Maybe twice.
Q. Do you ever recall testifying on behalf of a patent owner that his patent was invalid?
A. No.
Q. Okay. How many times have you testified on behalf of the accused infringer or the party challenging validity?
A. I don't know. Maybe a couple of times as well.
Q. In any of those cases, did you come to the conclusion that the patent was actually valid?
A. I don't think so.
Q. All right. And your opinion differs from the patent office opinion, correct?
A. Well, the patent office didn't look at Hardin and Monroe, so we don't know what their opinion would have been. My opinion is that claim 7 is invalid over that prior art.
Q. Are Hardin and Monroe significantly different than the, I believe, 16 references that the patent office looked at?
A. I haven't look at all those, but I would assume they are significantly different, yes.
Q. If you haven't looked at the -- I'm going to put the front of the -- this is the same patent that's in your report,

correct?
A. Yes.
Q. And I believe that is actually same framing as Slide 8.
And you see those 16 references there, correct?
A. Yes.
Q. Okay. How do you know that Hardin and Monroe are significantly different if you did not look at each of these references?
A. I don't know for sure that they are, but I expect they are because I just explained in detail how Hardin and Monroe invalidate claim 7 of the '221 Patent, which is one of the claims in this patent.
Q. But it is possible that the patent office looked at information that was equivalent to Hardin and Monroe and still came to the conclusion that claim 7 is valid?
A. It could be possible.
Q. Okay. And you didn't check that?
A. I'm sure I have looked at some of these references, but I don't know all of them off the top of my head.
Q. Okay. We'll get into it, I guess, this afternoon -- save that until after lunch, because I don't want to jump into it.
MR. ZITO: If we could look at Slide 21 as an example.
Q. (By Mr. Zito) Do you recognize Slide 21 from your slide deck, the PowerPoint we just went through?
A. Yes.

THE COURT: Mr. Zito, it is time for our lunch break.

For our jury, please follow my instructions about recesses. Don't talk about the case with each other or anyone else. No independent research. We'll see you at 1:30.

(Jury absent.)

THE COURT: We'll be back at 1:30. I'm going to look at the parties' filings related to the jury instructions during the lunch break. I may request that you all come back a little bit sooner so that we can address any issues that I've identified outside the presence of the jury. Mr. Cogswell will be in touch with you if that's the case.

MR. MACHLEIDT: Thank you, Your Honor.

MR. ZITO: Your Honor, just for clarification, the revised instructions in the 10-page brief is the preferred that we think is correct. The one in the attachment is the second version. So I don't want -- they're similar, but I don't want the Court to think they're the same. So there's a preferred one that's in the 10-page brief, and then there's a second one that's in the actual red-lined instructions.

THE COURT: All right. Thank you for the clarification, Mr. Zito. We're at recess.

(Court in recess 12:01 p.m. to 1:34 p.m.)

(Jury present.)

THE COURT: Please be seated. Welcome back from lunch. We're going to start the second half of our trial day,

resuming with the cross-examination of Dr. Sorini. So if I could have Dr. Sorini come back to the witness stand, please.

All right. Let's continue the cross-examination.

MR. ZITO: Thank you, Your Honor.

THE COURT: Mr. Zito, whenever you're ready.

Q. (By Mr. Zito) Dr. Sorini, I don't remember exactly where we left off, but we'll pick up about there.

You talked a bit about what Hardin teaches, correct?

A. Uh-huh.

Q. And you kind of, in my opinion, glanced over a little bit what the actual '221 Patent teaches. In layman's term, can you briefly describe what the '221 Patent teaches? And I'll go ahead and put what's in your folder as Exhibit 488 -- it's in the binder that's in front of you.

Do you recognize Exhibit 488 in your binder?

A. Yes.

Q. And what is that?

A. That's the '221 Patent.

MR. ZITO: I'd ask if we could move 488 into evidence so we can show it to the jury from his binder, the one he looked at.

THE COURT: All right. This is another duplicated exhibit. Don't we have this '221 Patent at 831 already?

MR. ZITO: Yes. I can put that one up here, and then he can confirm it's the same patent.

THE COURT: Let's proceed with what's in the binder here. But I'm mindful of sending identical or near-identical exhibits back to our jury without explanation. So let work from Exhibit 488.

I'll ask Mr. Reed. Is there any objection.

MR. REED: No objection, Your Honor.

THE COURT: 488 is admitted. You may publish.

(Plaintiff Exhibit 488 admitted.)

Q. (By Mr. Zito) Again, can you explain in layman's terms what this patent teaches?

A. Yes. Yeah. So I would point to the abstract. So generally, it's "a system, method, and device for media content storage and delivery." I spoke a little bit about the different components. There are consumer devices that interoperate over a network with a broadcast server or set of broadcast servers that can store broadcast content, and there's another set of servers called remote servers that can store a subset of that content, as well as a registration database. So it's sort of a hierarchy for servers for distributing media content.

Q. What's the reason for having a hierarchy of servers?

A. Well, so with respect to the '221?

Q. Correct.

A. That is disclosed. So when I say "a hierarchy of servers," I mean there's the broadcast server, which is going to store and the content, and then there's the remote servers, which don't

necessarily have to store all the content. So there's multiple of those. That's what I'm referring to as a hierarchy. I would expect the reason would be to more easily distribute the content to the consumer devices.
Q. And does the '221 Patent also talk about storing media content?
A. Yes.
Q. Okay. And that's in a storage request message?
A. So the content can be stored. The claim 7 discusses a storage request message as one of the two types of request messages discussed in that claim.
Q. And what does that mean? Is that where you upload content from your device to the Internet?
A. No. The way -- well, the way I understand it, so a content request message would be where the content is delivered to the consumer device. A storage request message is where the remote server would request that content from the broadcast server and download it to its own storage. That's why it's a storage request for later delivery.
Q. So in your understanding, the user or the user's device would not be able to make the storage request; that would have to come from the local server?
A. No.
Q. Okay.
A. No. The consumer device makes the request message. The

system processes that as either a storage request or a content request.
Q. Okay. So there's a request message. The system then determines whether that's a content request -- in other words, play the media -- or a storage request, go find it somewhere else and download it?
A. I mean, roughly speaking, yes. There's various other things disclosed. But, yeah, I think that's a good starting point.
Q. Okay. And would there ever be a time where the media was retrieved from a user's device, such as a cell phone or a computer?
A. The media retrieved from?
I think the patent does disclose certain embodiments where the consumer device can act as something of a proxy so there is an interaction between the devices in that way. That may be disclosed as well. I don't know where exactly it is.
Q. Let's look at claim 6 -- excuse me, Column 6.
Do you see where at Line 7 it says "alternatively"?
A. Yes.
Q. Could you read that sentence out loud?
A. Yes. "Alternatively, remote server may download content from consumer device 12 such that consumer device acts as a proxy server, e.g., consumer device serves as an intermediary between remote server and broadcast server or another content

server."
Q. Did you find that feature in Hardin?
A. I'm not sure if this feature is in Hardin; so Hardin may disclose it. I was concerned with claim 7 of the '221 Patent.
Q. Rather than running through the claim, if you could explain why Hardin is relevant prior art, in the same layman's terms?
A. Yes. Because it is also a method for content storage and distribution, including video-on-demand content.
Q. And does it teach the hierarchy of servers you were talking about?
A. Yeah, there's -- you could also consider the national server and the regional servers to be a hierarchy of servers in a similar way. Yes, it teaches a hierarchy of servers, in that sense.
Q. And why do you say in a "similar way," as opposed to the same?
A. Well, because I'm not -- I'm not concerned with everything that's taught in the '221 Patent. I'm concerned with claim 7 of the '221 Patent. So there is a hierarchy of servers. There is a server in both cases that stores all the content or a majority of the content and a set of servers that stores some of the content.
Q. Okay. And you find that to be different from the prior art considered by the patent office?
A. You mean Hardin or --

Q. Hardin, yeah. Hardin and the hierarchy of servers.
A. Hardin is different from the prior art considered by the patent office. The prior art considered by the patent office is listed on the front of the patent, and Hardin is not listed there.
Q. Okay. So it's got a different name?
A. Well, it has entirely different content. It's not -- it's not one of these with a different name. It's a completely different document.
Q. It has entirely different content, you said?
A. Yes.
Q. Okay. So did you look at the -- and I have them here.
Did you look at the prior art that was cited in the -- all of the prior art that was cited in the patent? I think I asked you that question already.
A. I think you did. And I said --
Q. I did --
A. No, no. I think you asked me. And I think I said I probably looked at at least some of it.
Q. And you didn't find any that teach a hierarchy of servers that was already examined by the patent office?
A. There maybe a hierarchy of servers in one of those documents. But, again, I'm concerned with claim 7 of the '221 Patent, not a hierarchy of servers. There are many different hierarchies of server in the prior art technology background.

Q. What is it about claim 7 that's different from a hierarchy of servers?
A. Well, for one thing, claim 7 only talks about one server. So there's a first server in claim 7. That first server should be the remote server in '221 Patent. I guess there's an implication that it has to go elsewhere to download content. We don't have to use that word, "hierarchy," but that's how I described it in my demonstrative slides.
Q. So in your analysis of claim 7, only one server is necessary?
A. No, only one server is mentioned; a first server, I believe.
You know what? It's actually claim 1, I think, talks about a first server, and claim 7 talks about a first processor. And I mentioned that processor has to run on a server. But let me check, actually. I don't want to just...
Yeah. Yeah, so claim 1, the other independent claim, talks about a first server and the first processor. Claim 7 talks about a method and the first processor.
Q. There's a element of the claim that I thought you indicated required a hierarchy of servers. If the request message is a storage request message that determined whether requested media content is available for storage, how would the system do that -- let me back up.
What I understand the hierarchy of servers to mean is that

there is a local server that has some media content, and there's a global, distant, whatever server that has all the media content. Okay? And then if the request message is a content request message -- or excuse me -- is storage request message, that's then interpreted as a message to go get content from the global server and re-store it -- store it down on the local server; is that correct?

A. Yeah, so the claim requires this determining -- if the request message is the storage request message, then determining whether the requested media content is available for storage; and I gave the example of -- for example, if the regional server doesn't have the content, it can check the national server to see if it's available for storage.

Q. But that doesn't require a national server to be there in claim 7?

A. Oh, it requires, presumably, somewhere to download that content from so that you can store it.

Q. Okay. All right. Then if it's not the hierarchy of servers, what is it you find different about Hardin from the art that the patent office already examined?

A. I mean, there's probably -- presumably many differences. I don't know. I'd have to look at the art.

Q. Let's look at a few from the prosecution history.

Do you see Ruhlen, 8,108,441, in the prosecution history?

A. Yes.

MR. ZITO: I'll go ahead and put the abstract up there. You can take a look at it.

THE COURT: I'm sorry, Counsel, what are we looking at now?

MR. ZITO: I'm sorry. This is -- can we unpublish to the jury?

THE COURT: Thank you.

MR. ZITO: This is U.S. Patent 8,108,441, which is on the front of the '221 Patent.

THE COURT: I'm sorry, though. Is this an exhibit?

MR. ZITO: No, it's not. It's part of the file history which was attached to his report.

THE COURT: All right. Thank you.

Q. (By Mr. Zito) Is that the patent that's referenced in the front of the '221?

A. This is one of them, yeah.

Q. Okay. It is a public record, and I would ask that it be entered as Exhibit A-32, I believe, would be the next exhibit.

MR. REED: Objection, Your Honor, 106 is not a trial exhibit.

THE COURT: This particular patent, it's referenced on the face of the '221 Patent; do I have that right?

MR. ZITO: Correct.

THE COURT: I think it's a fair rebuttal exhibit. So in that way, your objection is overruled.

Do you have copies for everyone?

MR. ZITO: Yes.

THE COURT: I'm sorry, Mr. Zito. This still hasn't been admitted. This is A-32, is what you'd like to mark it as?

MR. ZITO: Yes, I believe that's the next number.

THE COURT: Does the Court have a copy of A-32?

MR. ZITO: No, I do not believe the Court has a copy of it.

THE COURT: I need to see a copy.

Mr. Reed?

MR. REED: Can I also ask that the witness receive a copy of the exhibit, a full copy?

THE COURT: Yes.

Do you have a copy for Mr. Reed?

MR. REED: I have a copy, Your Honor.

THE COURT: You have a copy? All right. Thank you.

Does the witness have a copy?

MR. ZITO: Yeah, we're going to publish one on the screen for the witness to see, and then we'll get him a copy.

MR. REED: Your Honor, I believe we'd asked that the witness have a full copy of the exhibit.

THE COURT: Mr. Zito, he's made that request. The witness is entitled to it. Do you have a copy for the witness?

MR. ZITO: The copy I have for the witness I've given to opposing counsel, but we're about to get another copy. My

apologies.

THE COURT: Mr. Zito, you flashed a stack of patents. Are we going to go through the same procedure with other patents that are listed on the face of the '221 Patent?

