# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| **PAY AS YOU GO, LLC,**<br>Plaintiff,<br>v.<br>**VIASAT, INC.,**<br>Defendant. | C.A. No. 7:26-cv-00245-DC-DTG<br>**JURY TRIAL DEMANDED**<br>**PATENT CASE** |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Pay As You Go, LLC, files this First Amended Complaint for Patent Infringement against Viasat, Inc., and would respectfully show the Court as follows:

## I. THE PARTIES

1. Plaintiff Pay As You Go, LLC ("PAYG" or "Plaintiff") is a Wyoming limited liability company having an address at 1 East Broward Boulevard, Ste 700, Fort Lauderdale, FL 33301. PAYG was formed on October 2, 2020. (Ex. B).

2. On information and belief, Defendant Viasat, Inc. ("Viasat" or "Defendant") is a Delaware corporation with a regular and established place of business at 600 Congress Ave., 14th Floor, Austin, Texas 78701. Defendant has a registered agent at C T Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## II. JURISDICTION AND VENUE

3. This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4. On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long-Arm Statute, due at least to its business in this forum, including at least a portion of the infringements alleged herein at 600 Congress Ave., 14th Floor, Austin, Texas 78701.

5. Without limitation, on information and belief, Defendant has derived revenues from its infringing acts occurring within Texas. Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from goods and services provided to persons or entities in Texas. Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its sale of products and/or services within Texas. Defendant has committed such purposeful acts and/or transactions in Texas such that it reasonably should know and expect that it could be sued in this Court as a consequence of such activity.

6. Venue is proper in this District under 28 U.S.C. § 1400(b). On information and belief, Defendant has a regular and established place of business in Texas and in this District at 600 Congress Ave., 14th Floor, Ausitn, Texas 78701. On information and belief, from and within this District, Defendant has committed acts of infringement, including at least a portion of the infringements at issue in this case.

7. For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

## III. THE PATENT-IN-SUIT

8. Plaintiff incorporates the above paragraphs herein by reference.

9. On March 14, 2006, United States Patent No. 7,013,127 ("the '127 Patent") was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '127 Patent is attached hereto as Exhibit A and incorporated herein by reference.

10. On December 5, 2022, PAYG was assigned the '127 patent. (Ex. C). The assignment transferred to PAYG "all right, title, and interest that exist today and may exist in the future" to "all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents [including the '127 Patent]… , including without limitation, all causes of action and other enforcement rights for:

(i) damages,

(ii) injunctive relief,

(iii) any other remedies of any kind

for past, current, and future infringement." (Ex. B at §(f)).

11. The assignment also assigned "all rights to collect royalties and other payments under or on account of any of the Patents [including the '127 Patent]…." (*Id.* at §g).

12. The assignor of the '127 Patent did not retain any right, title, or interest to enforce the '127 Patent. (*See*, *generally*, Ex. B).

13. PAYG therefore is the assignee of all right, title, and interest in the '127 patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '127 Patent. PAYG further possesses the exclusive right and standing to prosecute the present action for infringement of the '127 Patent by Defendant.

14. PAYG has not assigned any right, title, or interest in the '127 Patent to any other entity.

15. No entity other than PAYG has any right, title, or interest in the '127 Patent.

16. No entity other than PAYG has any rights to bring a lawsuit for infringement of the '127 Patent.

17. No entity other than PAYG has any rights to recover past, present, or future damages for infringement of the ‘127 Patent.

18. No entity other than PAYG has any rights to seek injunctive relief or any other remedies of any kind for infringement of the ‘127 Patent.

19. Patent Asset Management, LLC (“PAM”), a Florida limited liability company, owns 100% of PAYG and is the sole member of PAYG. PAM was formed on May 23, 2017. (Ex. D). PAM is an agent of PAYG and, as PAYG’s agent, has authority to bind PAYG in the ordinary course of PAYG’s business.

20. PAM does not own any right, title, or interest in the ‘127 patent.

21. PAM has no authority to bring any action for infringement of the ‘127 Patent.

22. PAM has no authority to collect past, present, or future damages, seek an injunction, or seek any other remedy for infringement of the ‘127 Patent.

23. Leigh Rothschild is PAYG’s manager.

24. Mr. Rothschild does not own any right, title, or interest in the ‘127 patent.

25. Mr. Rothschild has no authority to bring any action for infringement of the ‘127 Patent.

26. Mr. Rothschild has no authority to collect past, present, or future damages, seek an injunction, or seek any other remedy for infringement of the ‘127 Patent.

## Background of the Invention

27. The ’127 Patent relates to telecommunications services and methods that enable a user and/or other responsible party to make payments as the user uses the telecommunication services.

28. As described in the specification of the ‘127 Patent, before the invention claimed in the ‘127 Patent, it was known in the art of telecommunication services to provide calling card accounts to customers. A customer would receive account information in the form of a personal identification number (“PIN”) and a toll-free access number that allowed the customer to utilize the account. Those accounts were generally one of two types: (1) a pre-paid account, which was an account with a pre-defined amount of usage paid for in advance by the customer; and (2) a usage-based account, which was an account that is billed on a periodic billing cycle according to usage during the billing period. Pre-paid wireless (cell phone) service was one example of a pre-paid account.

29. Prior to the ‘127 Patent, pre-paid wireless service enabled customers to use the convenience of cellular and digital communications by establishing a pre-paid account with a wireless telecommunication vendor. Typically, pre-paid wireless cards, each card corresponding to a wireless services account, were purchased in preset denominations, such as $20, $50 or $100, often from a limited number of locations. Each card provided the user with a specified amount of wireless calling dollars or minutes. After the initial allocation was exhausted, the user could “recharge” or reload their wireless account, usually by calling a toll-free number, and either talking with a customer service representative or using an automated system to charge additional calling dollars or minutes to a credit card.

30. There were many inventions directed to these types of systems and methods. For example, U.S. Pat. No. 6,185,545 discloses a method for effecting payment of goods or services that establishes an intermediary account associated with the user account to permit the user to pre-pay for telecommunications services. Another patent, U.S. Patent No. 6,282,276, discloses value-added service calls that traditionally have been “800” or “900” number calls. U.S. Patent No.

6,397,055 discloses a system and method for charting a pre-paid wireless call user. U.S. Patent No. 6,424,706 discloses a system and method for accessing the value associated with a pre-purchased amount of telecommunication time. WO 01/82582 discloses communication billing systems that provides interrelated processing of wireless service events and wire line service events. WO 02/11422 discloses a communication account system for dynamically providing communication accounts to communication devices for immediate transfer to users, including a means for determining an amount of prepaid time for communication.

31. These prior art pre-paid systems were burdensome to both the user and the telecommunication service provider. Moreover, these prior art pre-paid systems generally required that the user have a current credit card with an available balance, which created a significant burden in and of itself to certain classes of user, such as individuals who lacked sufficient regular income, individuals with too much existing debt, individuals with poor credit histories, and individuals who lacked and/or were unable to obtain a social security number.

**The Patented Invention**

32. The '127 Patent discloses specific improved methods for effecting payment for pay-as-you-go telecommunication services via a third-party. The claimed method comprises: monitoring a user's use of telecommunication services at regular time intervals; communicating results of the monitoring to the provider of the telecommunication services, who then processes the results and communicates those to the user; and receiving a payment from the user, wherein: (i) the payment is received from the user at a third-party point-of-sale together with an account identifier, (ii) data indicative of the payment transaction is received sale by the telecommunication services provider from the third party; and (iii) an amount of money equal to the payment is received by the telecommunications services provider from the third-party. The point-of-sale can

be a physical location, such as a retail merchant site; a vending machine; and an automated teller machine, or a virtual location, such as a website or application. The payment at the point-of-sale can be made in any acceptable form, including cash, a wire-transfer or bank-transfer, a debit card transaction, and a credit card transaction.

33. The methods of the claimed invention are an improvement over conventional methods that allow a user to pay as the telecommunication services are being used (*i.e.*, "pay-as-you-go"). Various embodiments of pay-as-you-go methods are illustrated in FIG. 1 and FIG. 2 of the '127 Patent.

34. Unlike standard mobile phone calling plans that charged a set monthly fee for a specific amount of calls or usage, pay-as-you-go plans only required the user to purchase minutes or usage when they would like to make a call or use the telecommunication services. This was a significant advantage to consumer-users who did not want to be bound by an annual, or even biannual, contract, as well as to consumer-users who did not possess sufficient credit (or credit-worthiness) to qualify for such a contract. This latter group included not only individuals with bad credit ratings, but also hourly-wage earners, individuals under the age of 18, and individuals unable to obtain a social security number.

35. Pay-as-you-go calling plans also represented an advance to consumer-users who, for whatever reason, wanted to preserve their privacy and so were reluctant to enter into a contract with a telecommunications service provider that would require the disclosure of confidential personal information, like the consumer-user's name, home address, social security number, and the like. In 2020, there were approximately 74 million pay-as-you-go consumer-users in the United States.

36. Pay-as-you-go systems also provide an advantage for telecommunication service providers. With pay-as-you-go systems, use of the telecommunication services can be suspended by the telecommunication services provider upon the available balance in a user's account being fully consumed. And, because use is monitored at regular time intervals, such a suspension can generally be achieved before the user and/or the responsible party accumulates any balance due.