MR. ZITO: No, just one other. We're not going to -- didn't mean to scare the Court. We're not going through that entire stack of patents.

THE COURT: While we're waiting for a copy, Mr. Zito, can you move on with your cross-examination?

MR. ZITO: Certainly.

Q. (By Mr. Zito) Do you see the abstract on the screen?

A. Yes.

Q. Have you reviewed this -- you said you reviewed some of the prior art to the patent office. Do you know if you reviewed this particular piece of prior art?

A. I would --

THE COURT: Mr. Zito, sorry, let me be more precise. Move on from this '441 Patent until -- oh, all right, we have a copy. Please provide it to the witness.

THE WITNESS: Thanks.

MR. ZITO: Can you zoom in on the abstract? You can publish. It's been admitted.

THE COURT: Mr. Zito, your next question?

MR. ZITO: Yes.

Q. (By Mr. Zito) Is this one of the patents that you reviewed

from the file history or one of the ones you did not review?
A. I believe I reviewed this in 2025, maybe early 2025.
Q. Okay. And if you look at the abstract, does it also describe a hierarchy of servers?
A. Oh, I don't know. I was flipping through this. It looks like it's talking about distributing documents, like some kind of web bundle from a client to a server or a server to a browser. I don't --
THE COURT: Hold on.
THE WITNESS: I can't -- I can't -- I can't see --
THE COURT: I'm sorry, Dr. Sorini, if you could stop for one moment.
I have to be a stickler, because it's my job to be a stickler as to the rules. Could we please take this exhibit down? It hasn't been admitted yet.
MR. ZITO: I thought we admitted it. I'm sorry. I though we admitted it.
THE COURT: I have not. There was an objection. There was a request for the witness to review the entirety of the document.
So lay your foundation, please offer your exhibit, and we'll see where it goes from there.
MR. ZITO: Okay. The witness has now identified it as an exhibit that he believes he has reviewed before, that's part of the history of the '221 Patent. So we would move it for

admission.

THE COURT: Any objection?

MR. REED: No objection, Your Honor.

THE COURT: All right. A-32 is admitted. You may publish.

(Defense Exhibit A-32 admitted.)

Q. (By Mr. Zito) Do you see the language that says, "It is determined that a particular chunk is not stored locally at the server, so the particular chunk is requested and received from bundle storage."

Do you see that?

A. Is the arrow...

Q. I don't know how to clear that.

A. There's no "if," but I think I see "it is determined" --

Q. Yeah, sorry, about that. The annotation is on, so I guess if I touch the screen, it does that.

Do you see that language in the abstract?

A. "It is determined that the particular chunk is not stored locally at the server, so the particular chunk is requested and received from bundle storage"?

Q. Correct, that language.

A. Yes.

Q. Would that not be -- "bundle storage," the -- the remote large storage, and the "not stored locally" would mean it's not on the local server?

A. Not necessarily, no.
Q. How is that different from the teaching in Hardin if something is not on the local server you look to see if it's on the remote server and then download it?
A. Well, I mean -- okay. While it's different on its face, I can't perform a technical analysis on the fly, sitting here on the stand, to compare this functionality you're pointing to to the exact functionality of Hardin.
Q. So you haven't technically analyzed whether Hardin is at all different from the reference we're looking at now, which is referred to as Ruhlen; is that correct?
A. No.
Q. You performed that technical analysis and you don't recall it?
A. No. I'm saying I -- I can't tell you if this is the same thing that's disclosed in Hardin right now. I think this looks to be some kind of web bundle, perhaps, so it's serving chunks of data at a time. I'm not sure, though.
Q. It references a local server and a remote server, correct?
A. No -- well, can you point me to that, please?
Q. Are the words of the '221 Patent the same as the words in Hardin?
A. Which words? Some of the words are the same; some are different.
Q. All of the words.

A. No. They're not all the same, no.
Q. But yet you say Hardin discloses the same thing, correct?
A. No. So it's my opinion that Hardin would render claim 7 of the '221 Patent obvious to a person of ordinary skill in the art.
Q. Okay. Would the disclosure of Ruhlen, which was looked at by the patent office, also render claim 7 obvious to one skilled in the art?
A. I don't know.
Q. So you haven't made that analysis?
A. I haven't, no.
Q. Okay. So you haven't compared whether or not Hardin is brand-new disclosure that would make claim 7 obvious or if it's the same disclosure that did not make claim 7 obvious to the patent examiner?
A. I don't know how to answer that question.
Q. Okay. Do you see where, again, Ruhlen, Exhibit A-32, says if it's not stored locally, find that chunk from bundle storage?
A. I -- I don't think it literally says that. But it mentions "bundle storage," and it mentions "not stored locally at the server."
Q. Okay. But you can't tell me whether that's different from the teachings of Hardin as far as they pertain to the issue of obviousness to one of ordinary skill?
A. It appears quite different, but I don't want to on the fly

tell the jury something I don't know for sure.

MR. ZITO: Can we unpublish and go back to...

Q. (By Mr. Zito) I'm going to show you another document. Could you read the patent number on that document?

A. Yes. It's 7,496,608.

Q. And is that document also found as one of the references on the '221 Patent?

A. Yes.

MR. ZITO: May I approach and hand a copy of what we'll call A-33 to the Court and the witness?

THE COURT: You may.

Q. (By Mr. Zito) Are you familiar with that document?

A. Give me one second.

Q. Okay.

A. So this looks to be the patent referenced on the face of the '221 Patent, this Wilbrink et al.

Q. And have you reviewed that document previously?

MR. REED: We still need a copy of the document?

MR. ZITO: Could you give him a copy of this one?

THE COURT: While the witness is reviewing the exhibit, I'd like sidebar with counsel, please.

(The following was held at sidebar:)

THE COURT: It's important that we speak one at a time and into this microphone right here so that our court reporter

can pick up what we're discussing.

Now, Mr. Zito, it appears to me that you're conducting a deposition on the fly of this expert. This particular exhibit, has it been disclosed or marked as trial exhibit in this case?

MR. ZITO: No, I was unaware that the expert was going to testify that he had not looked at all of the prior art because his -- his report did not indicate that, so I was taken by surprise, and this is to -- this is for the terms of impeachment and exploring what he did and didn't look at.

MR. MACHLEIDT: May I respond to that, Your Honor?

THE COURT: No, you can't. Mr. Reed can.

MR. REED: Your Honor, the -- the expert provided a report in this case. He was never deposed. So it appears that counsel is taking a deposition in front of the jury, so we would object under 403 for waste of time. The witness disclosed his report, the materials he considered, and this is not a surprise.

THE COURT: Yeah, I mean, the whole idea behind a rebuttal exhibit, something being used at trial that hasn't been previously disclosed, is that you're caught unaware by something that the -- the witness might say and that you are going to use the exhibit perhaps to impeach the witness. But, I mean, if we're going to go through the references that are on the '221 Patent, I think this is all stuff that could have reasonably been anticipated. So I let in one of the patents. I'm not going to let this one in. I'm going to sustain the

objection.

MR. ZITO: Again, it's not a surprise document. It's a -- it's not a surprise document. It's a document that is part of the file history. It's a document that he said he reviewed, and then today, he said he didn't review it, and so I think it's -- the document is not a surprise. They've had it. It's a public document, publicly available. It's -- it's not anything confidential. And the surprise is that he said he didn't look at all of them.

THE COURT: All right. So, I mean, you --

MR. ZITO: This is the last one. This is the last one, Your Honor.

THE COURT: You're correct in the sense that it's not a surprise document, but this is, I think, undercutting your point. The fact that this is on the face of the '221 Patent should have been anticipated by you and put this particular exhibit on your trial list.

So if you can set it up such that you are impeaching the witness with this exhibit, then -- then I'll allow it. So you could put a question to him, Have you reviewed this patent? If he says yes, no, or I'm not sure, then we'll see where -- if he says -- I'm sorry -- something inconsistent with what he's already said on the face of his report, then I'll allow the inquiry, but right now, I mean, this is -- I don't know. I'm not accusing you of trial by ambush, but it's adjacent.

MR. ZITO: He said, and I almost quote, Hardy is completely -- and, yeah, Hardin -- Hardin is completely different from all of the references, and I'm impeaching that statement because he doesn't know that it is, so that's not a accurate statement by the witness, and I didn't think he was going to say that, so...

THE COURT: All right. You can ask the witness, Have you reviewed this particular patent? You can ask your question, Is this different than Hardin or the other one? I can't remember what it is. And we'll see what his response is. If he says that this is not different and you feel that you can set it up such that you can impeach him with the exhibit, then I'll allow it, but right now, we're -- we're not there. And then as far as this procedure goes, this is the last one that we're going to review in this way.

MR. ZITO: Thank you, Your Honor.

THE COURT: All right. Clear?

MR. REED: We understand. Thank you.

THE COURT: All right.

(Sidebar concluded.)

THE COURT: To our jury, I apologize. I really don't like sidebars. My mother was a school teacher, and there's something about it that seems like school children whispering in a corner. It just strikes me as rude. That said, sometimes it's unavoidable, so please forgive me for that. We had to work

a few things out.

All right. With that, Mr. Zito --

MR. ZITO: Yes.

THE COURT: -- you may continue your inquiry.

Q. (By Mr. Zito) Earlier in your testimony, before we took our lunch break, you stated that Hardin was different. I don't know if you said completely different, but different from all of the references. Do you recall that statement?

A. Not exactly, but I -- it would be -- it is a different reference. It's titled different. It was written by a different person. It has different content. It's a different document.

Q. Okay. So you meant "different" just because it's not the same reference, correct? I'm trying to understand what you meant by "different."

A. It's a prior art document that contains a lot of information. It's not the same as any of the prior art documents listed on the front of the patent.

Q. Did you also mean different in the sense of its ability or inability to invalidate the claim 7 of the '221 Patent?

A. I don't know because I haven't performed that analysis for all of the documents listed on the face of the '221 Patent. I've only performed it for Hardin --

Q. Okay. So --

A. -- and Monroe.

Q. Let me make sure I get your testimony straight, that when you looked at Hardin and made the determination that it would invalidate claim 7, you did not also look at each of the prior art references and determine if they would also invalidate claim 7 in the same manner by making it obvious.

A. That's correct.

Q. Okay. So your opinion is different from the opinion of the examiner, correct?

A. In the sense that the examiner didn't look at Hardin, but I don't know what their opinion would have been, but I guess it's different.

Q. Right. Let me make that question more clear.

Your opinion, based upon obviousness of claim 7, based upon Hardin, is a different conclusion than the examiner came to based upon the 16 prior art references he reviewed.

A. That -- I think that's right.

Q. Okay. And I'm not trying to say that the examiner's opinion on Hardin is the same as yours or different from yours, correct?

A. Right. Because the examiner didn't look at Hardin.

Q. Okay. But you don't know if when the examiner looked at the 16 references, they provided him with the same information from which to make an opinion on validity as the information you got by looking at Hardin and making your opinion on validity, correct?

A. I'm not sure I completely follow, but I guess I'd say I don't know. I don't know what the examiner knew or thought about those references relative to the Hardin reference.
Q. Okay.
Do you know examiner -- the examiner that examined the '221 Patent?
A. I know his name. I don't know him personally. We have not met.
Q. Do you know his education or his background?
A. I'm not sure, no. Not as I sit here.
Q. Okay. Do you know if he's a person of ordinary skill in the art?
A. I'm not sure.
Q. Do you know if he's a person of greater than ordinary skill in the art?
A. I don't know his background.
Q. Do you know how he got --
A. His or her -- I don't know if it's a he or a she, so...
Q. And I note that he is indicated here as a primary examiner. Do you see that?
A. Yes.
Q. Do you know that -- do you know if there's a difference between an examiner and a primary examiner?
A. I don't know.
Q. Then my next question, what -- do you know what the

difference is between an examiner and a primary examiner?
A. No.
Q. Okay. Do you know how he got to be an examiner?
A. No.
Q. Okay. Do you know what criteria was -- was used by the patent office to select him to be an examiner?
A. No.
Q. Do you know the criteria used by the patent office to make him a primary examiner?
MR. REED: 402 --
THE WITNESS: No.
MR. REED: -- 403, Your Honor.
THE COURT: Overruled.
MR. ZITO: Okay. I'll just give the ultimate...
Q. (By Mr. Zito) Do you think your opinion in assessing prior art is better or more skilled than the opinion of the examiner that examined the '221 Patent?
A. Sorry, could you say that again?
Q. Okay. How many patents have you assessed, how many claims, patents have you assessed for their validity?
A. I don't know.
Q. I think you indicated earlier it was maybe a half dozen that you've testified about?
A. Maybe. I think maybe I said a couple times. I don't know what that -- sorry. That was a different question.