37. However, a significant drawback of prior art pay-as-you-go systems and methods was the inability to add extra time or services after the initial purchase of the phone and time without a credit or debit card. Because of this, many prior art pay-as-you-go systems and methods were almost as bad as standard mobile phone calling plans for individuals with bad credit ratings, hourly-wage earners, individuals under the age of 18, and individuals without social security numbers. Such systems and methods were also less-than-desirable for individuals who wished to protect their private, personal confidential information and/or preserve their anonymity through cash-only transactions or the like. For all of those different groups of individuals, prior to the invention of the methods claimed in the '127 Patent, the only solution to the problem of running out of time was to purchase another pre-paid phone altogether—a "solution" which could end up being prohibitively expensive in the long term.

38. Unlike prior art pay-as-you-go systems and methods which required direct payment from a user to the telecommunications service provider via a credit or debit card to add time or data for further use, the methods of the invention claimed in the '127 Patent permit a user to make payments via a third-party point-of-sale site. Such a third-party point-of-sale site may be a physical location, such as a gas station or convenience store equipped with an electronic point-of-sale device, or a virtual location, such as a website or app like PayPal® or Venmo®. While such payments can be made electronically, *e.g.*, via credit card, debit card, check card or any other such

means, including on-line banking, they do not have to be made electronically like the prior art systems required. Rather, payments according to the invention claimed in the ‘127 Patent can also be made in cash, *i.e.*, the user can make a payment with cash at a designated location, and the amount paid at the designated location will credited to the user's account to cover the services rendered in step 68 of FIG. 2.

39. To use a designated location 12 to make payment, a user 10 may be issued an account identifier 14, *e.g.*, an individual account number, in step 62 of FIG. 2, that uniquely identifies that user 10. Such an account identifier 14 enables a user 10 to make a payment at the designated location in step 64 of FIG. 2. As noted above, this may be done, *e.g.*, via a point-of-sale terminal 16, where a user’s credit card or debit card is “swiped” both to identify the user 10 and to collect payment of a specified amount, or where a user physically inserts cash in the form of paper bills and/or metal coins and enters his/her account identifier via a pin pad or the like. The payment information is then relayed to the telecommunication services provider 18 in step 66 of FIG. 2. The designated location 12 can be any physical or virtual location that processes a credit or debit card and/or can accept cash, *e.g.*, retail stores such as a dry cleaner, a drug store, a supermarket, or a convenience store, etc., and websites and mobile applications like PayPal®.

40. The inventions claimed in the ’127 Patent include methods that enable a user of pay-as-you-go telecommunication services to make payments for those telecommunications services via a third-party point-of-sale.

41. Prior to the invention claimed in the ‘127 Patent, users of telecommunications services that did not have a credit card, debit card, and/or linkable bank account were generally unable to use “pay as you go” systems. This requirement presented a problem to users with bad

credit ratings, hourly-wage earners, and individuals under the age of 18, as well as individuals who wished to protect their privacy and/or preserve their anonymity.

42. The methods claimed in the '127 Patent are directed to novel ways of permitting users of telecommunications services to purchase those services on an as-needed basis without needing a credit card, debit card or linkable bank account, and without having to disclose personal identifying information. This represents a significant advantage to users with bad credit ratings, hourly-wage earners, individuals under the age of 18, and individuals without social security numbers, as well as individuals who wished to preserve their anonymity.

43. Claim 1 also provides a specific technical solution for integrating disparate systems, including telecommunication usage monitoring systems, telecommunication billing systems, and retail point-of-sale systems into a unified payment framework. For example, the limitation "monitoring a user's use of the telecommunication services at regular time intervals" is a technical element that involved not merely collection information but implements a specific technical monitoring mechanism that executes operations at defined intervals, which differs from traditional post-paid billing cycles. This real-time processing capability requires technical infrastructure to capture, process, and communicate usage data at predetermined intervals rather than relying on traditional monthly billing cycles. This represents a technical advancement because it enables immediate awareness of usage patterns and allows for responsive system actions based on current usage data. The specification of US 7,013,127, in column 4, lines 44-49, describes this as enabling the telecommunication services provider to produce "the equivalent of an updated invoice" immediately upon completion of service use. The technical implementation requires the system to maintain a running tally of usage that is updated every monitoring interval, implement algorithms to aggregate these frequent data points into billable amounts, and provide instant access

to this information when the user ends their session. This transformation from reactive billing systems to proactive usage management represents a technical solution to the problem of efficiently allocating resources and notifying users in telecommunication services. Regular interval monitoring establishes a technical framework that maintains ongoing awareness of system utilization, enabling both service providers and users to make informed decisions based on current usage data rather than historical data.

44. The limitation "communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user" is a technical limitation requiring a specific technical data flow and processing architecture, which is not a generic communication concept. The claimed invention implements a communication framework for relaying usage information and payment status. As described in the specification of US 7,013,127, in column 4, lines 52-57, "[t]he telecommunication services provider 18 then relays this information in step 78 of FIG. 2 back to the user 10 via e-mail 30, via interactive web access 40, via SMS 42, via MMS 44, and/or via a voice and/or a data call 46…." (Ex. A at 4:51-55). This multi-channel approach represents a technical solution because it implements multiple communication pathways to ensure users receive timely information about their usage and account status. The system can notify users through various technical means, adapting to user preferences and device capabilities. The specification describes that this includes notification "if the user 10 is at a pre-designated limit," demonstrating proactive account management. (Ex. A at 4:55-57). This limitation defines a specific technical protocol for data exchange. This is not generic communication but a defined technical flow: usage data → provider → processing → user notification.

45. The limitation "receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier" is another technical limitation requiring a specific technical implementation that utilizes account identifiers in point-of-sale systems, rather than any particular payment method. The limitation "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the telecommunication services provider" is another technical limitation requiring a specific three-part technical reconciliation system, which is not a simple payment transfer. This limitation requires a specific technical reconciliation mechanism that tracks and settles payments across multiple parties. Claim 1 of the '127 Patent therefore solves a technical problem by creating an integrated architecture or integrated system that enables real-time monitoring, immediate billing, and distributed payment processing through retail infrastructure.

46. The claimed invention also implements integration at the network level between telecommunication services networks and payment processing systems. As shown in Fig. 1 of the '127 Patent, the claimed invention requires technical connections between the telecommunication services network 24, the telecommunication services provider 18, point-of-sale terminals 16, and various communication channels. Figure 1 and the accompanying description in the specification of the '127 Patent demonstrate that the telecommunication services network 24 is technically coupled with the telecommunication services provider 18 through data communication pathways that enable transmission of call detail records (CDRs) and usage monitoring data. The point-of-sale terminals (16) are integrated into this architecture through the establishment of secure communication channels that permit the transmission of payment transaction data, including

account identifiers and payment amounts, to the telecommunication services provider (18). This network-level integration enables real-time data flow between disparate systems, creating a unified technical framework for service monitoring, billing, and payment processing.

47. The technical framework achieves unification through the implementation of a centralized data processing architecture at a telecommunication services provider, which serves as the integration hub for disparate data streams. The network-level integration is evidenced by the invention's ability to correlate usage data from the telecommunication services network with payment data from point-of-sale terminals, enabling immediate account updates and service adjustments. The data flow capability is achieved through event-driven architectures where state changes in one system component trigger notifications and updates in connected systems. Traditional telecommunication billing systems operated with temporal delays between service usage, billing calculation, and payment processing, with each function residing in isolated systems that exchanged data through batch processes. The invention coordinates multiple technical systems, including telecommunication networks, point-of-sale systems, communication platforms (such as email, SMS, MMS, and voice), and interactive voice and data systems. This coordination creates a comprehensive technical ecosystem for pay-as-you-go telecommunication services.

48. Claim 1 of the '127 Patent cannot be performed with mental processing, along with pen and paper. The step of "monitoring a user's use of the telecommunication services at regular time intervals" cannot be manually performed as it necessitates a technical integration within a telecommunication network. Nor can "communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user" be performed manually because it

also requires a technical integration within a telecommunication network and the ability to process results from such electronic monitoring.

49. The claims of the '127 Patent are therefore not directed to an abstract idea or law of nature.

50. The claims of the '127 Patent provide solutions to a specific and persistent problems that existed with conventional pay-as-you-go systems and methods, including how could certain users (such as individuals with bad or no credit, hourly-wage earners, individuals under the age of 18, individuals without a social security number, and individuals who wished to maintain their privacy) continue to use a prepaid phone or similar device once the original time had expired and/or been consumed. The inventions claimed in the '127 Patent provide a real-world solution to that real-world problem.

51. The invention described in the claims of the '127 Patent enables users to add to a pre-paid phone or similar device after the initial purchase thereof without using a credit or debit card or bank account and without needing to reveal personal confidential information, such as an individual's name or social security number. The patented invention does this by enabling such users to provide payment to the telecommunications service provider through a third-party willing to accept forms of payment other than a credit or debit card, including virtual sites, like PayPal®, and brick-and-mortar businesses, like convenience stores and gas stations.

52. The claimed invention also has several inventive concepts.

53. The claimed invention is distinguishable from claims that merely recite generic steps of "receiving," "authenticating," and enabling transactions without specifying how these functions are performed. Claim 1 of the '127 patent specifies how monitoring occurs (*e.g.*, at regular time intervals), how communication flows (*e.g.*, specific bi-directional paths with

processing; usage data → provider → processing → user notification), how payment is integrated (*e.g.*, through point-of-sale transactions using account identifiers), and how reconciliation occurs (*e.g.*, three-part settlement system, involving a telecommunication services provider, a point-of-sale proprietor, and a user). It was not routine, well-known, or conventional to use any of these limitations at the priority date of the '127 Patent.