Q. Okay.
A. Sorry. Go ahead.
Q. That was a different question.
Earlier I asked you how many times you had testified about validity of a patent.
A. Yes.
Q. And I seem to recall that number between -- somewhere between four and seven, roughly.
A. Okay.
Q. I don't -- I don't think you gave a precise number, but that's my --
A. I don't know the precise number, but, I mean, let's go with that. I don't know if we're counting patents or times or -- yes, I've testified about validity before.
Q. Okay. I'm talking about the number of patents where you have assessed validity. And let's not narrow it down to where you've testified, but the number of patents you've looked at and assessed validity.
A. I don't know how many that would be.
Q. In the tens, in the hundreds?
A. Well, I mean, so normally -- so I guess I understand validity is more than just a factual inquiry, so I would -- in my work, I might look at whether a patent is anticipated by a reference and understand the facts behind that, or -- or whether a reference may render a claim obvious, so, I mean, that's sort

of the factual inquiry that I would make. I don't know how many references or patents I've looked at to make that kind of inquiry.

Q. Do you know how many that the examiner in the '221 Patent has looked at?

A. No.

Q. Okay. So my question before was do you have the belief that your opinion regarding the validity of the patent is better than the opinion of examiner -- the examiner who allowed the patent?

A. I don't know that I could say. I'm not sure what you mean by "better." They're different. He had different prior art he was looking at, he or she. I don't -- I wouldn't characterize mine as "better" per se. We looked at different prior art.

MR. ZITO: All right. Thank you. No further questions, Your Honor.

THE COURT: Thank you, Mr. Zito.

Redirect?

MR. REED: No redirect, Your Honor.

THE COURT: All right. Thank you, Dr. Sorini. You are excused.

Ms. Geyer, are you up?

MS. GEYER: Yes, Your Honor.

THE COURT: All right. Who's your next witness?

MS. GEYER: Valve calls Ms. Kimberly Schenk.

THE COURT: All right. Ms. Schenk, if you could just stand right there in front of Mr. Cogswell. He's got his back turned, working right now, but he will swear you in in a moment.

KIMBERLY SCHENK,
having been first duly sworn, testified as follows:

THE CLERK: Can you please state your name for the record?

THE WITNESS: Kimberly Schenk.

THE CLERK: And spell it.

THE WITNESS: K-i-m-b-e-r-l-y S-c-h-e-n-k.

THE COURT: Ms. Schenk, please make your way to the witness box. Take a moment to get comfortable. You can adjust the chair as you need to. There is a tissue box. There's some water for you. There is an exhibit binder as well as a monitor to your right. Exhibits may appear on that monitor from time to time. Most importantly, you'll see that microphone. Please speak directly into the mic slowly and clearly so that our court reporter can pick everything up.

THE WITNESS: I will do my best.

THE COURT: Ms. Geyer, go ahead.

MS. GEYER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. GEYER:

Q. Good afternoon, Ms. Schenk.

A. Good afternoon.

Q. Can you please introduce yourself to the jury?
A. Good afternoon. My name is Kimberly Schenk. I go by Kim.
Q. We heard from a Valve witness, Mr. Chris Schenck, any relation?
A. No, just a coincidence, and we actually spell our last names differently from one another.
Q. Ms. Schenk, did you prepare any demonstratives to assist with your testimony today?
A. I did, yes.
Q. Can you please turn to the front of your binder in front of you? Are those the demonstratives you prepared?
A. They are.
MS. GEYER: Your Honor, permission to publish those demonstratives.
THE COURT: As a demonstrative, not substantive evidence, but, yes, you may.
Q. (By Ms. Geyer) Ms. Schenk, can you please explain to the jury what issues you considered in your work on this case?
A. Yes, I considered three issues as part of my work in this case. The first was I looked at RBDS's history of licensing the '221 Patent. The second was damages for breach of contract and the Washington Patent Troll Prevention Act. And the third was my review of financials for PAM, Display Technologies, and RBDS.
Q. Before we jump too deep into the details of those, I'd like to ask you a few more questions about your background. Where do

you work?
A. I work in Chicago at a firm called Charles River Associates, or, for short, we call it CRA.
Q. What do you do at CRA?
A. I'm a vice president in our intellectual property group, so, again, we do consulting for clients, largely economic consulting. My personal work is largely focused on analyzing the value of patent technology both within and outside of the context of litigation like this.
Q. How long have you worked at CRA?
A. Coming up on 25 years this year.
Q. Can you please describe your educational background?
A. Sure. I've got bachelor's degrees in finance and economics from Penn State University, and I have a master's degree in forensic accounting from Florida Atlantic University.
Q. What is forensic accounting?
A. Forensic accounting is a specialty within the broader field of accounting that focuses on, say, using investigative techniques in conjunction with evidence, accounting records, banks statements, things like that, so a part of that is doing damages analysis, like I do regularly in my work and in this case, and part of it, it can be more of like a -- you think about it like a fraud investigation, just asset tracing and things like that.
Q. What are some of your professional credentials?

A. Well, I'm a CPA, so a certified public accountant, and I'm also certified in financial forensics through the American Institute of CPAs.
Q. Are you a member of any professional organizations?
A. I am. So I'm a member of a group called AIPLA, which is the American Intellectual Property Law Association.
I'm a member of the Patent Litigation Committee, and a few years ago, I cofounded and cochaired and also chaired a subcommittee within that larger committee related to patent damages specifically.
I'm also a member of the ABA, which is the American Bar Association, and specifically within their section of intellectual property law.
Q. What specific experience do you have in analyzing license agreements?
A. Quite a bit. So I mentioned I do a lot of patent damages work, and oftentimes, when we're looking at the value of patented technology, we obviously have to look at, you know, any licenses to the patent that is at issue, and we also look at license agreements for comparable technologies as part of our valuation.
Q. Ms. Schenk, are you being paid for your time here today and in doing work on this case?
A. I receive a salary from my employer, and my employer bills the Kilpatrick firm by the hour.

Q. What is your hourly rate?
A. $850.
Q. I'd like to start with your opinion on licensing of the '221 Patent. What did you conclude about the amount of money paid for licenses to the '221 Patent?
A. I concluded that the payments for the licenses to the '221 Patent were consistent -- consistent with nuisance value settlements.
Q. What is a nuisance value settlement?
A. So unlike a license that's entered because the defendant or licensee recognizes the validity and value of the patented technology, a nuisance value settlement would be one where the -- the defendant wished to avoid the cost of expensive litigation and entered an agreement for a value much less than what it would cost them to defend themselves in court.
Q. Ms. Schenk, can you turn your binder to Exhibit 582?
A. I'm there.
Q. Do you recognize this document?
A. I do, yes.
Q. Who created this document?
A. I did.
Q. What is Exhibit 582?
A. This is a summary from my expert report where I went through the agreements that I could identify that were entered by RBDS related to the '221 Patent and summarized some of the

information about those agreements.

MS. GEYER: Your Honor, we offer into evidence Exhibit 582.

THE COURT: Any objection?

MR. ZITO: No objections, Your Honor.

THE COURT: 582 is admitted. You may publish.

(Plaintiff Exhibit 582 admitted.)

Q. (By Ms. Geyer) Ms. Schenk, based on the information you had from defendants, how many agreements did you identify involving the '221 Patent?

A. I identified 61 agreements.

Q. In your -- performing your analysis, were you able to review all 61 of those agreements?

A. No, I was not.

Q. Why not?

A. My understanding is that counsel for Valve requested those agreements and that not all of them were produced to us.

Q. How do you know that you didn't have all 61 agreements to the '221 Patent?

A. What we did find in the production were some spreadsheets listing out settlement or license agreement for various Rothschild entities, and I was able to identify 61 agreements. And I compared that list to the actual copies of the settlement agreements I had, and I determined that I did not receive all of them.

Q. What was the average payment across those 61 licenses to the '221 Patent?
A. A little bit less than $25,000.
Q. Ms. Schenk, have you prepared a visual representation of the information contained in Exhibit 582?
A. Yes, I have.
Q. Can you please describe to the jury what is on the screen?
A. So what I did with those 61 agreements was I put them into buckets based on how much the licensee had paid for the agreement, and this is a visual reflection of that. So what you see starting on the left-hand side, the first category is $0 to $10,000, and there were 18 agreements that fell into that bucket. And then we move across, the next bar is 10,001 to $20,000. And then we go all the way across, and on the far right, we have a category for $100,000-plus.
Q. Starting with that category you just ended on, what was the most amount of money that a company paid for a license to the '221 Patent?
A. $130,000.
Q. And then going back to the left side of the page, in the agreements in the 0 to 10,000 thousand bucket, did every licensee pay some amount of money to license the '221 Patent?
A. No. Within those 18 agreements in the first bucket, five of them were for zero consideration.
Q. What does this distribution tell you about the typical

amount of money paid to license the '221 Patent?

A. Well, certainly, the most common amount of payment was, say, $20,000 or less. The vast majority of the agreements had payments that were $60,000 or less.

Q. How does $60,000 or less compare to the cost of defending against allegations of patent infringement in a lawsuit?

A. That is significantly lower than the cost of litigating for the defendant.

Q. We're looking -- we're looking at a summary of license agreements, but were some companies able to resolve allegations of infringement of the '221 Patent without taking a license?

A. Yes, they were.

Q. What, if anything, did you learn about those companies and those patterns?

A. So I was able to review a series of letters. I think there were about -- there were 14 total, and out of those, 11 of them reflected a situation where RBDS had sued a defendant; defendant's counsel sent a letter to RBDS' counsel indicating that they had good-faith belief that the -- the patents were either subject matter ineligible, invalid, not infringed, or some combination of the above. And in, like I said, 11 of those instances, the underlying litigation was dropped within a month and sometimes within days by RBDS without even a settlement agreement being entered.

Q. Ms. Schenk, switching gears a little bit, what evidence

have you seen about the cost of defending against patent infringement allegations in a lawsuit?
A. One of the things I looked at, for purposes of this case, was a survey that's conducted every couple of years by AIPLA, which that organization I mentioned earlier, and they do a survey of their membership to evaluate the cost of litigation.
Q. Did you prepare any demonstratives to summarize that information for the jury?
A. I did, yes.
Q. Can you please explain what the jury is looking at?
A. Yes. So this is a chart I prepared reflecting the median cost of litigation for defending a claim of patent infringement by a non-practicing entity, and you can see I -- I summarize the data all the way from 2014 to 2022. It's broken down in the survey by how much money was at risk in the litigation, so anywhere from a smaller litigation, where there was less than $1 million at risk for the defendant, up to a larger litigation with more than $25 million dollars at risk.
And these costs are inclusive of the entire pretrial process, so discovery, taking depositions, gathering documents, going through motion practice. It includes the trial, and then to the extent that there's an appeal after the trial, it would include that cost as well.
Q. What is the range of cost shown here to defend against a claim of patent infringement brought by a non-practicing entity

that goes all the way through trial?
A. On the low end, it's $500,000, and on the high end, it's $4 and a half million.
Q. Ms. Schenk, let's switch gears and talk a little bit about damages. When evaluating damages, are there any assumptions that you make?
A. Yes. So the main assumption that I have to make is that liability will be found because if -- if it's not, then there won't be any damages.
Q. When you say "liability," what do you mean by that?
A. That the plaintiff will prevail on at least one claim.
Q. Do you have any opinions in this case about whether or not Valve will prevail on any of its claims?
A. No, that's not what I was asked to do. I was asked to assume liability and just focus on damages.
Q. What is your understanding of what damages Valve is seeking for its breach of contract claim?
A. For its breach of contract claim, I understand Valve is seeking a return of the $130,000 it paid RBDS -- excuse me -- it paid Display Technologies for the Global Settlement and License Agreement.
Q. What is your understanding of what damages Valve is seeking for violation of the Washington Patent Troll Prevention Act?
A. It is seeking damages based on the value of time spent by Valve employees and outside counsel in evaluating the claims in

the June 2023 demand letter.
Q. Which employees at Valve spent time evaluating those claims?
A. Mr. Chris Schenck.
Q. How did you calculate the amount of damages from the time Mr. Schenck spent investigating the allegations in the June 2023 letter?
A. Well, I understand that Mr. Schenck spent at least 15 hours evaluating those claims. I think he testified that that was a pretty conservative estimate. And I calculated the value of his time per hour on basically an effective hourly rate for him and multiplied those out to get to the damages for his time.
Q. How did you calculate Mr. Schenck's effective hourly rate?
A. I think we've got a slide for that. So I first looked at his salary and benefits that he receives from Valve. That total amount was $754,102. And then we can flip forward. He estimates that he worked about 2,000 hours in 2023, and so I divided the 754,000 by those 2,000 hours to get to an effectively hourly rate for the year 2023 of $377 per hour.
Q. Once you had Mr. Schenck's effective hourly rate, how did you determine the amount of damages from the time he spent?
A. I multiplied the $377 per hour by the 15 hours that, again, he testified was a pretty conservative estimate, and that gave us a total of $5,656 for the value of his lost time.
Q. Wait till you're finished sipping your water.