54. The use of "a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider" represents an unconventional technical solution because it creates a new payment pathway that leverages existing retail infrastructure for telecommunication services. For example, "[t]he designated location 12 can be any location that processes a credit card, e.g., retail stores such as the dry cleaners, the drug store, the supermarket, etc." (Ex. A at 4:34-37). The technical implementation requires coordination between disparate systems, including retail point-of-sale terminals and telecommunication billing systems, to create a unified payment ecosystem. This goes beyond traditional payment methods by enabling cash payments through a distributed network of retail locations.

55. The independent Claim 1 further recites that "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider." This element requires the establishment of a communication pathway between the retail point-of-sale system and the telecommunication services provider's billing infrastructure. The technical implementation must include secure data transmission protocols. The system must implement authentication mechanisms to verify legitimate transactions. The system must provide real-time or near-real-time data synchronization to ensure timely account crediting.

56. Claim 1 also recites ”a payment is received from the user at a point-of-sale together with an account identifier,” necessitates the implementation of a technical interface at the point of sale. The point-of-sale terminal must be configured to accept the account identifier associated with telecommunication services. The terminal must be programmed to process payments designated for telecommunication accounts rather than retail purchases. The system must implement data capture mechanisms that associate the payment amount with the specific account identifier.

57. Claim 1 further recites that “data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider.” This element requires the establishment of a communication pathway between the retail point-of-sale system and the telecommunication services provider's billing infrastructure. The technical implementation must include secure data transmission protocols. The system must implement authentication mechanisms to verify legitimate transactions. The system must provide real-time or near-real-time data synchronization to ensure timely account crediting.

58. Claim 1 also recites “an amount of money equal to the payment amount is received from a point-of-sale proprietor by the telecommunication services provider,” which establishes a unique payment architecture for telecommunication systems. This architecture involves three distinct parties in each transaction. The user provides payment at the retail location. The point-of-sale proprietor collects and temporarily holds these funds. The telecommunication services provider ultimately receives the payment from the proprietor. This three-part system necessitates the implementation of sophisticated tracking and reconciliation mechanisms. The system must maintain transaction records that link each user's payment to the corresponding account identifier. The technical implementation requires the establishment of a trusted intermediary relationship. The point-of-sale proprietor effectively becomes a payment agent for the telecommunication

services provider. This relationship requires technical mechanisms for transaction verification and dispute resolution.

59. The ordered combination of the claim limitations was also not routine, well-known, or conventional at the priority date of the ‘127 Patent. The claimed invention’s interval-based monitoring represents an unconventional technical solution to the problem of real-time billing and account management. As described in the specification of ‘127 Patent, the system monitors usage “at regular time intervals... e.g., at 5-, 10-, 15- or 30-minute intervals.” (Ex. A at 4:40-44). This granular monitoring enables immediate billing calculations and account management decisions. Similarly, the technical advancement is further described in the ’127 Patent, which describes how “Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated.” (Ex. A at 2:26-32). The invention’s ability to monitor and process usage data at regular intervals enables dynamic account management, including the automated suspension and reactivation of accounts based on payment status. This creates a technical framework that prevents debt accumulation while maximizing service availability.

60. The technical implementation differs from traditional billing architectures. Traditional systems employ batch processing models with monthly data aggregation. The claimed system implements stream processing with continuous data flow. As explained in the ‘127 Patent, “Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated.” (Ex. A at 2:26-32). This capability requires the system to maintain real-time usage accumulators. The invention implements calculation engines that process accumulated interval data upon session termination. The invention must also provide data access interfaces for user queries.

61. The comprehensive data flow system described in Claim 1 creates an interconnected network of information exchange that enables sophisticated management of telecommunication services. The process begins with the monitoring component, which tracks a user's telecommunication usage at regular time intervals. As described in the '127 Patent, this monitoring generates detailed usage data that captures when services are used, for how long, and what types of services are consumed. (Ex. A at 4, lines 40-57). This raw monitoring data then flows to the telecommunication services provider through established communication channels. The telecommunication services provider acts as the central processing hub in this ecosystem. When the provider receives the monitoring results, it processes this information to create meaningful data for the user. As disclosed in the '127 Patent, the provider produces "the equivalent of an updated invoice" from the call detail records received from the telecommunications services network. (Ex. A at 4:46-49). This processing involves calculating charges, applying rate plans, and preparing comprehensive account status information. The provider can then communicates these processed results back to the user through one of multiple available channels. (*Id.* at 4:51-57).

62. The claims of the '127 patent recite a particular way of effecting such payments via a third-party point of sale site, which are not generic and do not preempt alternate methods of payment. Alternative ways exist and are known for a user to affect payment for pay-as-you-go telecommunications services, including the prior art method of submitting a credit or debit card directly to the provider of the telecommunications services.

## IV. <u>COUNT I</u>
## <u>(PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 7,013,127)</u>

63. <u>**Direct Infringement.**</u> Upon information and belief, Defendant directly infringed claim 1 of the '127 Patent in Texas, this District. and elsewhere in the United States. As shown

below, Defendant performed steps of a pay-as-you-go method for affecting payment of telecommunication services with its usage-based pricing (Pay-per-Usage) plan that satisfied each limitation of claim 1 of the ‘127 Patent. Viasat provides the Viasat Internet service monetization platform, which is an all-in-one solution that enables merchants to offer and sell their services (*e.g.*, software, telecommunication services, PDF access, etc.) on a subscription, usage-based, or pay-as-you-go model. All steps of the asserted claim were performed using the BOSS Revolution monetization platform.

64. Defendant provided a Pay-per-Usage plan that allows merchants to charge customers based on their consumption of products and services, such as calls and messages (“telecommunication services”). Defendant perform a method for affecting payment of telecommunication services. For example, Viasat provides the Viasat Internet service, a home internet service for users, through a Viasat-provided modem or gateway that is Wi-Fi enabled and provides connectivity to devices within the home. Further, Viasat provides the My Viasat application, which enables users to manage the Viasat Internet service. The application enables users to monitor data usage, view and pay bills, manage account settings, and purchase additional high-speed data through the “Data Boost” feature (“payment of telecommunication services”).

**SATELLITE INTERNET FOR ALL**

**Two plans. One mission: better internet from above.**

Connect to reliable, high-speed home internet — so you can browse, shop, learn, and more — wherever you call home, whenever you want. Viasat Internet plans gives you:

- Unlimited data*
- No contract plan option*
- Professional installation
- Live customer support
- And more!

(*E.g.*, https://www.viasat.com/satellite-internet/).[1]

**Will my Viasat Internet service come with a wireless modem?**

Yes, your Viasat Internet service will come with a new Viasat modem or gateway with built-in Wi-Fi. If you want, you can use any modern wireless modem. A wireless modem will allow you to create a home network with your Viasat Internet service, which will let you share the service wirelessly with your computer and other devices such as tablets and smart phones.

(*E.g.*, https://www.viasat.com/satellite-internet/faq/).

[1] Red boxes and text added to figures unless otherwise noted.

# Welcome to Viasat Internet!

It's our mission to connect you to the things you care about without a lot of hassle, so let's get down to business: This guide will help you set up your Viasat Internet account, show how to get the most out of your service, and answer some common questions.

If you'd like more information about a certain topic, visit **help.viasat.com**. Otherwise, enjoy your Viasat experience, and know that we are thrilled to have you as a customer.

*The Viasat Internet Team*

The Viasat Internet Team

My Viasat

ACCOUNT NUMBER:

USERNAME:

PASSWORD:

## My Viasat – my.viasat.com

My Viasat is the online consumer portal where you'll manage your Viasat Internet service. Once you set up your account, write your login information here for future reference.

**Note: For information on setting up your account, refer to page 2 of this guide.**

(*E.g.*, https://www.viasat.com/content/dam/us-site/residential/documents/EasyStart_Welcome_Guide%20(1)-compressed-compressed%20(1).pdf).




(*E.g.*, https://play.google.com/store/apps/details?id=com.viasat.cts.store.ViasatInternet&pli=1).

## What can I use the mobile app for?

You can use the My Viasat mobile app, depending on your plan:

- **Billing:** billing summary, pay your bill, view statements and payment history
- **Personal Information:** edit contact info, change password
- **Alerts:** Set up alerts for weather and network outages
- **Tech Support:** Troubleshoot, check your modem diagnostics, reboot your modem
- **Data**: see your usage summary and buy more High-Speed Data (if available)
- **Installation:** check your installation date, change installation date

(*E.g.*, https://play.google.com/store/apps/details?id=com.viasat.cts.store.ViasatInternet&pli=1).

If you run out of High-Speed Data, most Choice and unlimited data plans have the option to buy more with Data Boost! This feature is perfect for movie night, extra house guests, and more!

Most Choice and unlimited data plans come with a set amount of High-Speed Data. If you run out of High-Speed Data, you will continue to receive unlimited access to Standard Data which may result in slower speeds.

(*E.g.*, https://www.viasat.com/satellite-internet/help/residential/plans-and-add-on-services/buy-more-high-speed-data-with-data-boost/).

65. Defendant performed the step of monitoring a user's use of the telecommunication services at regular time intervals. For example, the Viasat-provided modem or gateway collects internet and network activity data, including the amount of data consumed by each device ("monitoring a user's use of the telecommunication services"), when those devices are connected to the Viasat modem providing the Viasat Internet service. Further, the My Viasat app provides functionality that enables users to view current data usage for the current billing cycle ("regular time intervals"), check remaining high-speed data, monitor account activity, track billing

information, and receive notifications and account updates relating to internet usage and service status.

**Will my Viasat Internet service come with a wireless modem?**

Yes, your Viasat Internet service will come with a new Viasat modem or gateway with built-in Wi-Fi. If you want, you can use any modern wireless modem. A wireless modem will allow you to create a home network with your Viasat Internet service, which will let you share the service wirelessly with your computer and other devices such as tablets and smart phones.