A. Thank you.
Q. How did you calculate the amount of money Valve paid outside counsel to investigate the allegations in that letter?
A. I looked at an invoice that the Kilpatrick Townsend firm submitted to Valve for their work during June 30th, 2023 -- or excuse me -- through June 30th, 2023, so for the month of June, and there were two time entries that I determined were -- that at least time partially involved time spent investigating the claims in the 2023 demand letter.
Q. You said at least partially. You kind of jumped to my next question. Did all of the time spent in those two time entries relate to those investigations?
A. No. It was approximately half of the time in those entries.
Q. How much did Valve pay its outside counsel to investigate the allegations in the June 2023 letter?
A. $1,708.
Q. And then considering both Mr. Schenck's time and the cost paid to outside counsel, what are the total damages for defendants' violation of the Washington Patent Troll Prevention Act?
A. $7,364.
Q. Mr. Schenk, let's turn to your analysis of defendants' financial records. What financial records from defendants did you look at?

A. There were four categories. So I had bank statements from a couple of different banks for each of Display Technologies, RBDS, and PAM, and I also had PAM's federal tax returns.
Q. Did you analyze any of Mr. Rothschild's personal financial records?
A. No, I did not have access to those.
Q. From the records you did have access to, were you able to glean any insight into Mr. Rothschild's personal financials?
A. Yes. So there were a number of transfers from the PAM bank accounts to accounts that I either knew for a fact were his personal accounts or deduced through my work also was a personal account of his. So I had that information of at least those transfers, but I didn't have his full bank statements.
Q. Starting with Display Technologies and RBDS, what is your understandings of the business that those companies are in?
A. They each hold patents, and they are the entity that litigates those patents.
Q. What type of revenue, if any, do Display Technologies and RBDS receive?
A. They receive the funds that are paid to settle those lawsuits.
Q. Based on your review of those financial records, at a high level, please explain to the jury what happens to those settlement payments once they are received by Display Technologies or RBDS.

A. Sure. And I've got a visual for that that will help us.

So starting at the left-hand side here, we see the litigation settlement funds are received by either Display Technologies or RBDS, and then within a short period of time, they're transferred out of those accounts through one of two paths. They can either go directly to PAM's bank account at TD Bank, or some of the transactions go from the Display Technologies or RBDS accounts first to PAM's account at First Horizon Bank, and then from there to the PAM TD Bank account, and then ultimately, those funds will be transferred to Mr. Rothschild's personal accounts.

Q. Do all of the funds that are received from Display Technologies and RBDS from litigation settlements ultimately end up in Mr. Rothschild's personal accounts?

A. Not all of them. So PAM pays expenses for the organization out of those two accounts, so the expenses are taken out of the accounts, but then after that, the majority of what's left has been transferred into Mr. Rothschild's personal accounts.

Q. Based on your review of the defendants' financial records, what are some examples of the expenses that are paid from PAM's accounts?

A. Things like salary for the PAM employees, attorney fees, and subscriptions, fees paid to the USPTO, things like that.

Q. How much money do Display Technologies and RBDS typically keep in their bank accounts?

A. Almost nothing. They tend to keep a zero balance or effectively a zero balance.
Q. Ms. Schenk, if you could please turn to your binder to Tab 667?
A. I'm there.
Q. Do you recognize this document?
A. Yes, I do.
Q. Who created this document?
A. I did.
Q. What is Exhibit 667?
A. This is another attachment from my expert report, and it's a summary of the beginning and ending and average balances of the Display Technologies and RBDS bank accounts.
MS. GEYER: Your Honor, Valve offers Exhibit 667 into evidence.
MR. ZITO: No objection, Your Honor.
THE COURT: All right. Exhibit 667 is admitted.
(Plaintiff Exhibit 667 admitted.)
THE COURT: You may publish.
Q. (By Ms. Geyer) And, Ms. Schenk, I think -- did you create some visual representations to help us understand the data in Exhibit 667 a little better?
A. Yes, I did.
Q. Can you please explain what we're looking at here on the slide?

A. Yes, so this is a visual I created to reflect the ending monthly balance for the two Display Technologies bank accounts, the TD Bank account and the First Horizon Bank account.
Q. What is shown by the -- the bars on the slide here?
A. So this is a bar graph, and we did it monthly, and for each month, I put in the amount of ending balance for the month in either the TD Bank account or the First Horizon Bank account, so the -- the TD Bank account is in blue, and the First Horizon account is in that orange-ish color.
Q. Does the fact that there are amounts of money shown here on the slide mean that Display Technologies or RBDS keeps funds in their account?
A. No. So most of the months, you'll see zero or a very, very small line, so they might have $100 or less in the account. The bars that you do see, like little spikes, what that represents is a settlement has come in towards the end of the month, and it takes a week or, you know, sometimes two weeks to actually transfer the funds out of the account. So if you look at the balance at the end of the month, you'll actually see a balance there, but it's just because those funds had not yet been transferred out, and they would at the beginning of the following month to zero the account back out.
Q. Do you have an example from one of those spikes on the graph?
A. Yeah, if we flip forward. So in August of 2017, Display

Technologies received $15,985 on the 25th of the month, and they ultimately transferred all but -- what? -- $75 of that out between September 5th and September 26th so that by the end of September, the balance in that account was basically back to zero.

Q. What about the orange bar shown on the right-hand side of the screen?

A. So that reflects a settlement that was some proceeds that were received from a company called RPX that totaled $120,000. That was one of their larger settlements. And rather than moving that money out of the account almost immediately, they actually drew down the account over the course of five months, but by the end of the fifth month, the balance in the Display Technologies account was back down to zero.

Q. Ms. Schenk, we're obviously looking at Display Technologies. Do you have a similar graphic for RBDS?

A. I do, yes.

Q. Again, could you please explain to the jury what they're looking at?

A. So, again, we're looking at end-of-month balances for RBDS's bank accounts, and for the majority of the months, we're seeing either zero balance or a very minimal balance, and then there's a handful of spikes that represent the same phenomenon we saw with Display Technologies.

Q. Do you have an example of what's happening with one of

those spikes for RBDS?
A. I do, yes. So this is February 2021. They received -- it was actually two settlements, but they received a total of $40,000 between February 25th and 26th, so we see a balance there of $40,000 at the end of that month, but then on the first day of March, they transferred all but $100 of that out of the account again such that the balance was now down to $100.
Q. Ms. Schenk, when did Valve file this lawsuit?
A. July of 2023.
Q. How much money did RBDS keep in its accounts from July 2023 through December 2025?
A. Effectively, nothing. We can see a tiny, little bar there, I guess. That was -- I looked at that. That was less than a $1,000.
Q. After Display Technologies or RBDS transfers funds to the PAM bank account, can you please remind us, how is that money used?
A. So it's used to pay expenses, again, things like legal fees and subscriptions, salaries, and then the majority of what remains is transferred out to Mr. Rothschild's personal accounts.
Q. How do you know that the majority of that money is transferred to Mr. Rothschild's personal accounts?
A. So the bank statements for PAM show the account numbers of transfers going out, and, again, I had evidence of two accounts

that I could see money going out to Mr. Rothschild's personal accounts. And then there was a third account that, although I didn't have any evidence, per se, that it was his account, the pattern of transactions looked very similar to the other two, so I think it's very likely that that third account is also one of his personal accounts.
Q. Let's start with those first two known accounts. What evidence did you see that confirmed those were Mr. Rothschild's personal bank account numbers?
A. For one, I saw deposition testimony from Mr. Falcucci. And for the other, there was an invoice produced where Mr. Rothschild was providing consulting services to someone and asked for funds to be wired to that particular account.
Q. For that third account that you said is likely Mr. Rothschild's personal account, what pattern of activity led you to make that conclusion?
A. So what we see is frequent withdrawals, like, every couple of days in most -- most instances, of amounts that were, say, in the thousands or tens of thousands of dollars and in even amounts, so exactly $10,000 and not roughly $10,000, things like that. And so we saw the same pattern in all three of those accounts.
Q. Ms. Schenk, can you please turn to Exhibit 663 in your binder?
A. I'm there.

Q. Do you recognize this document?
A. Yes, I do.
Q. Who created this document?
A. I did.
Q. What is Exhibit 663?
A. This is a summary of transfers out from PAM's TD account to various checking accounts, and there's also a handful of savings accounts and credit cards, but it shows, by account, the amounts that were being transferred out to these accounts.

MS. GEYER: Your Honor, we offer Exhibit 663 into evidence.

THE COURT: Any objection?

MR. ZITO: No objection, Your Honor.

THE COURT: 663 is admitted.

(Plaintiff Exhibit 663 admitted.)

THE COURT: Ms. Geyer, it's time for our afternoon recess. Let's take a 15-minute break. We'll be back at three o'clock.

(Jury absent.)

THE COURT: Give me a quick timeline. Are you still calling Professor Gugliuzza?

MS. GEYER: Yes, we have less than ten minutes left of testimony, and I believe Professor Gugiluzza is around 30 minutes.

MR. MACHLEIDT: 30 to 35, Your Honor, the direct, of

course.

THE COURT: All right. Very good. All right. Are we anticipating to have cross for either witness, Mr. Zito?

MR. ZITO: No.

THE COURT: All right. We're at recess. See you at three o'clock.

(Court in recess 2:45 p.m. to 3:02 p.m.)

(Jury present.)

THE COURT: Welcome back. We are in the homestretch for the day. We left off with the direct examination of Ms. Schenk.

Ms. Geyer, go ahead.

MS. GEYER: Thank you, Your Honor.

Q. (By Ms. Geyer) Ms. Schenk, I believe we left off discussing Exhibit 663; is that correct?

A. Yes.

Q. Now that the jury can see Exhibit 663, can you please describe what's on -- shown on the screen here?

A. Yes. So, again, this is a summary of transfers out of Rothschild's PAM account and into various checking accounts, savings accounts, and credit card. And what we see -- I guess we've got the years from 2019 to 2025 going across the top and then a total on the far right side, and then each row is a different account that transfers were made out to.

Q. Which accounts shown in Exhibit 663, if any, are

Mr. Rothschild's two known personal accounts?
A. The first one is the very top row, the account that ends in 553, and the second is the third row down, the account that ends in 431.
Q. Which account shown in Exhibit 663 is the account that you believe is likely another one of Mr. Rothschild's personal accounts?
A. It's the one between those two, so it's the account that ends in 579. That's the second row on the schedule.
Q. At the bottom of this exhibit, what information do you calculate?
A. Well, I add up all of the transfers to all of the accounts, and then I add up the transfers to those three accounts we just mentioned, and I calculated the percent of the total transfers that went to those three accounts.
Q. Is that calculation shown on the slide?
A. It's up on the screen right now, yes.
Q. What is the total amount of payments between 2019 and 2025 that were made from PAM's TD Bank account to Mr. Rothschild's personal bank accounts?
A. $3,660,537.
Q. And what percentage of that is the -- that 3 million -- almost 3.7 million compared to all the payments made from the PAM TD Bank checking account?
A. And to be clear, it's the transfers out, not the expense

payments. But it's 98.5 percent, so effectively all of it.
Q. Ms. Schenk, did you create another graphical way of looking at this data?
A. I did.
Q. Please describe what we're looking at here.
A. So this is a bar chart of all of those transfers out of the PAM account to checking, savings accounts, and credit cards. The black bars that you see there are the total transfers coming out of the PAM account. And the red bar is the portion of those transfers that went to those three accounts that we talked about, so the two accounts that I knew from evidence were -- are, in fact, Mr. Rothschild's personal accounts and the one that followed similar patterns and that I think is very likely one of his personal accounts.
MS. GEYER: All right. Your Honor, I have no further questions, subject to redirect.
THE COURT: Thank you. Mr. Zito, cross?
MR. ZITO: Yes. Thank you.

CROSS-EXAMINATION

BY MR. ZITO:
Q. If we could, I'm going to put back up 663, which I think is the last exhibit we were just looking at, just to try and keep it fresh there.
So what we're looking at here is not all money spent out of the PAM account, correct?