(*E.g.*, https://www.viasat.com/satellite-internet/faq/).

- **Information Automatically Collected**

When you use our Sites, we may use cookies, log files, or other similar technologies to conduct analytics of our Sites. For example, we may automatically collect certain non-personal information from you such as your browser type, operating system, software version, Internet Protocol (IP) address, Internet service provider and platform types. We may also collect non-personal information about your use of the Sites, including the areas or pages of the Sites that you visit, the amount of time you spend using the Sites, the number of times you return to the Sites, the amount of time it takes to load a page, the order in which the content on a page loads, and other Site usage data. This information helps us to track and understand how visitors use our Sites and improve the performance and user experience of our Sites.

We may also collect information regarding your use of our Services and how our Services perform, including account login credentials, the amount of time it takes to load a page, the order in which the content on a page loads, your browser type, IP address or media access control (MAC) address, cookies, domain and subdomain names and the complete addresses ("URLs") of the websites you visit. If you connect devices (via a wired and/or wireless connection) to our modem, we may also collect information specific to each device you connect, including, but not limited to, the device's unique MAC address, the hostname of the device, connection properties specific to each device, the times the device connects to or accesses the modem and the amount of data each device consumes. We may use the information described in this paragraph to troubleshoot your home network and to optimize, troubleshoot, measure, and monitor the performance of our network and Services, including performing de-bugging, measuring service levels and

(*E.g.*, http://viasat.com/content/dam/us-site/legal/documents/subscriber-privacy-policy.pdf).

| | |
|---|---|
| **Online usage information** including Internet and other network activity data that we capture as an internet service provider (ISP), including the website domains you visit, the date and time of visits, and related network metadata, details of mobile apps on your device that make use of the Mobility Services, malicious traffic your device may encounter when visiting websites, and crash reports | • Indirectly |

(*E.g.*, https://www.viasat.com/privacy/mobility-privacy-notice/en-us/).

The My Viasat mobile app offers troubleshooting, alerts, the ability to view and pay your bill, check your usage and so much more. It's designed to let you have more control over your Viasat Internet Experience.

(*E.g.*, https://www.viasat.com/satellite-internet/help/residential/account-admin-billing-support/my-viasat-mobile-app/).

## About this app →

The Viasat Internet app is an easy, fast way to manage your account needs. Pay your bill, check your data usage, troubleshoot common issues and more – all without having to pick up the phone.

Pay your bill: Easily make a one-time payment or update your payment method.

Check your data: See how much data you have used during the current billing cycle.

regular time intervals




user's use of the telecommunication services at regular time intervals

(*E.g.*, https://play.google.com/store/apps/details?id=com.viasat.cts.store.ViasatInternet&pli=1).

## What can I use the mobile app for?

You can use the My Viasat mobile app, depending on your plan:

- **Billing:** billing summary, pay your bill, view statements and payment history
- **Personal Information:** edit contact info, change password
- **Alerts:** Set up alerts for weather and network outages
- **Tech Support:** Troubleshoot, check your modem diagnostics, reboot your modem
- **Data**: see your usage summary and buy more High-Speed Data (if available)
- **Installation:** check your installation date, change installation date

(*E.g.*, https://www.viasat.com/satellite-internet/help/residential/account-admin-billing-support/my-viasat-mobile-app/).

Log in to My Viasat with your username and password. You will immediately see:

- Your current data usage
- Your data remaining to use
- When your usage will reset back to zero (on your bill cycle date)

From here, you can determine if you'll need more data.

(*E.g.*, https://www.viasat.com/satellite-internet/help/residential/plans-and-add-on-services/buy-more-high-speed-data-with-data-boost/).

66. Defendant performed the step of communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user. For example, the Viasat modem or gateway monitors and collects information relating to a user's internet data consumption over

various time intervals, including connection sessions, daily usage, and monthly usage ("results of said monitoring"). This usage information is communicated to Viasat's backend servers ("telecommunication services provider"), configured to receive, process, and analyze the collected data. Based on such processing, the servers determine metrics including, but not limited to, total data consumed, remaining high-speed data allowance, data usage scores, and eligibility for supplemental services such as Data Boost. The processed usage information is subsequently communicated to the user through the "Usage" section of the My Viasat application. Specifically, the application presents the processed results in the form of usage graphs, consumption meters, remaining data indicators, and billing-related information associated with the subscribed data services ("communicates processed results to said user").

| | |
|---|---|
| **Online usage information** including Internet and other network activity data that we capture as an internet service provider (ISP), including the website domains you visit, the date and time of visits, and related network metadata, details of mobile apps on your device that make use of the Mobility Services, malicious traffic your device may encounter when visiting websites, and crash reports | • Indirectly |

(*E.g.*, https://www.viasat.com/privacy/mobility-privacy-notice/en-us/).

- **Information Automatically Collected**

When you use our Sites, we may use cookies, log files, or other similar technologies to conduct analytics of our Sites. For example, we may automatically collect certain non-personal information from you such as your browser type, operating system, software version, Internet Protocol (IP) address, Internet service provider and platform types. We may also collect non-personal information about your use of the Sites, including the areas or pages of the Sites that you visit, the amount of time you spend using the Sites, the number of times you return to the Sites, the amount of time it takes to load a page, the order in which the content on a page loads, and other Site usage data. This information helps us to track and understand how visitors use our Sites and improve the performance and user experience of our Sites.

We may also collect information regarding your use of our Services and how our Services perform, including account login credentials, the amount of time it takes to load a page, the order in which the content on a page loads, your browser type, IP address or media access control (MAC) address, cookies, domain and subdomain names and the complete addresses ("URLs") of the websites you visit. If you connect devices (via a wired and/or wireless connection) to our modem, we may also collect information specific to each device you connect, including, but not limited to, the device's unique MAC address, the hostname of the device, connection properties specific to each device, the times the device connects to or accesses the modem and the amount of data each device consumes. We may use the information described in this paragraph to troubleshoot your home network and to optimize, troubleshoot, measure, and monitor the performance of our network and Services, including performing de-bugging, measuring service levels and

(*E.g.*, http://viasat.com/content/dam/us-site/legal/documents/subscriber-privacy-policy.pdf).

## About this app →

The Viasat Internet app is an easy, fast way to manage your account needs. Pay your bill, check your data usage, troubleshoot common issues and more – all without having to pick up the phone.

Pay your bill: Easily make a one-time payment or update your payment method.

Check your data: See how much data you have used during the current billing cycle....

(*E.g.*, https://play.google.com/store/apps/details?id=com.viasat.cts.store.ViasatInternet&pli=1).




(*E.g.*, https://www.viasat.com/satellite-internet/help/residential/account-admin-billing-support/my-viasat/).




(*E.g.*, https://www.viasat.com/satellite-internet/help/residential/account-admin-billing-support/my-viasat/).

- View your current plan details
- Check your data usage and even buy more High-Speed Data (if available for your plan)
- Check your balance due
- Set up auto-pay
- Add on additional services

(*E.g.*, https://www.bossrevolution.com/en-us/unlimited-plans-terms).

67. Defendant performed a step of receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the telecommunication

services provider. For example, the My Viasat app enables users to make payments for the availed internet services, such as the "Data Boost" service, directly through their user accounts. Access to the app is provided through the Viasat login system using user account credentials ("account identifier"). Further, the My Viasat app includes billing and payment management features that support online payment methods, such as credit cards, debit cards, and PayPal ("point-of-sale"). Upon completion of a payment transaction, payment details and account-related transaction information ("data indicative of the payment transaction") are communicated to Viasat servers ("telecommunication services provider") for processing and account management. Therefore, upon information and belief, payment for the data services is received by Viasat through a payment processor or financial institution, and an amount corresponding to the payment amount is received by the telecommunication services provider from the point-of-sale proprietor.

- **Make a secure, one-time payment through My Viasat and avoid the $5 assistance fee if an agent processes your payment.**
  - Click on *Billing* at the top of the page. Next, locate and click on *Make a payment*
- **Make a one-time payment using your current payment method on file**
  - Select Billing; then select *Make a payment*
  - Select one of the payment options offered by clicking on the link, and the payment amount will appear for the payment option selected:
    - Pay balance
    - Pay another amount
  - Your payment will automatically come from the current payment method on file
  - Click *Pay* and your payment will begin to process. That's all there is to it
- **Are you using a different payment method for this one-time payment?**
  - If you use a different payment method for only this payment, check the *Use a different payment method box*, then select payment type
    - Credit/Debit Card- Enter your card details then click *Pay*
    - Bank Account - Login to our secure online banking tool with your banking username and password to process your payment. You no longer need a routing or account number.
    - PayPal - Login to your PayPal account and confirm payment details then click agree and pay

(*E.g.*, https://www.viasat.com/satellite-internet/help/residential/account-admin-billing-support/my-viasat/).




(*E.g.*, https://play.google.com/store/apps/details?id=com.viasat.cts.store.ViasatInternet&pli=1).

The following table describes the personal data we collect from and about you depending on the Mobility Service, some of which we combine in our systems.

| Personal Data Description | Information Source |
|---|---|
| **Identifiers** such as your name or alias, Mobility Service account credentials like username and password, online identifiers (*e.g.*, cookies and similar tracking technology), airline frequent flyer account number or pilot and crew identifiers (for our inflight internet services), and other similar identifiers | • Directly from you<br>• Indirectly<br>• Third parties |
| **Contact details** such as address, phone number and email address used for contact or service support purposes | • Directly from you |
| **Financial and related information** like your credit card number for payments and payment transaction related details | • Directly from you<br>• Third parties (payment processor) |
| **National identification numbers** such as your tax identification number that we associate with your access to Mobility Services in certain countries | • Directly from you |

(*E.g.*, https://www.viasat.com/privacy/mobility-privacy-notice/en-us/).