A. Correct. This does not include expense payments that went for the expenses that we talked about, like the lawyer fees and the salaries. This is just transfers to other accounts.
Q. So why did you create a chart that didn't actually represent the total money in and the total money out?
A. Because the -- I recognized that the expenses are coming out, and those are separate and apart from the transfers that are going out to the different accounts.
Q. Why are those separate and apart?
A. Because that's not the focus of my -- my analysis here.
Q. So the focus of your analysis is to try and make it seem like Mr. Rothschild gets 98 percent of the money that comes from licensing? Is that the focus?
A. After expenses are paid.
Q. Okay. How much does he get if you include expenses being paid?
A. The expenses were about -- I think on the order of about a half million dollars a year, so looking at the numbers here in this exhibit...
Q. So in 2019, that would mean that Mr. Rothschild got less than 30 percent of the total revenue?
A. I'd have to do the math on that. He got 381,000. I don't have the exact number for 2019. I recall looking at the tax returns, and the expense totals were on the order of a half million a year. I can't say for sure for 2019, but -- so, I

mean, on average, I'd say roughly half the money was used for expenses, and then what was left primarily went to his accounts.
Q. That's not -- you're -- you're an accountant. You should be more accurate. 500,000 for expenses and 300,000 for Mr. Rothschild is not about half. It's less than 40 percent.
A. Well, you're looking at one year, sir.
Q. Just that year is what we're talking about. What were the expenses -- I mean, what were the salaries in 2022?
A. I don't have that number handy.
Q. Okay. Did you have that number anywhere in your materials?
A. I've got the tax returns that itemize those expenses, yes, and then, also, there are various, like, ACH payments and things within the bank statements. But, again, the bank -- the bank statements were turned over to Valve, as I understand it, about six weeks ago, and they were voluminous, so to go through all those ACH transactions and summarize them when that's not really the point of the analysis I was doing just didn't --
Q. Where does the --
A. -- make a lot of sense.
Q. Where does the other 2 percent go?
A. Account fees. Like, if you make a wire transfer, you've got to pay fees for that. And they tend to keep a nonzero balance in the PAM account presumably because they've got payment going in and out, so they keep -- you know, I -- I've -- I've seen months where they were actually overdrawn, but for the

most part, I think they kept, you know, 10,000, $20,000 in that account.
Q. Okay. So instead of realistically portraying Mr. Rothschild as getting about a third of the money that came in after he pays his employees, the lawyers, the other people that work for him, office expenses, overhead, you created a chart in the little time that you had that shows that he gets 98.5 percent of all the money?
A. No. First of all, I think I testified that that one-third number was not a fair and accurate characterization of this. And now on top of that, I think the point of the exercise was to show that when all the expenses were paid, the money was taken out of the account and transferred to his personal accounts. That was the point of the exercise.
Q. Isn't -- isn't that what an owner of a business does? He gets the profit from the business?
A. They may.
Q. Okay. Then how is that an interesting statistic?
A. I understand that that's relevant to some of the factual questions that are going to be part of the jury's determination. As I sit here, I'm not here to opine on the legality of it. I'm here to opine on the facts.
Q. Okay. So it's true that he gets -- does he get a salary?
A. I've seen testimony that he get a salary, but I don't recall any of the witnesses being able to say what that was. It

certainly wasn't part of the salary expense line item from his taxes, as far as I'm aware. I believe it took the form more of these kind of distributions out of the accounts.

Q. Okay. So it's fair to say -- let's just take 2022 -- that Mr. Rothschild received 369,000 from the business.

A. I identified that amount of transfers out to his personal checking accounts.

Q. Okay. And then you said -- you testified that about 30 percent was not correct?

A. I think that was not my testimony.

Q. No. You just said, when I asked you about the percentage, that 30 percent was -- your testimony was 30 percent was not accurate?

A. Right, 30 percent was your number.

Q. What's your number?

A. I don't have the exact number here, but I think my testimony was that over the course of the period that I've got reflected on this schedule, my recollection from the tax returns was that the expenses were on the order of half a million dollars.

But you were focusing just on 2019, where his -- his transactions out of that account were $381,000. As you can see, the -- the transfers to his personal accounts went up over time, so I think that $381,000 is kind of cherry-picking the lowest number on that schedule.

Q. Okay. Well, no, actually, 369,000 was the lowest number --
A. Okay.
Q. -- 381 is just the first one.
A. Fair enough.
Q. All right. Do you know the -- that the expenses went up every year when -- when these numbers go up and then back down?
A. I don't recall if they do or don't. I'd have to look at the tax returns.
Q. Is it fair to say that in no year did he earn $750,000?
A. No, I don't think that's fair.
Q. So there is a year where he earned $750,000?
A. I -- I can't say for sure the total of what he earned. All I can say is what I've seen transferred out of the PAM account to those three checking accounts that I either specifically had evidence to demonstrate were his or drew the conclusion that they likely were his based on the similar pattern of transactions.
Q. Is there some other mysterious account where some of the income went to?
A. I'm not sure that I have full access. In fact, I know that for a fact, that I don't have full access to Mr. Rothschild's personal records nor the records of any of the other entities sitting below PAM in the -- the hierarchy. So I understand that information was certainly requested by Valve's counsel, but to my knowledge, it's not been turned over.

So the best I can say is looking at the PAM account, I see three checking accounts that appear to be his, and beyond that, if there's more money going to his personal accounts, I -- I don't have the records to demonstrate that.

Q. Okay. So you think there's some mysterious records out there of money that's being secreted away to Mr. Rothschild?

A. Without saying too much, I believe that there is -- that's a possibility.

Q. Okay. But where'd the money come from if you have all the licensing information?

A. I only have licensing information for RBDS. I don't have licensing information for any of the dozens of other entities.

Q. But that money all goes through PAM, also, because you have -- you have money coming in from the other entities into PAM, correct?

A. That's my belief. I did not receive the financial records for any of the entities other than Display Technologies, RBDS, and PAM, so I can't confirm that.

Q. Okay. Let me look at one of your pages here on your demonstrative. Can you explain what you mean by "litigation settlement funds received from DT or RBDS"?

A. I think that should say received by Display Technologies or RBDS.

Q. Okay.

A. So those are the funds that are coming out from the people

who took the licenses and going into those accounts. So I apologize if that was confusingly labeled.

Q. Okay. And those would be received into a DT or RBDS bank account?

A. Yes.

Q. Okay. So I noticed you have the PAM bank account, the PAM TD Bank account, and the Rothschild personal accounts, but on this chart I don't see the -- so is it your understanding that each of the entities has their own bank account?

A. This -- yes, each -- so they actually have two. So each of Display Technologies, RBDS, and PAM have two accounts, one with TD Bank and one with First Horizon Bank.

Q. And you looked at all those records?

A. When -- when you say "all those records," what do you mean?

Q. That were made available to you from those accounts.

A. Yes.

Q. Okay. And those accounts all fed the money from the -- is it your understanding that DT and RBDS own patents?

A. That is my understanding.

Q. Okay. And that's the same entity that would own the bank account, correct?

A. That's my understanding.

Q. Okay. And so they would receive the funds from licensing and litigation of those patents, correct?

A. Correct.

Q. Okay. And then those funds -- but they didn't pay any of the expenses associated with the licensing and litigation, correct?
A. Correct.
Q. Okay. So they would transfer those funds into PAM, who was responsible to pay those expenses, correct?
A. That's correct.
Q. Okay. And then those expenses would all be paid, and there would be some money left over, correct?
A. I mean, I can't say if they paid all their expenses, but there are expenses that are being paid out of the PAM accounts.
Q. And that includes salaries, correct?
A. Yes.
Q. Taxes?
A. I -- well, the federal tax return, I understand, was filed by Mr. Rothschild personally. Whether there were other types of taxes coming out of that account, I can't say as I sit here. It's possible.
Q. Office expenses, overhead, things like that?
A. Yes.
Q. And outside vendors, including attorneys?
A. Yes.
Q. Okay. And then there was money left over at the end of the quarter or the end of the year, correct?
A. At the end of the month, yeah.

Q. Okay. And that money was distributed to the owner of the business, correct?
A. Yes. And not just at month end. It was -- it was frequently throughout the month.
Q. Okay. Tell me, how does that differ from any other business that you've looked at?
A. I mean, I can't speak to every business. I think the transfers looked pretty frequent to me, but, again, I'm not saying that there's anything that I've determined to be illegal about that. It's a -- it's just a factual determination about how the funds are flowing.
Q. Okay. So you don't see anything nefarious in this situation that you've outlined here?
A. I've have not done that evaluation. I have not reached any conclusions about whether this is nefarious or not. I understand that the factual flow of funds is relevant to some of the issues in this case.
Q. Okay. So you're not -- I'm not saying that you -- but you're not asserting that somehow having a subsidiary that transfers money into the main company that pays all the expenses and then has a profit and distributes it to the owner is an improper way to do business?
A. That, in and of itself, I understand to be like the ordinary way a business might operate.
Q. You said something about you do patent valuation?

A. I do.
Q. Okay. Did you value any of the patents that are at issue in any of these holding companies?
A. No. I expected I would be asked to, but the infringement allegations in this case were dropped.
Q. Okay. If a patent is worth $50 million, would a settlement of 100,000 be a nuisance fee?
A. Yes.
Q. Okay. If the patent was worth $10,000, would a settlement of $100,000 be a nuisance fee?
A. It could or could not be. That -- I think you'd have to look a little bit closer.
Q. So without valuing any of these patents, which may be worthless, how did you conclude that the fees that were received for licensing were not fair and reasonable but were actually nuisance?
A. Well, my understanding is that we've heard testimony here that the Rothschild witnesses have claimed that companies, large companies have used their technology extensively and were very happy to take licenses, and so what I looked at is whether the pattern of settlement amounts was consistent with companies acquiescing to the -- or accepting the validity of the patents and the value of the technology or whether the pattern was more consistent with a pattern of nuisance value settlements where, consistent with a lot of the other evidence I've seen in this

case, including the -- the letters that were sent by defendants to RBDS indicating that they had strong grounds for 101, which is patent-ineligible subject matter or invalidity, that -- that was all inconsistent with what I view as a campaign of nuisance value settlements.

Q. Okay. So you took, at face value, Mr. Rothschild and his employees' assessment that his inventions were highly valuable, used throughout the country, and valued by large corporation throughout America?

A. No. I think I did the opposite of taking that at face value. I think I looked at the pattern of settlements that were all, you know, mostly below $60,000, and along with testimony and documents indicating that the reason that companies, including Valve, settled for those amounts of money was not because of any sort of recognition of the value of the technology or the validity of the patents but just because, as we've heard repeatedly throughout this trial, it's very expensive to defend against claims of patent infringement, even if those claims have no merit.

Q. Okay. Is it free for a patent owner to take a case through trial?

A. It can be. Contingency agreements certainly make that possible.

Q. So they don't have to pay any expenses associated with trial? For -- for -- for example, wouldn't a patent owner have

to hire someone like you to -- to talk about damages?
A. Sometimes the patent holder pays that fee in a contingent arrangement, and sometimes that's paid up front by the law firm and then recouped on the back end if there's a recovery.
Q. So there is some cost for that, correct?
A. If the patent holder agreed to pay that, then yes. If the contingency law firm agreed to pay it, then no.
Q. So things are free if a law firm pays them? That's -- I don't understand that. What I'm saying is there is a cost associated with a patent holder bringing a case to trial. I'm not asking who pays it or a cost to the patent holder, but that cost exists, correct?
A. If a case proceeds to trial, yes, there is a cost associated with that.
Q. Okay. What's the average cost for you to -- to argue -- to present a damages expert report in a patent trial?
A. For me?
Q. For you.
A. It depends on the case.
Q. What's the low number that you've ever billed?
A. Ever?
Q. Yes --
A. Gosh, I didn't -- probably low tens of thousands.
Q. That's to go through trial?
A. I'd have to think. A lot of our cases don't go to trial.

I have to think about the ones that have gone to trial and what that actually looks like.

Q. What percentage of your cases don't go to trial?

A. More than half.

Q. Two-thirds?

A. It's -- it could be two-thirds.

Q. Could it be 80 percent?

A. I'd have to think. I mean, I can tell you how many times I've been deposed versus how many times I've testified at trial, but there is also cases that don't even get to deposition or a party, like your client, decides not to depose me.

Q. So it's not rare for a patent case not to make it to trial?

A. I'd say it's more frequent than -- than actually making it.

Q. But you don't -- you don't have a statistic on how frequently?

A. You know, I heard something about 98 percent or something. That seemed high to me. But a lot of cases, also, are -- say, nuisance value cases, the -- the plaintiff doesn't typically hire a damages expert. They're not -- they're not intending to take that case anywhere near trial, not even through expert discovery.

So if Mr. Rothschild was including those cases and there's -- as we saw in that bar chart, there's quite a few of those. If we don't include those cases, 98 percent might be a good ballpark, but when it -- you look to cases that are

actually being taken seriously by the parties and you're hiring damages experts and taking actual discovery, I'd say my experience is -- is much -- is much more than -- much more than that.

Q. What's the most you've ever billed to testify at trial about damages in a patent case?

A. Just for the trial? Just for the trial?

Q. No, no, to --

A. For the whole case?

Q. To get all the way to trial.

A. Probably somewhere between 3- and 500,000.

Q. Okay. So for someone to be serious enough to take their case to trial, it might cost them 3- to 500,000 just for your testimony?

A. It could. I mean, that's the -- you -- that's the highest.

Q. Okay. Does that give you some indication why maybe a lot of plaintiffs wouldn't be "serious enough" to take it to trial, to use your words?

A. That's exactly the point -- is that if you can get away from paying all of the fees associated with going to trial, if you can avoid that and pay something in the $10,000 range, like, that -- you don't care if the patent's valid. Like, you -- you're willing to pay that for an invalid patent just -- just to avoid the cost of having to prove that it's invalid.