# Welcome to Viasat Internet!

It's our mission to connect you to the things you care about without a lot of hassle, so let's get down to business: This guide will help you set up your Viasat Internet account, show how to get the most out of your service, and answer some common questions.

If you'd like more information about a certain topic, visit **help.viasat.com**. Otherwise, enjoy your Viasat experience, and know that we are thrilled to have you as a customer.

*The Viasat Internet Team*

The Viasat Internet Team

account identifier




## My Viasat – my.viasat.com

My Viasat is the online consumer portal where you'll manage your Viasat Internet service. Once you set up your account, write your login information here for future reference.

**Note: For information on setting up your account, refer to page 2 of this guide.**

(*E.g.*, https://www.viasat.com/content/dam/us-site/residential/documents/EasyStart_Welcome_Guide%20(1)-compressed-compressed%20(1).pdf).




(*E.g.*, https://login.viasat.com/oauth2/auss5o0l1DDF9mIke696/v1/authorize?client_id=0oa1z83muzscFURhw697&response_type=code&redirect_uri=https%3A%2F%2Fmy.viasat.com%2Fcallback&scope=openid%20profile%20email%20offline_access%20sbn&state=asdfasdf).

68. Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such infringement of the '127 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

69. The claims of the '127 Patent are method claims to which the marking requirements are not applicable. Plaintiff has therefore complied with the marking statute.

## V. COUNT II
## (FRAUD BY NONDISCLOSURE (TEXAS COMMON LAW))

70. Plaintiff PAYG realleges and incorporates by reference all preceding paragraphs.

71. The Court has supplemental jurisdiction over the common law fraud by nondisclosure count under 28 U.S.C. §267 because it is related to this action.

72. After the Original Complaint was filed in this case, on July 3, 2026, Viasat's Vice President, Chief Legal Counsel, Mr. Colin Ward, reached out to PAYG requesting settlement discussions for this case.

73. PAYG and Viasat engaged in settlement negotiations beginning July 8, 2026, during which PAYG provided settlement demands and Viasat's Vice President, Chief Legal Counsel, Mr. Ward, responded substantively, including expressing interest in a total peace resolution involving all Mr. Rothschild-affiliated entities.

74. On August 11, 2026, Viasat's Vice President, Chief Legal Counsel, Mr. Ward, requested that PAYG provide a draft of a global settlement agreement involving all Mr. Rothschild-affiliated entities. PAYG reasonably understood this request to be made within the ongoing confidential settlement-negotiation context.

75. On August 26, 2026, PAYG sent Viasat's Vice President, Chief Legal Counsel, Mr. Ward, an email expressly marked **"CONFIDENTIAL FRE 408 SETTLEMENT COMMUNICATION"** attaching a draft global agreement marked **"DRAFT HIGHLY CONFIDENTIAL FRE 408."** These markings clearly indicated PAYG's expectation that the materials were confidential settlement communications.

76. Viasat received the materials, did not object to the confidentiality designations, and Viasat's Vice President, Chief Legal Counsel, Mr. Ward, affirmatively responded on September 4, 2026: "Thanks for sending the draft… We will continue to consider settlement options and will get back to you when we have a counterproposal." Viasat's response reinforced PAYG's reasonable belief that Viasat accepted the confidential nature of the communications.

77. Viasat knew PAYG believed the documents were confidential and intended solely for settlement purposes. Viasat also knew PAYG provided the documents in reliance on that belief.

78. Viasat had a duty to disclose that it did not intend to honor the confidentiality designations or that it intended to publicly file the documents. This duty arose because:

a. Viasat made partial disclosures that created a false impression of confidentiality and continued settlement consideration;

b. Viasat knew PAYG was operating under a mistaken assumption that the documents would be treated as confidential;

c. Viasat requested additional confidential materials, reinforcing PAYG's belief; and

d. Settlement negotiations create a context requiring candor and good faith.

79. Viasat failed to disclose its intent to publicly file the confidential materials and instead remained silent, inducing PAYG to continue relying on the confidentiality of the communications.

80. On October 12, 2026, Viasat publicly filed PAYG's confidential email and draft agreement as exhibits to its motion to dismiss (Dkt. No. 16), without notifying PAYG and without seeking leave to file under seal, despite the documents' explicit confidentiality markings.

81. The Court's Standing Order Regarding Filing Documents Under Seal and Redacted Public Version grants leave to parties in patent cases to file confidential information under seal without a motion.

82. Viasat was aware of the Court's Standing Order Regarding Filing Documents Under Seal and Redacted Public Version grants leave to parties in patent cases to file confidential information under seal without a motion prior to filing its motion to dismiss (Dkt. No. 16).

83. Viasat intentionally ignored the Standing Order and instead chose to publicly file the documents without prior notice to PAYG.

84. Viasat's nondisclosure was material. PAYG would not have provided the draft global agreement or continued settlement discussions had it been known that Viasat intended to publicly disclose the materials.

85. PAYG justifiably relied on Viasat's silence and conduct, including Viasat's acceptance of the confidential materials and its continued settlement communications.

86. PAYG suffered injury as a direct and proximate result of Viasat's nondisclosure, including harm to PAYG's litigation posture, disclosure of sensitive settlement positions, and reputational and strategic injury.

87. PAYG seeks actual damages, exemplary damages, costs, and all other relief the Court deems just and proper.

## VI. COUNT III
## (COMMON LAW FRAUD (TEXAS COMMON LAW))

88. Plaintiff PAYG realleges and incorporates by reference all preceding paragraphs.

89. The Court has supplemental jurisdiction over the common law fraud by nondisclosure count under 28 U.S.C. §267 because it is related to this action.

90. Viasat made material misrepresentations and omissions during settlement negotiations, including:

a. requesting a draft global settlement agreement on August 11, 2026;

b. accepting confidential settlement materials marked "CONFIDENTIAL FRE 408" and "HIGHLY CONFIDENTIAL FRE 408"; and

c. responding on September 4, 2026, that it was "still considering" settlement options and would provide a counterproposal.

91. These statements and conduct represented, expressly and implicitly, that Viasat would treat the settlement communications as confidential and would use them solely for settlement purposes. These representations were false.

92. At the time Viasat made the representations, Viasat intended to publicly file the confidential materials or was recklessly indifferent to the truth of its implied assurances. Viasat's actions supporting that its representations were false and that it intended to publicly file the confidential materials or was recklessly indifferent to the truth of its implied assurances including:

a. Viasat intentionally ignored the "CONFIDENTIAL FRE 408 SETTLEMENT COMMUNICATION" and "DRAFT HIGHLY CONFIDENTIAL FRE 408" markings clearly placed on the email and draft agreement when it filed the documents;

b. Viasat intentionally chose not to notify PAYG in advance of publicly filing the documents and chose to file the document on a federal holiday when courts are closed so PAYG could not seek immediate relief;

c. Viasat intentionally chose not to file the documents under seal pursuant to the Court's Standing Order Regarding Filing Documents Under Seal and Redacted Public Version and later negotiate redactions, even though Viasat could have done this without prior notice to PAYG;

d. Viasat intentionally chose not to redact the proposed settlement values from the emails and draft agreement, when that information is irrelevant to standing and could only fall under a prohibited use under FRE 408; and

e. When PAYG requested that Viasat withdraw the publicly filed documents and to refile them under seal, Viasat refused.

93. Viasat made the representations with the intent that PAYG rely on them and provide additional confidential settlement materials.

94. PAYG reasonably and justifiably relied on Viasat's representations and conduct by providing the draft global agreement and continuing settlement discussions.

95. Viasat's October 12, 2026, public filing of the confidential materials (Dkt. No. 16-54 (Exhibit 53))—without notice, without objection to the confidentiality designation, and without seeking to seal the documents—demonstrates that Viasat never intended to honor the confidentiality implied by its conduct.

96. PAYG suffered injury as a direct and proximate result of Viasat's fraudulent conduct, including disclosure of sensitive settlement positions, strategic litigation harm, reputational injury, and other damages to be proven at trial.

## VII. JURY DEMAND

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that claim 1 of United States Patent No. 7,013,127 has been infringed directly and indirectly, either literally and/or under the doctrine of equivalents, by Defendant;

b. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

c. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein;

d. That Plaintiff be awarded damages, exemplary damages, costs, and all other relief the Court deems just and proper under the circumstances for Defendant's Common Law Fraud;

e. That Plaintiff be awarded damages, exemplary damages, costs, and all other relief the Court deems just and proper under the circumstances for Defendant's Fraud By Nondisclosure; and

f. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

October 26, 2026

Respectfully Submitted,

/s/ *David R. Bennett*
David R. Bennett (IL Bar No. 6244214)
Steven G. Kalberg (IL Bar No. 6336131)
(admitted *pro hac vice*)
Direction IP Law
P.O. Box 14184
Chicago, IL 60614-0184
(312) 291-1667
dbennett@directionip.com
skalberg@directionip.com

*Attorneys for Plaintiff*
*Pay As You Go, LLC*

# Exhibit A

US007013127B2

(12) **United States Patent**
**Wills et al.**

(10) **Patent No.: US 7,013,127 B2**
(45) **Date of Patent: Mar. 14, 2006**

(54) **SYSTEMS AND METHODS FOR EMPLOYING "PAY-AS-YOU-GO" TELECOMMUNICATION SERVICES**

(75) Inventors: **Harold S. Wills**, Great Falls, VA (US); **David A. Steinberg**, Washington, DC (US)

(73) Assignee: **InPhonic, Inc.**, Washington, DC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 238 days.