Q. And that only holds for defendants is what you're saying?

A. I'm not sure how -- what do you mean?
Q. Okay. Doesn't the same logic -- if Mr. Rothschild or PAM or any other company could settle their case for 120,000 instead of somehow finding $300,000 to $500,000 just to pay you, wouldn't it make sense to them to accept the 120,000? Not as a nuisance or I don't believe in my patent; I just don't have $300,000 to go to trial, even if my attorney works for free?
A. In my experience, the intent of nuisance value business model is never to actually take the case to trial.
MR. ZITO: Okay. I'm going to ask to strike that. I don't think she can testify to the intent of other people.
THE COURT: Your question, so I'm going to overrule the objection.
MR. ZITO: Okay. All right.
Q. (By Mr. Zito) So you've spoken to all -- to the nuisance people and asked what their intent is?
A. I'm -- I've been operating in this industry for 25 years. It's pretty well-established. There's academic literature. There's all sorts of information out there about the business model of non-practicing entities who pursue this nuisance value model.
Q. And those studies have been published by non-practicing entities who disclose what their motivations are, correct?
A. It could be that.
Q. Have you read a study that said, I'm a non-practicing

entity and here I'm disclosing my motivations?
A. Not an academic study, probably, but certainly, there's a lot of talk in the industry about what the business model looks like. I don't think this is a well-kept secret.
Q. Okay. All right. Are you the only expert that testifies at a patent trial, typically?
A. No, not typically.
Q. What other experts would testify at patent trial?
A. There's typically at least one technical expert. There may be other -- say, an industry expert. It just -- it depends on the case.
Q. So it could be 3-, 4-, 5-, 6-, $700,000 just for the experts? We're not talking attorneys' fees, correct?
A. It could be, yes.
Q. Okay. All right. So what's a patent holder supposed to do if they don't have a half million or more dollars to take their case all the way to trial? And I'm -- I've got your chart here. It could be half a million; it could be four and a half million, according to your testimony.
A. They could hire a contingency fee law firm.
Q. That only takes care of the attorneys' fees. What about the expert fees, never mind the other costs associated with going to trial?
A. I think I testified that's not always true. Are there options? I think there's -- litigation finance is a big thing

where there's these big companies that fund litigation in exchange for a cut of the proceeds. You can take a personal loan, as I understand it, or a business loan to fund litigation.
Q. But settling early wouldn't be an option as opposed to paying hundreds of thousands?
A. It is.
Q. Okay. So I'm going to go back again.
How much money do you understand Mr. Rothschild has taken in for the '221 Patent? And I know you have a -- one of the pages has that on it, if you need to see it.
A. The schedule that I have summarizing all of the agreement or at least all the ones that I'm aware of doesn't have a total on it, but we can probably to do the math. The average payment is about 25,000, and there's 61 agreements, so do the math on that, I think that's -- sorry. I'm doing this on the fly, but you could do the math on that.
Q. About $1.2 million?
A. I don't know. I'd have to look at a calculator. I apologize. It's hard doing math in your head when you're on the stands sometimes.
Q. If I take 2 times 6, it's 12, and we're talking 20,000 and 60, that's 1.2 million?
A. Sure.
Q. Okay.
A. If you've done the math.

Q. So you haven't evaluated the '221 Patent, right?
A. What do you mean by "evaluated"?
Q. Well, you do patent valuation? You do that, right?
A. That's correct.
Q. And if you did not perform that on the '221 Patent, correct?
A. Correct. I understand that the infringement allegations were dropped.
Q. Okay. So do you know if 1.2 million is more than the value of that patent or less than the value of that patent?
A. I have not done that analysis.
Q. So it could be that what PAM has done, because they have 15 years of experience, is made a valuation of the patent -- let's say it's 3 million -- and said a fair payment to avoid all those costs is about 1.2 million, and so they collected fair value of their patent as opposed to whatever nefarious troll aspects you think of NPEs just to extort money. Could that be also true?
A. I -- I kind of disagree with the language you used at the end of your question, but to answer -- answer what I understand you're asking, I mean, I suppose it's possible that Mr. Rothschild used the '221 Patent as not having a lot of value and is willing to take settlements that are for low dollar amounts, but I think that's -- given all the evidence in this this case, I think that's inconsistent with what I've seen and, quite frankly, highly unlikely.

Q. But possible?
A. I have trouble even agreeing with that, but I suppose everything is possible.
Q. And of that 1.2 million, based upon your assessment of cost and the like -- we'll go with 50 percent -- then Mr. Rothschild got about 5- or $600,000 out of that patent?
A. I'm sorry. Say that again.
Q. If he collected 1.2 million and he takes home -- or the profits are about 40 percent of the company, that would leave him about 4- or $500,000 of profit after expenses?
A. I'm trying to think about how to answer that. You're kind of mixing a few different things there.
Q. Okay. I'll withdraw the question.
I think I asked is this before, but according to your calculations, there was never...
I'll pull the page back up.
The maximum money left over after expenses, again, in PAM was $635,845 in any one year?
A. I'm sorry. Where are you looking? At the bottom of that schedule?
Q. On Page 1 of 3 of Exhibit 663?
A. Page 1 of 3.
Q. The first page of Exhibit 663.
A. Can you point me to the number that you're referring to?
Q. It looks like the highest number was in 2023, but you have

to add the entire column. That's correct.
A. Yeah, so that's -- that's just transferred to that one 553 account of Mr. Rothschild's.
Q. Okay. And if you go to the bottom, it goes up to 659,000?
A. That the total for the three accounts that we were talking about.
Q. Okay. So that's the total for the year of profit after costs and expenses?
A. It's -- I wouldn't call it profit. I would call it funds transferred out from PAM to those three accounts.
Q. That's good. Do you know that that is the profit made that year?
A. No, I don't believe PAM turned over profit and loss statements.
Q. Okay. Could that represent less than the outstanding expenses of PAM and actually be a loss that year?
A. I'm not sure what you mean.
Q. Okay. Well, you said you didn't call it "profit" because you don't know if it's profit?
A. No, I don't think that's exactly right.
Q. Okay. Is that the profit from the year of 2023?
A. That is not profit. I can't tell you the profit for 2023 precisely because I understand that information was requested and was supposed to be turned over but was not. But what I'm saying is that I wouldn't call that number profit, but I would

refer to that is -- as, excuse me -- is once we look at the PAM bank account. So this is not a financial statement. This is just a bank account. We look at the starting balance. We take out the expenses that were paid. 98.1 percent of the cash in transfers out of that bank account were reflected in that $369,180.

They -- like I said, they did keep some balance in the PAM account, so they didn't take all of the money out, but the balances -- compared to $369,000, the month-end balances were pretty small.

Q. So the profit in that year could be more than that number?

A. Again, I can't -- I can't say without looking at their bank statements. I mean, the -- profit numbers are different from cash accounting. So there's -- there's noncash transactions that -- that are reflected in a -- say, a profit and loss statement, which is where I would look to see the profit that year, but, again, those weren't turned over, so I can't say for sure what the profit was in that year.

Q. Okay. So it could also be less, then?

A. If you've got the statements, I'm happen to look at them, but they weren't turned over in discovery.

MR. ZITO: No further questions.

THE COURT: Very good. Ms. Geyer, any redirect?

MS. GEYER: No redirect, Your Honor.

THE COURT: All right. Ms. Schenk, thank you. You're

excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Mr. Machleidt, your next witness.

MR. MACHLEIDT: Yes, Your Honor. Valve calls Professor Gugliuzza to the stand.

THE COURT: All right. Professor Gugliuzza, if you'd make your way up here to the front.

PAUL GUGLIUZZA,
having been first duly sworn, testified as follows:

THE CLERK: State and spell your name for the court reporter.

THE WITNESS: Yes. Paul Gugliuzza, P-a-u-l G-u-g-l-i-u-z-z-a.

THE COURT: Professor Gugliuzza, if you could make your way to the witness box, please. I know you've heard this before, but I'm going to say it anyway. There's a tissue box. There is water. You'll see the monitor to your right. Exhibits might show up on that. There's also an exhibit binder in front of you. Please speak slowly and clearly into the microphone.

THE WITNESS: I will.

THE COURT: Go ahead.

MR. MACHLEIDT: Thank you, Your Honor. My monitor still shows a -- from the ELMO, but I don't believe it's being published anywhere else, so...

DIRECT EXAMINATION

BY MR. MACHLEIDT:

Q. Professor Gugliuzza, please introduce yourself to the jury.

A. My name is Paul Gugliuzza. I'm the Thomas W. Gregory Professor of Law at the University of Texas at Austin School of Law.

Q. What do you teach at the University of Texas School of Law?

A. So right now, I'm teaching law students a course in patent law. I'm also teaching a seminar in which I invite professors from other law schools to come in and present their draft research papers to my students. I also regularly teach the intellectual property course, which covers not just patent law but also copyrights, trademarks, and the law on trade secrets. And then because I was a patent litigator before I became a law professor, I also teach a first-year course called Civil Procedure, which introduces students to the U.S. court system and the basics of the litigation process.

Q. Professor Gugliuzza, what areas of research do you focus on at the University of Texas?

A. My research focuses on patent law, patent enforcement, and patent litigation.

Q. How long -- or please remind us how long have you been at the University of Texas?

A. This is actually my first year at the University of Texas at Austin.

Q. Where did you work before moving to Texas?
A. I'll rewind all the way to the beginning of my legal career, at least. I graduated law school from Tulane University law school in New Orleans in 2006. After I graduated law school, I spent a year clerking for a federal judge right here in Seattle, actually -- a judge named Ronald Gould, who is just down the street with the Federal Court of Appeals for the Ninth Circuit. After my clerkship, I spent three years at a large law firm in Washington, D.C., practicing patent litigation. And then I began my academic career at Boston University Law School, where I received tenure in 2019. And immediately before coming to the University of Texas at Austin, I was a professor of law at Temple University Law School in Philadelphia for five years.
Q. Focusing on the academic part of your career, for how many years have you been a professor?
A. Sixteen years.
Q. How many of those years have you spent focusing your research broadly on the area of patent law?
A. The entire time. As I said, I practiced patent litigation before becoming a law professor, so it 's the area of law that I know best.
Q. Has any of the research work that you've done been published?
A. It has.
Q. What sources, what publications, has your work potentially

been put into?
A. Yeah, so I've been fortunate to publish some articles in places including the *Stanford Law Review*, the *Duke Law Journal*, the *University of Pennsylvania Law Review*. And I just recently published an article on pharmaceutical patent litigation in the *New England Journal of Medicine*.
Q. Specific to the answer you just gave, what is a law review?
A. So a law review is the primary scholarly publication where law professors publish their research -- their research articles. So most every law school has a law review, and the editors for the law review are typically, like, the top-performing students at the school.
Q. Professor Gugliuzza, what articles have you written that relate specifically to abusive patent enforcement?
A. One of the articles that got me tenure was actually an article published in the *Virginia Law Review* about abusive patent enforcement, and it was really one of the first to relate abusive patent enforcement to some new laws that were being passed to outlaw bad faith assertions of patent infringement, such as the Washington law that brings us here today.
Q. Has the research that you've done ever been cited by others?
A. It has.
Q. What are some of the sources where your work has been cited?

A. So at last count, my scholarship had been cited in at least 20 judicial opinions across sort of all levels of the court system, and it's been cited in other academic literature probably about 600 times.
Q. Excluding today with you on the witness stand, how many other times have you ever testified, in any setting, about issues of patent law?
A. Well, this is actually my first time testifying in court as an expert witness, but I have testified before both the U.S. Senate and the U.S. House of Representatives on issues of patent law and patent litigation. For example, back in 2015, the U.S. House was considering a bill that would have outlawed bad faith assertions of patent infringement under federal law. And so the House committee that was considering that bill read my research on the topic and invited me in to testify.
Q. What happened to the potential federal law that was under consideration?
A. It didn't pass at the time.
Q. Professor Gugliuzza, what jurisdictions are you admitted to practice law in?
A. I'm admitted to practice law in the state of New York, the District of Columbia, and various federal courts.
Q. We've heard this question a few times today: Are you being compensated for the time that you spend here today?
A. I am.

Q. Per hour, how much is that compensation?
A. $850 an hour.
Q. How does your compensation depend on whether Valve wins or loses this case?
A. It does not.
Q. At a very general level before we kind of dive into specifics, what have you been asked to talk about today for the jury or in front of the jury?
A. At a very high level, I'd say I've been asked to talk about the process of patent enforcement.
Q. Professor Gugliuzza, just to sort of orient us, were you in the courtroom when the video -- I'll call it the patent 101 video -- was displayed or played?
A. Yes. I've been here for the entire trial.
Q. What -- it was a few days ago. What aspects of that video should we keep in mind as you go through the rest of your testimony today?
A. Well, if you bear with me, I think I would suggest four things to keep in mind. First and most important is just the purpose of the patent system, which is to incentivize innovation.

The second thing that I would keep in mind is the process of how one obtains a patent, right. It's that back-and-forth process between the patent office employee called an examiner and the patent applicant, and no one else is in the room. No

adversary in the room.