(21) Appl. No.: **10/337,301**

(22) Filed: **Jan. 7, 2003**

(65) **Prior Publication Data**

US 2004/0203585 A1 Oct. 14, 2004

(51) **Int. Cl.**
*H04M 11/00* (2006.01)
*H04M 15/00* (2006.01)

(52) **U.S. Cl.** ................. **455/406**; 455/408; 379/114.01; 379/121.06

(58) **Field of Classification Search** ................ 455/406, 455/407, 408, 26.1; 379/111, 114.01, 114.19, 379/114.2, 114.23, 116, 118, 120, 122, 124, 379/127.01, 121.06
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,650,219 A * 3/1987 Sigman ....................... 283/70
5,325,419 A 6/1994 Connolly
5,425,087 A * 6/1995 Gerber et al. ............... 379/134
5,475,740 A * 12/1995 Biggs et al. ............. 379/91.02
5,479,411 A 12/1995 Klein
5,506,887 A 4/1996 Emery et al.
5,557,664 A 9/1996 Burns et al.
5,579,379 A 11/1996 D'Amico et al.
5,594,740 A 1/1997 LaDue
5,604,788 A 2/1997 Tett
5,625,669 A 4/1997 McGregor et al.
5,633,919 A 5/1997 Hogan et al.
5,635,918 A 6/1997 Tett
5,724,407 A 3/1998 Bruno et al.
5,742,668 A 4/1998 Pepe et al.
5,742,905 A 4/1998 Pepe et al.
5,758,088 A 5/1998 Bezaire et al.
5,845,203 A 12/1998 LaDue
5,867,566 A 2/1999 Hogan et al.
5,872,926 A 2/1999 Levac et al.
5,912,956 A * 6/1999 Longo et al. .......... 379/144.07
5,951,638 A 9/1999 Hoss et al.
5,959,543 A 9/1999 LaPorta et al.
5,987,100 A 11/1999 Portman et al.
6,002,750 A 12/1999 Ertz
6,023,499 A * 2/2000 Mansey et al. ............. 379/111
6,061,718 A 5/2000 Nelson
6,072,862 A 6/2000 Srinivasan
6,073,029 A 6/2000 Smith et al.
6,178,331 B1 1/2001 Holmes et al.
6,185,545 B1 2/2001 Resnick et al.
6,212,506 B1 4/2001 Shah et al.
6,282,276 B1 8/2001 Felger
6,317,490 B1 * 11/2001 Cameron et al. ...... 379/114.01
6,397,055 B1 5/2002 McHenry et al.
6,424,706 B1 7/2002 Katz et al.

(Continued)

*Primary Examiner*—Binh K. Tieu
(74) *Attorney, Agent, or Firm*—Patton Boggs, LLP

(57) **ABSTRACT**

Telecommunication services systems and methods are disclosed. The telecommunication services systems and methods preferably enable the user and/or the responsible party to make payments as the user uses the telecommunication services. The systems and methods may also be employed to provide the user and/or the responsible party with specialized pricing options and other customized services.

**8 Claims, 2 Drawing Sheets**



U.S. PATENT DOCUMENTS

6,442,406 B1 * 8/2002 Harris et al. ................ 455/565
6,483,907 B1 * 11/2002 Wong et al. ........... 379/112.01
6,529,593 B1 * 3/2003 Nelson .................... 379/114.2
6,539,082 B1 3/2003 Lowe et al.
6,553,108 B1 4/2003 Felger
6,668,046 B1 * 12/2003 Albal ......................... 379/119
6,697,468 B1 * 2/2004 Wong et al. ........... 379/112.01
6,704,563 B1 * 3/2004 Senn et al. ................. 455/406

* cited by examiner


CDR
22
TELECOMMUNICATION SERVICES NETWORK
24
TELECOMMUNICATION SERVICES
20
USER
E-MAIL ADDRESS
32
10
TELECOMMUNICATION SERVICES PROVIDER
ACCOUNT
50
ONS
28
18
DESIGNATED LOCATION
POS
16
12
ACCOUNT IDENTIFIER
14
IDS
26
IVS
34
VOICE/ DATA CALL
46
MMS
44
SMS
42
WEB ACCESS
40
E-MAIL
30

FIG. 1

FIG. 2



62
ESTABLISHING A TELECOMMUNICATION SERVICES ACCOUNT AND ACCOUNT IDENTIFIER
64
RECEIVING PAYMENT AND ACCOUNT IDENTIFIER AT POS
66
COMMUNICATING DATA INDICATIVE OF PAYMENT FROM POS TO TELECOMMUNICATION SERVICES PROVIDER
68
COLLECTING MONEY FROM POS PROPRIETOR TO TELECOMMUNICATION SERVICES PROVIDER
70
SELECTING TELECOMMUNICATION SERVICE
72
MONITORING USE OF TELECOMMUNICATION SERVICE AT REGULAR TIME INTERVALS
74
COMMUNICATE RESULTS OF MONITORING TO TELECOMMUNICATION SERVICES PROVIDER
76
PROCESS RESULTS
78
COMMUNICATE PROCESSED RESULTS TO USER
80
NOTIFY USER OF AN EVENT

# SYSTEMS AND METHODS FOR EMPLOYING "PAY-AS-YOU-GO" TELECOMMUNICATION SERVICES

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to telecommunication services systems and methods, and in particular, to telecommunication services systems and methods that enable the user to make payments as the user uses the telecommunication services. The systems and methods may also be employed to provide the user with specialized pricing options and other customized services.

2. Description of the Prior Art

It is known in the art of telecommunication services to provide calling card accounts to customers. A customer receives account information in the form of a personal identification number ("PIN") and a toll free access number that allows the customer to utilize the account. The accounts are generally one of two types: (1) a pre-paid account, which is an account with a pre-defined amount of usage paid for in advance by the customer; and (2) a usage-based account, which is an account that is billed on a periodic billing cycle according to usage during the billing period.

Pre-paid wireless (cell phone) service provides an illustrative example. Pre-paid wireless service enables customers to utilize the convenience of cellular and digital communications by establishing a prepaid account with a wireless telecommunication vendor. Typically, prepaid wireless cards, each card corresponding to a wireless services account, are purchased in preset denominations in a limited number of locations. The cards are issued in fixed value increments, for example, $20, $50 or $100. Each card provides the user with a specified amount of wireless calling dollars or minutes. After the initial allocation is exhausted (or before), the user can "recharge" or reload their wireless account usually by calling an 800 number, having a credit card handy, and either talking with a customer service representative (CSR) or using an automated system to charge additional minutes to the credit card.

U.S. Pat. No. 6,185,545 discloses a method for effecting payment of goods or services. The method includes establishing an intermediary account and associating the intermediary account with a user account maintained by a vendor. The method permits the user to, e.g., pre-pay for telecommunication services.

U.S. Pat. No. 6,282,276 discloses a method for billing a value-added service call. Value-added service calls include calls that have traditionally been "800" or "900" number calls.

U.S. Pat. No. 6,397,055 discloses a system and method for charging a pre-paid wireless call user.

U.S. Pat. No. 6,424,706 discloses a system and method for accessing the value associated with a pre-purchased amount of telecommunication time.

WO 01/82582 A2 discloses a communication billing system that provides interrelated processing of wireless service events and wire line service events.

WO 02/11422 A2 discloses a communication account system for dynamically providing communication accounts to communication devices for immediate transfer to users. The system includes a means of determining an amount of prepaid time for a communication.

The pre-paid systems such as those discussed above are burdensome to both the user and the telecommunication services provider. There is thus a need for a system and method for affecting payment for telecommunication services that enables a user to pay as the user uses the telecommunication services. There is also a need for a system and method that provides convenient payment options to the user.



## SUMMARY OF THE INVENTION

An object of the present invention is to provide systems and methods that enable a user of telecommunication services to make payments as the user uses the telecommunication services. Examples of the telecommunication services include, but are not limited to, telephone calls, data calls, audio transfers, video transfers, e-mail sessions, voice mail sessions, video mail sessions, web sessions, and/or other services provided over a telecommunication network.

These services include wireless services, wire line services and internet ("on-line") services.

Another object of the present invention is to provide systems and methods that enable the user of telecommunication services to determine the cost of the telecommunication services as the user uses the services. In accordance with this object, a total charge for the user's use of the telecommunication services that is based on the actual time that the user is using the telecommunication services is calculated via a telecommunication services provider network when the user terminates use of the services. Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated, the call charge information including information regarding the amount representing a charge for the use of the telecommunication services.

According to another embodiment, the system and method comprise a notification system. The notification system may be an interactive voice notification system, an on-line notification system, a short message service ("SMS") notification system, a multimedia service ("MMS") notification system or any other similar service that may be provided over a telecommunication network. The interactive voice notification system provides the user with a voice mail message at a designated phone number. The on-line notification system provides an e-mail message to the user at a designated e-mail address. The SMS notification system provides a short text message over any telecommunication network. The MMS notification system provides video, voice or any other multimedia service or capability that may arise over a telecommunication network. The user then accesses his account information by calling a specified number, and/or by logging in using an identifier by communication to and/or from a SMS or a MMS. The user may then purchase more time if desired.

Another object of the invention is to provide systems and methods that provide the user of telecommunication services with specialized pricing options and other customized services related to the user's use of the telecommunication services.