The third thing I would keep in mind is that although patents are presumed to be valid, that presumption can be rebutted in later litigation.

And then the final thing I would keep in mind is that we have different decision-makers at different stages of the process, right. So the patent office examiner who decides whether to issue the patent, it's a technically trained person. But when a patent's validity or its infringement is litigated in court, we have judges and juries decide the issues.

Q. Professor, when someone obtains a patent, when they became a patent owner, what are some of the ways that person or company can enforce their patent rights?

A. I can think of two ways in particular. First and most obviously, a patent owner can file an infringement lawsuit against someone it thinks is infringing the patent. But also, as we've heard a lot about in is this case, patent enforcement occurs outside of court through letters or emails, usually in an effort to resolve an infringement dispute without having to go to court.

Q. Specific to the second category that you mentioned, sort of the letters outside of court, what restrictions are there, if any, on what a patent owner can do with that type of letter?

A. Well, there's the law, such as the Washington law that brings us here today which prohibits assertions of patent

infringement that are made in bad faith.
Q. Thinking again or focusing on a patent owner, what are the requirements on a patent owner to actually practice their own patent by making, using it, things of that nature?
A. None. There's no requirement that a patent owner make, use, or sell anything that's covered by the patent that they own.
Q. In the patent field, generally speaking, what are some of the terms that are applied to patent owners that may not practice their own patents?
A. I can think of three terms, and I think we've probably heard all three of them here today or this week: There's non-practicing entity or NPE; you also hear patent assertion entity or PAE; and then sometimes, "patent troll."
Q. The Washington law that you mentioned that brings us here today, please remind the jury, what is the title of that law?
A. The title of law is the Washington Patent Troll Prevention Act.
Q. What definition do you apply to "patent troll"?
A. I think the typical definition of a patent troll is an entity that doesn't make any products or provide any services; rather, its entire business is asserting patents.
Q. In your view, how important is the label that is applied to a patent owner when deciding whether their actions are abusive in terms of patent enforcement or not?

A. The label doesn't matter. What the focus is on is conduct, right. The question is whether an assertion of patent infringement was made in bad faith, regardless of the identity of the patent owner who made the assertion.

Q. Are there any benefits that can be provided by non-practicing entities?

A. Sure. So the classic non-practicing entity, or classic example of a non-practicing entity, would be a research university, right? University faculty obtain patents all the time. But universities usually aren't capable of commercializing those inventions, so universities will license patents and sometimes even assert those patents in litigation.

Non-practicing entities can also help small inventors, startup companies who don't have much money; non-practicing entities can help with licensing and litigation.

Q. When a company gets targeted by a non-practicing entity with allegations of infringement, what are some of the ways that the company or the defendant can defend itself?

A. There's two main arguments that anyone who is accused of patent infringement can make in response. The first is that they don't infringe the patent, right? In other words, whatever the accused infringer is doing isn't actually covered by the patent, right? So that's the first argument: noninfringement.

The second argument is that the patent is invalid; which is saying, even though the patent office issued this patent, the

patent doesn't actually meet the statutory requirements for patentability, which require, as the video told us, you know, the invention has to be new, non-obvious, sufficiently disclosed, and there's a few other requirements as well.

Q. Professor Gugliuzza, rough order of magnitude, when a target, when an alleged infringer, decides to defend itself, either argue noninfringement or invalidity or, perhaps, both, to get to this stage of a case, trial, approximately how much does that cost to the alleged infringer?

A. Seven figures. Millions of dollars.

Q. What are some of the activities that go into getting to that seven-figure bill?

A. First off, there's the expenses of hiring lawyers, especially specialized patent lawyers, who are not cheap. They're also hiring experts, hiring consultants and vendors to help with the litigation process. And those expenses are not just paying fees and hourly rates; it's also paying their expenses. So if a trial is in some distant place, or a hearing is in some distant place, the client also has to pay for those lawyers, consultants, experts, and vendors to travel.

Q. Sticking with a patent case that the alleged infringer decides to defend all the way, and setting aside some of the direct financial items you mentioned, what are some of the indirect costs that an alleged infringer faces during such a case?

A. Well, patent litigation takes employees away from doing their jobs, right? So instead of doing things like, you know, research, developing new products, developing new customers -- right? -- tending to existing customers, marketing, advertising -- right? -- all the things that any business might do, its employees are dealing with patent litigation instead of what their normal responsibilities would be.

Q. Taking your past -- or your prior two answers, sort of the costs financial and otherwise to an alleged infringer, how does the -- all of those costs compare to the costs a non-practicing entity or patent assertion entity faces when it litigates a case?

A. Really for any patent owner, the costs of asserting a patent are lower, particularly in the early stages of a case.

Q. Why is that the case?

A. Well, the main reason is that patent owners can hire lawyers on what's called a contingency fee, which means the patent owner doesn't have to pay anything to its lawyers up front; but instead, the lawyers will take some percentage of any recovery that the patent owner obtains. And to be clear, that recovery could be in the form of damages awarded after a successful trial, or it could be in the form of a settlement payment.

Q. Why don't alleged infringers also make use of these contingency fee-type deal?

A. Well, alleged infringers can't. I mean, if an alleged infringer wins a case at trial, that just means it doesn't have to pay anything; but there's no pot of money left over for the lawyers to take some percentage of.

Q. Sticking with the non-practicing entity, if you will, how do those types of patent owners, in your experience, make use of the difference in costs between them and alleged infringers when they embark on a lawsuit?

A. Well, I think we've seen evidence in this trial that some patent owners leverage the cost of litigation by making relatively low-dollar settlement offers early in a case. So we've seen evidence, for instance, that Mr. Rothschild's defendants' opening typical early -- sorry -- standard early settlement offer is $75,000.

Now, $75,000 probably sounds like a lot of money. But to hire a lawyer to actually investigate infringement allegations, much less to take a patent case all the way to a trial, is going to be far, far more than $75,000.

Q. What value is there in a business model that makes use of low -- generally low-dollar settlement offers?

A. Well, as I said, the patent owners' costs are low because they can hire lawyers on a contingency fee.

Also, once a patent owner has a lawyer draft either a demand letter or a complaint, that complaint can easily be, you know, slightly revised to be asserted against many different

patent owners -- right? -- that would either apply to a demand letter or a complaint. It's easy to sort of edit it once you have one version of it.

Q. When a patent owner threatens or actually files a lawsuit, what are some of the risks that the patent owner faces by taking that conduct or taking that course of conduct?

A. Well, the main risk to a patent owner of taking its infringement claim all the way to trial is that the court will find the patent to be invalid -- right? -- meaning that the patent office never should have issued the patent in the first place. A patent that's been held to be invalid by a court can never again be enforced, right? So a patent that's been held to be invalid is completely worthless.

Now, for a patent owner who sues a competitor, there's a second risk, right? So let's take the example of, say, Apple suing Samsung. All right? If Apple sues Samsung for patent infringement, Samsung can countersue for infringement of patents that Samsung owns. The consequence of that is that both Apple and Samsung are simultaneously playing the role of plaintiff and defendant in the case. So their litigation costs are relatively equal.

But when an accused infringer is sued by a non-practicing patent owner, the accused infringer can't countersue the non-practicing patent owner because the non-practicing patent owner, by definition, doesn't make or sell any products that

could infringe a patent.

Q. How does the strength of the non-patent-practicing owner's infringement case factor into the decision to settle or not?

A. Well, you know, in -- in the example that I was offering, where the settlement offer is far below the cost it would require to hire lawyers to litigate through trial, it's just economically rational to settle the case for, you know, five figures, rather than incur a seven-figure bill for the opportunity to try to win at a trial.

Q. Professor Gugliuzza, in the patent-type lawsuits that we've been discussing over the course of the past few days, what is the standard rule in terms of who pays for the attorney fees and expenses?

A. It's the same rule that applies in civil litigation throughout the United States, which is that each party is generally responsible for paying their own attorneys' fees.

Q. In what circumstances can a successful alleged infringer make a request that the patent owner pay for the alleged infringers' fees?

A. Well, in some circumstances, any litigant in a patent case can try to get an order from the court that the other side has to pay their attorneys' fees. That can happen if, for example, a litigant's case was particularly weak on the merits, or the opposing litigant engaged in some sort of litigation misconduct. But as I said, that's sort an exceptional case. The usual rule

is that it's not possible to recover your attorneys' fees from your opponent.

Q. In a situation where an alleged infringer successfully gets its attorney fees awarded; the patent owner now has to pay. When you're dealing with a non-practicing entity, what are some of the difficulties that the alleged infringer, now the adjudicated noninfringer -- what are some difficulties that they might face in terms of trying to collect on that fee award?

A. Well, as the question suggests, these awards can only happen at the end of litigation, right? The court will award the fees as a sanction at the end of the litigation process. So litigation has to have happened. And then because the sanction is the result of litigation, the sanction is only against the actual party to the litigation. And if that party is an entity that doesn't have a lot of money, the party who received the sanction award is going to have a very hard time actually turning that award into money.

Q. When a patent owner, any patent owner, decides to file a lawsuit, what is usually the first step that happens in that decision-making process?

A. Typically the first step in any patent infringement dispute would be the patient owner discovers the possibility of infringement and then would probably hire a patent lawyer to investigate the allegations.

Q. Specific to Mr. Rothschild and the companies that we've

heard of throughout this trial, what do you understand is their general approach to when they decide to begin a lawsuit?

A. As I understand it, the defendants' approach is backwards. It seems that the defendants start with a target number of infringement suits --

MR. ZITO: Objection, Your Honor.

THE COURT: Overruled.

Q. (By Mr. Machleidt) Please continue.

A. Yes.

The defendants start with a target number of suits they would like to file and then go out to find that number of potential infringers.

Q. Professor Gugliuzza, when -- in the situation where there's a license agreement and a defendant or an alleged infringer has obtained rights to a patent, promises not to be sued, under what circumstances can the patent owner continue to pursue that company for infringement?

A. It can't. That's the point of a license, is to be free from any concerns about future infringement, right? Think about, you know, a driver's license, right? If you have a driver's license, it is legal for you to drive. And if you don't have a license, it's illegal for you to drive. Patent licenses work basically the same way.

MR. MACHLEIDT: Your Honor, might I take 10 seconds?

THE COURT: You may.

MR. MACHLEIDT: Thank you.
Your Honor, no further questions at this time.
Valve thanks the witness. Thank you.
I pass the witness.
THE COURT: Very good. Mr. Zito, cross?

CROSS-EXAMINATION

BY MR. ZITO:
Q. Mr. Gugliuzza, I'm curious who testified that PAM picks a number of infringers to find and then goes out and finds that number of infringers?
A. I believe we saw a document to that effect.
Q. That said those words in it?
A. More or less.
Q. Do you recall which witness that document was with?
A. I believe it was Mr. Falcucci.
Q. And how much more and how much less than those actual words was it?
A. If you'd show me the document, I'd be glad do read it.
Q. I have no recollection of anyone saying anything close to that. I saw a document that said, Let's increase our revenue. I saw a document that said, Let's get more cases on file. Is that the one --
A. That's exactly what I'm talking about.
Q. So that document said, We need to find X number of infringers for some patent; go out and find them?

A. I believe it set a target of 40 cases a month.
Q. For a particular patent?
A. I don't recall it mentioning a particular patent, but it did mention a particular number of cases.
Q. Okay. And that's over the 300 patents that Patent Asset Management controls, correct?
A. I don't know.
Q. So you're just surmising that someone was saying, Here's a number of defendants we need to find for a particular patent; go out and find anybody and sue them?
A. The goal was file 40 patent cases -- 40 new patent cases per month.
Q. Did you also hear the process was to hire outside vendors who would identify products that might be infringing, to review those products, and then hire outside vendors to do claim charts to make a proper valuation?
A. I heard testimony to that effect.
Q. Okay. So it's not just, Let's file some random suits, is it?
A. It says, File 40 suits per month.
Q. All right. Is this a correct statement, that abusive tactics when deployed against a large number of accused infringers, that those tactics include asserting patents through shell companies to obscure patent owners identity; targeting the end users of allegedly infringing technology, instead of the

manufacturer; sending letters alleging infringement without actually investigating the recipients' products or activities; claiming that other businesses had purchased license to the asserted patents when few, if any, had done so.

Is that an accurate statement of a description of abusive patent litigation?

A. I believe those tactics that you mentioned are all abusive.

Q. Okay. To your understanding, does PAM obscure the patent owner's identity?

A. PAM certainly isn't a named party to many, if any, of the cases we've discussed here.

Q. So PAM wouldn't even be the one obscuring, would it?

Okay. Let me ask you, does DT obscure the ownership of the patents it's asserting?