According to another object of the invention, the system comprises an e-mail system and the method comprises the use of the e-mail system. The system and method involve the user using the e-mail system to access account information and to make payment, if required, for use of the telecommunication services. The user may also use the e-mail system to access additional information related to the use of the telecommunication services. In accordance with this object, a system and method for accessing information and for effecting payment for telecommunication services are

provided. The system and method comprise establishing a telecommunication services account for a telecommunication services user, wherein said telecommunication services user is provided with a corresponding account identifier; and conducting a transaction via an e-mail system at the user's request, wherein said transaction requires the user's use of the account identifier.

According to another object of the invention, the system comprises a web server and the method comprises the use of the web server. The system and method involve the user using the web server to access account information and to make payment, if required, for use of the telecommunication services. The user may also use the web server to access additional information related to the use of the telecommunication services. In accordance with this object, a system and method for accessing information and for effecting payment for telecommunication services are provided. The system and method comprise establishing a telecommunication services account for a telecommunication services user, wherein said telecommunication services user is provided with a corresponding account identifier; and conducting a transaction via a web server at the user's request, wherein said transaction requires the user's use of the account identifier.

According to another object of the invention, the system comprises an interactive voice system ("IVS") and/or an interactive data system ("IDS"). The method involves the user using the IVS and/or the IDS to access account information and to make payment, if required, for use of the telecommunication services. The user may also use the IVS and/or IDS to access additional information related to the use of the telecommunication services. In accordance with this object, a system and method for accessing information and for effecting payment for telecommunication services are provided. The system and method comprise establishing a telecommunication services account for a telecommunication services user, wherein said telecommunication services user is provided with a corresponding account identifier; and conducting a transaction via an IVS and/or an IDS at the user's request, wherein said transaction requires the user's use of the account identifier.

According to yet another object of the invention, a system and method for effecting payment for telecommunication services at a designated location, e.g., a "point-of-sale," are provided. The system and method comprise establishing a telecommunication services account having a corresponding account identifier; conducting a payment transaction comprising receiving a payment from a user at a point-of-sale together with the account identifier; communicating data indicative of the payment transaction from the point-of-sale to a telecommunication services provider; and collecting an amount of money equal to the payment amount, subject to adjustment, from a point-of-sale proprietor to the telecommunication services provider. The point-of-sale can be, e.g., a retail merchant site; a vending machine; and an automated teller machine (ATM). The payment at the point-of-sale can be made, e.g., in the form of cash; as a debit card transaction; and as a credit card transaction effected via communication with a computer.

These and other objects of the invention will be apparent to those of ordinary skill in the art from the following Detailed Description.



## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

All patents and patent publications cited herein are hereby incorporated herein by reference.

Most telecommunication services providers require that the user pay in advance. If the user does not use the telecommunication services, the amount paid is not given back to the user. The systems and methods of the present invention allow the user to pay as the telecommunication services are being used (otherwise known as "pay-as-you-go"). Pay-as-you-go is a user driven-service that permits the user to conveniently make payment for telecommunication services. Various embodiments of the present invention are described in further detail in the remainder of the detailed description, as illustrated in FIG. **1** and FIG. **2** using like reference numerals to those identified herein.

The systems and methods permit the user **10** to make payment electronically, i.e., via credit card, debit card, check card or any other such means including on-line banking; or to make payment in cash, i.e., wherein the user **10** can make payment at a designated location **12**, wherein the amount paid at the designated location **12** is credited to the user's account **50** in order to make payment for the services rendered in step **68** of FIG. **2**. In order to use the designated location **12**, the user **10** will be issued an account identifier **14**, e.g., a plastic card, in step **62** of FIG. **2** that identifies the user **10**. The account identifier **14** permits the user **10** to make payment at the designated location in step **64** of FIG. **2**. This may be done, e.g., via a point-of-sale ("POS") terminal **16**, wherein the user's card is "swiped" to identify that the user **10** is paying a specified amount of cash. This information is then relayed to the telecommunication services provider **18** in step **66** of FIG. **2**. The designated location **12** can be any location that processes a credit card, e.g., retail stores such as the dry cleaners, the drug store, the supermarket, etc. The benefit to the retail store providing such a service would be a commission for providing the service.

The systems and methods are configured so as to monitor the user's use of the telecommunication services at regular time intervals in step **72** of FIG. **2**, e.g., at **5**, **10**, **15** or **30** minute intervals. When the user **10** completes use of the telecommunication services **20**, the user **10** may then access a call detail record ("CDR") **22**, which is sent from a telecommunication services network **24** to the telecommunication services provider **18** in step **74** of FIG. **2**, who is then able to produce the equivalent of an updated invoice in step **76** of FIG. **2**. All telecommunication services charges, including, e.g., information "**411**" charges, operator assistance, etc., are included. The telecommunication services provider **18** then relays this information in step **78** of FIG. **2** back to the user **10** via e-mail **30**; via interactive web access **40**; via SMS **42**, via MMS **44**; and/or via a voice and/or a data call **46**, e.g., if the user **10** is at a pre-designated limit, the telecommunication services provider **18** can notify the user **10** of such.

According to an embodiment of the invention, the system and method comprise an interactive voice system ("IVS") **34** and/or an interactive data system ("IDS") **26**. The IVS **34** and/or the IDS **26** permit a user **10** to conduct a complete range of business with the telecommunication services provider **18**. For example, the IVS **34** and/or the IDS **26** may provide notice to the user **10** that the user **10** has a limited amount of time left for use of its telecommunication services **20**. The user **10** may then access the TVS **34** and/or the IDS **26** and conduct business with the IVS **34** and/or the IDS **26**

as if a service representative was on the line. Secure access can be assured by requiring the user **10** to provide caller identification information, e.g., social security number, driver's license number, or some other information that has previously been provided by the user **10**. Once the user **10** is identified, the user **10** may obtain information regarding its telecommunication services **20** in step **78** of FIG. **2**, including how much time the user **10** has used, when the user **10** last made payment, etc. Should the user **10** choose to make payment for additional service at this time, the user **10** may do so via credit account information which has previously been provided by the user **10**.

According to another embodiment, the system and method comprise an on-line notification system ("ONS") **28**. The on-line notification system **28** provides an e-mail message **30** to the user **10** at a designated e-mail address **32**. The on-line notification system **28** may also provide an e-mail message **30** to an owner or responsible party of the services. The user **10** and/or the responsible party may then accesses account information on-line by logging in using an identifier. The user **10** and/or the responsible party may then purchase more time if desired.

Use of the telecommunication services **20** may be suspended by the telecommunication services provider **18**. Because the use is monitored at regular time intervals, the suspension can be achieved before the user **10** and/or the responsible party accumulates a balance due. When the telecommunication services **20** are suspended, the user **10** and/or the responsible party is automatically directed to an IVS **34** and/or an IDS **26**, which, as discussed above, permit the user **10** and/or the responsible party to add money to the account **50**. The user **10** and/or the responsible party is thus prevented from spending money that is not in the account **50**.

Also, because the use is monitored at regular time intervals, the telecommunications services provider **18** can provide selected time, day and/or date service to the user **10**. For example, a user **10** can buy a specified amount of time for the telecommunication services **20**, e.g., "anytime" service, nighttime service and/or weekend service. Should the user **10** use up all of its anytime service, e.g., the system can still permit the user **10** to employ other services **20**, e.g., nighttime service and/or weekend service only (i.e., exclusive of the anytime service) via a special price plan related to either one or both of these services **20**. The service(s) **20** can therefore be portioned by day, date and/or time based on the user's needs. In this example, if the user **10** tries to use the anytime service, the user **10** would be directed to the IVS **34** and/or the IDS **26** discussed above, wherein the user **10** would be asked to make payment for the anytime service via the means described herein.

The user **10** may use the ONS **28** to obtain an invoice or a statement of its account **50**. The user **10** may then print the CDR **22** out and submit it with payment as if the CDR **22** was an invoice that came in the mail.

According to another embodiment, the systems and methods of the invention can be employed to provide specialized pricing options to a user **10**. A user **10** can thus be charged a base fee for a telecommunication service **20** based on the user's intended use of the service **20**. For example, some users **10** may only want to use the service **20** for emergencies. The user **10** will then be charged a small monthly fee (e.g., $5.00). The user **10**, however, will have the option to add to the service **20** by the interactive means discussed above in step **70** of FIG. **2**. Another example is wherein the telecommunication services provider **18** agrees not to charge for certain calls, e.g., emergency phone calls to and from,



e.g., the American Automobile Association ("AAA"). The phone can also be set up so that calls are directed to the AAA via, e.g., the push of one button, via the dial of a specified code and/or via voice recognition. Yet another example of a specialized pricing option is a parent who may want to provide limited access to his/her child. For example, the parent can pay a small monthly fee so long as the child only calls home. If the child uses two or more numbers, additional fees may be charged. In addition, because the calls are monitored at regular time intervals, a parent can be notified when calls are made if so desired.

The systems and methods of the invention also permit a user **10**, such as a parent, to monitor the use of the telecommunication services **20**, e.g., who is using the service, what service is being used, where the service is being used, when the service is being used and/or how the service is being used (both ingoing and outgoing). The parent may access this information by any of the means discussed above.

The user **10** may also provide information to the telecommunication services provider **18** so that the user **10** is notified upon the happening of an event in step **80** of FIG. **2**. For example, the user **10** can ask that the services provider **18** notify the user **10** by e-mail when the user **10** has a voice mail or notify the user **10** if a family member such as an elderly family member dials **911**. A "notice tree" can be set up by the user **10** with the telecommunication services provider **18**.