A. Could you repeat that question? I'm sorry.

Q. Sure. DT is one the defendants here. You understand that, right?

A. I do.

Q. And RBDS is another defendant.

A. I believe so.

Q. And they're the ones asserting patents, correct?

A. They have asserted patents, yes.

Q. And Mr. Rothschild is a defendant, but he hasn't asserted any patents, correct?

A. Correct.

Q. Okay. And the Meyler defendants haven't asserted any patents, correct?
A. That's not true.
Q. The Meyler defendants have asserted patents?
A. They were representing parties that were asserting patents.
Q. Okay. Well, if we included that in there, did the Meyler defendants obscure the owners' identity of any patents that were -- they represented?
A. I don't believe they obscured the identity of the owner of the patents.
Q. In fact, in the June 23, 2023, letter specifically recite the owners of the three patents. And I can put that up if you...
A. I take your word for it.
Q. And didn't they also include claim charts on those three patents?
A. There were claim charts included with that letter, if I recall correctly.
Q. And isn't it true that Mr. Rothschild is actually the inventor and the original owner of all those patents?
A. I believe so.
Q. Is Valve an end user of those patents?
A. I'm not sure I know enough about Valve's business to opine on whether they use any of the patents covered or use of the patents involved in this case.

Q. What do you mean by the term "end user"?
A. So under the patent laws, it can be an active infringement to either make an infringing product or use an infringing product. So, you know, an end user is someone who is using a product manufactured by someone else in a way that infringes a patent.
Q. Okay. Is it a correct statement to say that in one high-profile example from the early 2010s, one patent owner, through dozens of different shell companies, sent to over 16,000 recipients, accusing them of infringing a patent on the use of an office scanner to send documents via email?
A. Yes, that happened.
Q. Okay. Would that be an example of suing the end user, the 16,000 end users, instead of the manufacturer of the scanner?
A. Yes.
Q. Do you have any evidence that PAM has ever done that?
A. Yeah, I believe -- it's just one example; one of Valve's customers was sued.
Q. So PAM sent 16,000 letters to people playing games on the Steam platform?
A. I think the question was whether PAM had ever asserted patents against end users.
Q. No, the question was had PAM ever engaged in the activity that you described and attribute to -- I'm not sure who you attribute that to, sorry -- have they ever engaged in that kind

of activity; 16,000 letters to the end user -- gamers.
A. I believe the number we've heard is about 1,400.
Q. So those -- all litigation that is PAM was engaged in are of the end users and not the manufacturer or the primary company?
A. I didn't realize your question was limited to end users.
Q. Well, I'm talking about end users. And you agreed with the statement that if you target the end user instead of manufacturer; that would be, in the case that you discussed, use of an office scanner instead of the manufacturer of a scanner.
In Valve's situation, wouldn't that be the players that play on the Steam platform?
A. It would very much depend on the language of the patent.
Q. Do you know of any false claims to having previously licensed a patent were ever made by PAM?
A. I'm sorry. Could you rephrase that question a little bit?
Q. Sure. The statement I read earlier, that one of the attributes of abusive litigation is claiming that many other businesses had purchased license to the asserted patents when few, if any, had done so.
A. I'm not sure I know enough about PAM's business to offer an opinion about that.
Q. All right. You talked about how much it costs for a defendant in a patent case, correct?
A. Yes, I did testify about that.

Q. And that there's very low cost because of these contingent orders -- correct? -- to the plaintiff?
A. For plaintiffs they can use contingency fee lawyers, that's correct.
Q. Is that a free lawyer?
A. It's free until the end of the case, yes.
Q. Then you have to pay them, correct?
A. The lawyer takes a percentage of any recovery.
Q. Typically, what percent?
A. In my experience, 30 to 40 percent.
Q. Is it sometimes higher than that?
A. Yes. Also sometimes lower.
Q. Okay. And we saw on the chart earlier that sometimes cases are worth 10- to $20 million in the chart that Ms. Sorini [sic] put up?
A. Patent -- patent cases?
Q. Where there was a value -- cases under one million, cases five million, and cases over.
A. Oh, yes. Patent cases' damages are often in the billions of dollars.
Q. And is the -- what she had the typical cost of lawyer fees, is that 30, 40 percent or more of that exposure? There was a cost of three and a half million if you're $20 million worth of exposure.
A. I think it depends on that chart. You know, the smaller

the damages, the greater percentage that's going to go to the lawyers if you're paying by the hour.

Q. And then the larger it is, the smaller the percentage, correct?

A. If you're paying by the hour, correct.

Q. Okay. So in some cases, the lower cost could be to the defendant.

A. I'm not sure I follow that question. I'm sorry.

Q. Let's say the patent owner sues and gets $10 million, and they have to pay 4- or $5 million to their attorney, but the defendant only had to pay 2. So wouldn't the defendant have a lower cost than the plaintiff?

A. I'm sorry. I don't mean to be thick. I really had a hard time following that question.

Q. Let's say a plaintiff files a patent suit using a contingent lawyer --

THE COURT: Mr. Zito, we'll pick up with that question tomorrow.

MR. ZITO: Sounds good. Good idea.

THE COURT: It's 4:15. To our jury, please follow my instruction about recesses. Don't talk to anyone about the case. Don't do any independent research. I'm going to speak with lawyers about timing and how much we have left in this trial. All right? With that, we are at recess. Have a good night.

(Jury absent.)

THE COURT: Please be seated.

All right. So this is Valve's last witness.

Mr. Zito, I won't hold you to it, but can you give us a rough estimate of how much longer?

MR. ZITO: I'll wait for him.

THE COURT: Sure.

MR. ZITO: I would anticipate a very short time finishing up on the cross-examination of Mr. Gugliuzza -- 15, 20 minutes.

THE COURT: All right.

MR. ZITO: Again, not being held to that.

And then we're going -- right now, the intent is to call one witness in our case-in-chief to clean up things that have happened since our witnesses were on.

THE COURT: All right.

MR. ZITO: Depending upon cross, that could take a half hour; at the outside, I would think maybe 45 minutes. So I think we could have it go to the jury certainly before lunch, and maybe before the first break.

THE COURT: That is my goal, is to get this to the jury tomorrow, certainly before lunch. I want to get them deliberating as soon as possible.

Time estimates for closing arguments. Who will be arguing on behalf of Valve?

MR MACHLEIDT: I will, Your Honor. Dario Machleidt.

THE COURT: Mr. Machleidt, give me a rough estimate.

MR. MACHLEIDT: Under an hour.

THE COURT: All right. Mr. Zito?

MR. ZITO: I wasn't going to go that long. I'll give you 45 minutes.

THE COURT: All right. I had a trial in front of a judge in the Eastern District of Washington. He told me that if an entire episode of *Law and Order* can go from crime to sentencing in 40 minutes, Counsel, I'm sure you can do your closing in less than an hour. So I'll say that less is more, but I'll let you all do your thing.

As far as the jury instructions go, thank you. You've given me plenty to think about. I will come in tomorrow -- I may ask for some argument from the parties; I may not, but I will have a set of final instructions for you to review early in the day. Of course, we will go on the record, and I will take formal exceptions from the parties as to any jury instructions that you all take issue with. I'll also entertain any motions at the conclusion of the plaintiff's case or at the conclusion of the defense case-in-chief.

All right. Is there anything else to address here while we're all convened?

MR. MACHLEIDT: One thing, Your Honor. There may be more. The timing of JMOL motions, just with tomorrow morning

being apparently pretty quick, what would you prefer from the parties?

THE COURT: Yeah, when you rest, I will excuse the jury from the room and then the parties can make whatever motions they'd like to make. It sounds like we can anticipate one here from Valve. Perhaps one from the defense. I'm not sure. But I'll take the motions up. I don't think you need to file anything. I won't stop you if you want to. But, as I said, these motions are rarely granted, and I've heard plenty for a jury to chew on in this case.

MR. MACHLEIDT: Would you like Valve to orally submit its motion before the rebuttal case, or may we do it after the rebuttal case?

THE COURT: It depends on how you want to play it. I don't know if you were going to file one at the conclusion of your case, if you think that you have met your elements conclusively on anything. So I suppose I could hear one from you then. We'll hear the defense case-in-chief. I suppose there could be another motion at that juncture as well.

Are you anticipating a rebuttal case? I know you haven't heard this defense case-in-chief, but are you anticipating a rebuttal case?

MR. MACHLEIDT: Right now, the answer is no. If I may, I don't quite know -- I can guess; I don't know who the witness will be in their case. If there's been a disclosure,

I've missed it. I think if I knew that, it would at least give me some guidance. But at the moment, in the abstract, I do not envision Valve putting on a rebuttal case.

THE COURT: Well, then there's certainly my chambers procedure and an agreement between the parties about exchanging the names of witnesses. This is not trial by ambush. So what my expectation is that Mr. Zito and his team disclose to you the witness they may call, if any, tomorrow -- assuming they put on a case-in-chief.

MR. MACHLEIDT: Understood, Your Honor. Thank you.

THE COURT: Mr. Zito, anything else?

MR. ZITO: Yeah, I have no problem -- we've already named our witnesses. We've provided them our exhibits. But I have no problem informing opposing counsel that it will be Mr. Rothschild. I believe that all the issues that have come up, he can address personally. I don't want to commit to that. We're going to go back through all of our notes, but that's my anticipation.

THE COURT: Understood.

MR. MACHLEIDT: May I have one more issue, Your Honor?

THE COURT: Yes.

MR. MACHLEIDT: I was reminded -- I believe during the examination of Mr. Rothschild, he testified along the lines of he understood his lawyers took the position that Valve has breached the settlement agreement, and that's why the '195 is or

was asserted as a counterclaim. I objected at the time. You overruled it.

I just want to put on the record my objection was based on our understanding of you granting Valve's Motion in Limine 5. The defendant's raised a breach-of-contract claim against Valve, and then they voluntarily dropped it. We believe it is unduly prejudicial -- 403, among others, pretrial rulings -- for them to now during testimony be able to say, Oh, yeah, we did it because Valve breached the contract. And they have done nothing to prove it; in fact, they walked away from that very contention.

THE COURT: All right. I will take a look at the transcript and see if there's -- if I missed a ruling, if there's anything that needs to be done to the extent that I did.

Mr. Zito?

MR. ZITO: Yes. It was in response to the question, Why did you assert? And at the time that it was asserted, that was the defendants' position. So it wasn't, Are you currently, and, Why are you currently suing? So look at the time frame of it. And he answered, When we asserted that -- when we did that, we had the -- we had the position that there was a breach. Since then, the breach is gone and the counterclaim is gone. So it's not contrary to any ruling in this case.

THE COURT: That's -- not to get too deeply into my rationale, but in the moment, that was how I viewed things, is

that it was responsive to the question that was being asked. But like I said, I'll take a look at the transcript, and we can address it tomorrow morning.

I also saw Mr. Schenck's salary in one of the exhibits, so I take it that we are good as to Exhibit 572 on the previous request about sealing or redacting that exhibit further?

MR. MACHLEIDT: Yes. We will provide a further redacted version. You had mentioned some other numbers.

THE COURT: All right.

MR. MACHLEIDT: Your Honor, may I take ten seconds to respond to Mr. Zito?

THE COURT: Briefly.

MR. MACHLEIDT: If I asked, on cross-examination, a question that begins with "why," I believe my team would have thrown many things at me, so I look forwards to looking at that record.

THE COURT: Sounds good. All right. With that, we are adjourned. I'll see you all tomorrow morning.

(Proceedings adjourned at 4:23 p.m.)

INDEX OF EXAMINATION


| EXAMINATION OF | | PAGE |
|---|---|---|
| LEIGH ROTHSCHILD | DIRECT EXAMINATION continued BY MR. MACHLEIDT | 8 |
| | CROSS-EXAMINATION BY MR. ZITO | 34 |
| | REDIRECT EXAMINATION BY MR. MACHLEIDT | 76 |
| | RECROSS-EXAMINATION BY MR. ZITO | 80 |
| ADAM SORINI | DIRECT EXAMINATION BY MR. REED | 82 |
| | CROSS-EXAMINATION BY MR. ZITO | 110 |
| KIMBERLY SCHENK | DIRECT EXAMINATION BY MS. GEYER | 140 |
| | CROSS-EXAMINATION BY MR. ZITO | 162 |
| PAUL GUGLIUZZA | DIRECT EXAMINATION BY MR. MACHLEIDT | 185 |
| | CROSS-EXAMINATION BY MR. ZITO | 200 |

# INDEX OF EXHIBITS

## PLAINTIFF EXHIBITS

| EXHIBIT | ADMITTED | WITHDRAWN |
|---|---|---|
| 348 | 92 | |
| 350 | 91 | |
| 463 | 79 | |
| 488 | 116 | |
| 553 | 93 | |
| 582 | 145 | |
| 636 | 11 | |
| 638 | 14 | |
| 646 and 647 | 18 | |
| 663 | 159 | |
| 667 | 154 | |

## DEFENSE EXHIBITS

| EXHIBITS | ADMITTED | WITHDRAWN |
|---|---|---|
| A-22 | 65 | |
| A-31 | 60 | |
| A-32 | 127 | |

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 12th day of February 2026.

/S/ Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter
WSL#22003010