While, in the foregoing, the present invention has been described in accordance with specific embodiments, those skilled in the art would appreciate that variations of these embodiments fall within the scope of the invention. As a result, the invention is not limited to the specific examples and illustrations discussed above.

What is claimed is:

**1**. A method for affecting payment of telecommunication services, comprising:

monitoring a user's use of the telecommunication services at regular time intervals;

communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user; and

receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the telecommunication services provider.

**2**. The method of claim **1**, wherein said telecommunication services are selected from the group consisting of telephone calls, data calls, audio transfers, video transfers, e-mail sessions, voice mail sessions, video mail sessions, web sessions, and/or other services provided over a telecommunication network.

**3**. The method of claim **1**, wherein said telecommunication services are selected from the group consisting of wireless services, wire line services and internet ("on-line") service.

**4**. The method of claim **1**, wherein said telecommunication services provider notifies said user of a happening of an event, wherein said event is determined as a result of said monitoring of said telecommunication services.

**5**. The method of claim **1**, wherein said telecommunication services provider notifies said user using an interactive voice notification system, an on-line notification system, a SMS notification system or a MMS notification system.

**6**. The method of claim **1**, wherein a telecommunication services account is associated with said user, the telecommunication services account having a corresponding account identifier.



**7**. The method of claim **1**, wherein said point-of-sale is selected from the group consisting of a retail merchant site; a vending machine; and an automated teller machine (ATM).

**8**. The method of claim **7**, wherein payment at the point-of-sale is made in the form of cash; as a debit card transaction; or as a credit card transaction.

* * * * *

# Exhibit B

# STATE OF WYOMING
## Office of the Secretary of State

I, CHUCK GRAY, Secretary of State of the State of Wyoming, do hereby certify that according to the records of this office,

**Pay As You Go, LLC**

is a

**Limited Liability Company**

formed or qualified under the laws of Wyoming did on **October 2, 2020**, comply with all applicable requirements of this office. Its period of duration is Perpetual. This entity has been assigned entity identification number **2020-000948902**.

This entity is in existence and in good standing in this office and has filed all annual reports and paid all annual license taxes to date, or is not yet required to file such annual reports; and has not filed Articles of Dissolution.

I have affixed hereto the Great Seal of the State of Wyoming and duly generated, executed, authenticated, issued, delivered and communicated this official certificate at Cheyenne, Wyoming on this 22nd day of December, 2023 at 11:21 AM. This certificate is assigned ID Number 068013321.

Secretary of State

Notice: A certificate issued electronically from the Wyoming Secretary of State's web site is immediately valid and effective. The validity of a certificate may be established by viewing the Certificate Confirmation screen of the Secretary of State's website https://wyobiz.wyo.gov and following the instructions displayed under Validate Certificate.

# Exhibit C

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

EPAS ID: PAT7934038

| | |
|---|---|
| **SUBMISSION TYPE:** | NEW ASSIGNMENT |
| **NATURE OF CONVEYANCE:** | ASSIGNMENT |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| EBM/IP, LLC | 12/05/2022 |

**RECEIVING PARTY DATA**

| | |
|---|---|
| **Name:** | PAY AS YOU GO, LLC |
| **Street Address:** | 1712 PIONEER AVE |
| **Internal Address:** | STE 500 |
| **City:** | CHEYENNE |
| **State/Country:** | WYOMING |
| **Postal Code:** | 82001 |

**PROPERTY NUMBERS Total: 3**

| Property Type | Number |
|---|---|
| **Patent Number:** | 7013127 |
| **Patent Number:** | 8068810 |
| **Patent Number:** | 8295458 |

**CORRESPONDENCE DATA**

**Fax Number:** (801)349-2453

***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***

**Phone:** 8019696609
**Email:** geoff@dobbiniplaw.com
**Correspondent Name:** GEOFFREY E DOBBIN
**Address Line 1:** 2250 S REDWOOD RD
**Address Line 2:** STE 5
**Address Line 4:** WEST VALLEY CITY, UTAH 84119-1355

| | |
|---|---|
| **NAME OF SUBMITTER:** | GEOFFREY E. DOBBIN |
| **SIGNATURE:** | /GEDobbinEsq/ |
| **DATE SIGNED:** | 05/03/2023 |

**Total Attachments: 2**
source=Signed Exhibit B#page1.tif
source=Signed Exhibit B#page2.tif

## EXHIBIT B: ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, EBM / IP, LLC, a limited liability company with an address at 10218 Cedar Pond Drive, Vienna VA 22182 ("**Assignor**"), does hereby sell, assign, transfer, and convey unto Pay as You Go, LLC, a Wyoming limited liability company with an address at 1712 Pioneer Avenue Suite 500, Cheyenne, WY 82001 ("**Assignee**"), all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "**Patent Rights**"):

(a) the provisional patent applications, patent applications and patents listed in the table below (the "***Patents***");

(b) all patents and patent applications (i) to which any of the Patents directly or indirectly claims priority, (ii) for which any of the Patents directly or indirectly forms a basis for priority, and/or (iii) that directly or indirectly incorporate by reference the Patents or are directly or indirectly incorporated by reference by the Patents;

(c) all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a) and (b);

(d) all items in any of the foregoing in categories (b) through (c), whether or not expressly listed as Patents below an whether or not claims in any of the foregoing have been rejected, withdrawn, cancelled, or the like;

(e) all inventions, invention disclosures, and discoveries described in any item in any of the foregoing categories (a) through (e) and all other rights arising out of such inventions, invention disclosures, and discoveries;

(f) all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or any item in any of the foregoing categories (b) through (e), including, without limitation, all cause of action and other enforcement rights for

(i) damages,
(ii) injunctive relief,
(iii) any other remedies of any kind

for past, current, and future infringement; and

(g) all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (a) through (f).

| U.S. Patent or Application Number | Earliest Effective Filing Date | Title of Patent and First Named Inventor | Issue Date | Patent Term Expiration |
|---|---|---|---|---|
| US Patent No. 7,013,127 | 01/07/2003 | Systems and methods for employing "pay-as-you-go" telecommunication services; Harold S. Wills (US) | 03/14/2006 | Term Expires: 01/07/2023 plus 238 days |
| US Patent No. 8,068,810 | 01/07/2003 | Systems and methods for monitoring "pay-as-you-go" telecommunication services; Harold S. Wills (US) | 11/29/2011 | Term Expires: 01/07/2023 |
| US Patent No. 8,295,458 | 01/07/2003 | Systems and methods for monitoring "pay-as-you-go" telecommunication services; Harold S. Wills (US) | 10/23/2012 | Term Expires: 01/07/2023 |

Assignor represents, warrants, and covenants that:

(1) Assignor has the full power and authority, and has obtained all third-party consents, approvals, and/or other authorizations required to enter into this Agreement and to carry out its obligations hereunder, including the assignment of the Patent Rights to Assignee; and

(2) Assignor owns, and by this document assigns to Assignee, all right, title, and interest to the Patent Rights, including, without limitation, all right, title and interest to sue for infringement of the Patent Rights. Assignor has obtained and properly recorded previously executed assignments for the Patent Rights as necessary to fully perfect its rights and title therein in accordance with governing law and regulations in each respective jurisdiction. The Patent Rights are free and clear of all liens, claims, mortgages, security interests or other encumbrances, and restrictions. There are no actions, suits, investigation, claims or proceedings threatened, pending, or in progress relating in any way to the Patent Rights. There are no existing contracts, agreements, options, commitments, proposals, bids, offers, or rights with to, or in any person to acquire any of the Patent Rights.

Assignor hereby authorizes the United States Patent and Trademark Office to issue any and all patents, certificates of invention, utility models or other governmental grants or issuances that may be granted upon any of the Patent Rights in the name of the Assignee, as the assignee to the entire interest therein.

Assignor will, at the reasonable request and expense of Assignee and without demanding any further consideration therefor, do all things necessary, proper, or advisable, including without limitation, the execution, acknowledgment, and recordation of specific assignments, oaths, declarations, and other documents to assist Assignee in obtaining, perfecting, sustaining, and/or enforcing the Patent Rights. Such assistance will include providing, and obtaining from the respective inventors, prompt production of pertinent facts and documents, giving of testimony, execution of petitions, oaths, powers of attorney, specifications, declaration or other papers, and other assistance reasonably necessary for filing patent applications, complying with any duty of disclosure, and conducting prosecution, reexamination, reissue, interference or other priority proceedings, opposition proceedings, cancellation proceedings, public use proceedings, infringement or other court actions and the like with respect to the Patent Rights. With prior written approval by Assignee, Assignee will pay Assignor's reasonable costs and expenses.

The terms and conditions of this Assignment of Patent Rights will inure to the benefit of Assignee, its successors, assigns, and other legal representatives and will be binding upon Assignor, its successors, assigns, and other legal representatives.

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at 4.00 PM on DECEMBER 5, 2022.

**ASSIGNOR: EBM / IP, LLC**

By: ______________________

Name: DAVID MOIR

Title: PARTNER

# Exhibit D

# *State of Florida*
## *Department of State*

I certify from the records of this office that PATENT ASSET MANAGEMENT, LLC is a limited liability company organized under the laws of the State of Florida, filed on May 25, 2017, effective May 23, 2017.

The document number of this limited liability company is L17000116365.

I further certify that said limited liability company has paid all fees due this office through December 31, 2026, that its most recent annual report was filed on April 24, 2026, and that its status is active.

***Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-fourth day of April, 2026***




*Secretary of State*

**Tracking Number: 9215237960CC**

**To authenticate this certificate,visit the following site,enter this number, and then follow the instructions displayed.**

**https://services.sunbiz.org/Filings/CertificateOfStatus/CertificateAuthentication**